Kelly M. Dermody (SBN 171716)
Yaman Salahi (SBN 288752)
Jallé Dafa (SBN 290637)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008
kdermody@lchb.com
ysalahi@lchb.com
jdafa@lchb.com

Eva Paterson (SBN 67081)
Mona Tawatao (SBN 128779)
Christina Alvernaz (SBN 329768)
EQUAL JUSTICE SOCIETY
1939 Harrison St., Suite 818
Oakland, CA  94612
Telephone: 415-288-8703
Facsimile:  510-338-3030
epaterson@equaljusticesociety.org
mtawatao@equaljusticesociety.org
calvernaz@equaljusticesociety.org

[Additional counsel listed on signature page]

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| COLIN SCHOLL and LISA STRAWN, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>v.<br><br>STEVEN MNUCHIN, in his official capacity as the Secretary of the U.S. Department of Treasury; CHARLES RETTIG, in his official capacity as U.S. Commissioner of Internal Revenue; U.S. DEPARTMENT OF THE TREASURY; the U.S. INTERNAL REVENUE SERVICE; and, the UNITED STATES OF AMERICA.<br><br>            Defendants. | Case No.  3:20-cv-5309-CRB<br><br>**PLAINTIFFS' NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR: (1) PRELIMINARY INJUNCTION; (2) CLASS CERTIFICATION; AND (3) APPOINTMENT OF CO-LEAD CLASS COUNSEL**<br><br>Date:       Sept. 11, 2020<br>Time:       10:00am<br>Location:  Courtroom 6, 17th Floor<br>Judge:      The Honorable Charles R. Breyer |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION .................................................................................................. viii

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.  BACKGROUND ............................................................................................................. 1

    A.  The CARES Act ................................................................................................... 1

    B.  Defendants' Implementation of the CARES Act ................................................. 2

    C.  Defendants' Exclusion of Incarcerated People From EIP Benefits ..................... 3

    D.  The Delay of EIP Benefits Harms Incarcerated People and Their Families
        Who Face New Financial Pressure During the Pandemic ................................... 5

III.  LEGAL STANDARD ..................................................................................................... 10

IV.  ARGUMENT .................................................................................................................. 10

    A.  There Is a Strong Likelihood of Success on the Merits ..................................... 10

        1.  The CARES Act Is Crystal Clear ......................................................... 10

        2.  Defendants Have Unlawfully Withheld or Unreasonably Delayed
            Plaintiffs' and the Class's Stimulus Checks ......................................... 12

        3.  Defendants' Policy Violates the APA .................................................... 12

            a.  The IRS's Policy Is Final Agency Action ................................... 13

            b.  The Policy Is Contrary to Law and Exceeds Statutory
                Authority ...................................................................................... 14

            c.  The Policy Is Arbitrary and Capricious ....................................... 15

    B.  Plaintiffs and the Class Are Suffering Irreparable Harm ................................... 16

        1.  Delay of Time-Sensitive Assistance Causes Irreparable Harm ............... 17

        2.  Plaintiffs, the Proposed Class, and Their Families and Friends Are
            Suffering Concrete Irreparable Harm ..................................................... 18

    C.  Equity and the Public Interest Support a Preliminary Injunction ....................... 18

    D.  The Court Should Certify a Class ...................................................................... 19

        1.  Rule 23(a) Is Satisfied ........................................................................... 20

            a.  Numerosity ................................................................................... 20

            b.  Commonality ................................................................................ 20

            c.  Typicality ..................................................................................... 21

            d.  Adequacy ..................................................................................... 21

        2.  Rule 23(b)(2) Supports Certification ..................................................... 22

        3.  Rule 23(b)(3) Supports Certification ..................................................... 23

V.  CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

Page

**Cases**

*A. O. v. Cuccinelli*,
No. 19-CV-06151-SVK, 2020 WL 2097586 (N.D. Cal. May 1, 2020) ................................... 19

*Abdullah v. U.S. Sec. Associates, Inc.*,
731 F.3d 952 (9th Cir. 2013) ......................................................................................... 24

*Ahlman v. Barnes*,
No. SACV-20835 JGB, 2020 WL 2754938 (C.D. Cal. May 26, 2020) ................................... 20

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ......................................................................... 10, 16, 18, 19

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ..................................................................................................... 22

*Beltran v. Myers*,
677 F.2d 1317 (9th Cir. 1982) ........................................................................................ 16

*Beno v. Shalala*,
30 F.3d 1057, 1064 n.10 (9th Cir. 1994) ....................................................................... 5, 16

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ..................................................................................................... 23

*Briggs v. Sullivan*,
886 F.2d 1132 (9th Cir. 1989) ........................................................................................ 16

*California v. Trump*,
963 F.3d 926, 947-49 (9th Cir. 2020) ............................................................................. 15

*City & Cnty of S. F. v. U.S. Citizenship & Immigration Servs.*,
408 F. Supp. 3d 1057 (N.D. Cal. 2019) ........................................................................... 15

*City & Cnty. of S.F. v. Sessions*,
372 F. Supp. 3d 928, 943 (N.D. Cal. 2019) ..................................................................... 15

*Doe v. Wolf*,
424 F. Supp. 3d 1028 (S.D. Cal. 2020) ........................................................................... 21

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014), *cert. denied*, 134 S. Ct. 2877 (2014) ...................................... 18

*East Bay Sanctuary Covenant v. Trump*,
932 F.3d 742, 774 (9th Cir. 2018) .................................................................................. 14

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) .................................................................................................. 15

*Fraihat v. U.S. Immigration & Customs Enf't*,
No. EDCV191546JGB, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020) ................................... 20

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ........................................................................................ 24

*Hart v. Colvin*,
310 F.R.D. 427 (N.D. Cal. 2015) .................................................................................... 23

*Hells Canyon Preservation Council v. U.S. Forest Serv.*,
593 F.3d 923, 932 (9th Cir. 2010) .................................................................................. 12

**TABLE OF AUTHORITIES**
(continued)

Page

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) ................................................. 17

*Hernandez v. Williams, Zinman & Parham PC*,
  829 F.3d 1068, 1072-73 (9th Cir. 2016) ................................ 11

*Inland Empire-Immigrant Youth Collective v. Nielsen*,
  2018 WL 1061408 (C.D. Cal. Feb. 26, 2018) .......................... 19, 20, 21

*Jensen v. Internal Revenue Service*,
  835 F.2d 196 (9th Cir. 1987) ................................................ 16

*Jones v. Upland Hous. Auth.*,
  No. EDCV 12-02074-VAP, 2013 WL 708540 (C.D. Cal. Feb. 21, 2013) ............ 16

*La. Pub. Serv. Comm'n v. F.C.C.*,
  476 U.S. 355, 374 (1986) .................................................... 15

*League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*,
  615 F.3d 1122, 1130 (9th Cir. 2010) ...................................... 15

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) ................................................ 25

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
  244 F.3d 1152 (9th Cir. 2001) ............................................. 24, 25

*Lopez v. Heckler*,
  713 F.2d 1432 (9th Cir.), *rev'd in part on other grounds*, 463 U.S. 1328 (1983) .......... 17

*Los Angeles Lakers, Inc. v. Fed. Ins. Co.*,
  869 F.3d 795, 802 (9th Cir. 2017) ........................................ 11

*Marceau v. Blackfeet Hous. Auth.*,
  540 F.3d 916 (9th Cir. 2008) ................................................ 23

*Medina v. U.S. Dep't of Homeland Sec.*,
  313 F. Supp. 3d 1237 (W.D. Wash. 2018) ................................ 17

*Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
  311 F.RD. 590 (C.D. Cal. 2015) ........................................... 25

*Ms. L. v. U.S. Immigration & Customs Enf't*,
  415 F. Supp. 3d 980 (S.D. Cal. 2020) .................................... 20

*Norsworthy v. Beard*,
  87 F. Supp. 3d 1164 (N.D. Cal.), *appeal dismissed and remanded*
  802 F.3d 1090 (9th Cir. 2015) ............................................. 18

*Norton v. S. Utah Wilderness Alliance*,
  542 U.S. 55, 62 (2004) ...................................................... 12

*Ore. Natural Desert Ass'n v. U.S. Forest Serv.*,
  465 F.3d 977, 985-86 (9th Cir. 2006) .................................... 14

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014) ............................................... 21, 22

*Paxton v. Sec'y of Health and Human Servs.*,
  856 F.2d 1352 (9th Cir. 1988) ............................................. 16

**TABLE OF AUTHORITIES**
(continued)

Page

*Preminger v. Principi*,
  422 F.3d 815 (9th Cir. 2005) ................................................................................. 19

*Rannis v. Recchia*,
  380 Fed. Appx. 646 (9th Cir. 2010) ....................................................................... 20

*Reganit v. Kay-Co. Invs.*,
  No. 2:09-CV-01120-MCE, 2009 WL 8633204 (E.D. Cal. Apr. 24, 2009) ............... 17

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013) ............................................................................... 18

*Ruiz-Diaz v. United States*,
  No. C07-1881RSL, 2008 WL 3928016, (W.D. Wash. Aug. 21, 2008) ..................... 17

*S.F. Herring Assoc. v. Dep't of the Interior*,
  946 F.3d 564, 577 (9th Cir. 2019) ......................................................................... 13

*Safer Chemicals, Healthy Families v. U.S. Env. Protection Agency*,
  943 F.3d 397, 425 (9th Cir. 2019) ......................................................................... 14

*Sammartano v. First Jud. Dist. Ct.*,
  303 F.3d 959 (9th Cir. 2002) ................................................................................. 19

*Saravia v. Sessions*,
  280 F. Supp. 3d 1168 (N.D. Cal. 2017) .................................................................. 20

*Sencion v. Saxon Mortg. Servs., LLC*,
  No. 5:10-CV-3108 JF, 2011 WL 1364007, (N.D. Cal. Apr. 11, 2011) .................... 17

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
  739 F.2d 1415 (9th Cir. 2014) ............................................................................... 10

*Staton v. Boeing Co.*,
  327 F.3d 938 (2003) .............................................................................................. 21

*Tablada v. Thomas*,
  533 F.3d 800, 806 (9th Cir. 2008) ......................................................................... 15

*Torres v. Mercer Canyons Inc.*,
  835 F.3d 1125 (9th Cir. 2016) ......................................................................... 21, 24

*U.S. Army Corps. of Eng'rs v. Hawkes Co.*,
  136 S. Ct. 1807, 1813 (2016) ................................................................................ 13

*United States v. Mead*,
  533 U.S. 218, 230 (2001) ...................................................................................... 15

*Util. Air Regulatory Grp. v. EPA*,
  573 U.S. 302, 327-28 (2014) ................................................................................. 14

*V.L. v. Wagner*,
  669 F. Supp. 2d 1106 (N.D. Cal. 2009), *order enforced,* No. C 09-04668 CW,
  2009 WL 4282079 (N.D. Cal. Nov. 25, 2009) ........................................................ 16

*Valenzuela Gallardo v. Lynch*,
  818 F.3d 808, 815 (9th Cir. 2016) ......................................................................... 15

*Vaquero v. Ashley Furniture Indus., Inc.*,
  824 F.3d 1150 (9th Cir. 2016) ............................................................................... 25

1

2

**TABLE OF AUTHORITIES**
(continued)

**Page**

3

*Vietnam Veterans of Am. v. Central Intelligence Agency*,
    811 F.3d 1068, 1075 (9th Cir. 2016) ........................................................................ 12

4

*W. Watersheds Project v. Bernhardt*,
    391 F. Supp. 3d 1002 (D. Or. 2019) ......................................................................... 19

5

*Wang v. Chinese Daily News, Inc.*,
    737 F.3d 538 (9th Cir. 2013) .................................................................................... 24

6

*Winter v. Natural Resources Def. Council, Inc.*,
    555 U.S. 7 (2008) ......................................................................................... 10, 19

7

*Wit v. United Behavioral Health*,
    317 F.R.D. 106 (N.D. Cal. 2016) ............................................................................. 23

8

**Statutes**

9

26 U.S.C. § 32 ................................................................................................................ 11

10

26 U.S.C. § 6428 ...................................................................................................... passim

11

42 U.S.C. § 402 ................................................................................................................ 3

5 U.S.C. § 551(11)(A)-(B) ............................................................................................. 12

12

5 U.S.C. § 704 ................................................................................................................ 13

13

5 U.S.C. § 706 ......................................................................................................... 12, 14

14

**Rules**

15

Fed. R. Civ. P. 23(a) ................................................................................................ 20, 21

16

Fed. R. Civ. P. 23(a)(1) ................................................................................................. 20

17

Fed. R. Civ. P. 23(b)(1) ........................................................................................... 22, 23

Fed. R. Civ. P. 23(b)(2) ............................................................................... 1, 20, 22, 23

18

Fed. R. Civ. P. 23(b)(3) ............................................................................... 1, 20, 23

19

Fed. R. Civ. P. 23(g) ..................................................................................................... 22

**Other Authorities**

20

166 Cong. Rec. E339 (Mar. 31, 2020) .......................................................................... 11

21

166 Cong. Rec. S1929 (Mar. 23, 2020) ........................................................................ 11

22

166 Cong. Rec. S2007 (Mar. 24, 2020) ........................................................................ 11

23

*From Prison to Home: The Effect of Incarceration & Reentry on Children,
    Families, & Communities*, National Policy Conference of the U.S. Department of Health &
    Human Services at 17 (Jan. 30, 2002) ........................................................................ 7

24

*In Overcrowded San Quentin,
    Coronavirus Shelter-In-Place Measures Mean Decreased Quality of Life*, The Appeal (Apr.
    16, 2020) ..................................................................................................................... 6

25

IR-2020-61 (Mar. 30, 2020) ............................................................................................ 2

26

IRS, *Treasury, IRS Announce Delivery of 159 Million Economic Impact Payments*
    (June 3, 2020) .............................................................................................................. 3

27

28

- vi -

# TABLE OF AUTHORITIES
**(continued)**

**Page**

Pub. L. 116-136, 135 Stat. 335
(Mar. 27, 2020)..................................................................................................... 1

*Racial Disparities in Incarceration and Coronavirus*, FWD.us, (Apr. 14, 2020)........................... 6

Ryan Shanahan & Sandra Villalobos Agudelo,
*The Family & Recidivism*, American Jails at 1, 21-22 (Sept. 2012) ........................................ 7

*The Economic Fallout of the Coronavirus for People of Color*
Center for American Progress (Apr. 14, 2020) ........................................................... 6

*US inmates got virus relief checks, and IRS wants them back*,
Associated Press (June 24, 2020) ......................................................................... 5

1

## NOTICE OF MOTION AND MOTION

2      **TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD**:  Please take

3   notice that Plaintiffs Colin Scholl and Lisa Strawn hereby move for a preliminary injunction

4   requiring Defendants to issue unlawfully withheld CARES Act Economic Incentive Payments to

5   them and the proposed Class Members; to stop enforcing their unlawful policy of excluding

6   incarcerated persons from eligibility for Economic Incentive Payments; and to re-consider the

7   eligibility of any person for whom an Economic Incentive Payment was previously withheld or

8   denied on the basis of incarcerated status alone.  Plaintiffs also move the Court for an order

9   certifying the Class, appointing Plaintiffs as Class Representatives, and appointing the

10  undersigned as Class Counsel.

11      This motion is based on this Notice of Motion and Motion, the accompanying

12  Memorandum of Law and Points and Authorities, Declarations of Kelly M. Dermody, Mona

13  Tawatao, and Yaman Salahi; Declarations of Colin Scholl and Lisa Strawn; Declarations of

14  Sandra Johnson, David Cowan, and San Francisco District Attorney Chesa Boudin; the exhibits

15  attached thereto; and the papers, records, and pleadings on file in this matter.

16

17  Dated:  August 4, 2020            Respectfully submitted,

18

19                                By:     */s/ Kelly M. Dermody*
                                        Kelly M. Dermody

20                                Kelly M. Dermody (SBN 171716)
21                                Yaman Salahi (SBN 288752)
                                  Jallé H. Dafa (SBN 290637)
22                                LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                  275 Battery Street, 29th Floor
23                                San Francisco, CA  94111-3339
                                  Telephone:  415.956.1000
24                                Facsimile:  415.956.1008
                                  kdermody@lchb.com
25                                ysalahi@lchb.com
                                  jdafa@lchb.com

26

27

28

1
2
3
4
5
6

Eva Paterson (SBN 67081)
Mona Tawatao (SBN 128779)
Christina Alvernaz (SBN 329768)
EQUAL JUSTICE SOCIETY
1939 Harrison St., Suite 818
Oakland, CA  94612
Telephone: 415-288-8703
Facsimile:  510-338-3030
epaterson@equaljusticesociety.org
mtawatao@equaljusticesociety.org
calvernaz@equaljusticesociety.org

7
8
9

Lisa Holder (SBN 212628)
EQUAL JUSTICE SOCIETY
P.O. Box 65694
Los Angeles, CA 90065
Telephone: 323-683-6610
lisaholder@yahoo.com

10

*Attorneys for Plaintiffs and the Proposed Class*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.       **INTRODUCTION AND SUMMARY OF ARGUMENT**

In the midst of an unprecedented pandemic and economic crisis, Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act, which in part provided for direct cash relief to qualifying United States citizens and legal permanent residents, otherwise known as Economic Impact Payments ("EIPs").  *See* 26 U.S.C. § 6428.  Congress did not exclude incarcerated people from these benefits.  Indeed, hundreds of thousands of incarcerated persons will soon re-enter a devastated economy; many have a pressing need for economic aid to maintain communication and relationships with loved ones that are critical to healthy families; all need to purchase basic necessities (*e.g.,* hygiene products, food, and clothing) even while behind bars; and many have children who are in need of assistance, either through child support obligations or otherwise, or owe restitution to the victims of crime.  When they cannot afford those necessities, incarcerated people, who disproportionately come from economically disadvantaged and Black and Latinx communities, must rely on friends and family also devastated by COVID-19.

Notwithstanding clear statutory criteria regarding EIPs, Defendants have unlawfully withheld EIP benefits from otherwise eligible incarcerated persons.  Because the delayed delivery of such benefits will cause Plaintiffs and members of the proposed Class irreparable harm, Plaintiffs respectfully request that the Court certify a class of incarcerated persons under Rule 23(b)(2) and/or (b)(3) and enter a class-wide preliminary injunction declaring Defendants' policy unlawful and requiring them to issue EIP benefits to eligible Class Members.

II.      **BACKGROUND**

A.      **The CARES Act**

Congress passed the CARES Act on March 27, 2020, and the President signed it into law on the same day.  *See* Pub. L. 116-136, 135 Stat. 335 (Mar. 27, 2020).  Section 2201(a) of the CARES Act, codified at 26 U.S.C. Section 6428, created a mechanism to issue direct cash support called "Economic Impact Payments" (EIP) to Americans and legal permanent residents through the federal government's tax infrastructure.  *Id.*

**How the Benefit Works:**  The Act creates a 2020 tax-year "credit" of $1,200 for an eligible individual, or $2,400 for eligible individuals filing a joint return, plus $500 per qualifying

1   child.  26 U.S.C. § 6428(a).[1]  The statute deems all eligible individuals to have made an

2   overpayment in tax years beginning in 2019 (whether or not they made any payment at all), such

3   that the EIP is termed a "refund."  *Id.* §§ 6428(f)(1)-(2).  The statute directs that EIP benefits may

4   be issued automatically through electronic deposits, *id.* § 6428(f)(3)(B).

5            **Eligible Individuals**:  The statute defines an "eligible individual" as:

6                any individual other than—
                   **(1)** any nonresident alien individual,

7

8                **(2)** any individual with respect to whom a deduction under section
                151 is allowable to another taxpayer for a taxable year beginning in
                the calendar year in which the individual's taxable year begins, and

9

10              **(3)** an estate or trust.

11   26 U.S.C. § 6428(d).[2]

12        **Timing:**  Because the purpose of the EIP is emergency relief, the statute directs that "[t]he

13   Secretary shall . . . refund or credit any overpayment attributable to this section as rapidly as

14   possible," no later than December 31, 2020.  26 U.S.C. § 6428(f)(3)(A).

15        **B.**      **Defendants' Implementation of the CARES Act**

16        Three days after the CARES Act's passage, on March 30, 2020, the IRS issued a news

17   release explaining that "distribution of economic impact payments will begin in the next three

18   weeks and will be distributed automatically, with no action required for most people.  However,

19   some taxpayers who typically do not file returns will need to submit a simple tax return to receive

20   the economic impact payment."  *See* IRS, *Check IRS.gov for the latest information: No action*

21   *needed by most people at this time*, IR-2020-61 (Mar. 30, 2020),

22   https://www.irs.gov/newsroom/economic-impact-payments-what-you-need-to-know (attached as

23   Ex. 1).  It explained that for "[t]he vast majority of people," "[t]he IRS will calculate and

24   automatically send the economic impact payment to those eligible."  *Id.*

---

25

26   [1]  Payments are reduced by 5% of the amount of a taxpayer's income above $150,000 if a joint
return, $112,500 if a head of household, and $75,000 for all others.  26 U.S.C. § 6428(c).

27   [2]  The statute also directs that "[n]o credit shall be allowed . . . to an eligible individual who does
not include" a valid social security number on a tax return for themselves, for their spouses, or for

28   any qualifying children, with limited exceptions for members of the Armed Forces.  26 U.S.C. §
6428(g)(1)-(3).

For those for whom EIP benefits cannot be issued automatically, the IRS established an online "non-filer" claim portal.  *See* IRS, Economic Impact Payments, https://www.irs.gov/coronavirus/economic-impact-payments (accessed Aug. 3, 2020) (attached as Ex. 2).  The portal is intended for people who "are not required to file federal income tax returns for 2018 and 2019 for any reason including: Your income is less than $12,200; You're married filing jointly and together your income is less than $24,400; You have no income."  *Id.*

By June 3, 2020, the IRS and Treasury Department had announced that "159 million Economic Impact Payments, worth more than $267 billion, have been distributed to Americans in two months.  Payments have been sent to **all** eligible Americans for whom the IRS has the necessary information to make a payment."  *See* IRS, *Treasury, IRS Announce Delivery of 159 Million Economic Impact Payments* (June 3, 2020), https://home.treasury.gov/news/press-releases/sm1025 (Ex. 3).  The IRS instructed that "[i]ndividuals who do not normally file taxes and have not yet received their Economic Impact Payment should use the [online] Non-Filers Tool" which "will remain available until October 15," stating that "anyone who registers by October 15 will receive their payment by the end of the year."  *Id.*  As explained below, contrary to its statements, the IRS has not made payments to all eligible persons and, instead, has taken steps to prevent eligible persons from receiving these critical benefits.

### C.   Defendants' Exclusion of Incarcerated People From EIP Benefits

On May 6, 2020, more than five weeks after the passage of the CARES Act, the IRS announced that it would treat incarcerated individuals as ineligible for the EIP.  The IRS stated:

> Q15.   Does someone who is incarcerated qualify for the Payment?
>
> A15.   No.  A Payment made to someone who is incarcerated should be returned to the IRS by following the instructions about repayments.  A person is incarcerated if he or she is described in one or more of clauses (i) through (v) of Section 202(x)(1)(A) of the Social Security Act (42 U.S.C. § 402 (x)(1)(A)(i) through (v)).[3] For a Payment made with respect to a joint return where only one spouse is incarcerated, you only need to return the portion of the Payment made on account of the incarcerated spouse.  This amount will be $1,200 unless adjusted gross income exceeded $150,000.

---

[3]  The proposed Class only includes persons who fall within 42 U.S.C. § 402(x)(1)(A)(i) (confined pursuant to the conviction of a criminal offense) and (v) (held to be in violation of probation or parole).

- 3 -

1    Salahi Decl., Ex. 4.  On June 18, 2020, the IRS updated its internal procedures manual to reflect

2    this change in policy.  Salahi Decl., Ex. 5 at 2 (stating that "[a]n eligible individual is any

3    individual other than . . . an incarcerated individual . . . .").

4         A report by the Treasury Department's Inspector General for Tax Administration confirms

5    that the IRS implemented the policy announced on May 6, 2020.[4]  The IRS made at least three

6    disbursements of funds, on April 10, May 1, and May 8, 2020.  Salahi Decl., Ex. 6 at 4-5.  The

7    IRS apparently included payments to incarcerated people in the April 10, 2020 disbursement.  *Id*.

8    When questioned on April 14, 2020, "IRS management noted that payments to these populations

9    of individuals were allowed because the CARES Act does not prohibit them from receiving a

10   payment.  However, the IRS subsequently changed its position, noting that individuals who are

11   prisoners . . . are not entitled to an EIP."  *Id.*  To prevent the subsequent disbursement of EIPs to

12   incarcerated people, "the IRS provided the [Bureau of the Fiscal Service] with a file that

13   contained the Taxpayer Identification Numbers of prisoners . . . and requested that the BFS

14   remove these individuals from payment files.  This approach was applied to the May 1, 2020 and

15   May 8, 2020 payment files."  *Id.*  In addition, "IRS management informed [the IG] that on May

16   13, 2020, programming was implemented to discontinue calculating and sending EIPs to

17   prisoners . . . ."  *Id.*  The IRS also "issued new guidance on May 6, 2020" concerning prisoners,

18   as described above.  *Id.*

19        According to the IG report, as of May 21, 2020, and before the IRS had taken measures to

20   exclude incarcerated people from future payments, EIPs had been issued to 84,861 of them,

21   totaling approximately $100 million.  Salahi Decl., Ex. 6 at 5-6.  In response:

22              [T]he IRS included steps that should be taken to return these
               payments as part of its Frequently Asked Questions.  Individuals
23             who received a direct deposit payment in error that was not returned
               to the IRS by the bank were instructed to submit a personal check
24             or money order for the payment amount, notate the check as an EIP
               along with their Taxpayer Identification Number, and mail the
25             check with a short note to the IRS at a specified address based on
               where the individual lives.  Individuals who received a paper EIP
26

_____

27   [4]  *See* Treasury Inspector General for Tax Administration, *Interim Results of the 2020 Filing
     Season: Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and
28   Assessment of Efforts to Implement Legislative Provisions*, Ref No. 2020-46-041, at 4-5 (June 30,
     2020), https://www.treasury.gov/tigta/auditreports/2020reports/202046041fr.pdf (Ex. 6).

check in error were instructed to return the voided check with a short note to the IRS at the address provide based on where the individual lives.

*Id.* at 6.  The IRS has taken proactive steps to intercept and retrieve any payments that were previously sent to some incarcerated persons: "the IRS directed state correction departments to intercept payments to prisoners and return them."  Rebecca Boone, *US inmates got virus relief checks, and IRS wants them back*, Associated Press (June 24, 2020), https://apnews.com/0810bb67199c9cef34d4d39ada645a92 (Ex. 7).  Pursuant to the IRS's directive, "[t]he Kansas Department of Correction alone intercepted more than $200,000 in checks by early June.  Idaho and Montana combined had seized over $90,000."  *Id.*  Other states, including Washington, Vermont, Mississippi, Pennsylvania, Arizona, California, Oregon, and Utah, intercepted stimulus payments to incarcerated persons at the IRS's behest.  *Id.*

To date, the IRS refuses to issue EIP benefits to incarcerated persons.

### D.       The Delay of EIP Benefits Harms Incarcerated People and Their Families Who Face New Financial Pressure During the Pandemic

Incarcerated people live "at the economic margin of existence."  *Beno v. Shalala*, 30 F.3d 1057, 1064 n.10 (9th Cir. 1994).  They are disproportionately among the most economically disadvantaged in our society, with "a median annual income of $19,185" prior to entering prison.  *See* Salahi Decl., Ex. 8.  Incarcerated individuals have few opportunities for gainful income.  For their labor in prison, incarcerated people earn an average of $0.14 to $1.41 per hour (or $291.20 to $2,932.80 annually based on a 40-hour week), and access a fraction of that amount in most places due to the garnishing of earnings for restitution, child support, and other obligations.  *See* Salahi Decl., Ex. 9.  Yet the costs of life in prison far exceed that amount for most people, as incarcerated people spent an average of $947 per year on hygiene, food, clothing, and similar products.  *See* Salahi Decl., Ex. 10.[5]  Moreover, in light of COVID-19 related lockdowns, prison labor has been suspended in many places.  *See*, *e.g.*, Scholl Decl. ¶ 5.

---

[5] *See also* Salahi Decl., Ex. 11 ("I think the biggest misconception that people have about prison is that 'the state' pays for everything . . . [n]o one realizes that it's the friends and families of loved ones that pay."); *id.*, Ex. 30 (reporting that data collected "contradict the myth that incarcerated people are buying luxuries; rather, most of the little money they have is spent on basic necessities").

Many incarcerated people also rely on the assistance of friends and family on the outside to cover the gap between necessary expenses and low incomes.  *See* Salahi Decl., Ex. 12 (reporting that families spend $2.9 billion per year on commissary funds and telephone calls); *id.*, Ex. 11 ("Many families said they shell out hundreds of dollars each month to feed, clothe and stay connected to someone behind bars, paying for health care, personal hygiene items and phone calls and other forms of communication.").  But with many prisons on lockdown due to COVID-19,[6] and many family members outside losing jobs and dodging community health scares, incarcerated people have been doubly hit by the pandemic.  *Id.*, Ex. 16 (reporting that over 31 million people claimed unemployment benefits for the week ending July 4—as compared to about 1.7 million people in the same week last year)  Further, not only are Black and Latinx communities dramatically overrepresented among prison populations, but they are also amongst those most severely affected by COVID-19 health-wise and economically.[7]

In this context, Defendants' withholding of CARES Act assistance from incarcerated people has impaired their ability to communicate with loved ones; purchase basic hygiene and food necessities; and prepare for reentry into society.

**Communication with Loved Ones**: During the pandemic, contacts with the outside world are more important than ever.  However, many prisons have eliminated or severely curtailed in-person visitation.  *See* Salahi Decl., Ex. 17 (non-legal visits suspended in 44 states).  Exorbitantly-priced phone calls are thus the primary way that incarcerated people can stay in timely communication with loved ones on the outside.  *Id.*, Ex. 18 ("As jails and prisons suspend in-person visits, most incarcerated people and their families are paying outrageously high costs to

---

[6]  *See, e.g.*, Juan Moreno Haines, *In Overcrowded San Quentin, Coronavirus Shelter-In-Place Measures Mean Decreased Quality of Life*, The Appeal (Apr. 16, 2020), https://theappeal.org/san-quentin-state-prison-coronavirus-shelter-in-place/ ("Programming has been cancelled, and prisoners will miss out on opportunities to earn good-time credits and may face longer prison stays as a result.  Many can no longer work their jobs, cutting off the only means that some of San Quentin's older and longer-sentenced population, whose loved ones have passed away, have to support themselves.") (Ex. 13).
[7]  *See Racial Disparities in Incarceration and Coronavirus*, FWD.us, (Apr. 14, 2020), https://www.fwd.us/news/coronavirus-disparity (Ex. 14); *The Economic Fallout of the Coronavirus for People of Color,* Center for American Progress (Apr. 14, 2020), https://www.americanprogress.org/issues/race/news/2020/04/14/483125/economic-fallout-coronavirus-people-color/ (Ex. 15).

1  simply stay connected . . . ."); *id.*, Ex. 11 (reporting one family member paying $3,586 in charges

2  for phone calls with incarcerated loved one and $419 for emails); *id.*, Ex. 19 (average cost of a

3  fifteen-minute phone call from a California jail is $5.70 and highest is $17.80).  Frequent

4  communication between incarcerated people and their loved ones is essential to maintaining their

5  emotional well-being and relationships.  Indeed, strong relationships between incarcerated people

6  and their communities on the outside are an important and recognized factor for reducing

7  recidivism and improving the re-entry process upon release.  *See*, *e.g.*, Ryan Shanahan & Sandra

8  Villalobos Agudelo, *The Family & Recidivism*, American Jails at 1, 21-22 (Sept. 2012),

9  https://www.prisonpolicy.org/scans/vera/the-family-and-recidivism.pdf ("Incarcerated men and

10  women who maintain contact with supportive family members are more likely to succeed after

11  their release. . . .  Family members . . . reported the cost of phone calls as a significant barrier to

12  communication (39%).") (Ex. 20).

13      Conversely, when relationships between incarcerated people and their friends and family

14  outside break down, incarcerated individuals experience severe emotional distress, including

15  anxiety and depression.  *See*, *e.g.*, Craig Haney, *From Prison to Home: The Effect of*

16  *Incarceration & Reentry on Children, Families, & Communities*, National Policy Conference of

17  the U.S. Department of Health & Human Services at 17 (Jan. 30, 2002),

18  https://aspe.hhs.gov/system/files/pdf/75001/Haney.pdf  (recommending "[a] clear and consistent

19  emphasis on . . . supporting contact with the outside world . . . both to minimize the division

20  between the norms of prison and those of the freeworld, and to discourage dysfunctional social

21  withdrawal that is difficult to reverse upon release") (Ex. 21).  Outside contact is an important

22  factor in rehabilitation and mitigating the harmful mental health effects of social isolation.

23      The harm from loss of contact with the outside is heightened during this pandemic, when

24  serious outbreaks in and out of prisons have left incarcerated people and their loved ones in

25  constant worry about one another's welfare.  *See* Salahi Decl., Ex. 22 (seven of the ten largest

26  COVID-19 outbreaks are at correctional facilities and the known infection rate for incarcerated

27  people is 2.5 times higher than the general population); *id.*, Ex. 23 ("I don't know if I'm going to

28  call home one day, and one of my family members are going to be gone or if something's going

1  to happen to them."); *id.*, Ex. 24 ("[F]amilies describe anxiety and worry when they do not know

2  when their loved one will be able to call home.").

3  **Hygiene:** Incarcerated people do not receive the hygiene products they need to maintain

4  their cleanliness and health for free.  Rather, they must purchase their own basic goods like

5  menstrual products, soap, and over-the-counter remedies for chronic medical conditions.  *See*,

6  *e.g.*, Salahi Decl., Ex. 25 at 2 ("Inmates in some facilities must pay for their own soap and

7  personal hygiene items . . . ."); Ex. 10 at 5 (detailing commissary profits on essential items like

8  antifungal cream and soap—even though prisoners were supposedly entitled to one free bar of

9  soap per week); Ex. 26 ("Arizona prisons force men and women to pay for their own personal

10  hygiene supplies like soap and toothpaste."); Ex. 27 at 56 ("The vast majority of women [the

11  Correctional Association] interviewed reported that the monthly supply of sanitary napkins [given

12  to] them does not meet their sanitary needs . . . .  [I]n order to obtain more, women . . . need to be

13  financially able to purchase them on their own through the commissary."); Ex. 28 at 5 (thirty-

14  eight states have no law requiring the provision of menstrual products to incarcerated people); Ex.

15  10 at 5 (noting that the commissary provides the only source for over-the-counter remedies for

16  chronic medical conditions like antacid tablets, vitamins, skin ointments, antihistamine, or eye

17  drops); Scholl Decl. ¶ 4 (spending approximately $100 a month on hygiene products); Strawn

18  Decl. ¶ 9 (spending approximately $36-100 a month on basic necessities).  Without relief, their

19  ability to maintain hygiene—especially important during the pandemic—will also be impaired.

20  **Food:** Incarcerated people who lack sufficient funds also cannot pay for food items from

21  the commissary, which typically "allows inmates to supplement their meager or low quality

22  [prison-] provided provisions."  Salahi Decl., Ex. 29 at 38-9 (noting that "many inmates rely on

23  commissary food to survive because substantial food is not provided by the institution, leaving

24  many inmates hungry each day" and reporting that the average inmate lost 20 pounds in prison);

25  *id.*, Ex. 10 (describing how maggots, dirt, and mold were reported in prison meals); *id.*, Ex. 30 at

26  369 n.44 ("Some states have reduced the number of daily calories budgeted for each prisoners

27  and have even cut back to two meals a day on weekends and holidays."); *id.*, Ex. 31 at 2 (at one

28  prison, "[l]unch was removed from weekend menus and portion sizes in every meal were

1    reportedly reduced"); *id.*, Ex. 31 at 206 (one incarcerated individual stated that without buying

2    your own food, "you're gonna starve").  And for some prisoners with special needs, the

3    commissary provides the *only* source of food.  *Id.*, Ex. 29 at 2 ("Inmates with allergies often find

4    prison commissary food is the only available food they can eat.").  Delayed EIP funds will impair

5    incarcerated people's ability to feed themselves.

6        **Re-Entry:**  Hundreds of thousands of incarcerated people and Class Members will be

7    released imminently or have been released in recent weeks.  Salahi Decl., Ex. 44; Strawn Decl. ¶

8    3.  Upon release, formerly incarcerated people face the same bleak economy that necessitated

9    passage of the CARES Act, compounded by the challenges of obtaining a job with a criminal

10   record.  For example, a Brookings Institute study recently found that almost half of formerly

11   incarcerated people reported no earnings in the first several years after leaving prison, and those

12   who did find work received a median income of $10,090 per year—well below the CARES Act's

13   means test of a $75,000 annual income.  *See* Salahi Decl., Ex. 32.  Withholding EIP benefits

14   deprives them of a vital foundation for successful and safe reentry to society.  *See* Salahi Decl.,

15   Ex. 33 (finding that cash grants, along with personalized case management, reduced recidivism

16   among participants in one study by helping them navigate the reentry process); Johnson Decl. ¶¶

17   3-5; Cowan Decl. ¶¶ 4-6; Boudin Decl. ¶¶ 3-7.

18       **Harm to Families:**  "[T]he incarcerated population is concentrated among individuals . . .

19   from low-income, single parent families."  *See* Salahi Decl., Ex. 32 at 13 (47 percent of

20   individuals incarcerated around age 30 grew up in families in the bottom 20 percent of the income

21   distribution, and 82 percent are from the bottom half.); *id.*, Ex. 34 (incarceration "lead[s] to

22   higher relative poverty rates is by reducing income on the individual/family level" because the

23   incarcerated family member "is unable to meaningfully contribute to family income").  Even

24   prior to the pandemic, 49% of families with an incarcerated loved one struggled to meet basic

25   food needs and 48% had trouble meeting basic housing needs.  *Id.*, Ex. 35.  Further, many

26   incarcerated people have family members on the outside who need financial support.  *Id.*, Ex. 36

27   ("at least 1 in 5 [prisoners] has a child support obligation"); *id.*, Ex. 37 (2003 study estimated one

28   quarter of inmates in federal or state prison have open child support cases); *id.*, Ex. 38 (22 to 28%

1   of prisoners and parolees have child support obligations).

2          Delayed EIP funds harms the families of incarcerated people by forcing the latter to bear

3   their loved ones' prison expenses, even while they struggle to make ends meet in the pandemic

4   economy.  It also undermines incarcerated people's ability to satisfy child support, restitution, and

5   other obligations.

6   **III.     LEGAL STANDARD**

7          A preliminary injunction should be granted if Plaintiffs establish that (1) they are likely to

8   succeed on the merits; (2) they will otherwise suffer irreparable harm; and (3) the balance of

9   equities and the public interest favor an injunction.  *Winter v. Natural Resources Def. Council,*

10  *Inc.*, 555 U.S. 7, 20 (2008).  A "stronger showing of irreparable harm to [the plaintiff] might

11  offset a lesser showing of likelihood of success on the merits."  *Alliance for the Wild Rockies v.*

12  *Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Thus, "'serious questions going to the merits' and

13  a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction."

14  *Id.* at 1132.  A "serious question" is one on which Plaintiffs have "a fair chance of success on the

15  merits."  *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 2014).

16  **IV.     ARGUMENT**

17         Plaintiffs are likely to demonstrate that Defendants' exclusion of incarcerated people from

18  the EIP program is unlawful and that further delay will cause irreparable harm to themselves, the

19  proposed Class, and their friends and family members, particularly given that the CARES Act's

20  express purpose is to provide relief "as rapidly as possible."  26 U.S.C. § 6428(f)(3)(A).  The

21  public interest and balance of the equities also weigh in favor of requiring Defendants to follow

22  the clear statutory requirements.  Finally, Plaintiffs request the certification of a Class so that this

23  preliminary relief can be provided class-wide.

24         **A.     There Is a Strong Likelihood of Success on the Merits**[8]

25                **1.     The CARES Act Is Crystal Clear**

26  The CARES Act creates stimulus payments for "eligible individuals" in the amount of

27  _____

28  [8] Although Plaintiffs have also alleged a cause of action pursuant to the Little Tucker Act, *see* Compl. ¶¶ 50-54, this motion is not brought on the basis of that claim.

1   $1,200 per individual, with additional relief of $500 per qualified child.  26 U.SC. § 6428(a).  The

2   eligibility requirements are intentionally broad, and could not be clearer: *"The term 'eligible

3   individual' means **any** individual other than—(1) any nonresident alien individual, (2) any

4   individual with respect to whom [another taxpayer claims them to be a dependent], and (3) an

5   estate or trust."*  26 U.SC. § 6428(d).  There are **no** other statutory criteria.

6          Interpretation of Section 6428(a) should begin and end here, with the unambiguous text of

7   the statute.  *See Los Angeles Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 802 (9th Cir. 2017).

8   Courts "must presume that [the] legislature says in a statute what it means and means in a statute

9   what it says there," so a court's "sole function" when "the statutory meaning is plain and

10  unambiguous" is "to enforce it according to its terms."  *Hernandez v. Williams, Zinman &*

11  *Parham PC*, 829 F.3d 1068, 1072-73 (9th Cir. 2016).

12         Because the statutory text is unambiguous, there is no need to consult "extrinsic

13  indicators, such as legislative history."  *Hernandez*, 829 F.3d at 1073.  But even that history

14  confirms the straightforward text.  Congress intended the CARES Act's stimulus payments to

15  reach American citizens and legal permanent residents with virtually no exceptions, in

16  recognition of the broad impact of the pandemic.  *See*, *e.g.*, 166 Cong. Rec. S2007 (Mar. 24,

17  2020) (statement of Sen. McConnell) (stating that purpose of Act was to "rush financial

18  assistance to Americans through direct checks to households *from the middle class on down*")

19  (Ex. 39) (emphasis added); 166 Cong. Rec. E339 (Mar. 31, 2020) (statement of Rep. Jayapal)

20  (stating the CARES Act provides "relief to the vast majority of *everyday people* to immediately

21  help put cash in people's pocket to pay those mounting bills") (emphasis added) (Ex. 40); 166

22  Cong. Rec. S1929 (Mar. 23, 2020) (statement of Sen. Lankford) (same) (Ex. 41).  There is no

23  indication that Congress intended to exclude incarcerated persons from the relief package.

24         Significantly, when Congress has excluded incarcerated people from benefits programs in

25  the past, it has done so explicitly.  For example, when Congress passed a stimulus package during

26  the Great Recession of 2008, eligibility for a stimulus was based on meeting a certain minimum

27  income, *see* 26 U.SC. § 6428(e)(4) (eff. Feb. 13, 2008), and Congress specifically excluded

28  incomes earned by incarcerated persons from the calculation, *see* 26 U.SC. § 32(c)(2)(B)(iv)

(excluding any amount earned by "an inmate at a penal institution").  No similar exclusion exists under the CARES Act.  The CARES Act does not limit the ability of incarcerated persons to obtain stimulus aid.

### 2.  Defendants Have Unlawfully Withheld or Unreasonably Delayed Plaintiffs' and the Class's Stimulus Checks

Section 706(1) of the APA provides that a court "shall compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1); *see* Compl. ¶¶ 40-43.  "A court can compel agency action under this section only if there is 'a specific, unequivocal command' placed on the agency to take a 'discrete agency action,' and the agency has failed to take that action."  *Vietnam Veterans of Am. v. Central Intelligence Agency*, 811 F.3d 1068, 1075 (9th Cir. 2016).

The CARES Act provides such a command.  Congress gave the Secretary *zero* discretion in deciding whether to issue a payment to an eligible person.  The statute unequivocally commands that "[t]he Secretary *shall*, subject to the provisions of this title, refund or credit any overpayment attributable to this section *as rapidly as possible*."  26 U.S.C. § 6428(f)(3)(A) (emphasis added).  The delivery of this financial assistance constitutes "discrete agency action." *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004) ("discrete agency actions" include, *inter alia*, an "agency rule, order, license, sanction [or] relief"); 5 U.S.C. § 551(11)(A)- (B) ("relief" includes the "grant of money" and the "recognition of a claim [or] right").

Defendants have "both a legal duty to perform a discrete agency action [i.e., issue stimulus payments to eligible persons] and [have] fail[ed] to perform that action."  *Vietnam Veterans*, 8111 F.3d at 1079.  Defendants have thus "ignored a specific legislative command." *Hells Canyon Preservation Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010).

### 3.  Defendants' Policy Violates the APA

Notwithstanding the unambiguous text of the statute, Defendants on May 6, 2020 announced their policy that incarcerated persons were ineligible for a stimulus payment, and have refused to issue payments to such persons.  Salahi Decl., Exs. 4 & 6; *see* Section II.C, *supra*. Defendants did not cite any statutory authority for their policy, explain the basis for it, or adopt it after a formal notice-and-comment process.  Plaintiffs are likely to establish that the policy is

contrary to law, exceeds statutory authority, and is arbitrary and capricious.

#### a.     <u>The IRS's Policy Is Final Agency Action</u>

The Court may review Defendants' unlawful policy as a "final agency action." 5 U.S.C. § 704. Agency action is final when (1) it "mark[s] the consummation of the agency's decision-making process," *i.e.*, it is not "of a merely tentative or interlocutory nature," and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *S.F. Herring Assoc. v. Dep't of the Interior*, 946 F.3d 564, 577 (9th Cir. 2019) (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016)). This analysis is "pragmatic." *Id.* (citing *Hawkes*, 136 S. Ct. at 1815). Both conditions are met here.

First, Defendants' policy is not "merely tentative or interlocutory." *S.F. Herring*, 946 F.3d at 577. Defendants announced their position publicly on May 6, 2020 through the IRS's website. Salahi Decl., Ex. 4. The announcement declared incarcerated persons ineligible, and stated that any such person who had received a payment (including spouses who received a check for an incarcerated loved one) were to return them. *Id.* In addition, Defendants took steps to enforce their policy. Although Defendants had already disbursed over 80,000 payments to incarcerated persons by May 2020, *id.*, Ex. 6, Defendants subsequently contacted state correctional facilities and requested that payments be intercepted and returned, and a significant number were. *Id.*, Ex. 7. Further, Defendants took preventative action to ensure no checks would be sent to prisoners in disbursements issued in early May 2020 or thereafter by cross-referencing the payment data files with a list of known incarcerated people and implementing programming to exclude them. *Id.*, Ex. 6. This behavior "does not suggest [Defendants are] still in the middle of trying to figure out [their position] on whether [incarcerated persons are eligible for CARES Act relief], and that this action somehow prematurely inserts the counts into the mix." *S.F. Herring*, 946 F.3d at 578.

Second, Defendants' policy is "one by which rights or obligations have been determined, or from which legal consequences will flow." *S.F. Herring*, 946 F.3d at 577. Incarcerated people like Plaintiff Colin Scholl, who were entitled to *automatic* payments under the CARES Act, did not receive them, and the IRS has made clear it will deny claims presented by incarcerated

- 13 -

1   persons who must file them to receive a payment.  Salahi Decl., Ex. 6 & Ex. 4.  Indeed, when Mr.

2   Scholl attempted to make a claim for payment, he was denied on the basis of his incarceration.

3   Scholl Decl. ¶ 2.  IRS policy likewise subjects recently released persons, such as Plaintiff Lisa

4   Strawn who was incarcerated at the time the stimulus funds were released, to the untenable choice

5   of filing a claim that will be denied or could invite law enforcement review and/or potential

6   criminal enforcement for filing a false claim.  Strawn Decl. ¶ 2.

7          These factors demonstrate that the IRS's policy is not tentative or non-binding, but rather

8   is final and ripe for review by the Court.  *See also Ore. Natural Desert Ass'n v. U.S. Forest Serv.*,

9   465 F.3d 977, 985-86 (9th Cir. 2006) (final agency action found where agency "arrived at a

10  definitive position" and "put that decision into effect").

### b.      The Policy Is Contrary to Law and Exceeds Statutory Authority

11
12         Under the APA, the Court "shall" "hold unlawful and set aside agency action . . . found to

13  be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

14  [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

15  5 U.S.C. § 706(2)(A), (C).

16         The Secretary's addition of eligibility requirements beyond those provided by the CARES

17  Act effectively re-writes the statutory definition of "eligible individual," violating core separation

18  of powers principles.  *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 327-28 (2014) ("The

19  power of executing the laws . . . does not include a power to revise clear statutory terms," because

20  of the "core administrative-law principle that an agency may not rewrite clear statutory terms to

21  suit its own sense of how the statute should operate."); *Safer Chemicals, Healthy Families v. U.S.

22  Env. Protection Agency*, 943 F.3d 397, 425 (9th Cir. 2019) (holding EPA's re-definition of

23  statutory term was unlawful because "[w]here Congress has explicitly provided a definition for a

24  term, and that definition is clear, an agency must follow it"); *East Bay Sanctuary Covenant v.

25  Trump*, 932 F.3d 742, 774 (9th Cir. 2018) (upholding injunction enjoining executive order and

26  agency rule suspending entry of certain asylees because they "do[] indirectly what the Executive

27  cannot do directly: amend the [Congressional statute]").  *See also La. Pub. Serv. Comm'n v.*

28

1    *F.C.C.*, 476 U.S. 355, 374 (1986) ("an agency literally has no power to act . . . unless and until

2    Congress confers power upon it"); *California v. Trump*, 963 F.3d 926, 947-49 (9th Cir. 2020)

3    (Department of Defense lacked statutory authority to transfer funds to other agencies for border

4    wall construction); *City & Cnty. of S.F. v. Sessions*, 372 F. Supp. 3d 928, 943 (N.D. Cal. 2019)

5    (agency lacked statutory authority to impose additional conditions on federal grants).

6    　　　　To the extent Defendants' policy can be construed as an "interpretation" of the CARES

7    Act, it is not entitled to judicial deference.  The policy was not adopted through notice-and-

8    comment, so the *Chevron* framework does not apply.  *See United States v. Mead*, 533 U.S. 218,

9    230 (2001).  Even if *Chevron* could apply, Defendants' interpretation would not be entitled to

10   deference because the statute itself is unambiguous.  *See* Section IV.A.1, *supra*; *see also*

11   *Valenzuela Gallardo v. Lynch*, 818 F.3d 808, 815 (9th Cir. 2016) ("If the statute unambiguously

12   bars the agency's interpretation, that is the end of the analysis, for the court, as well as the

13   agency, must give effect to the unambiguously expressed intent of Congress.").  Nor is

14   Defendants' policy entitled to *Skidmore* deference because it is unexplained and cites no legal

15   authority, so lacks persuasive value.  *See Tablada v. Thomas*, 533 F.3d 800, 806 (9th Cir. 2008).

16   　　　　　　　**c.**　　　　**The Policy Is Arbitrary and Capricious**

17   　　　　Defendants' policy is also unlawful because it "relied on factors Congress did not intend it

18   to consider . . . ."  *League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615

19   F.3d 1122, 1130 (9th Cir. 2010) (quotation omitted).  Specifically, in deciding who was an

20   "eligible individual," Defendants considered whether individuals were incarcerated, a criteria that

21   Congress itself did not adopt or intend to be material.  *See* Section  IV.A.1, *supra*.

22   　　　　Additionally, Defendants violated the "basic procedural requirement" that "an agency

23   must give adequate reasons for its decisions," and when it "has failed to provide even that

24   minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of

25   law."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).  That is particularly

26   serious because Defendants abruptly changed their position on the eligibility of incarcerated

27   persons without any explanation.  *See* Salahi Decl., Ex. 6; *see*, *e.g.*, *City & Cnty of S. F. v. U.S.*

28   *Citizenship & Immigration Servs.*, 408 F. Supp. 3d 1057, 1105 (N.D. Cal. 2019) ("[A]n

1   unexplained inconsistency in agency policy is a reason for holding an interpretation to be an

2   arbitrary and capricious change from agency practice.") (quotation and citation omitted).

3          **B.        Plaintiffs and the Class Are Suffering Irreparable Harm**

4          As described in Section II.D, *supra*, Plaintiffs and the proposed Class are likely to suffer

5   irreparable harm "in the absence of the injunction." *All. for the Wild Rockies*, 632 F.3d at 1135.

6   Although their claims are meritorious and it is expected that payment eventually will be made, the

7   delay in payments here gives rise to irreparable harm because "the injured could not be made

8   whole by retroactive payments at some later time." *Briggs v. Sullivan*, 886 F.2d 1132, 1140 (9th

9   Cir. 1989) (finding irreparable harm where agency withheld non-discretionary SSI payments).

10         This principle holds particularly true when the government wrongfully withholds benefits

11  that are intended to provide critical assistance to vulnerable populations.  For example, in *Beno v.*

12  *Shalala*, the Ninth Circuit held that economic hardship resulting from denial of welfare benefits

13  constituted irreparable harm because back payment would not be adequate compensation.  30

14  F.3d 1057, 1064 n.10 (9th Cir. 1994) (reversing denial of preliminary injunction for a class of

15  families who experienced cuts to their Aid for Families with Dependent Children checks because

16  "[f]or people at the economic margin of existence, the loss of $172 a month and perhaps some

17  medical care cannot be made up by the later entry of a money judgment"); *see also Beltran v.*

18  *Myers*, 677 F.2d 1317, 1322 (9th Cir. 1982) (holding that the possibility that plaintiffs would be

19  denied Medicaid benefits was sufficient to establish irreparable harm); *Paxton v. Sec'y of Health*

20  *and Human Servs.*, 856 F.2d 1352, 1354 (9th Cir. 1988) (recognizing that for those at the

21  economic margins a 15% reduction in SSI benefits and the possibility HHS might try to recover

22  overpaid benefits "can make a significant difference to [a family's] budget and to its ability to

23  survive"); *Jensen v. Internal Revenue Service,* 835 F.2d 196, 198 (9th Cir. 1987) (IRS levy on

24  wages that "deprived [plaintiff] of the ability to provide necessities of life for himself and family"

25  constituted irreparable harm); *V.L. v. Wagner*, 669 F. Supp. 2d 1106, 1121 (N.D. Cal. 2009),

26  *order enforced,* No. C 09-04668 CW, 2009 WL 4282079 (N.D. Cal. Nov. 25, 2009) (loss of

27  public medical benefits is evidence of irreparable harm); *Jones v. Upland Hous. Auth.*, No. EDCV

28  12-02074-VAP, 2013 WL 708540, at *15 (C.D. Cal. Feb. 21, 2013) (denial of rental assistance

1   constitutes irreparable harm); *cf. Lopez v. Heckler*, 713 F.2d 1432, 1436–38 (9th Cir.)

2   (distinguishing deprivation of the necessities of life from monetary harm compensable at a later

3   time), *rev'd in part on other grounds,* 463 U.S. 1328 (1983).

4         The Court may also evaluate irreparable harm to Class Members' family and friends.  *See*

5   *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (court "may consider . . . the indirect

6   hardship to [the plaintiffs'] friends and family members" (citation omitted)).[9]

7                    **1.     Delay of Time-Sensitive Assistance Causes Irreparable Harm**

8         Here, delay will clearly cause irreparable harm because, in passing the CARES Act,

9   Congress intended to provide *rapid* economic relief at a moment of crisis: it directed the Treasury

10  to distribute payments "as rapidly as possible." 26 U.S.C. § 6428(f)(3)(A).  Speed is critical because

11  individuals need relief "during this unprecedented time," not at some future date.  *See* Salahi

12  Decl., Ex. 3 (statement by Secretary Mnuchin).  Senate Majority Leader Mitch McConnell, for

13  example, said the purpose of the CARES Act was to "*rush* financial assistance to Americans through

14  direct checks."  *Id.*, Ex. 39 (emphasis added).  Senator Mike Rounds stated that he expected the public

15  to receive EIP benefits as soon as possible, "not a month and a half or 2 months from now" because

16  families "are hurting, and they need this additional assistance *at this time*."  *Id.*, Ex. 42 (emphasis

17  added).  Indeed, Defendant Commissioner Rettig stated the agency was "working hard to get more

18  payments *quickly* to taxpayers," *id.*, Ex. 17 (emphasis added).

19        Further, preliminary relief is warranted because the IRS's October 15, 2020 deadline for "non-

20  filers" to make claims is rapidly approaching.  There is also a risk that Defendants will argue that they

21  may not disburse benefits to the Class in case of a favorable judgment after December 31, 2020, if not

22  after October 15.  26 U.S.C. § 6428(f)(3)(A).

23

24

25   _____

[9]   *See also Sencion v. Saxon Mortg. Servs., LLC*, No. 5:10-CV-3108 JF, 2011 WL 1364007, at *3
26   (N.D. Cal. Apr. 11, 2011) (harm to both plaintiff and his family); *Reganit v. Kay-Co. Invs.*, No.
     2:09-CV-01120-MCE, 2009 WL 8633204, at *1 (E.D. Cal. Apr. 24, 2009) (harm to plaintiff's
27   four children); *Medina v. U.S. Dep't of Homeland Sec.*, 313 F. Supp. 3d 1237, 1247 (W.D. Wash.
     2018) (harm to plaintiff and family); *Ruiz-Diaz v. United States*, No. C07-1881RSL, 2008 WL
28   3928016, at *2 (W.D. Wash. Aug. 21, 2008) (harm to class and their families).

1

2.      **Plaintiffs, the Proposed Class, and Their Families and Friends Are Suffering Concrete Irreparable Harm**

2

3       Plaintiffs, the proposed Class, and their families and friends will also suffer concrete

4       harms in the absence of a preliminary injunction because timely assistance is critical to

5       maintaining their physical and emotional health by communicating with loved ones, providing

6       essential hygiene and food assistance, supporting the re-entry of thousands of incarcerated people

7       being released on a daily basis, and mitigating the economic burden on families and friends from

8       supporting incarcerated loved ones.  *See* Section II.D, *supra*; *see also* Strawn Decl. ¶¶ 5-8; Scholl

9       Decl. ¶¶ 3-6; Johnson Decl. ¶¶ 3-5; Cowan Decl. ¶¶ 4-6; Boudin Decl. ¶¶ 3-7.  In these

10      circumstances, failure to receive a timely EIP benefit is not simply an economic injury that "could

11      be remedied by a damage award" down the line.  *L.A. Memorial Coliseum Comm'n*, 634 F.2d

12      1197, 1202 (9th Cir. 1980).  *See also Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D.

13      Cal.), *appeal dismissed and remanded,* 802 F.3d 1090 (9th Cir. 2015) ("Emotional distress,

14      anxiety, depression, and other psychological problems can constitute irreparable injury.").  There

15      is a clear likelihood of irreparable harm to Plaintiffs, the proposed Class Members, and their

16      friends and family if the delivery of EIP benefits is delayed further.

17      **C.      Equity and the Public Interest Support a Preliminary Injunction**

18      The final two elements—whether the public interest and the balance of the equities favor

19      an injunction—merge when the government is a party.  *Drakes Bay Oyster Co. v. Jewell*, 747

20      F.3d 1073, 1092 (9th Cir. 2014), *cert. denied*, 134 S. Ct. 2877 (2014).  The balance here tips

21      "sharply . . . in favor" of an injunction.  *Alliance*, 632 F.3d at 1137-39.  Without a preliminary

22      injunction, Plaintiffs and the Class will be forced to forego access to immediate basic needs such

23      as food and hygiene products, and the ability to communicate with loved ones.  They will have to

24      rely heavily on family members, who are already under strain as a result of the economic

25      downturn.  And individuals with approaching release dates will be released into an unstable

26      economy on precarious financial footing—facing food and housing insecurity and an increasing

27      risk of recidivism.  In contrast, the IRS and Defendants do not suffer harm from being required to

28      follow the letter of the law.  *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)

1    (government "cannot suffer harm from an injunction that merely ends an unlawful practice").

2         The public also has a strong interest in the enforcement of legally-protected rights,

3    including Plaintiffs' and the Class's rights under the CARES Act.  *See A. O. v. Cuccinelli*, No.

4    19-CV-06151-SVK, 2020 WL 2097586, at *11 (N.D. Cal. May 1, 2020) ("These factors weigh in

5    favor of a preliminary injunction when plaintiffs have also established that the government's

6    policy violates federal law."); *W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1026

7    (D. Or. 2019) (same); *Inland Empire-Immigrant Youth Collective v. Nielsen*, 2018 WL 1061408,

8    at *21 (C.D. Cal. Feb. 26, 2018) (same); *cf. Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir.

9    2005) (public interest is "implicated when a constitutional right has been violated, because all

10   citizens have a stake in upholding the Constitution"); *Sammartano v. First Jud. Dist. Ct.*,

11   303 F.3d 959, 974 (9th Cir. 2002) (same) (citation and quotation omitted), abrogated on other

12   grounds by *Winter*, 555 U.S. at 22.  Moreover, there is no public interest that "cut[s] in favor of

13   *not* issuing the injunction."  *Alliance*, 632 F.3d at 1138.  This factor supports Plaintiffs.

14        **D.    The Court Should Certify a Class**

15        Plaintiffs respectfully seek certification of the following Class:

16        All United States citizens and legal permanent residents who:

17             (a) are or were incarcerated (*i.e.*, confined in a jail, prison, or
18        other penal institution or correctional facility pursuant to their
          conviction of a criminal offense) in the United States, or have been
19        held to have violated a condition of parole or probation imposed
          under federal or state law, at any time from March 27, 2020 to the
20        present;

21             (b) filed a tax return in 2018 or 2019, or were exempt from a
          filing obligation because they earned an income below $12,200 (or
22        $24,400 if filing jointly) in the respective tax year;

23             (c) were not claimed as a dependent on another person's tax
          return; and

24             (d) filed their taxes with a valid Social Security Number, and,
25        if they claimed qualifying children or filed jointly with another
          person, those individuals also held a valid Social Security Number.

26        Excluded from the Class are estates and trusts; Defendants; the
27        officers, directors, or employees of any Defendant; and, any judicial
          officer presiding over this action and the members of his/her
28        immediate family and judicial staff.

1     Courts regularly grant class certification in connection with the entry of a preliminary

2 injunction.[10]  All factors under Rule 23(a), (b)(2), and (b)(3) are satisfied.

3           **1.**     **Rule 23(a) Is Satisfied**

4           **a.**     **Numerosity**

5     Numerosity is satisfied because joinder of over 1.4 million incarcerated persons as parties

6 would be impractical.  *See* Fed. R. Civ. P. 23(a)(1); *Rannis v. Recchia*, 380 Fed. Appx. 646, 651

7 (9th Cir. 2010) (numerosity satisfied "when a class includes at least 40 members").  *See* Salahi

8 Decl., Ex. 44 (statistics indicating that there are at least 1.4 million incarcerated people); *id.*, Ex. 6

9 (IRS attempted to retrieve payments initially sent to at least 84,000 incarcerated people).

10           **b.**     **Commonality**

11     Commonality is satisfied here because the Class members' claims "depend upon a

12 common contention . . . of such a nature that it is capable of classwide resolution—which means

13 that determination of its truth or falsity will resolve an issue that is central to the validity of each

14 one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  A

15 single common question of law or fact is sufficient to satisfy this criteria.  *Id.* at 359.

16     Here, the common questions include: (1) whether the CARES Act authorizes Defendants

17 to withhold stimulus payments from incarcerated persons based solely on their status as such; (2)

18 whether Defendants have unlawfully withheld or unreasonably delayed CARES Act payments to

19 incarcerated persons based on their status as such; (3) whether Defendants' policy of refusing to

20 issue CARES Act payments to otherwise eligible incarcerated persons is contrary to law, exceeds

21 statutory authority, or is otherwise arbitrary and capricious; (4) whether declaratory relief

22 confirming that incarcerated persons are not disqualified from relief under the CARES Act based

23 solely on their incarcerated status is appropriate; (5) whether injunctive relief prohibiting

24 Defendants from taking incarcerated status into consideration in determining whether to issue a

25

---

26   [10]  *See, e.g.*, *Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017); *Ms. L. v. U.S. Immigration & Customs Enf't*, 415 F. Supp. 3d 980, 985 (S.D. Cal. 2020); *Inland Empire-Immigrant Youth Collective v. Nielsen*, No. EDCV-17-2048 PSG, 2018 WL 1061408 (C.D. Cal.

27 Feb. 26, 2018); *Ahlman v. Barnes*, No. SACV-20835 JGB, 2020 WL 2754938 (C.D. Cal. May 26, 2020); *Fraihat v. U.S. Immigration & Customs Enf't*, No. EDCV191546JGB, 2020 WL 1932570,

28 at *29 (C.D. Cal. Apr. 20, 2020).

    MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-5309-CRB

1   CARES Act payment is appropriate; and (6) whether the Court should enter an order compelling

2   Defendants to issue CARES Act payments to those automatically eligible to receive one based on

3   past tax filings, but for their incarcerated status, and to re-consider any adverse eligibility

4   determinations previously made on the basis of incarcerated status.

5        These questions will "generate common answers apt to drive the resolution of the

6   litigation." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1133 (9th Cir. 2016) (quotation

7   omitted). *See, e.g.*, *Doe v. Wolf*, 424 F. Supp. 3d 1028, 1041 (S.D. Cal. 2020) (commonality

8   satisfied in re: question whether "practice of prohibiting putative class members access to retained

9   counsel prior to and during non-refoulement interviews violates the APA"); *Inland Empire—*

10  *Immigrant Youth Collective v. Nielsen*, 2018 WL 1061408, at *8 (C.D. Cal. Feb. 26, 2018) (same

11  re: whether government's "practice of terminating DACA without notice and an opportunity to be

12  heard violates their internal rules and the [APA]").

13              **c.**    **Typicality**

14       Plaintiffs' claims arise from the same course of events and rely on the same legal

15  arguments as other class members' claims, so Rule 23(a)(3)'s typicality requirement is satisfied.

16  *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) ("[R]epresentative claims are 'typical' if they

17  are reasonably coextensive with those of absent class members; they need not be substantially

18  identical."). Like all Class members, Plaintiffs Scholl and Strawn have either been denied

19  benefits or were incarcerated at the time Defendants' policy was issued, making any claim for

20  benefits futile. Scholl Decl. ¶ 2; Strawn Decl. ¶ 2.

21              **d.**    **Adequacy**

22       Adequacy is satisfied because (1) the named plaintiffs and counsel have no conflicts with

23  the class; and (2) plaintiffs will "prosecute the action vigorously." *Staton v. Boeing Co.*, 327 F.3d

24  938, 957 (2003); *see also* Fed. R. Civ. P. 23(a)(4). There are no conflicts between Plaintiffs and

25  other Class Members. Plaintiffs, like all other Class Members, share a common interest in

26  vigorously prosecuting these claims and obtaining the requested declaratory, injunctive, and

27  monetary relief. Plaintiffs are current or recently incarcerated people who did not receive EIP

28  payments despite being eligible, and have participated in the litigation and are committed to

- 21 -

1   prosecuting the case on behalf of the Class.  Scholl Decl. ¶¶ 7-10; Strawn Decl. ¶¶ 10-13.

2   Further, under Rule 23(g), Plaintiffs have retained proposed Class Counsel with significant

3   experience prosecuting class actions and have the ability to litigate a case of this nature.

4   Dermody Decl. ¶¶ 3-12 and Ex. A; Tawatao Decl. ¶¶ 4-8.

5               **2.**      **Rule 23(b)(2) Supports Certification**

6          "Rule 23(b)(2) permits class actions for declaratory or injunctive relief where 'the party

7   opposing the class has acted or refused to act on grounds generally applicable to the class.'"

8   *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) (citations omitted).  In *Dukes*, the

9   Supreme Court has explained:

10              The key to the (b)(2) class is the indivisible nature of the injunctive
                or declaratory remedy warranted—the notion that the conduct is
11              such that it can be enjoined or declared unlawful only as to all of
                the class members or as to none of them. In other words, Rule
12              23(b)(2) applies only when a single injunction or declaratory
                judgment would provide relief to each member of the class. It does
13              not authorize class certification when each individual class member
                would be entitled to a *different* injunction or declaratory judgment
14              against the defendant.

15   *Dukes*, 564 U.S. at 360 (quotation marks and citation omitted).  Indeed, "[Rule 23(b)(2)'s]

16   requirements are unquestionably satisfied when members of a putative class seek uniform

17   injunctive or declaratory relief from policies or practices that are generally applicable to the class

18   as a whole."  *Parsons*, 754 F.3d at 688 (affirming certification of incarcerated class seeking

19   injunctive and declaratory relief challenging Corrections policy).

20          That requirement is readily satisfied here.  The answer to whether Defendants may deny

21   CARES Act payments to incarcerated persons on the basis of their status as such is the same for

22   all Class Members.  A single declaration and injunction will be appropriate.

23          It is immaterial that as a consequence of the aforementioned declaratory and injunctive

24   relief, incidental monetary relief could flow to the Class as Defendants re-determine their

25   eligibility for an EIP benefit under the correct legal standard (*i.e.*, without taking incarcerated-

26   status into consideration).  In *Wit v. United Behavioral Health*, for example, the plaintiffs sought

27   to certify a class of persons who alleged they were improperly denied coverage for mental health

28   and substance use disorder treatment under Rule 23(b)(1) and 23(b)(2), seeking an injunction

1    requiring the health administrator to re-process their claims under the correct coverage policy.

2    317 F.R.D. 106 (N.D. Cal. 2016).  Judge Spero rejected the defendants' contention that

3    certification was inappropriate under Rule 23(b)(1) or (b)(2) merely because class members might

4    receive money after the defendants were required to apply the correct legal standard in

5    determining their eligibility.  *Id.* at 133-34 ("The mere possibility that some class members may

6    recover from [defendants] some of the money they spent on treatment as a result of the

7    reprocessing of their claims under new Guidelines does not mean that their claims are

8    'predominantly for money damages' for the purposes of Rule 23(b)(1) or 23(b)(2).").

9         Similarly, in *Hart v. Colvin*, the plaintiffs sought to certify a class seeking declaratory and

10   injunctive relief requiring the Social Security Administration to stop relying on examination

11   reports by a disqualified physician and "to reopen any benefits determination that relied, at least

12   in part, on a report prepared by [the physician]."  310 F.R.D. 427, 429 (N.D. Cal. 2015).

13   Although the ultimate re-determination of eligibility might reach a different result for each class

14   member, Judge Tigar held that Rule 23(b)(2)'s requirements were satisfied because "Plaintiffs

15   seek uniform injunctive and declaratory relief from policies that are generally applicable to the

16   class as a whole," including "requiring SSA to reopen all of the closed claims."  *Id.* at 438-39.

17        Plaintiffs request the same relief as in *Wit* and *Hart*: an identical declaration and

18   injunction, such that Defendants (a) may not take incarcerated status into consideration when

19   determining eligibility for an EIP, (b) must withdraw their Policy on this point, (c) must reverse

20   rejected claims on this basis, and (d) issue payments to those eligible under the correct standard.

21              **3.    Rule 23(b)(3) Supports Certification**

22        Plaintiffs' APA claims seek injunctive and declaratory relief, not money damages.  *Bowen*

23   *v. Massachusetts*, 487 U.S. 879 (1988) (monetary relief pursuant to an APA injunction does not

24   constitute "damages"); *Marceau v. Blackfeet Hous. Auth.*, 540 F.3d 916, 929 (9th Cir. 2008)

25   (same).  Nevertheless, if the Court determines that Rule 23(b)(2) certification alone would not be

26   adequate for the preliminary relief requested, then certification under Rule 23(b)(3) would also be

27   proper at this juncture because Plaintiffs satisfy predominance and superiority.

28        As discussed above, the central common question here is whether the CARES Act

1    excludes incarcerated people from the definition of an "eligible individual" based solely on their

2    incarceration.  That question "present[s] a significant aspect of the case and . . . can be resolved

3    for all members of the class in a single adjudication, [so] there is clear justification for handling

4    the dispute on a representative basis rather than on an individual basis."  *Hanlon v. Chrysler*

5    *Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (citation omitted).  Because the Class definition

6    includes only people who meet the objective criteria necessary to qualify as "eligible" under the

7    CARES Act, the only remaining question that could bear on whether each Class Member receives

8    a check is whether adjustments need to be made to each person's entitlement based on the number

9    of qualified children, *see* 26 U.S.C. § 6428(a)(2), or adjusted gross income, *see id.* § 6428(c).[11]

10    However, the presence of these standardized questions does not defeat predominance.

11    Rather, the predominance analysis "focuses on 'the relationship between the common and

12    individual issues in the case,' and tests whether the proposed class is 'sufficiently cohesive to

13    warrant adjudication by representation.'"  *Abdullah v. U.S. Sec. Associates, Inc.*, 731 F.3d 952 at

14    963-64 (9th Cir. 2013) (quoting *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538 (9th Cir. 2013)).

15    "[M]ore important questions apt to drive the resolution of the litigation are given more weight in

16    the predominance analysis over individualized questions which are of considerably less

17    significance to the claims of the class."  *Torres*, 835 F.3d at 1134 (citation omitted).  And

18    predominance may be satisfied despite "*some* variation" among individual class members'

19    claims.  *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244

20    F.3d 1152, 1163 (9th Cir. 2001) (emphasis added).

21    Applied here, predominance is clearly satisfied.  Defendants have calculated the EIP

22    entitlement of nearly 160 million people based on tax returns already in Defendants' possession,

23    in a period of less than three months.  Salahi Decl., Ex. 3.  For individuals who did not or have

24    not filed a 2018 or 2019 tax return, Defendants have been receiving and reviewing claims

25    submitted by such persons through their online "nonfiler" portal.  The fact that Defendants have

26    themselves adopted and implemented a streamlined and reliable process for administering these

27

28    ---
     [11]  People who lack social security numbers—or whose co-filing spouses or other qualifying
     children lack them—are excluded from the Class.  S*ee* 26 U.S.C. § 6428(g).

1    millions of claims in a rapid fashion indicates that mechanical variations of objective

2    characteristics can easily be accommodated in a streamlined fashion.

3           In any case, these minor variations go to what is essentially a question of how much each

4    individual is entitled to, and it is well settled that similar questions related to "[t]he amount of

5    damages" do "not defeat class action treatment."  *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514

6    (9th Cir. 2013).  To the extent some individualized review might be necessary with respect to

7    these minor issues, that review can easily be accommodated by the various tools that the Court

8    has at its disposal, including the use of a formulaic aggregate data analysis and/or a special

9    master.  *See, e.g., Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1156 (9th Cir.

10   2016) ("district court has discretion to shape the proceedings" to accommodate individual issues

11   "such as the use of individual claim forms or the appointment of a special master"); *Moore v.*

12   *Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.RD. 590, 622 (C.D. Cal. 2015) (where

13   calculation of damages is complex, court has tools such as special master or aggregate analysis).

14          Finally, it is unquestionable that litigating the claims of 1.4 million incarcerated people

15   raising fundamentally the same legal question in a single proceeding is superior to the alternative

16   of forcing each person to litigate their suit independently or, more likely, to abandon their claim

17   altogether, given how difficult it is for incarcerated people to locate qualified legal counsel.  *See*

18   *Las Vegas Sands*, 244 F.3d at 1163. Certification under Rule 23(b)(3) therefore is appropriate.

19   **V.    CONCLUSION**

20          For these reasons, Plaintiffs respectfully request that the Court grant this motion.

21

22

23

24

25

26

27

28

1    Dated: August 4, 2020                    Respectfully submitted,

2

3                                        By: _/s/ Kelly M. Dermody_____
                                                Kelly M. Dermody
4
                                            Kelly M. Dermody (SBN 171716)
5                                           Yaman Salahi (SBN 288752)
                                            Jallé Dafa (SBN 290637)
6                                           LIEFF CABRASER HEIMANN
                                                & BERNSTEIN, LLP
7                                           275 Battery Street, 29th Floor
                                            San Francisco, CA 94111-3339
8                                           Telephone: 415.956.1000
                                            Facsimile: 415.956.1008
9                                           kdermody@lchb.com
                                            ysalahi@lchb.com
10                                          jdafa@lchb.com

11                                          Eva Paterson (SBN 67081)
                                            Mona Tawatao (SBN 128779)
12                                          Christina Alvernaz (SBN 329768)
                                            EQUAL JUSTICE SOCIETY
13                                          1939 Harrison St., Suite 818
                                            Oakland, CA 94612
14                                          Telephone: 415-288-8703
                                            Facsimile: 510-338-3030
15                                          epaterson@equaljusticesociety.org
                                            mtawatao@equaljusticesociety.org
16                                          calvernaz@equaljusticesociety.org

17                                          Lisa Holder (SBN 212628)
                                            EQUAL JUSTICE SOCIETY
18                                          P.O. Box 65694
                                            Los Angeles, CA 90065
19                                          Telephone: 323-683-6610
                                            lisaholder@yahoo.com
20
                                            *Attorneys for Plaintiffs and the Proposed Class*
21

22

23

24

25

26

27

28

2016842.1                              - 26 -            MOTION FOR PRELIMINARY INJUNCTION
                                                         CASE NO. 3:20-CV-5309-CRB

**<u>CERTIFICATE OF SERVICE</u>**

I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 275 Battery St., 29th Floor, San Francisco, CA 94111.  I am readily familiar with this firm's practices for collection and processing of mail with the United States Postal Service.  On August 4, 2020, I placed with this firm at the above address for deposit with the United States Postal Service, for delivery by certified mail, a true and correct copy of this document and the supporting declarations and exhibits to Defendants, postage fully paid, addressed as follows:

> Civil Process Clerk
> United States Attorney's Office
> Northern District of California
> 450 Golden Gate Avenue, 11th Floor
> San Francisco, CA 94102
>
> The Honorable Steven T. Mnuchin
> United States of America
> Secretary of the Treasury
> U.S. Department of the Treasury
> 1500 Pennsylvania Avenue, NW
> Washington, DC 20220
>
> The Honorable Charles P. Rettig, Commissioner
> Internal Revenue Service
> 1111 Constitution Avenue, NW
> Washington, DC 20224
>
> U.S. Department of the Treasury
> 1500 Pennsylvania Avenue, NW
> Washington, DC 20220
>
> U.S. Internal Revenue Service
> 1111 Constitution Avenue, NW
> Washington, DC 20224
>
> United States of America
> Department of Justice
> Civil Process Clerk
> 950 Pennsylvania Ave, NW
> Washington, DC 20530

Following ordinary business practices, the envelope was sealed and placed for collection and mailing on this date, and would, in the ordinary course of business, be deposited with the

1  United States Postal Service on this date.  Additionally, as a courtesy in light of the COVID-19

2  pandemic, a copy was sent electronically to the United States Attorney's Office of the Northern

3  District of California to Sara Winslow, Chief of the Civil Division of the United States Attorney's

4  Office in the Northern District of California, at sara.winslow@usdoj.gov.

5        I declare under penalty of perjury under the laws of the United States that the above is true

6  and correct.  Executed on August 4, 2020, at San Francisco, California.

7

8                                    */s/ Kelly M. Dermody*
                                     Kelly M. Dermody

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28