Kelly M. Dermody (SBN 171716)
Yaman Salahi (SBN 288752)
Jallé Dafa (SBN 290637)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008
kdermody@lchb.com
ysalahi@lchb.com
jdafa@lchb.com

Eva Paterson (SBN 67081)
Mona Tawatao (SBN 128779)
Christina Alvernaz (SBN 329768)
EQUAL JUSTICE SOCIETY
1939 Harrison St., Suite 818
Oakland, CA  94612
Telephone: 415-288-8703
Facsimile:  510-338-3030
epaterson@equaljusticesociety.org
mtawatao@equaljusticesociety.org
calvernaz@equaljusticesociety.org

[Additional counsel listed on signature page]

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| COLIN SCHOLL and LISA STRAWN, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>STEVEN MNUCHIN, in his official capacity as the Secretary of the U.S. Department of Treasury; CHARLES RETTIG, in his official capacity as U.S. Commissioner of Internal Revenue; U.S. DEPARTMENT OF THE TREASURY; the U.S. INTERNAL REVENUE SERVICE; and, the UNITED STATES OF AMERICA.<br><br>                    Defendants. | Case No. 3:20-cv-5309-CRB<br><br>**DECLARATION OF YAMAN SALAHI IN SUPPORT OF  PLAINTIFFS' MOTION FOR: (1) PRELIMINARY INJUNCTION; (2) CLASS CERTIFICATION; AND (3) APPOINTMENT OF CO-LEAD CLASS COUNSEL** |

I, Yaman Salahi, declare as follows:

1.      I am a partner at the law firm of Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser"), attorneys for the Plaintiffs and the proposed Class in the above-titled action.  I have personal knowledge of the facts herein and, if called upon to testify to those facts, I could and would do so competently.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of a news release published by the IRS entitled "Economic Impact Payments: What You Need to Know."  It explains how the IRS will distribute EIP checks and what taxpayers need to do to receive their EIP check.  It is available online at https://www.irs.gov/newsroom/economic-impact-payments-what-you-need-to-know (last visited August 3, 2020).

3.      Attached hereto as **Exhibit 2** is a true and correct copy of a webpage published by the IRS entitled "Economic Impact Payments."  The webpage serves as a portal for individuals who did not file taxes ("non-filers") to claim their EIP checks.  It is available online at https://www.irs.gov/coronavirus/economic-impact-payments (last visited August 3, 2020).

4.      Attached hereto as **Exhibit 3** is a true and correct copy of a press release from the Department of Treasury announcing the delivery of 159 million Economic Impact Payments.  It is available online at https://home.treasury.gov/news/press-releases/sm1025 (last visited July 29, 2020).

5.      Attached hereto as **Exhibit 4** is a true and correct copy of an excerpt from a webpage published by the IRS entitled "Economic Impact Payment Information Center."  The webpage contains a series of answers to Frequently Asked Questions.  The answer to question 15 states that someone who is incarcerated does not qualify for a Payment.  It is available online at https://www.irs.gov/coronavirus/economic-impact-payment-information-center (last visited August 3, 2020).

6.      Attached hereto as **Exhibit 5** is a true and correct copy of an update to the IRS's internal procedure manual issued on June 18, 2020 entitled "Clarified amended return filing and revised Over the Phone Interpreter procedures."  It states that "[a]n **eligible individual** is any

1    individual other than . . . an incarcerated individual."  It is available online at

2    https://www.irs.gov/pub/foia/ig/wi/wi-21-0620-0714.pdf (last visited August 3, 2020).

3          7.     Attached hereto as **Exhibit 6** is a true and correct copy of a report by the Treasury

4    Department's Inspector General for Tax Administration issued on June 30, 2020 and entitled

5    "Interim Results of the 2020 Filing Season: Effect of COVID-19 Shutdown on Tax Processing

6    and Customer Service Operations and Assessment of Efforts to Implement Legislative

7    Provisions."  It is available online at

8    https://www.treasury.gov/tigta/auditreports/2020reports/202046041fr.pdf (last visited August 3,

9    2020).

10         8.     Attached hereto as **Exhibit 7** is a true and correct copy of an article written by

11   Associated Press journalists entitled "US Inmates Got Virus Relief Checks, and IRS Wants Them

12   Back."  The article describes how the IRS is asking state officials to help claw back the EIP

13   payments send to incarcerated individuals.  It is available online at

14   https://apnews.com/0810bb67199c9cef34d4d39ada645a92 (last visited July 29, 2020).

15         9.     Attached hereto as **Exhibit 8** is a true and correct copy of an excerpt of an article

16   written by Bernadette Rabuy (Senior Policy Analyst at the Prison Policy Initiative) and Daniel

17   Kopf (Data Editor at Quartz) entitled "Prisons of Poverty: Uncovering the Pre-Incarceration

18   Incomes of the Imprisoned."  The article describes the authors' study, which analyzed a data set

19   from the Bureau of Justice Statistics regarding incomes of people pre-incarceration and found that

20   they have a median annual income of $19,185 prior to incarceration.  It is available online at

21   https://www.prisonpolicy.org/reports/income.html (last visited July 29, 2020).

22         10.    Attached hereto as **Exhibit 9** is a true and correct copy of an article written by

23   Wendy Sawyer, Research Director at the Prison Policy Initiative, entitled "How Much Do

24   Incarcerated People Earn in Each State?" that reviews policies of state correctional agencies to

25   compile a comprehensive list of wages paid to incarcerated people.  It is available online at

26   https://www.prisonpolicy.org/blog/2017/04/10/wages/ (last visited July 29, 2020).

27         11.    Attached hereto as **Exhibit 10** is a true and correct copy of an excerpt of a report

28   written by Stephen Raher, an attorney and contributor to the Prison Policy Initiative, entitled "The

Company Store: A Deeper Look at Prison Commissaries." The report analyzes commissary sales from state prisons in Illinois, Massachusetts, and Washington.  It is available online at https://www.prisonpolicy.org/reports/commissary.html (last visited August 3, 2020).

12.     Attached hereto as **Exhibit 11** is a true and correct copy of an article written by Nicole Lewis and Beatrix Lockwood, staff writers for The Marshall Project, entitled "The Hidden Costs of Incarceration."  The article details the results of surveys of nearly 200 families of incarcerated people who documented their spending for The Marshall Project.  It is available online at https://www.themarshallproject.org/2019/12/17/the-hidden-cost-of-incarceration (last visited August 3, 2020).

13.     Attached hereto as **Exhibit 12** is a true and correct copy of an excerpt of an article written by Peter Wagner, Executive Director of the Prison Policy Initiative, and Bernadette Rabuy entitled "Following the Money of Mass Incarceration."  The article reports on spending within the criminal justice system and finds that families spend $2.9 billion per year on commissary funds and telephone calls.  It is available online at https://www.prisonpolicy.org/reports/money.html (last visited August 3, 2020).

14.     Attached hereto as **Exhibit 13** is a true and correct copy of an article written by Juan Moreno Haines, a journalist currently incarcerated in San Quentin, entitled "In Overcrowded San Quentin, Coronavirus Shelter-in Place Measures Mean Decreased Quality of Life."  The article details the current state of life in prisons amidst the pandemic.  It is available online at https://theappeal.org/san-quentin-state-prison-coronavirus-shelter-in-place/ (last visited August 3, 2020).

15.     Attached hereto as **Exhibit 14** is a true and correct copy of a report by FWD.us, a bipartisan political organization committed to solving problems in the criminal justice and immigration sectors. The article is entitled "Racial Disparities in Incarceration and Coronavirus" and outlines data showing the heavy impact of incarceration and coronavirus on Blank and Latino populations.  It is available online at https://www.fwd.us/news/coronavirus-disparity (last visited August 3, 2020).

16.     Attached hereto as **Exhibit 15** is a true and correct copy of an article by Connor Maxwell (Senior Policy Analyst at Center for American Progress) and Danyelle Solomon (Vice President of Race and Ethnicity Policy at the Center for American Progress) entitled "The Economic Fallout of the Coronavirus for People of Color."  The article demonstrates how communities of color are impacted by the coronavirus.  It is available online at https://www.americanprogress.org/issues/race/news/2020/04/14/483125/economic-fallout-coronavirus-people-color/ (last visited August 3, 2020).

17.     Attached hereto as **Exhibit 16** is a true and correct copy of a news release by the Department of Labor outlining the data for weekly unemployment insurance claims for the weeks ending in July 4 and July 11.  It reports that over 31 million people claimed unemployment benefits for the week ending July 4—as compared to about 1.7 million people in the same week last year.  It is available online at https://oui.doleta.gov/press/2020/072320.pdf (last visited July 29, 2020).

18.     Attached hereto as **Exhibit 17** is a true and correct copy of an article published by The Marshall Project entitled "How Prisons in Each State Are Restricting Visits Due to Coronavirus."  The article reviews visitation policies during the pandemic in each state.  It is available online at https://www.themarshallproject.org/2020/03/17/tracking-prisons-response-to-coronavirus (last visited July 29, 2020).

19.     Attached hereto as **Exhibit 18** is a true and correct copy of an article written by Mignon Clyburn, an Opinion contributor at The Hill, entitled "Prison Phone Companies Are Profiting from a Pandemic, Here's How the FCC Can Help" that discusses how incarcerated people stay in touch with their families as visitation is suspended due to Covid-19.  It is available online at https://thehill.com/opinion/technology/493864-prison-phone-companies-are-profiting-from-a-pandemic-heres-how-the-fcc-can (last visited July 29, 2020).

20.     Attached hereto as **Exhibit 19** is a true and correct copy of an excerpt of an article written by Peter Wagner and Alexi Jones, Policy Analyst at the Prison Policy Initiative, entitled "State of Phone Justice: Local Jails, State Prisons, and Private Phone Providers" that compiles a

1    comprehensive list of telephone rates for those housed in jails and prisons. It is available online at

2    https://www.prisonpolicy.org/phones/state_of_phone_justice.html (last visited July 29, 2020).

3        21.    Attached hereto as **Exhibit 20** is a true and correct copy of an article written by

4    Ryan Shanahan and Sandra Villalobos Agudelo entitled "The Family and Recidivism."  The

5    article, published in *American Jails*, discusses how of maintaining contact with family members

6    while incarcerated can lead to success upon release. It is available online at

7    https://www.prisonpolicy.org/scans/vera/the-family-and-recidivism.pdf (last visited August 3,

8    2020).

9        22.    Attached hereto as **Exhibit 21** is a true and correct copy of a paper written by

10   Craig Haney, a psychology professor at University of California, Santa Cruz, entitled "The

11   Psychological Impact of Incarceration: Implications for Post-Prison Adjustment."  It was

12   produced for a conference funded by the U.S. Department of Health and Human Services.  It is

13   available online at http://webarchive.urban.org/UploadedPDF/410624_PyschologicalImpact.pdf

14   (last visited August 3, 2020).

15       23.    Attached hereto as **Exhibit 22** is a true and correct copy of an article published by

16   Equal Justice Initiative entitled "Covid-19's Impact on People in Prison." The article finds that

17   seven of the ten largest Covid-19 outbreaks have been at correctional facilities and that the known

18   infection rate for those housed in prisons is 2.5 times higher than the general population.  It is

19   available online at https://eji.org/news/covid-19s-impact-on-people-in-prison/ (last visited July

20   29, 2020)

21       24.    Attached hereto as **Exhibit 23** is a true and correct copy of an article published by

22   CBS News entitled "Inmates Share What Life Is Like Inside Prison During the Coronavirus

23   Pandemic." The article shares the experiences of incarcerated people during the pandemic in their

24   own words.  It is available online at https://www.cbsnews.com/news/coronavirus-pandemic-

25   prison-inmates-voices-from-inside-05-20-2020/ (last visited July 29, 2020).

26       25.    Attached hereto as **Exhibit 24** is a true and correct copy of an article written by

27   Breanna Boppre (Assistant Professor in the School of Criminal Justice at Wichita State

28   University) and Meghan Novisky (Assistant Professor of Criminology, Anthropology &

2015139.1

DECL. OF YAMAN SALAHI ISO MTN. FOR
PRELIMINARY INJUNCTION
3:20-CV-5309-CRB

Sociology at Cleveland State University), entitled "Pandemic and Prison Policies Combine To Stress Families of Nevada's Incarcerated."  The article reports the results of a nationwide survey of families of those incarcerated that asks families how COVID-19 has affected their loved ones. It is available online at https://www.nevadacurrent.com/2020/07/12/pandemic-and-prison-policies-combine-to-stress-families-of-nevadas-incarcerated/ (last visited July 29, 2020).

26.     Attached hereto as **Exhibit 25** is a true and correct copy of an article written by Joan Stephenson, JAMA Editor, and published in the Journal of the American Medical Association's "Health Forum."  It is entitled "COVID-19 Pandemic Poses Challenge for Jails and Prisons" and notes that "[i]nmates in some facilities must pay for their own soap and personal hygiene items." It is available online at https://jamanetwork.com/channels/health-forum/fullarticle/2764370 (last visited July 29, 2020).

27.     Attached hereto as **Exhibit 26** is a true and correct copy of an article written by Jimmy Jenkins, a Senior Field Correspondent at National Public Radio entitled "Prisons and Jails Change Policies To Address Coronavirus Threat Behind Bars."  It notes that "Arizona prisons force men and women to pay for their own personal hygiene supplies like soap and toothpaste." It is available online at https://www.npr.org/2020/03/23/818581064/prisons-and-jails-change-policies-to-address-coronavirus-threat-behind-bars (last visited July 29, 2020).

28.     Attached hereto as **Exhibit 27** is a true and correct copy of an excerpt of a student note written by Kate Walsh and published in the *Columbia Journal of Law and Social Problems*, entitled "Inadequate Access: Reforming Reproductive Health Care Policies for Women Incarcerated in New York State Correctional Facilities." The note finds that the vast majority of women in [New York prisons] interviewed reported that the monthly supply of sanitary napkins [the New York Department of Corrections] gives them does not meet their sanitary needs . . . in order to obtain more, women . . . need to be financially able to purchase them on their own through the commissary."  It is available online at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2778668#:~:text=reproductive%20health%20care%20for%20women,quality%20of%20reproductive%20health%20care (last visited July 29, 2020).

29.     Attached hereto as **Exhibit 28** is a true and correct copy of an excerpt of a report published by the ACLU entitled "The Unequal Price of Periods: Menstrual Equity in the United States."  It includes a graph showing the number of states with laws addressing menstrual equity issues in correctional facilities.  It is available online at

https://www.aclu.org/sites/default/files/field_document/111219-sj-periodequity.pdf (last visited July 29, 2020).

30.     Attached hereto as **Exhibit 29** is a true and correct copy of an excerpt from an article written by Kristen M. Zgoba (Professor of Criminology and Criminal Justice at Florida International University), Richard Tewksbury (Professor of Criminology and Criminal Justice at Arizona State University), and Elizabeth Mustaine (Professor of Sociology at the University of Central Florida), and published in the *Journal of Crime and Justice*, entitled "Who Gets the Biggest Bang for the Buck? A Review of Minimum Wage and Purchasing Power in Prison Commissaries Versus Superstores."  The article finds that "[i]nmates with allergies often find prison commissary food is the only available food they can eat."

31.     Attached hereto as **Exhibit 30** is a true and correct copy of an excerpt of a book written by Marie Gottschalk entitled "The Prison and the Gallows: The Politics of Mass Incarceration in America." The book reports that "some states have reduced the number of daily calories budgeted for each prisoners and have even cut back to two meals a day on weekends and holidays."

32.     Attached hereto as **Exhibit 31** is a true and correct copy of an excerpt of an article written by Michael Gibson-Light, Assistant Professor of Sociology and Criminology at the University of Denver, and published in the journal *Qualitative Social Work*, entitled "Ramen Politics: Informal Money and Logics of Resistance in the Contemporary American Prison."  The article studies incarcerated people at the Sunbelt State Penitentiary and finds that "[l]unch was removed from weekend menus and portion sizes in every meal were reportedly reduced," and that one person reported that, absent supplementary food, those inside would starve.

33.     Attached hereto as **Exhibit 32** is a true and correct copy of an excerpt of a paper written by Adam Looney (Senior Fellow at the Brookings Institution) and Nicholas Turner

(Senior Economist at the Federal Reserve Board) entitled "Work and Opportunity Before and After Incarceration."  The paper examines the labor market outcomes and economic characteristics of the incarcerated population using data from the IRS.  It is available online at https://www.brookings.edu/wp-content/uploads/2018/03/es_20180314_looneyincarceration_final.pdf (last visited July 29, 2020).

34.     Attached hereto as **Exhibit 33** is a true and correct copy of an excerpt of an article written by Nora Wikoff, Donald M. Linhorst, and Nicole Morani entitled "Recidivism Among Participants of a Reentry Program for Prisoners Released Without Supervision" and published in the journal *Social Work Research*.  The article examined whether participation in reentry programming was associated with reduced recidivism and found that cash grants, along with personalized case management, reduced recidivism

35.     Attached hereto as **Exhibit 34** is a true and correct copy of an excerpt of an article written by Aaron Gottlieb, Assistant Professor at the University of Illinois at Chicago, and published in the University of Chicago's *Social Service Review*. It is entitled "Incarceration and Relative Poverty in Cross-National Perspective: The Moderating Roles of Female Employment and the Welfare State" and researches the association between incarceration and poverty.  It is available on the National Institute of Health's website at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5663300/ (last visited July 29, 2020).

36.     Attached hereto as **Exhibit 35** is a true and correct copy of an excerpt of a report published by the Ella Baker Center for Human Rights, Forward Together, and Research Action Design entitled "Who Pays?: The True Cost of Incarceration on Families." The report is based on surveys of 712 formerly incarcerated people, 368 family members of the formerly incarcerated, 27 employers, and 34 focus groups with family members and individuals impacted by incarceration.  It is available online at https://ellabakercenter.org/sites/default/files/downloads/who-pays.pdf (last visited July 29, 2020).

37.     Attached hereto as **Exhibit 36** is a true and correct copy of an article written by Eli Hager, a staff writer at The Marshall Project, entitled "For Men in Prison, Child Support Becomes a Crushing Debt" that notes that at least one in five incarcerated people have child support

1  obligations.  It is available online https://www.themarshallproject.org/2015/10/18/for-men-in-
2  prison-child-support-becomes-a-crushing-debt (last visited July 29, 2020).

3      38.     Attached hereto as **Exhibit 37** is a true and correct copy of an excerpt of a paper
4  written by Daniel R. Meyer (Professor of Social Work at University of Wisconsin-Madison) and
5  Emily Warren for the Institute for Research on Poverty and School of Social Work at the
6  University of Wisconsin-Madison entitled "Child Support Orders and the Incarceration of
7  Noncustodial Parents." The paper cites a 2003 study that estimated one-quarter of the people in
8  federal or state prison have open child support cases. It is available online at
9  https://www.irp.wisc.edu/wp/wp-content/uploads/2018/06/Task7b-2011-12-Report.pdf (last
10  visited July 29, 2020).

11     39.     Attached hereto as **Exhibit 38** is an excerpt of a report written by Jennifer L.
12  Noyes, Distinguished Researcher and Associate Director of the University of Wisconsin-
13  Madison's Institute for Research on Poverty.  It is entitled "Review of Child Support Policies for
14  Incarcerated Payers" and cites state estimates that 22 to 28% of those inside and on parole have
15  child support obligations.

16     40.     Attached hereto as **Exhibit 39** is a true and correct copy of a statement made by
17  Senator Mitch McConnell while discussing the CARES Act that is included in the March 24,
18  2020 Congressional Record.

19     41.     Attached hereto as **Exhibit 40** is a true and correct copy of a statement made by
20  Representative Pramila Jayapal while discussing the CARES Act that is included in the March 31,
21  2020 Congressional Record.

22     42.     Attached hereto as **Exhibit 41** is a true and correct copy of a statement made by
23  Senator James Lankford while discussing the CARES Act that is included in the March 23, 2020
24  Congressional Record.

25     43.     Attached hereto as **Exhibit 42** is a true and correct copy of a statement made by
26  Senator Mike Rounds while discussing the CARES Act that is included in the March 23, 2020
27  Congressional Record.

28

44.     Attached hereto as **Exhibit 43** is a true and correct copy of a news release from the IRS that quotes the IRS Commissioner as saying that the agency is "working hard to get more payments quickly to taxpayers."  It is available online at https://www.irs.gov/newsroom/act-by-wednesday-for-chance-to-get-quicker-economic-impact-payment-timeline-for-payments-continues-to-accelerate (last visited July 29, 2020).

45.     Attached hereto as **Exhibit 44** is a true and correct copy of an excerpt of a report by statisticians Jennifer Bronson and E. Ann Carson at the Bureau of Justice Statistics entitled "Prisoners in 2017."  The report provides data regarding the number in individuals incarcerated, as well as data regarding releases.  It is available online at https://www.bjs.gov/content/pub/pdf/p17.pdf (last visited August 3, 2020).

*          *          *

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on the 4th of August, 2020, in San Francisco, California.

*/s/ Yaman Salahi*
Yaman Salahi

# EXHIBIT 1

 **IRS**

# Economic impact payments: What you need to know

*Updated with new information for seniors, retirees on April 1, 2020. Also see Treasury news release.*

## Check IRS.gov for the latest information: No action needed by most people at this time

IR-2020-61, March 30, 2020

WASHINGTON — The Treasury Department and the Internal Revenue Service today announced that distribution of economic impact payments will begin in the next three weeks and will be distributed automatically, with no action required for most people. However, some taxpayers who typically do not file returns will need to submit a simple tax return to receive the economic impact payment.

## Who is eligible for the economic impact payment?

Tax filers with adjusted gross income up to $75,000 for individuals and up to $150,000 for married couples filing joint returns will receive the full payment. For filers with income above those amounts, the payment amount is reduced by $5 for each $100 above the $75,000/$150,000 thresholds. Single filers with income exceeding $99,000 and $198,000 for joint filers with no children are not eligible. Social Security recipients and railroad retirees who are otherwise not required to file a tax return are also eligible and will not be required to file a return.

Eligible taxpayers who filed tax returns for either 2019 or 2018 will automatically receive an economic impact payment of up to $1,200 for individuals or $2,400 for married couples and up to $500 for each qualifying child.

## How will the IRS know where to send my payment?

The vast majority of people do not need to take any action. The IRS will calculate and automatically send the economic impact payment to those eligible.

For people who have already filed their 2019 tax returns, the IRS will use this information to calculate the payment amount. For those who have not yet filed their return for 2019, the IRS will use information from their 2018 tax filing to calculate the payment. The economic impact payment will be deposited directly into the same banking account reflected on the return filed.

## The IRS does not have my direct deposit information. What can I do?

In the coming weeks, Treasury plans to develop a web-based portal for individuals to provide their banking information to the IRS online, so that individuals can receive payments immediately as opposed to checks in the mail.

## I am not typically required to file a tax return. Can I still receive my payment?

Yes. The IRS will use the information on the Form SSA-1099 or Form RRB-1099 to generate Economic Impact Payments to recipients of benefits reflected in the Form SSA-1099 or Form RRB-1099 who are not required to file a tax return and did not file a return for 2018 or 2019. This includes senior citizens, Social Security recipients and railroad retirees who are not otherwise required to file a tax return.

Since the IRS would not have information regarding any dependents for these people, each person would receive $1,200 per person, without the additional amount for any dependents at this time.

## I have a tax filing obligation but have not filed my tax return for 2018 or 2019. Can I still receive an economic impact payment?

Yes. The IRS urges anyone with a tax filing obligation who has not yet filed a tax return for 2018 or 2019 to file as soon as they can to receive an economic impact payment. Taxpayers should include direct deposit banking information on the return.

## I need to file a tax return. How long are the economic impact payments available?

For those concerned about visiting a tax professional or local community organization in person to get help with a tax return, these economic impact payments will be available throughout the rest of 2020.

## Where can I get more information?

The IRS will post all key information on IRS.gov/coronavirus as soon as it becomes available.

The IRS has a reduced staff in many of its offices but remains committed to helping eligible individuals receive their payments expeditiously. Check for updated information on IRS.gov/coronavirus rather than calling IRS assistors who are helping process 2019 returns.

*Page Last Reviewed or Updated: 16-Apr-2020*

# EXHIBIT 2

Economic Impact Payments | Internal Revenue Service



# Economic Impact Payments

 **Mailed Check Payments May Be Sent As Debit Cards**

If Get My Payment says your Economic Impact Payment will be issued as a check, you may instead get a debit card in a plain envelope from "Money Network Cardholder Services." If you haven't activated your card, you'll get a follow-up letter. For more information, see Prepaid Debit Cards.

The IRS is committed to helping you get your Economic Impact Payment as soon as possible. The payments, also referred to by some as stimulus payments, are automatic for most taxpayers. No further action is needed by taxpayers who filed tax returns in 2018 and 2019 and most seniors and retirees.

## Check Your Payment Status

Use "Get My Payment" to:

- Check your payment has been sent
- Confirm your payment type: direct deposit or by mail

## Provide Direct Deposit Information

In certain situations, *Get My Payment* will give you the option of providing your bank account information to receive your Payment by direct deposit. For example, if your payment was sent by mail and the Post Office was unable to deliver it.

Use "Get My Payment" to enter your bank account information to get your payment through direct deposit.

## Non-Filers: Enter Your Payment Info Here

Use the "Non-Filers: Enter Payment Info Here" application if you are eligible for an Economic Impact Payment and:

- You **are not required to file** federal income tax returns for 2018 and 2019 for any reason including:
  - Your income is less than $12,200
  - You're married filing jointly and together your income is less than $24,400
  - You have no income

**Do not** use this tool if you are required to file a 2018 or 2019 tax return; you should file your return electronically.

**Do not** use this tool if you can be claimed as a dependent on someone else's return.

**Get My Payment**

**Non-Filers: Enter Payment Info Here**

# Get more information about Economic Impact Payments

Visit our Economic Impact Payments Information Center to answer your questions about eligibility, payment amounts, what to expect, when to expect it and more.

IRS Partners can visit our Economic Impact Payments: Partner and Promotional Materials page for our latest products to share with clients, stakeholders, customers and constituents.

Also, visit the FDIC website for information on where to find a bank that can open an account online and how to choose the right account for you.

*Page Last Reviewed or Updated: 15-Jul-2020*

# EXHIBIT 3

# U.S. DEPARTMENT OF THE TREASURY

## Treasury, IRS Announce Delivery of 159 Million Economic Impact Payments

June 3, 2020

**WASHINGTON**—The U.S. Department of the Treasury and IRS announced today that 159 million Economic Impact Payments, worth more than $267 billion, have been distributed to Americans in two months. Payments have been sent to all eligible Americans for whom the IRS has the necessary information to make a payment. These totals do not include the more than $2.5 billion that have been delivered to U.S. territories for payment to territory residents.

"The Trump Administration has delivered 159 million Economic Impact Payments worth more than $267 billion to Americans in record time," said Secretary Steven T. Mnuchin. "These payments are an integral part of our commitment to providing much-needed relief to the American people during this unprecedented time."

The last time a similar effort was undertaken, it took over two months to make 800,000 payments. Of the Economic Impact Payments, 120 million were sent to Americans by direct deposit, 35 million by check and 4 million payments were made in the form of a pre-paid debit card. For EIP figures, click here 📄.

Even with these unprecedented efforts, there are eligible Americans who still did not yet receive their payments, and need to take action.

**Individuals who do not normally file taxes and have not received my Economic Impact Payment.**

Individuals who do not normally file taxes and have not yet received their Economic Impact Payment should use the Non-Filers Tool. Americans who did not file a tax return in 2018 or 2019 can submit basic personal information to the IRS so that they can receive payments. This tool will remain available until October 15 and anyone who registers by October 15 will receive their payment by the end of the year. The Non-Filers Tool can be found here.

**Individuals who do file taxes, and believe they are eligible for an Economic Impact Payment, but haven't received one.**

Individuals who do file taxes, and believe they are eligible for an Economic Impact Payment, but haven't received one will be able to claim their payment when they file their 2020 tax return.

If you need the payment sooner, you may call the IRS Economic Impact Payment line at 800-919-9835. Call volumes are high, so call times may be longer than anticipated.

**Individuals who think their Economic Impact Payment was incorrect.**

Payment amounts vary based on income, filing status and family size. If you filed a 2019 tax return, the IRS used information from it about you, your spouse, your income, filing status and qualifying children to calculate the amount and issue your Payment. If you haven't filed your 2019 return or it has not been processed yet, the IRS used the information from your 2018 return to calculate the amount and issue your Payment.

If you did not receive the full amount to which you are entitled, you will be able to claim the additional amount when you file your 2020 tax return.

**Individuals who have dependents and did not receive the $500 per dependent**

If you did not receive the full amount for a dependent to which you believe you are entitled, you will be able to claim the additional amount when you file your 2020 tax return.

For more Information on the Economic Impact Payment, including answers to frequently asked questions and other resources, visit IRS.gov/coronavirus.

####

# EXHIBIT 4



# Economic Impact Payment Information Center

---

 **Mailed Check Payments May Be Sent As Debit Cards**

If Get My Payment says your Economic Impact Payment will be issued as a check, you may instead get a debit card in a plain envelope from "Money Network Cardholder Services." If you haven't activated your card, you'll get a follow-up letter.

For more information, see Prepaid Debit Cards.

---

For additional questions regarding the Get My Payment application check out our Get My Payment FAQs.

Millions of Americans have already received their Economic Impact Payments (Payments) authorized by the Coronavirus Aid, Relief, and Economic Security Act (CARES Act). The Internal Revenue Service (IRS) continues to calculate and automatically send the Payments to most eligible individuals, however some may have to provide additional information to the IRS to get their Payments. Below are answers to frequently asked questions related to these Payments. These questions and answers will be updated periodically. Please DO NOT call the IRS.

- EIP Eligibility and General Information
- Requesting My Economic Impact Payment
- Calculating My Economic Impact Payment
- Receiving My Payment
- Prepaid Debit Cards
- Payment Issued but Lost, Stolen, Destroyed or Not Received
- Non-Filer Tool
- Social Security, Railroad Retirement and Department of Veteran Affairs benefit recipients
- Returning the Economic Impact Payment
- Reconciling on your 2020 tax return

## EIP Eligibility and General Information

> ❯ **Q1. Who is eligible? (updated June 5, 2020)**

> **Q2. Who is not eligible? (updated June 5, 2020)**

> **Q3. How much is it worth? (updated May 29, 2020)**

> **Q4. Do I need to take action?**

> **Q5. Will I receive notification from the IRS about my Payment?**

> **Q6.** How do I avoid scams related to Economic Impact Payments or COVID-19?

> **Q7. Should I use Get My Payment or Non-Filers: Enter Payment Info Here?**

> **Q8. As a U.S. citizen living abroad, am I entitled to a Payment?**

> **Q9. If I live in Puerto Rico, the U.S. Virgin Islands, American Samoa, Guam, or the Commonwealth of the Northern Mariana Islands, will I get a Payment if I'm eligible?**

> **Q10. I am a citizen or resident of one of the Freely Associated States (Federated States of Micronesia, the Republic of the Marshall Islands, and the Republic of Palau). Can I be eligible to receive a Payment? (added June 8, 2020)**

> **Q11. What does it mean if I received a Payment from both the IRS and a U.S. territory tax agency? (added June 8, 2020)**

> **Q12. Does someone who has died qualify for the Payment? (updated July 10, 2020)**

> **Q13. Why did the IRS send Economic Impact Payments (EIPs) to deceased individuals? What happens to uncashed Economic Impact Payment checks issued to ineligible recipients? (updated July 10, 2020)**

> **Q14. Does someone who is a resident alien qualify for the Payment? (added May 6, 2020)**

> **Q15. Does someone who is incarcerated qualify for the Payment? (added May 6, 2020)**

A15. No. A Payment made to someone who is incarcerated should be returned to the IRS by following the instructions about repayments. A person is incarcerated if he or she is described in one or more of clauses (i) through (v) of Section 202(x)(1)(A) of the Social Security Act (42 U.S.C. § 402(x)(1)(A)(i) through (v)). For a Payment made with respect to a joint return where only one spouse is incarcerated, you only need to return the portion of the Payment made on account of the incarcerated spouse. This amount will be $1,200 unless adjusted gross income exceeded $150,000.

# Requesting My Economic Impact Payment

> **Q16. I recently filed a tax return. What do I need to do to get a Payment?**

> **Q17. I haven't filed a tax return for 2018 or 2019 and don't need to file tax returns for those years. I receive Social Security, SSI, Railroad Retirement, or Department of Veterans Affairs (VA) benefits. What do I need to do to get a Payment? (updated April 24, 2020)**

> **Q18.  I haven't filed a federal tax return for 2018 or 2019 because I'm not required to file.  I  don't receive Social Security retirement or any other federal benefits. What do I need to do to get a Payment? (Updated June 10, 2020)**

> **Q19. I did not file a tax return for 2018 or 2019. How do I know if I am required to file a tax return?**

> Q20. I haven't filed my 2019 tax return but filed my 2018 return and already received an Economic Impact Payment. Will filing a 2019 return affect my Economic Impact Payment? (added June 10, 2020)

> **Q21. I need to file a tax return but am concerned about visiting a tax professional or local community organization in person right now to get help with my tax return. How long is the Payment available?**

> **Q22. Will the IRS contact me about my Payment? (updated May 8, 2020)**

# Calculating My Economic Impact Payment

> **Q23. What is the amount of the Payment I will receive? Who is a qualifying child? (updated May 8, 2020)**

> **Q24. How do I calculate my Economic Impact Payment? (added April 27, 2020)**

# EXHIBIT 5

## IRM PROCEDURAL UPDATE

**DATE: 06/18/2020**

**NUMBER: wi-21-0620-0714**

**SUBJECT: Economic Impact Payment**

**AFFECTED IRM(s)/SUBSECTION(s): 21.6.3.4.2.13**

**CHANGE(s):**

**IRM 21.6.3.4.2.13 - Clarified amended return filing and revised Over the Phone Interpreter procedures.**

1. The Coronavirus Aid, Relief, and Economic Security Act (CARES Act), created IRC § 6428, which provides for a recovery rebate credit for eligible individuals. The credit amount is equal to the sum of $1,200 ($2,400 for married filing jointly), plus an additional $500 for each qualifying child. The credit is subject to limitations.

2. The CARES Act allows for advance payment of the recovery rebate credit (referred to as Economic Impact Payments (EIP)). Taxpayers will report the recovery rebate credit on their tax year 2020 return and reduce the credit by the Economic Impact Payment. Any remaining credit will be allowed on the tax year 2020 return. If the taxpayer received more Economic Impact Payment than they were entitled to, no repayment will be required.

   **EXCEPTION:** For those taxpayers who received the Economic Impact Payment but were not eligible, advise the taxpayer return or repay the payment.

3. Economic Impact Payments began April 10, 2020. The payment is based on:
   a. A posted tax year 2019 return (2018 return if 2019 was not filed) as filed, or as allowed by the Error Resolution System (ERS). The payment takes into consideration updated AGI (as adjusted), but not updated filing status or child tax credit data.

      **EXAMPLE:** ERS removed a child at filing, thus reducing the number of dependents who qualify for the Child Tax Credit (CTC). The taxpayer called the Service to correct the error and CTC was allowed. The Economic Impact Payment will not take the correction of the error into consideration.

   b. Form SSA-1099 or Form RRB-1099 data on file for tax year 2019 (for taxpayers who do not have to file a 2019 or 2018 return). The Service allowed a $1,200 payment if eligibility was met. Payments are made

as if the taxpayer currently receives those benefits, either as direct deposit or paper check.

c. Individuals receiving Supplemental Security Income (SSI) and income from the Veterans Administration (VA). This group includes veterans, surviving spouses, surviving parents, and surviving children. The Service allowed a $1,200 payment if eligibility was met. Payments are made as if the taxpayer currently receives those benefits, either as direct deposit or paper check.

The refund is issued from the tax year 2020 module (tax year 202101 - 202111 for fiscal year filers) and can only offset to child support. No Economic Impact Payments are allowed after Dec. 31, 2020, and no credit interest is allowed. See IRM 21.6.3.4.2.13.1, *Economic Impact Payments - Account Information*, for the transaction codes used to identify the payment.

4. An **eligible individual** is any individual other than:
   o a non-resident alien
   o a deceased individual
   o an incarcerated individual
   o an individual who can be claimed as a dependent on another tax return
   o a filer of Form 1040-NR, 1040-PR, or 1040SS
   o an estate or trust

   **NOTE:** For joint returns, if one spouse meets eligibility requirements, as shown in the first two bullets, and the other does not, the eligible spouse is legally entitled to $1,200. However, programming does not determine which spouse qualifies, so no payment is issued. Either, or both of the spouses, if eligible, can claim the recovery rebate credit on the 2020 return.

   **REMINDER:** Taxpayers who received less payment than entitled to in 2020 can claim the difference, as the recovery rebate credit, on their 2020 tax return.

5. Taxpayers must have a valid SSN assigned before July 15, 2020, or October 15, 2020, if an extension was filed. If a joint return is filed and only one spouse has a valid SSN, **no** Economic Impact Payment will be issued.

   **EXCEPTION:** For joint filers, if either spouse is a member of the Armed Forces at any time during the taxable year, then only one spouse needs to have a valid SSN. Members of the Armed Forces can be identified with a TC 971 AC 162 in the entity (Command Code ENMOD or IMFOLE).

6. **Qualifying children** are those that qualify for the child tax credit, as shown in IRM 21.6.3.4.1.24.1, *CTC - Qualifications*. However, for Economic Impact Payments, an ATIN is allowed and can be issued at any time.

7. **Limitation** - the Economic Impact Payment is reduced by 5 percent of the taxpayer's AGI exceeding:

- o $150,000 for joint filers (filing status 2)
- o $112,500 for head of household filers (filing status 4) or head of household filers who don't claim a dependent (filing status 7)
- o $75,000 for other filers (other than filing status 2, 4, or 7)

**EXAMPLE:** A single taxpayer with no qualifying children, AGI is $90,000.
$90,000 minus the $75,000 limitation = $15,000.
$15,000 x 5 percent = $750.
The taxpayer's payment is $450 ($1,200 reduced by $750).

**EXAMPLE:** Married filing jointly return with two qualifying children, AGI of $160,000.
$160,000 minus the $150,000 limitation = $10,000.
$10,000 x 5 percent = $500.
The taxpayer's payment is $2,900 ($2,400 for the base amount plus $500 for each child, reduced by $500).

**EXAMPLE:** A head of household taxpayer with two qualifying children, AGI is $155,000.
$155,000 minus the $112,500 limitation = $42,500.
$42,500 x 5 percent = $2,125.
The taxpayer's payment is $75 ($1,200 for the base amount, plus $500 for each child, reduced by $2,125).

8. Individuals who don't normally file a return can use the Non-Filers Tool on irs.gov to register for an Economic Impact Payment. The taxpayer will enter basic information, such as SSN, name, address, and number of dependents, which creates a basic 2019 Form 1040 filing. The Service will use this information to determine eligibility and calculate the payment.

   **NOTE:** Returns filed using the "Non-Filers Tool" can be identified with $1 of taxable interest income, $1 total income, and $1 AGI.

   If a taxpayer used the tool in error and needs to file a 2019 return, advise them to file a paper Form 1040 with "Amended EIP Return" notated at the top center of the return.
   Taxpayers who have been issued an Identity Protection Personal Identification Number (IP PIN) must enter their IP PIN on the tool. If the taxpayer lost or never received their IP PIN, they should use the Get an IP PIN tool on irs.gov to retrieve it.

9. Before disclosing any account information, refer to IRM 21.1.3.2.3, *Required Taxpayer Authentication*.

10. If you receive an Economic Impact Payment related call from a limited English proficient taxpayer, you may need to transfer the customer to the Over the Phone Interpreter (OPI) Economic Impact Payment application (App 123). Customers who do not speak English or Spanish may require an interpreter to assist with the call.

- o If you are not staffing Application 123, the taxpayer does not speak English or Spanish, and requires an interpreter, transfer the call to 1123.
- o If you have an OPI PIN and are staffing the OPI application, follow procedures in IRM 21.8.1.2.3.2, *Over the Phone Interpreter Service (OPI) For International Non- Toll Free calls*. Address all Economic Impact Payment inquiries, even if it is determined that account research or connecting with an interpreter is not necessary.

11. A new phone number was created for Economic Impact Payments. Taxpayers can call 800-919-9835, between the hours of 7:00 AM and 7:00 PM local time, with questions related to the payment. Taxpayers may also refer to www.irs.gov/coronavirus tax relief and economic impact payments for additional information. Employees may also refer to COVID-19 for additional information and updates.

# EXHIBIT 6

# TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION



# Interim Results of the 2020 Filing Season: Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions

June 30, 2020

Reference Number:  2020-46-041

TIGTACommunications@tigta.treas.gov   |   www.treasury.gov/tigta   |   202-622-6500

This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.

**Redaction Legend:**
2 = Law Enforcement Techniques/Procedures and Guidelines for Law Enforcement Investigations or Prosecutions

To report fraud, waste, or abuse, please call us at 1-800-366-4484

**HIGHLIGHTS:  Interim Results of the 2020 Filing Season:
Effect of COVID-19 Shutdown on Tax Processing and Customer Service
Operations and Assessment of Efforts to Implement Legislative
Provisions**

**Final Audit Report issued on June 30, 2020
Reference Number 2020-46-041**



## Why TIGTA Did This Audit

This audit was initiated to provide selected information related to the impact of the Coronavirus Disease 2019 (COVID-19) on the 2020 Filing Season.  The overall objective of this review was to evaluate whether the IRS timely and accurately processed individual paper and electronically filed tax returns during the 2020 Filing Season.  TIGTA plans to issue the final results of our analysis later in Calendar Year 2020.

## Impact on Taxpayers

The 2020 Filing Season is unlike any other because the IRS had to take unprecedented and drastic actions to address COVID-19 to protect the health and safety of its employees and the taxpaying public.  These actions included closing Taxpayer Assistance Centers, Tax Processing Centers, and offices nationwide.  In addition, on March 20, 2020, the Department of the Treasury extended the Federal income tax filing due date from April 15, 2020, to July 15, 2020.

## What TIGTA Found

Significant coordination and efforts were taken by the IRS to expedite its analysis and reprogramming of systems and to educate individuals on the Economic Impact Payment (EIP).  The IRS began issuing EIPs on April 10, 2020, just 14 days after the passage of the CARES Act.  As a result of these efforts, the IRS has issued more than 157 million payments totaling more than $264 billion as of May 21, 2020.

TIGTA found that the IRS correctly computed the payment amount for approximately 98 percent of the more than 157 million payments issued as of May 21, 2020; however, some payments were erroneous.  The IRS issued 1.2 million payments (less than 1 percent) to prisoners and deceased individuals as of this same period.

The IRS initiated an education campaign to promote the availability of advanced tax credits for employers.  To enable employers to request an advance, the IRS developed Form 7200, *Advance Payment of Employer Credits Due to COVID-19*, and developed a process to enable employers to submit these requests via a dedicated E-fax line.  In addition, the IRS is coordinating with the Small Business Administration ******************************2********************************** *****************************************2********************************** ****************2***************.  As of May 30, 2020, the IRS received 7,789 Forms 7200, and processed 2,410 Forms 7200, with refunds totaling more than $50 million.

In response to the public health emergency, the IRS closed its four Tax Processing Centers.  The majority of work at these Tax Processing Centers is performed onsite and is not conducive to telework.  As of May 20, 2020, the IRS estimates that 10.4 million pieces of mail were received during the closure.  As of the week ending May 23, 2020, the IRS estimates that 10 million paper individual tax returns and 6.6 million paper business tax returns need to be processed.  In addition to unopened mail, the IRS had more than 1.7 million tax returns in its Error Resolution inventory as of this same period.  The IRS had 2.5 million cases in its Accounts Management inventory as of March 14, 2020, and has nearly 1.6 million returns in its fraud program inventories as of the week ending May 23, 2020.

When the IRS closed its offices nationwide, it ceased operations on its toll-free telephone lines and closed its Taxpayer Assistance Centers.  As of May 20, 2020, 48 of the 105 toll-free lines remained closed, and all of the Taxpayer Assistance Centers remain closed.  In addition, 10,792 (98 percent) of the 11,014 Volunteer Income Tax Assistance/Tax Counseling for the Elderly partner sites remain closed as of May 24, 2020.

## What TIGTA Recommended

This report was prepared to provide interim information only.  Therefore, no recommendations were made in this report.



**TREASURY INSPECTOR GENERAL
FOR TAX ADMINISTRATION**

# U.S. DEPARTMENT OF THE TREASURY

## WASHINGTON, D.C.  20220

June 30, 2020

**MEMORANDUM FOR:**   COMMISSIONER OF INTERNAL REVENUE

**FROM:**   Michael E. McKenney
Deputy Inspector General for Audit

**SUBJECT:**   Final Audit Report – Interim Results of the 2020 Filing Season:
Effect of COVID-19 Shutdown on Tax Processing and Customer Service
Operations and Assessment of Efforts to Implement Legislative
Provisions (Audit # 202040631)

This report presents the results of our review to evaluate whether the Internal Revenue Service
(IRS) timely and accurately processed individual paper and electronically filed tax returns during
the 2020 Filing Season.  This review is part of our Fiscal Year 2020 discretionary audit work and
addresses the major management and performance challenge of *Implementing Tax Law
Changes*.  As part of our Fiscal Year 2020 audit work, we are conducting several ongoing audits
that are related to specific issues in this report.  We will continue to provide IRS management
with information on any areas of immediate concern throughout our audit process.

This report was prepared to provide information only.  Therefore, we made no
recommendations in the report.  However, we provided IRS management officials with an
advance copy of this report for review and comment prior to issuance.

Copies of this report are also being sent to the IRS managers affected by the report information.
If you have any questions, please contact me or Russell P. Martin, Assistant Inspector General for
Audit (Returns Processing and Account Services).



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

# Table of Contents

**Background** ...............................................................................................Page  1

**Results of Review** .....................................................................................Page  3

    Economic Impact Payments ...........................................................Page  3

    Advance Tax Credits for Employers...............................................Page 11

    Tax Processing Center Closures Have Resulted in
    Significant Backlogs.........................................................................Page 12

    Closures Are Affecting Efforts to Provide Quality
    Customer Service .............................................................................Page 15

    More Than a Million Tax Returns Identified and Held As
    Potentially Fraudulent or With Erroneous Refundable
    Credit Claims Remain to Be Worked ...............................................Page 18

**Appendices**

    Appendix I – Detailed Objective, Scope, and Methodology...............Page 20

    Appendix II – High-Level Process Flow of IRS Documents ................Page 22

    Appendix III – Glossary of Terms......................................................Page 23

    Appendix IV – Abbreviations.............................................................Page.25



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

# Background

Due to Coronavirus Disease 2019 (COVID-19), the 2020 Filing Season[1] has been unlike any other.  The Internal Revenue Service (IRS) has taken unprecedented and drastic actions to protect the health and safety of its employees and the taxpaying public.  These actions have included closing Taxpayer Assistance Centers (TAC), Tax Processing Centers, and other offices nationwide.  Specifically, employees were directed to evacuate their work sites, and those who were approved to telework started working from home (or an alternate location).  Employees who were not yet approved but were able to telework had to complete training, sign agreements, and obtain the necessary equipment to enable teleworking.  The remaining employees were put on weather and safety leave.



The IRS's People First Initiative suspends or adjusts key compliance programs until July 15, 2020.

Along with protecting the safety of its workers, actions were also taken to assist taxpayers facing the challenges of COVID-19.  For example, on March 25, 2020, the IRS unveiled a new *People First Initiative*, which included a sweeping series of steps to assist taxpayers by providing relief on a variety of issues ranging from adjusting or suspending key IRS compliance programs to easing payment guidelines.  The IRS also postponed compliance actions by suspending liens and levies, suspending passport certifications of seriously delinquent taxpayers, not referring new delinquent accounts to Private Debt Collection, and delaying new field, office, or correspondence examinations.[2]  This relief is through July 15, 2020.

Furthermore, on March 20, 2020, the Department of the Treasury extended the Federal income tax filing due date from April 15, 2020, to July 15, 2020.  Taxpayers were also permitted to defer Federal income tax payments due on April 15, 2020, to July 15, 2020, without penalties and interest.  Finally, legislation was enacted to help businesses and individuals respond to the pandemic:

- *Families First Cornavirus Response Act*,[3] signed into law on March 18, 2020, provides businesses with tax credits to cover certain costs of providing employees with paid sick leave and expanded family and medical leave for reasons related to COVID-19, from April 1, 2020, through December 31, 2020.  Eligible employers can claim these credits on their Federal employment tax returns (*e.g.*, Form 941, *Employer's Quarterly Federal Tax Return*) or an employer can benefit more quickly by reducing their Federal employment tax deposits.  For those employers where there are insufficient Federal employment taxes to cover the amount of the employer's credit, the employer may request an advance payment of the credits from the IRS by submitting Form 7200, *Advance Payment of Employer Credits Due to COVID-19*.

- *Coronavirus Aid, Relief, and Economic Security (CARES) Act*,[4] signed into law on March 27, 2020, is the largest economic rescue package in U.S. history and included a

---

[1] See Appendix III for a glossary of terms.
[2] The IRS stated that it may start new examinations where deemed necessary to protect the Government's interest in preserving the applicable statute of limitations.
[3] Pub. L. No. 116-127.
[4] Pub. L. No. 116-136, 134 Stat. 281.



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

number of provisions that have a significant impact on the IRS and Federal tax administration.  Specifically, the CARES Act contains numerous tax-related provisions affecting individuals and businesses and appropriates more than $750 million in additional funding to the IRS to administer and oversee these provisions.  Figure 1 provides highlights of CARES Act provisions.

### Figure 1:  Highlights of CARES Act Provisions



*Source: TIGTA Analysis of CARES Act.*

As a result of the closure actions taken on the part of the IRS as well as the enactment of extensive legislation, the IRS will be faced with a number of significant challenges in regards to the COVID-19 pandemic.  For example:

- **Providing Tax Relief to Offset Economic Hardship.**  The IRS must implement many tax provisions intended to provide relief to those experiencing financial hardship.  As the IRS implements the individual and business tax relief provisions, it will face challenges to ensure that only eligible taxpayers are receiving financial relief and that the amount of relief is correct.  The IRS will also need to recover improper payments made to ineligible taxpayers.

- **Continuity of Operations.**  The IRS has not been able to perform many of its essential functions as a result of the pandemic.  The IRS closed most of its offices and Tax Processing Centers and extended the deadline for filing tax returns in response to the pandemic.  In addition, before the full impact of COVID-19 was felt, taxpayers were already experiencing lower levels of taxpayer service.  As the IRS slowly reopens and begins to address significant backlogs in paper return filings, payments, correspondence, error resolution, and fraud detection cases, it must continually assess the personal safety of its workers.  This may necessitate the IRS to continue offering telework flexibilities, place limits on the number of staff allowed in offices, and increase the procurement of personal protective equipment.  Trying to balance restarting operations with employee safety will challenge the IRS to provide quality customer service, deliver the filing season, and enforce compliance with tax laws.

TIGTA has ongoing and planned oversight activities to help ensure that eligible taxpayers are receiving timely relief from financial hardship caused by the COVID-19 pandemic and that the



IRS quickly identifies control weaknesses to prevent Federal Government funds from being wasted.

# Results of Review

This report presents the interim results of our assessment of the IRS's 2020 Filing Season and provides preliminary results of our review of the IRS's issuance of Economic Impact Payments (EIP), efforts to implement individual and business tax provisions included in relief legislation, and on its ability to process tax returns and provide quality customer service.  We plan to report on the final results of our assessment early next fiscal year.

For the purpose of this report, the EIP figures presented reflect payments issued as of the time frame noted.  These figures do not reflect direct deposit payments that may have been rejected and not converted to a paper check, paper checks returned as undelivered, or payments that were voluntariliy returned by recipients.  Our continued assessment will include a reconciliation of the EIPs issued and we will provide periodic reporting of these results.  However, the actual time frame to complete this reconciliation is contingent on the IRS's processing of unopened mail, which includes undelivered and returned payments.  As we note later in this report, the IRS has a significant backlog of unopened mail that needs to be processed.

## Economic Impact Payments

Significant coordination and efforts were taken by the IRS to expedite its analysis and reprogramming of systems and to educate individuals on the EIP.  Impressively, the IRS began issuing EIPs on April 10, 2020, just 14 days after the passage of the CARES Act, which was enacted at the same time the IRS was closing its facilities in response to COVID-19.  Efforts included:

- *Establishing a dedicated webpage on IRS.gov (www.IRS.gov/coronavirus/ economic-impact-payments) to provide updated information related to the issuance of the EIP, including a continually evolving list of Frequently Asked Questions* – In addition, the IRS developed an online tool "Get My Payment" that provides taxpayers with the ability to check the status of their EIP payment and submit bank information for taxpayer accounts that are missing that information.  To assist taxpayers who are eligible to receive an EIP but do not have a Federal tax return filing requirement, the IRS partnered with the Free File Alliance to develop the *Non-Filers: Enter Payment Info Here* tool.  This tool enables these individuals to quickly file a short tax return that contains the information the IRS needs to issue their EIP for free.

- *Coordinating with other Federal agencies to obtain program data that could be used to automatically send an EIP to individuals who receive benefits from these agencies and do not regularly interact with the IRS* – For example, the IRS worked with the Bureau of the Fiscal Service (BFS),[5] the Social Security Administration, and the Department of Veterans Affairs to identify beneficiary recipients along with their direct deposit account numbers, if available, for use in systemically issuing the EIP without the beneficiary having to file a short-form tax return.

---

[5] Agency of the U.S. Department of the Treasury that issues payments on behalf of the IRS.



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

- *Completing extensive computer programming and testing necessary to issue the EIPs* – Despite office closures and employees needing to work remotely, the IRS was able to complete the extensive programming and testing necessary to begin issuing EIPs. This included developing computer programming requirements to identify eligible individuals, compute their EIP amount, as well as modify the Master File to capture information related to the issuance of the EIP in each individual's tax account, including information provided through the "Get My Payment" tool.

As a result of its efforts, the IRS issued more than 81.4 million payments totaling more than $147.6 billion on April 10, 2020.  As of May 21, 2020, the IRS issued more than 157 million payments totaling more than $264 billion.  As required by the CARES Act, the IRS also established processes to issue a notice to each EIP recipient providing the amount of the payment and the method used to send the payment (*e.g.*, direct deposit, paper check, or prepaid debit card).

> **98 percent of EIPs issued as of May 21, 2020, were computed correctly.**

Similar to our assessment of prior IRS efforts to implement stimulus payment legislation, we developed an approach to provide results to the IRS quickly to allow the IRS to make timely programming corrections. Specifically, we used the payment criteria included in the CARES Act to develop a systemic program that enabled us to independently compute an EIP amount for all eligible taxpayers.  We then used these data to compare our amount of EIP to what the IRS payment file reflected for each individual.  Our review of the more than 157 million EIPs issued as of May 21, 2020, found that the IRS correctly computed the EIP amount for 98 percent (154 million) of these payments.  We are continuing to work with the IRS to determine whether the remaining 3.1 million payments (2 percent) were computed correctly and will monitor the IRS's efforts to address payments that are incorrect.  Figure 2 shows the percentage of EIPs issued as of May 21, 2020, that were computed correctly.

**Figure 2:  Accuracy of the Economic Impact Payment Amount as of May 21, 2020**



Source:  TIGTA analysis of EIPs issued as of May 21, 2020.

## EIP payments were issued to prisoners and deceased individuals

As part of our initial assessment of the 81.4 million payments issued on April 10, 2020, we identified payments that were sent to individuals who were prisoners or deceased.  We notified IRS management of our concerns with the issuance of payments to prisoners on April 14, 2020,



and to deceased individuals on April 15, 2020, in an e-mail alert.  In response, IRS management noted that payments to these populations of individuals were allowed because the CARES Act does not prohibit them from receiving a payment.  However, the IRS subsequently changed its position, noting that individuals who are prisoners or deceased are not entitled to an EIP.  As an interim measure, the IRS provided the BFS with a file that contained the Taxpayer Identification Numbers of prisoners and deceased individuals and requested that the BFS remove these individuals from payment files.  This approach was applied to the May 1, 2020, and May 8, 2020, payment files.

Subsequent to these payments being processed, we were alerted that the BFS may have incorrectly marked payments as having a child support offset when in fact the payment was held because the individual was a prisoner or deceased.  We notified IRS management of our concerns and provided the IRS with the results of our analysis that identified deceased individuals who do not have a pattern of having prior child support offsets, but the BFS marked the EIP as being offset.  Our analysis identified 185,380 deceased individuals with offsets totaling over $257 million with these characteristics.

IRS management informed us that the BFS used a pseudo offset to identify EIPs that the BFS stopped because the individual is a prisoner or deceased.  Although the payment is marked as being offset, the BFS provided additional information that the IRS can use to identify that the payment was stopped because the individual was a prisoner or deceased.

We are concerned that marking these payments as having the EIP offset can result in taxpayer confusion.  In addition, the spouse of a prisoner or deceased individual is entitled to their portion of the EIP, but the BFS incorrectly stopped the entire payment.  The BFS provided the IRS with the Taxpayer Identification Numbers of the prisoners and deceased individuals where the BFS stopped the EIP.  IRS management informed us that they are working to correct these accounts and issue the EIPs to the affected spouse where appropriate.  We will continue to monitor the IRS's efforts to ensure that these individuals' tax accounts are corrected to show no offset occurred and the spouse's portion of the payment is reissued if appropriate.

Additionally, IRS management informed us that on May 13, 2020, programming was implemented to discontinue calculating and sending EIPs to prisoners and deceased individuals.  The IRS also issued new guidance on May 6, 2020, and added the alerts below as part of the EIP Frequently Asked Questions on its website:

- **Does someone who has died qualify for the Payment?**  No.  A Payment made to someone who died before receipt of the payment should be returned to the IRS.  Return the entire Payment unless the payment was made to joint filers and one spouse had not died before receipt of the payment, in which case, you only need to return the portion of the payment made to the decedent.

- **Does someone who is incarcerated qualify for the Payment?**  No.  A payment made to someone who is incarcerated should be returned to the IRS.  For a payment made with respect to a joint return where only one spouse is incarcerated, you only need to return the portion of the payment made on account of the incarcerated spouse.

Figure 3 shows the number and amount of payments issued to prisoners and deceased individuals as of May 21, 2020.



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

### Figure 3:  Economic Impact Payments Issued as of May 21, 2020

|  | Payments | Dollars |
|---|---|---|
| Prisoners | 84,861 | $0.1 billion |
| Deceased | 1,151,353 | $1.6 billion |
| Total Payments Issued | 1,236,214 | $1.7 billion |

Source:  TIGTA analysis of EIPs issued as of May 21, 2020.

In response to another e-mail alert we sent the IRS on May 1, 2020, the IRS included steps that should be taken to return these payments as part of its Frequently Asked Questions.  Individuals who received a direct deposit payment in error that was not returned to the IRS by the bank were instructed to submit a personal check or money order for the payment amount, notate the check as an EIP along with their Taxpayer Identification Number, and mail the check with a short note to the IRS at a specified address based on where the individual lives.  Individuals who received a paper EIP check in error were instructed to return the voided check with a short note to the IRS at the address provided based on where the individual lives.

In our discussions with IRS management regarding the actions being taken to recover these payments, IRS management informed us that, at this time, they are relying on individuals to voluntarily return these payments.  We will continue to evaluate the IRS's issuance of potentially erroneous EIPs and its efforts to recover these payments once identified.

## EIP payments issued to nonresidents

On May 1, 2020, we sent an alert to the IRS detailing our identification of EIPs issued to individuals who are likely not U.S. residents.  We conducted our analysis based on reports by news media that individuals who were not U.S. residents were receiving EIPs.  Our analysis of payments issued as of May 21, 2020, identified 309,601 payments totaling more than $423 million that were issued to individuals whose Social Security Number indicates they are a legal alien authorized to work in the United States.  However, these individuals had no Federal Insurance Contributions Act tax withheld from their wages in Calendar Years 2018 or 2019.[6]  Of the 309,601 payments, 27,808 payments totaling $34 million were calculated by the IRS using a tax return with a foreign address.  In response to our alert, the IRS added the following Frequently Asked Question to its website:

- **Does someone who is a resident alien qualify for the Payment?**  A person who is a nonresident alien in 2020 is not eligible for the Payment.  A person who is a qualifying resident alien with a valid Social Security Number is eligible for the Payment only if he or she is a qualifying resident alien in 2020 and could not be claimed as a dependent of another taxpayer for 2020.  Aliens who received a payment but are not qualifying resident aliens for 2020 should return the payment to the IRS.

Finally, in response to our question about actions taken to ensure that EIPs are sent only to U.S. residents, IRS management indicated that only taxpayers filing a Form 1040, *U.S. Individual Income Tax Return*, were considered for the EIP.  Taxpayers filing the Form 1040-NR, *U.S.*

---

[6] Certain nonresident aliens are exempt from FICA taxes based on their VISA type, such as nonresident alien students and professors temporarily present in the United States.



*Nonresident Alien Income Tax Return*, are not eligible for the EIP.  IRS management further informed us that, at this time, they are relying on individuals to voluntarily return these payments.  We will continue to evaluate the IRS's issuance of potentially erroneous EIPs and its efforts to recover these payments once identified.

## Duplicate EIP payments issued

On May 12, 2020, we sent an alert to the IRS that we identified 40,656 individuals who received two EIP payments as of April 30, 2020.  The payments issued in error totaled more than $61 million.  Subsequent to our issuance of this alert, we continued to analyze payment files, and as of May 21, 2020, we identified 46,759 individuals who received two EIP payments.  The payments issued in error totaled more than $69 million.  These included:

- 16,339 individuals who filed as Married Filing Jointly in Tax Year 2018 as the secondary taxpayer on a tax return and filed as Single (*i.e.*, Single, Head of Household, Qualifying Widow(er), or Married Filing Separately) in Tax Year 2019 as the primary taxpayer on a tax return.  One payment was sent to the bank account or address shown on the Tax Year 2018 tax return, and one payment was sent to the bank account or address shown on the Tax Year 2019 tax return.

- 30,420 individuals who filed as Single in Tax Year 2018 as the primary taxpayer on a tax return and filed as Married Filing Jointly in Tax Year 2019 as the secondary on a tax return.  One payment was sent to the bank account or address shown on the Tax Year 2018 tax return, and one payment was sent to the bank account or address shown on the Tax Year 2019 tax return.

IRS management noted that programming requirements were put in place to ensure that multiple EIPs were not issued to the same individual.  However, because the IRS processed payments based on both Tax Years 2018 and 2019 return filings, the programming was unable to mark the account for the Tax Year 2018 return to show a payment was issued before the Tax Year 2019 payment was issued.  Presently, the IRS is asking individuals to voluntarily return payments.  We plan to continue monitoring the IRS's actions to recover these payments.

### Analysis of EIP payments issued as of May 21, 2020, identified 99,778 individuals with addresses in a U.S. Territory who received more than $162 million in EIPs

Based on the identification of duplicate payments and our concern that duplicate payments could also be issued to this population of individuals, we met with IRS management to discuss processes and procedures they developed to ensure that duplicate payments are not issued to individuals who have an address in a U.S. Territory and previously received an EIP.  IRS management indicated that U.S. Territories are responsible for determining who is eligible to receive an EIP payment, the amount of the payment, as well as issuing the payment.  IRS management further explained that each U.S. Territory included steps to identify duplicate payments in their respective EIP Implementation Plans.

In addition, to assist U.S. Territories in the identification of potential duplicate payments, the IRS also identified payments made to individuals with a U.S. Territory address similar to the analysis we performed and sent these files to the Territories.  Finally, IRS management noted that each U.S. Territory is required to send data to the IRS on a monthly basis beginning June 30, 2020, which detail the specific individuals who were issued an EIP by the U.S. Territory.  We requested



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

these files for use in our continued assessment of IRS processes to ensure individuals living in a U.S. Territory do not receive multiple payments.

## Some eligible individuals still have not received an EIP

Due to the complexity and speed at which the IRS was required to issue payments, it was unable to account for all potential scenarios like the ones we identified below in which eligible individuals will need the IRS's continued assistance to receive the payments to which they are entitled.  Our analysis of payment files as of May 21, 2020, identified the following conditions, which we brought to IRS management's attention to be addressed:

- **Multiple Deposits to the Same Bank Account** – Our analysis identified 49,141 payments totaling $75 million associated with 8,793 unique bank accounts that received four or more direct deposit EIPs.  We first notified the IRS of our concerns on April 15, 2020.  According to IRS management, some of these payments occurred because the computer programming intended to prevent the direct deposit of payments into bank accounts associated with advanced refund products such as a Refund Anticipation Loan did not work as intended.  IRS management stated that many of these payments may have already been returned by the banks and will be reissued.  We plan to continue to monitor the IRS's efforts to recover payments that have not been returned by entities associated with accounts that received multiple deposits, as well as IRS efforts to ensure individuals associated with these payments receive their EIP.

- **Individuals Who Divorced Between Tax Year 2018 and Tax Year 2019** – Our analysis identified 125,132 individuals who were associated with a joint tax return (married) in Tax Year 2018 (used by the IRS to compute the EIP).  Subsequent to issuance of the payment, one of the individuals filed a Tax Year 2019 return that was not a joint tax return (*i.e.*, Single, Head of Household, Qualifying Widow(er), or Married Filing Separately).  The EIP was sent to the bank account shown on the jointly filed tax return.  This scenario could result in the individual who filed a subsequent Tax Year 2019 return with a filing status of single not receiving an EIP.  We notified IRS management of our concerns on April 17, 2020.  IRS management stated that obtaining the EIP from the former spouse is a civil matter between the two individuals who filed the joint Tax Year 2018 return.

- **Social Security Retirement, Social Security Supplemental Income, and Veteran Administration Beneficiaries** – The IRS committed to proactively issuing payments to individuals who receive Social Security payments, Social Security Supplemental Income payments, and veteran's benefits and do not have a filing requirement.  However, as of May 21, 2020, we identified more than 1.3 million of these individuals who have still not received an EIP.  The IRS has direct deposit information for 585,329 of these individuals.  We notified IRS management of our concerns that these individuals have not yet received an EIP.  IRS management reviewed the cases we provided and indicated that there are conditions associated with some of these individuals that will take more time to resolve before eligibility can be determined and a payment can be issued.  We are continuing to work with the IRS to ensure that eligible individuals in this remaining population receive their EIP.



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

## Actions are being taken to better inform and assist homeless individuals

A letter to the Secretary of the Treasury dated April 7, 2020, signed by 28 U.S. Senators, inquired about the IRS's efforts to assist homeless individuals in receiving their EIPs.  To gain an understanding of the challenges faced by these individuals, we reached out to one of the Department of Housing and Urban Development's Continuum of Care Program partners in Massachusetts.  We learned that homeless individuals face additional challenges in filing the tax return needed to receive an EIP, and if successfully filed, they are then presented with additional challenges in accessing their issued payment.  For example:

> *The IRS recommends individuals use the online Non-Filers:  Enter Payment Info Here tool on IRS.gov.  However, many homeless do not have access to a computer to file a return.  This is further complicated by the fact that many locations with public access to a computer have been closed due to the pandemic.  Finally, these individuals often do not have access to a bank account and are unable to negotiate a paper check once received because they do not have the necessary government issued identification to verify their identity.*

Recognizing the significant challenges these individuals face, we alerted the IRS on May 15, 2020, of the need to take additional actions to further assist this population.  Our alert included the following recommendations:

- Coordinate with the Department of Housing and Urban Development to leverage the Continuum of Care Program to disseminate the following information to partner organizations for use in assisting homeless individuals and families in filing the tax return needed to obtain an EIP.

    - Instructions on how to access the Form 1040 on IRS.gov for use in filing a short-form paper return.  These instructions should also provide steps these organizations can take to place bulk orders for the Form 1040 once the National Distribution Center reopens.

    - Instructions on how to complete a paper Form 1040 for individuals who have no filing requirement, including how to notate the return to identify it as an EIP2020 return.

    - Instructions on where to mail the tax return based on their geographical location.

- Coordinate with the Department of Housing and Urban Development to obtain a list of trusted addresses for the Continuum of Care partners for use in processing tax returns filed by the homeless.  Often, the homeless use the address of these partners as their mailing address, resulting in multiple tax returns having the same address, which is one of the IRS's fraud screening factors.

- Partner with the BFS to issue the EIPs on a U.S. debit card to all individuals filing an EIP2020 return.  At a minimum, the IRS should use the trusted address information for the Continuum of Care partners to identify returns filed using these addresses and ensure that the associated EIPs are issued on a debit card.

- Partner with national organizations dedicated to serving the homeless, such as the National Health Care for the Homeless Council, to identify other potential solutions for assisting individuals experiencing homelessness in obtaining and accessing their EIP.



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

In response, IRS management stated that it has partnerships with numerous Federal agency and nongovernment organizations, including the Department of Housing and Urban Development, that provide assistance to the homeless.  As of June 12, 2020, the IRS has reached out to 4,598 homeless shelters with information on how to obtain an EIP.  The IRS agreed to reach out to the Department of Housing and Urban Development to include the Continuum of Care program to provide the information we recommended.  The IRS will also continue to reach out to other national organizations dedicated to assisting the homeless to identify other possible solutions for assisting these individuals.  In addition, the IRS created a strike team to research potential organizations nationwide that might assist homeless individuals and share IRS-related EIP resources with them.  The IRS asked these organizations if they would act as a "trusted partner" to receive payments on behalf of their homeless clients.  We will continue to monitor the IRS's efforts to inform this population of individuals on how to obtain an EIP.

## The issuance of EIPs on prepaid debit cards is presenting challenges for individuals

Limitations on the number of paper checks the BFS can issue each week further delay the issuance of some EIPs to individuals for whom the IRS does not have a direct deposit account number.  To minimize the impact of these limitations and to get the payments out to individuals, as of May 21, 2020, a total of 3.6 million individuals were sent their payment as a prepaid debit card instead of paper check.  An IRS news release dated May 27, 2020, noted that the determination of which taxpayers received a debit card was made by the BFS.  Those who receive their payment by prepaid debit card can do the following without any fees:

- Make purchases online and at any retail location where Visa is accepted.
- Get cash from in-network Automated Teller Machines.
- Transfer funds to their personal bank account.
- Check their card balance online, by mobile app, or by phone.

This free, prepaid card also provides consumer protections available to traditional bank account owners, including protection against fraud, loss, and other errors.

However, a number of news outlets have reported that the debit cards were mailed in unmarked envelopes and little notice was provided to the public about the issuance of these cards.  As such, individuals have reported that they destroyed the cards, thinking that they were a scam or an unsolicited credit card offer.  In an effort to address these concerns, the IRS recently added the information below to the Frequently Asked Questions on IRS.gov:

- **What do I do if my prepaid debit card was lost or destroyed?**

  The Economic Impact Payment Card is sponsored by the Treasury Department's Bureau of the Fiscal Service, managed by Money Network Financial, LLC and issued by Treasury's financial agent, MetaBank®, N.A.  If you receive an Economic Impact Payment Card, it will arrive in a plain envelope from "Money Network Cardholder Services."  The Visa name will appear on the front of the Card; the back of the Card has the name of the issuing bank, MetaBank®, N.A.  Information included with the Card will explain that the card is your Economic Impact Payment Card.  Please go to EIPcard.com for more information and additional FAQs.



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

*Individuals who have lost or destroyed their EIP Card may request a free replacement through MetaBank® Customer Service.  Individuals may request a replacement by phone at 800-240-8100 (option 2 from main menu).*

In our discussion with representatives from the BFS and MetaBank on June 11, 2020, MetaBank representatives estimated that they have received 30,000 to 35,000 requests for a replacement card to date.  We plan to continue to assess the IRS's issuance of EIPs on prepaid debit cards and assistance to those individuals issued these cards.

## A Separate TIGTA review is assessing IRS efforts to ensure eligible individuals receive an EIP

This review will monitor the IRS's efforts to address the conditions identified above and actions to reissue payments to eligible individuals.[7]  In addition, we will assess the IRS's efforts to address rejected direct deposits, payments returned as undeliverable, inquiries from individuals who received notification that a payment was sent but it has not been received, and outreach to individuals without a filing requirement who need to file a tax return to receive their EIP.

## Advance Tax Credits for Employers

As previously noted in our report, there are two new employer tax credits for businesses that have been severely affected by COVID-19 – the Credit for Sick and Family Leave, and the Employee Retention Credit:

- Paid sick leave credit and paid family leave credit are available for eligible employers who pay qualified sick leave wages or qualified family leave wages from April through December 2020 and who have fewer than 500 employees.

- The Employee Retention Credit is designed to encourage businesses to keep employees on their payroll.  The refundable tax credit is 50 percent of up to $10,000 in wages paid by an eligible employer whose business has been financially affected by COVID-19.

In response to the enactment of this legislation, the IRS initiated an educational campaign to promote the availability of these credits.  As we previously detailed, the law allows eligible employers to request advance payments of these credits.  Specifically, an eligible employer that pays qualified leave wages to its employees in a calendar quarter before it is required to deposit Federal employment taxes with the IRS for that quarter may reduce the amount of Federal employment taxes that it deposits by the amount of the qualified leave wages paid.  The eligible employer must account for the reduction on the Form 941.

However, if there are insufficient Federal employment taxes to cover the amount of the credits, an eligible employer may request an advance payment of the credits from the IRS.  To enable employers to request an advance, the IRS developed the new Form 7200.  Along with the development of the form, the IRS also developed processes and procedures to enable employers to submit these requests even though the Tax Processing Centers were closed.  For example, the IRS implemented a process to enable employers to submit these requests via a dedicated E-fax line.  Once a Form 7200 is received electronically, it is routed to a dedicated group of revenue agents and revenue officers who review and process these requests.

---

[7] TIGTA, Audit No. 202040634, *Assessment of Actions to Ensure That All Eligible Individuals Receive an Economic Impact Payment.*



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

Employers could begin to submit their Form 7200 starting April 1, 2020.  As of May 30, 2020, the IRS received 7,789 Forms 7200, and processed 2,410 Forms 7200 with refunds totaling more than $50 million.

In addition, the IRS also revised Form 941, adding lines to account for the various employment tax credits (*e.g.*, paid and sick leave credit and Employee Retention Credit) and other tax relief (*e.g.*, deferral of payroll tax) due to the coronavirus.  Businesses will begin filing the revised Form 941 for their second quarter employment taxes due at the end of July 2020.  In addition, businesses that requested and received an advance payment by filing Form 7200 will record that amount on the revised Form 941 to determine whether they owe additional employment taxes or are due a refund.

## Efforts are ongoing to obtain \*\*\*\*\*\*\*\*\*\*\*\*\*\*2\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* needed to verify that employers are not erroneously claiming the excluded credit

The CARES Act contains an exclusion that businesses which received a Paycheck Protection Program loan from the Small Business Administration cannot receive an advanced Employee Retention Credit.  \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*2\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*2\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*2\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*2\*\*\*.  According to IRS management, they are currently coordinating with the Small Business Administration \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*2\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*2\*\*\* to ensure employer compliance with provisions in the CARES Act.  \*\*\*\*\*\*\*\*\*\*\*2\*\*\*\*\*\*\*\*\*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*2\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*2\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*.  We are conducting a separate review to evaluate the actions taken by the IRS to ensure the validity and accuracy of the processing of advanced employer credits.[8]

## Tax Processing Center Closures Have Resulted in Significant Backlogs

Much of the work performed at the IRS's Tax Processing Centers is not conducive to a telework environment.  Work performed at Tax Processing Centers includes mail operations which involve the receiving, sorting, and distributing of mail and processing of paper tax returns.  Processing requires manual input of information from the tax return into IRS systems, correcting errors, and corresponding with the taxpayer, if needed.  As noted earlier, the IRS closed its Tax Processing Centers due to the COVID-19 pandemic.  Figure 4 shows the date each of these Tax Processing Centers were closed.

---

[8] TIGTA, Audit No. 202040633, *Actions Taken to Ensure the Validity of COVID-19 Relief Advanced Credits.*



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

**Figure 4:  Tax Processing Center Closures Due to COVID-19, as of April 6, 2020**

| Location | Date Closed |
|----------|-------------|
| Fresno | March 20 |
| Austin | March 25 |
| Kansas City | March 25 |
| Ogden | April 6 |

*Source:  IRS management reports and notification for each location's closure.*

To ensure an orderly shutdown of its Tax Processing Centers, the IRS followed existing guidelines that are used when operations are ceased due to a lapse in funding.  The big difference with the COVID-19 shutdown is that they had less time to prepare due the urgency of the health crisis.  However, IRS management worked with each function to complete any in-process inventory by the end of the final work shift on the day of closing.  They also ensured that all tax returns were secured and marked so it would be easy to pick up where they left off when the Tax Processing Centers reopened.  The paper tax returns are controlled in an IRS system that helps track levels of inventory at various stages of processing the tax returns.  IRS management also turned off all fax machines as part of its closure process in order to prevent correspondence from taxpayers coming into the sites when employees were not present to work the inventory.  Finally, the IRS also coordinated with the U.S. Postal Service to have all mail that could not be delivered onsite be either held by the Postal Service or stored in semi-trailers at each location as needed.

## Mail receipt and paper tax return processing have only partially resumed

As of May 20, 2020, the IRS estimates that it has received 10.4 million pieces of mail while the Tax Processing Centers were closed.  This includes mail stored within its various Tax Processing Centers and in 20 semi-trailers and six storage containers housed outside these Centers.  The unopened mail includes tax returns, taxpayer correspondence, payments, and mail returned as undeliverable.  Each Tax Processing Center has a mail operation that opens, sorts, counts, and routes all incoming mail and packages to their appropriate destinations.  These actions were all halted when the Tax Processing Centers were closed.  Furthermore, all paper tax return processing was halted.  Figure 5 shows the estimated volume of both individual and business paper tax returns received as of May 22, 2020.  These volumes include tax returns received and still being processed at the time the IRS closed its Tax Processing Centers as well as the estimated number of tax returns received while the centers were closed.



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

### Figure 5:  Estimated Paper Tax Return Volumes to be Processed as of the Week Ending May 23, 2020

| Type of Tax Return | Week Ending April 4, 2020 | Week Ending May 2, 2020 |
|---|---|---|
| Individual Tax Returns | 3,185,000 | 10,070,000 |
| Business Tax Returns | 2,569,000 | 6,569,000 |

*Source:  Estimated volumes of paper tax returns received from the IRS's Filing Season Statistics Reports for the weeks ending April 4, 2020, and May 23, 2020.*

IRS management noted that the above figures are only estimates and include tax returns received in the unopened mail.  The actual number will not be known for months (until all the mail is opened).  The IRS bases these estimates on scheduled and actual work generated through its inventory tracking system that keeps track of scheduled work for each Tax Processing Center.  Our review of the IRS's inventory tracking system showed that nearly 1.8 million individual and nearly 1.9 million business paper tax returns were in process at the time the IRS closed the Tax Processing Centers and need to be completed.

The IRS began recalling staff on a voluntary basis to open mail and deposit checks in each of the four Tax Processing Centers on April 27, 2020.  As of May 18, 2020, there were 389 employees working in the mail operations of the Tax Processing Centers.[9]  This is compared to 1,786 employees that worked in the mail operations prior to closure.  Our review of the IRS's inventory tracking system shows that, as of May 22, 2020, the IRS had extracted and input into its inventory system approximately 842,000 tax returns received in the mail that had accumulated during the closures.

## Error Resolution cases remain backlogged

When Tax Processing Centers were closed, taxpayers still had the ability to electronically file (e-file) their tax returns.  E-filed returns with no identified error or review conditions are processed to completion, with any associated refund being issued.  However, similar to paper tax returns, e-filed tax returns identified with errors are sent to the IRS's Error Resolution function for tax examiner review.  Specifically, when a tax return is identified with an error condition, the IRS suspends the tax return from processing and sends the tax return to a tax examiner to correct the error.  The Error Resolution function is responsible for correcting these error conditions.  Once corrected, the tax return will continue to be processed.  The majority of this work was unable to be performed while the Tax Processing Centers were closed.  However, the IRS was able to work some e-filed cases identified as needing correction by an Error Resolution function employee.  Figure 6 shows the volume of Error Resolution cases as of May 22, 2020, that still need to be worked.

---

[9] Austin, Texas, had 108 employees; Fresno, California, had 107 employees; Kansas City, Missouri, had 60 employees; and Ogden, Utah, had 114 employees that had returned to work.



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

**Figure 6:  Error Resolution Volumes for
Tax Processing Centers as of May 22, 2020**

| Type of Tax Return | As of April 3, 2020 | As of May 22, 2020 |
|---|---|---|
| Individual Tax Returns | 984,830 | 1,599,091 |
| Business Tax Returns | 111,816 | 153,287 |

Source:  Error Resolution volumes from the IRS's Filing Season Statistics Reports for the weeks ending April 4, 2020, and May 23, 2020.

## Closures Are Affecting Efforts to Provide Quality Customer Service

When the IRS closed its offices nationwide, most customer service assistance options for taxpayers ceased.  For example:

- **Toll-Free Lines** – According to the IRS, there are 105 toll-free lines available to provide assistance to taxpayers prior to March 19, 2020.[10]  The IRS ceased answering 96 (91 percent) of these lines between March 19 and 31, 2020, because the IRS locations were closing and employees answering these phone lines were not telework ready.  As of May 20, 2020, 48 (46 percent) of the 105 toll-free lines remained closed.  These include lines that provide assistance with tax law questions, requesting transcripts of tax accounts, and setting up appointments for face-to-face assistance.

  We asked IRS management how they are prioritizing the reopening of toll-free lines, and they informed us that their strategy included looking at the number of assistors available and their experience level for the type of assistance provided on the lines that need to be reopened.  Based on these considerations, management determined the potential levels of service they could provide by reopening the line.  IRS management stated that they will continue to monitor and open the remaining lines as soon as it is determined to have sufficient staffing with the necessary experience to operate that line.

- **TACs** – TACs provide taxpayers face-to-face assistance with an IRS employee, by appointment.  All 358 TACs were closed nationwide effective March 23, 2020.  According to IRS management, TAC employees are not eligible for telework and do not have laptops to allow for remote work.  IRS management did note that there was a pilot ongoing prior to the pandemic allowing a limited number of TAC employees to provide virtual assistance to taxpayers through a web-based software, but this went on hold when the TACs closed.  IRS management stated that they have no intention of expanding this service at this time because they do not have the results of the pilot to know if this was effective.  As of June 12, 2020, management stated that the software they were using in the pilot does not have the system capabilities to be used nationwide.

  At the time of closure, there were 79,264 appointments made to assist taxpayers, which were all cancelled.  As of May 19, 2020, there are approximately 1,040 employees that work in the 358 TACs nationwide on weather and safety leave.  As of June 1, 2020,

---

[10] Two additional lines, the EIP and COVID-19 Counsel Hotline, were opened after March 30, 2020, in response to the pandemic.



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

108 TAC employees were recalled in Kentucky, Texas, and Utah.  However, these employees are not providing face-to-face assistance at this time.

- **Free Tax Return Preparation** – The IRS Volunteer Income Tax Assistance and the Tax Counseling for the Elderly programs offer free tax help for taxpayers who qualify.  While the IRS manages the programs, the sites are managed by IRS partners and staffed by their volunteers.  For the week ending May 24, 2020, 10,792 (98 percent) of the 11,014 Volunteer Income Tax Assistance/Tax Counseling for the Elderly sites remain closed.

- **Distribution of Tax Products** – The National Distribution Center closed on March 25, 2020, and as of June 1, 2020, remains closed.  The National Distribution Center provides printing and distribution services of IRS forms, publications, *etc*., for both the IRS and external stakeholders.  Figure 7 provides a list of the National Distribution Center stakeholders.

**Figure 7:  Primary Users of the National Distribution Center Services**

| User | Description of Supplies Provided |
|---|---|
| Taxpayer | Supplies individuals with tax-related materials for personal use. |
| Tax Professional | A person or firm that prepares tax returns for compensation or orders products to meet tax reporting requirements. |
| Tax Forms Outlet Program | Supplies post offices, libraries, and other outlets with tax materials for distribution to the public. |
| TACs | Supplies TACs with products for distribution to the public. |
| Volunteer Income Tax Assistance | Supplies Volunteer Income Tax Assistance sites with tax forms, instructions, and publications. |
| International Program | Supplies American embassies with tax forms to meet the needs of Americans overseas. |
| Employer | Supplies businesses with employment tax products for employee and company use. |
| IRS | Supplies packages of tax products for conferences administered by IRS employees, *etc*. |
| Other Government Agencies | Supplies other Federal, State, and local agencies with tax materials to act as a third-party distributor or meet its tax reporting requirements. |

Source:  Internal Revenue Manual 1.18.5.

- **Printing and Mailing Correspondence to Taxpayers** – The IRS prints and mails the majority of its correspondence from two centralized sites located in Detroit, Michigan, and Ogden, Utah.  These operations are referred to as Correspondence Production Services.  Correspondence generated and mailed to taxpayers includes notices to alert taxpayers that error conditions on their held tax return need to be addressed, the need



to authenticate their return as it has been held as potentially fraudulent, as well as notices and letters required to be issued by law.

In response to the pandemic, the IRS closed both of these sites as of April 8, 2020.  A total of 154 employees work at these sites.  As of May 14, 2020, the IRS reported that there were more than 22.1 million items in the Correspondence Production Services queue to be printed and mailed.  IRS management explained that they are coordinating with all affected IRS functional areas to prioritize which notices should be mailed first when resuming operations and which notices are no longer necessary and could be purged (for example, monthly payment reminders on installment agreements for months that have already passed).

As of June 1, 2020, the IRS recalled 41 of its Ogden, Utah employees, in an effort to resume its printing and mailing services.  The IRS plans to reopen the operation in Detroit the week of June 15, 2020, with reduced staffing.  IRS management estimates that it will take Correspondence Production Services until mid-July to work through the backlog of print requests in the queue because of the anticipated reduced staffing levels and the need to social distance.  According to the IRS, the estimate of time to work through the backlog is contingent upon procuring a vendor to assist with printing or mailing notices.

## Accounts Management function has a significant backlog of cases critical to taxpayers

As of March 14, 2020, the IRS reports that there were 17,534 employees working in the Accounts Management function.  In comparison, as of May 16, 2020, only 5,562 Accounts Management employees (32 percent) were teleworking or reporting to an office.  The Accounts Management function is responsible for assisting taxpayers with questions about the tax laws, their account, and the status of their refunds and adjusting their tax accounts when necessary.  As of March 14, 2020, the IRS reported that the ending inventory that still needed to be worked was 2.5 million cases.  The inventory only increased slightly to 2.6 million as of May 16, 2020.  However, this inventory does not include additional Accounts Management work included in the unopened mail.  The IRS estimates that there are 970,333 pieces of unopened mail as of May 9, 2020, that require Accounts Management review at the four Tax Processing Centers.

In addition, Accounts Management also receives mail at six other Accounts Management locations nationwide.  The IRS estimates that there are 389,844 pieces of unopened mail at these campuses as of June 2, 2020.[11]  Based on staffing and IRS reports as of May 16, 2020, the IRS is closing nearly 119,000 cases per week.  At this rate, we estimate that it will take 33 weeks before Accounts Management is in a position to get through the backlog, not considering new receipts.  At best, the IRS was closing approximately 391,000 cases for the week proceeding March 14, 2020.

Although the majority of cases worked by Accounts Management are electronic and portable, there are two factors that affect the IRS's ability to address the type of cases worked:

- **Ability to Scan Correspondence into the Correspondence Imaging System** – Correspondence from taxpayers that needs to be worked by Accounts Management is received and scanned at IRS Tax Processing Centers to enable employees working in

---

[11] This includes all mail received at these six campuses.  The IRS does not have an estimate of mail specific to Accounts Management for these six locations.



remote locations to work the cases.  If employees responsible for scanning this correspondence are not allowed to return to the Tax Processing Centers or the number of employees returning is limited, this will have a direct impact on scanning inventory into the Correspondence Imaging System for Accounts Management employees to work.

- **Extensiveness of the Process to Make Employees Telework-Ready** – To make employees telework-ready, the IRS must obtain the necessary equipment, have employees complete the necessary training, and sign telework agreements with their manager.  IRS management noted that they can realistically get 200 to 400 employees telework-ready per week.  Since the closure of its operations, IRS management has continued to increase the number of telework-ready employees in order to remotely work the Accounts Management inventory.  For example, at the time of closure, a telework pilot included only 237 employees.  As of May 16, 2020, a total of 4,841 employees were actively teleworking.  However, despite these improvements, there are still nearly 8,427 employees who are not telework-ready and remain on weather and safety leave.

We will continue to monitor the IRS's efforts to address its backlogs.  In addition, we have a separate ongoing review that will assess the impact of the COVID-19 pandemic on IRS customer service operations and the actions taken to resume these operations.

## More Than a Million Tax Returns Identified and Held As Potentially Fraudulent or With Erroneous Refundable Credit Claims Remain to Be Worked

The IRS's Return Integrity and Compliance Services function is responsible for addressing potentially fraudulent returns identified as well as returns identified with questionable refundable credit claims.  Once a return is identified, those involving potential identity theft are held during processing until the IRS can verify the taxpayer's identity.  If the IRS cannot confirm the individual's identity, the IRS removes the tax return from processing to prevent the issuance of a fraudulent refund.  For other types of potentially fraudulent tax returns identified (*i.e.*, non-identity theft), the IRS suspends these tax returns to provide additional time to receive third-party income documents (*e.g.*, Form W-2, *Wage and Tax Statement*).  The suspended tax returns are held until either the IRS receives third-party documents and the income and withholding is verified or the tax returns are sent to Return Integrity and Compliance Services for screening and verification.

The Return Integrity and Compliance Services function also conducts examinations of tax returns with questionable refundable credit claims.  For those returns selected for examination, the IRS corresponds with taxpayers to request additional documentation to support their refundable credit claim.  During the week ending May 23, 2020, the Return Integrity and Compliance Services inventory included:

- 892,777 tax returns identified as identity theft for which the taxpayer has been asked to authenticate their identity.

- 463,192 tax returns identified as non-identity theft for which the IRS has selected the return for treatment.

- 243,925 tax returns selected for examination.  These returns primarily involve a questionable refundable tax credit.



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

The above figures do not include tax returns that were identified by the Return Integrity and Compliance Services fraud and examination filters that have not yet been selected for treatment.

Return Integrity and Compliance Services management noted that, although their employees can work cases remotely, external factors are preventing this work from being performed.  These factors include:

- *The inability to print and mail required correspondence due to Correspondence Production Services site closures* – Management noted that, even if the required correspondence could be printed and mailed, responses from taxpayers are sent to the IRS and require scanning to enable the information to be available for employees working remotely.  However, because the IRS locations have been closed, the responses cannot be scanned into the system.

- *Refundable credit claims are prerefund examinations* – Per the *People First Initiative*, no compliance actions can be taken until July 15.

As of June 3, 2020, Return Integrity and Compliance Services had 756 (41 percent) of their 1,863 employees on weather and safety leave because they were unable to perform work in a telework environment for various reasons, such as not having a laptop or high-speed Internet. In addition, while 544 (72 percent) of the 756 employees had laptops, their work was not portable.



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

# Appendix I

## Detailed Objective, Scope, and Methodology

Our overall objective was to evaluate whether the IRS timely and accurately processed individual paper and e-filed tax returns during the 2020 Filing Season.  This audit was initiated to provide selected information related to the impact of COVID-19 on the 2020 Filing Season.  To accomplish our objective, we:

- Monitored online news outlets and forums to identify any preparation, filing, or processing issues that taxpayers are experiencing.

- Coordinated with TIGTA's audit team covering the issuance of EIPs for individuals to obtain initial results on the accuracy of the EIP computation and related notifications.

- Coordinated with TIGTA's Business Return Services audit teams for information on business tax return processing and the impact of the COVID-19 relief provisions.

- Coordinated with TIGTA's audit team assessing the impact that closures of toll-free, TAC, and Volunteer Income Tax Assistance sites had on the IRS's ability to provide quality customer service.

- Identified volumes of paper tax returns in process at the time the Tax Processing Centers were closed and the estimated volumes of mail and tax returns received during closure through May 22, 2020.

- Evaluated IRS plans to address backlogs in paper return filings, payments, correspondence, error resolution, and fraud detection cases once Tax Processing Centers reopen.

### Performance of This Review

This review was performed with information obtained from the Wage and Investment Division Headquarters in Atlanta, Georgia; the Wage and Investment Division Submission Processing function offices in Cincinnati, Ohio; the Wage and Investment Division Customer Assistance, Relationships, and Education function in Atlanta, Georgia; the Wage and Investment Division Accounts Management function in Atlanta, Georgia; the Wage and Investment Division Return Integrity and Compliance Services function in Atlanta, Georgia; and the Information Technology organization in Lanham, Maryland, during the period March 30, 2020, through June 10, 2020. We conducted this performance audit in accordance with generally accepted government auditing standards.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective.  We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective.

Major contributors to the report were Russell P. Martin, Assistant Inspector General for Audit (Returns Processing and Account Services); Deann L. Baiza, Director; Linna K. Hung, Director; Diana M. Tengesdal, Director; Jeffrey D. Cullum, Audit Manager; Nina A. Hill, Audit Manager; Jonathan W. Lloyd, Audit Manager; Sharla J. Robinson, Audit Manager; Darryl J. Roth, Audit Manager; Ngan B. Tang, Audit Manager; Van A. Warmke, Audit Manager; Karen C. Fulte, Senior Auditor; Brieane K. Hamaoka, Senior Auditor; Tracy M. Hernandez, Senior Auditor; Sandra L.



Hinton, Senior Auditor; Robert J. Howes, Senior Auditor; Jane G. Lee, Senior Auditor; David P. Robben, Senior Auditor; Heidi C. Turbyfill, Senior Auditor; Linda M. Valentine, Senior Auditor; Michael J. Bibler, Auditor; Laura R. Christoffersen, Auditor; Branden L. Dreher, Auditor; Jaclynne O. Durrant, Auditor; James M. Allen, IT Specialist; Karen A. Brown, IT Specialist; Hong Cao, IT Specialist; Shannon D. Cummings, IT Specialist; Meera B. Dave, IT Specialist; Cheryl F. Joneckis, IT Specialist; Donald J. Meyer, IT Specialist; Johnathan D. Elder, IT Specialist, Applied Research and Technology; and Laura P. Haws, IT Specialist, Applied Research and Technology.

## Validity and Reliability of Data From Computer-Based Systems

During this review, we obtained extracts from the Individual Master File for Tax Years 2018 and 2019, Individual Return Transaction File for Processing Years 2019 and 2020, Information Returns Master File for Tax Years 2018 and 2019, Prisoner File for Processing Year 2019, Individual Master File Refund Files, and National Account Profile for Processing Year 2020 that were available on TIGTA's Data Center Warehouse.  We also obtained the Social Security Supplemental Income and Veteran Administration beneficiary recipient files from the IRS. Before relying on the data, we ensured that each file contained the specific data elements we requested.  In addition, we selected judgmental samples of each extract and verified that the data in the extracts were the same as the data captured in the Integrated Data Retrieval System. We also performed analysis to ensure the validity and reasonableness of our data, such as ranges of dollar values and obvious invalid values.  Based on the results of our tests, we believe that the data used in our review were reliable.

## Internal Controls Methodology

Internal controls relate to management's plans, methods, and procedures used to meet their mission, goals, and objectives.  Internal controls include the processes and procedures for planning, organizing, directing, and controlling program operations.  They also include the systems for measuring, reporting, and monitoring program performance.  We determined that the following internal controls were relevant to our audit objective:  the process for planning, organizing, directing, and controlling program operations for the 2020 Filing Season.  We evaluated these controls by meeting with IRS management, reviewing IRS procedures, and reviewing IRS reports.



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

# Appendix II

## High-Level Process Flow of IRS Documents

Figure 1 provides a high-level process flow of the processing of documents received by the IRS.

**Figure 1:  High-Level Process Flow of IRS Documents**



*Source:  TIGTA's analysis to show a high-level process flow of Submission Processing and Accounts Management inventory processes.*



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

# Appendix III

## Glossary of Terms

| Term | Definition |
|---|---|
| Filing Season | The period from January through mid-April when most individual income tax returns are filed. |
| Fiscal Year | Any yearly accounting period, regardless of its relationship to a calendar year.  The Federal Government's fiscal year begins on October 1 and ends on September 30. |
| Free File | A free Federal tax preparation and e-filing program for eligible taxpayers developed through a partnership between the IRS and Free File Alliance LLC. The Alliance is a group of private sector tax software companies. |
| Level of Service | The primary measure of service to taxpayers.  It is the relative success rate of taxpayers who call for live assistance on the IRS's toll-free telephone lines. The IRS's measure is titled Customer Service Representative Level of Service. |
| Individual Master File | The IRS database that maintains transactions or records of individual tax accounts. |
| Individual Return Transaction File | A database the IRS maintains that contains information on the individual tax returns it receives. |
| Information Returns Master File | Creates and maintains a master file of current and prior year information returns. |
| Integrated Data Retrieval System | IRS computer system capable of retrieving or updating stored information. It works in conjunction with a taxpayer's account records. |
| Master File | The IRS database that stores various types of taxpayer account information. This database includes individual, business, and employee plans and exempt organizations data. |
| National Account Profile | A compilation of selected entity data from various IRS Master Files and the Social Security Administration. |
| Prisoner File | The IRS compiles a list of prisoners received from the Federal Bureau of Prisons and State Departments of Corrections as well as Prisoner Update Processing System data from the Social Security Administration. |
| Processing Year | The calendar year in which the tax return or document is processed by the IRS. |
| Tax Year | A 12-month accounting period for keeping records on income and expenses used as the basis for calculating the annual taxes due.  For most individual taxpayers, the tax year is synonymous with the calendar year. |
| Taxpayer Assistance Centers | An IRS office with employees who answer questions, provide assistance, and resolve account-related issues for taxpayers face to face. |
| Volunteer Program | Includes the Volunteer Income Tax Assistance Program, including the Volunteer Income Tax Assistance Grant Program, and the Tax Counseling for the Elderly Program.  The Volunteer Program provides free tax assistance to |



|  | persons with low to moderate income (generally defined as within the Earned Income Tax Credit threshold), senior citizens, persons with disabilities, rural persons, those with limited English proficiency, and Native Americans. |
|---|---|
| Weather and safety leave | May be permitted when weather or other safety-related conditions prevent employees from safely traveling or safely performing work at an approved location, such as the official duty station or telework location. |



**Interim Results of the 2020 Filing Season:  Effect of COVID-19 Shutdown on Tax Processing and Customer Service Operations and Assessment of Efforts to Implement Legislative Provisions**

## Appendix IV

### Abbreviations

| | |
|---|---|
| BFS | Bureau of the Fiscal Service |
| COVID-19 | Coronavirus Disease 2019 |
| e-file(d); e-filing | Electronically File(d); Electronic Filing |
| EIP | Economic Impact Payments |
| IRS | Internal Revenue Service |
| TAC | Taxpayer Assistance Center |
| TIGTA | Treasury Inspector General for Tax Administration |

# EXHIBIT 7

# US inmates got virus relief checks, and IRS wants them back

**AP** apnews.com/0810bb67199c9cef34d4d39ada645a92

June 24, 2020



<u>1 of 2</u>

<u>FILE - In this April 23, 2020, file photo, President Donald Trump's name is seen on a stimulus check issued by the IRS to help combat the adverse economic effects of the COVID-19 outbreak, in San Antonio. Hundreds of thousands of dollars in coronavirus relief payments have been sent to people behind bars across the United States, and now the IRS is asking state officials to help claw back the cash that the federal tax agency says was mistakenly sent. (AP Photo/Eric Gay, File)</u>

BOISE, Idaho (AP) — Hundreds of thousands of dollars in coronavirus relief payments have been sent to people behind bars across the United States, and now the IRS is asking state officials to help claw back the cash that the federal tax agency says was mistakenly sent.

The legislation authorizing the payments during the pandemic doesn't specifically exclude jail or prison inmates, and the IRS has refused to say exactly what legal authority it has to retrieve the money. On its website, it points to the unrelated Social Security Act, which bars incarcerated people from receiving some types of old-age and survivor insurance benefit

payments.

ADVERTISEMENT

"I can't give you the legal basis. All I can tell you is this is the language the Treasury and ourselves have been using," IRS spokesman Eric Smith said. "It's just the same list as in the Social Security Act."

Tax attorney Kelly Erb, who's written about the issue on her website, says there's no legal basis for asking for the checks back.

"I think it's really disingenuous of the IRS," Erb said Tuesday. "It's not a rule just because the IRS puts it on the website. In fact, the IRS actually says that stuff on its website isn't legal authority. So there's no actual rule — it's just guidance — and that guidance can change at any time."

After Congress passed the $2.2 trillion coronavirus rescue package in March, checks of up to $1,200 were automatically sent in most cases to people who filed income tax returns for 2018 or 2019, including some who are incarcerated. A couple of weeks later, the IRS directed state correction departments to intercept payments to prisoners and return them.

The IRS doesn't yet have numbers on how many payments went to prisoners, Smith said. But initial data from some states suggest the numbers are huge: The Kansas Department of Correction alone intercepted more than $200,000 in checks by early June. Idaho and Montana combined had seized over $90,000.

Washington state, meanwhile, had only intercepted about $23,000 by early June. Some states, like Nevada, have refused to release the numbers, citing an IRS request for confidentiality.

While the IRS says checks sent to jail inmates also should be returned, the sheer number of jails and detention centers across the U.S. makes it difficult to tell if many are following those instructions.

The IRS seems to have decided by itself to pull back the payments approved by Congress, said Wanda Bertram, a spokeswoman for the Prison Policy Initiative, a think tank focusing on the harm of mass incarceration. She says prison officials are accustomed to intercepting tax documents to screen for potential scams, priming them to follow this request.

ADVERTISEMENT

"It appears that the IRS is just making this up," Bertram said.

Inmates and their families need the money, she said, especially as prisons try to reduce the spread of the virus by instituting lockdown conditions or releasing thousands of inmates

who are then trying to get back on their feet.

Lockdowns can increase expenses for inmates because they are often given lower-quality food or fewer meals and need to supplement by buying food from prison commissaries. Family and friends on the outside often cover those costs, and many have lost jobs during the economic downturn, Bertram said.

"Loved ones right now are also under a squeeze because of the pandemic and being out of a job, so when you send a stimulus check for someone, the person in prison is not the only one who benefits from that," Bertram said.

Intercepting relief checks may also have a disproportionate impact on Black and Hispanic inmates, who are incarcerated at a higher rate than white Americans. Black people are imprisoned at roughly twice the rate of Hispanic residents, and more than five times the rate of whites as of last year, according to the U.S. Department of Justice's Bureau of Justice Statistics.

Prison officials nationwide have been trying to intercept the checks, with varying results. Officials in Vermont, Mississippi, Pennsylvania, Arizona and California estimated that they each had intercepted fewer than a dozen checks as of early June. Oregon prison officials had seized 25 payments, with 21 returned to the IRS and four others given to relatives or other joint tax filers.

Kaitlin Felsted, a spokeswoman for the Utah prison system, said the state had intercepted 28 checks so far but noted that any relief money sent to an inmate's home address wouldn't be touched by prison officials.

Some states, like Alaska and Wyoming, aren't tracking the number of payments they intercept.

It's not clear if inmates have any recourse, said Erb, the tax attorney.

Those who are released before year's end and who didn't get a relief check can try to claim the missing money as a credit on their 2021 tax returns, but it's not clear if the IRS will honor such claims, Erb said. Other inmates may be out of luck.

"I think somebody has to sue, and you have to have the resources to be able to do that," she said. "I don't know that there's anything most people can do besides complain and see if they can attract some attention. You have to have somebody who will step up and be an advocate for that segment of the population."

——

Contributing are Associated Press journalists Amy Beth Hanson Jonathan Mattise, Andrew Selsky, Emily Wagster Pettus, Rachel La Corte, Michelle L. Price, Mark Scolforo, Don Thompson, John Hanna, Mead Gruver, Jacques Billeaud, Lindsay Whitehurst, Mark Thiessen and Wilson Ring.

# EXHIBIT 8



# Prisons of Poverty:
## Uncovering the pre-incarceration incomes of the imprisoned

By Bernadette Rabuy and Daniel Kopf
July 9, 2015
Press release
Leer en español

Correctional experts of all political persuasions have long understood that releasing incarcerated people to the streets without job training, an education, or money is the perfect formula for recidivism and re-incarceration. While the fact that people released from prison have difficulties finding employment is well-documented, there is much less information on the role that poverty and opportunity play in who ends up behind bars in the first place.

Using an underutilized data set from the Bureau of Justice Statistics, ① this report provides hard numbers on the low incomes of incarcerated men and women from *before* they were locked up.

# Findings

The findings are as predictable as they are disturbing. The American prison system is bursting at the seams with people who have been shut out of the economy and who had neither a quality education ② nor access to good jobs. ③ We found that, in 2014 dollars, incarcerated people had a median annual income of $19,185 prior to their incarceration, which is **41% less than non-incarcerated people of similar ages. ④**

The gap in income is not solely the product of the well-documented disproportionate incarceration of Blacks and Hispanics, who generally earn less than Whites. We found that incarcerated people in all gender, race, and ethnicity groups earned substantially less prior to their incarceration than their non-incarcerated counterparts of similar ages:

|          | Incarcerated people (prior to incarceration) | | Non-incarcerated people | |
|----------|-----------|-----------|-----------|-----------|
|          | Men       | Women     | Men       | Women     |
| All      | $19,650   | $13,890   | $41,250   | $23,745   |
| Black    | $17,625   | $12,735   | $31,245   | $24,255   |
| Hispanic | $19,740   | $11,820   | $30,000   | $15,000   |
| White    | $21,975   | $15,480   | $47,505   | $26,130   |

**Figure 1.** *Median annual incomes for incarcerated people prior to incarceration and non-incarcerated people ages 27-42, in 2014 dollars, by race/ethnicity and gender.*

|          | Men  | Women |
|----------|------|-------|
| All      | 52%  | 42%   |
| Black    | 44%  | 47%   |
| Hispanic | 34%  | 21%   |
| White    | 54%  | 41%   |

**Figure 2.** *Percentage difference between the median annual incomes for incarcerated people prior to incarceration and non-incarcerated people ages 27-42, in 2014 dollars, by race/ethnicity and gender.*

While the gap in income is most dramatic for White men, White men have the highest incomes. By contrast, the income gap is smallest for Hispanic women, but Hispanic women have the lowest incomes.

Not only are the median incomes of incarcerated people prior to incarceration lower than non-incarcerated people, but incarcerated people are dramatically concentrated at the lowest ends of the national income distribution:

# EXHIBIT 9

# How much do incarcerated people earn in each state?

Prison wages come up again and again in the context of prison conditions and policies. So, we found the most up-to-date information for each state.

by Wendy Sawyer, April 10, 2017

How much do incarcerated people earn? For this update, we combed through the policies of state correctional agencies and any other available sources, and found information for every state. Despite the inaccessibility of data for some state prison jobs, this is the most comprehensive list of wages paid to incarcerated people available today:

*Wages are per hour. Some states publish wage policies differently. For states that calculate wages on daily, weekly, monthly, and annual bases, I calculated the hourly rates based on work hours per day and work days per month, according to the written policies or what was reported in the 2001 Corrections Yearbook survey. For states where I could find no information on work hours, I assumed 22 work days per month and an average workday of 6.35 hours (for regular jobs) or 6.79 hours (for industry jobs) per day. I included all non-industry jobs paid by correctional agencies as "regular prison jobs" for the table, including rare and off-site jobs that pay more. In many states, most regular prison jobs pay well below the highest rates stated here. See the Appendix for policy details.*

| | Regular jobs (non-industry) | | Jobs in state-owned businesses ("Correctional Industries") | |
|---|---|---|---|---|
| | **Low** | **High** | **Low** | **High** |
| Alabama | 0.00 | 0.00 | 0.25 | 0.75 |
| Alaska | 0.30 | 1.25 | 0.65 | 4.90 |

| Arizona | 0.15 | 0.50 | 0.20 | 0.80 |
|---|---|---|---|---|
| Arkansas | 0.00 | 0.00 | 0.00 | 0.00 |
| California | 0.08 | 0.37 | 0.30 | 0.95 |
| Colorado | 0.13 | 0.38 | n/a | n/a |
| Connecticut | 0.13 | 1.00 | 0.30 | 1.50 |
| Delaware | n/a | n/a | 0.25 | 2.00 |
| Florida | 0.00 | 0.32 | 0.20 | 0.55 |
| Georgia | 0.00 | 0.00 | 0.00 | 0.00 |
| Hawaii | 0.25 | 0.25 | 0.50 | 2.50 |
| Idaho | 0.10 | 0.90 | n/a | n/a |
| Illinois | 0.09 | 0.89 | 0.30 | 2.25 |
| Indiana | 0.12 | 0.25 | n/a | n/a |
| ⁝ Show all states ⁝ | | | | |
| **Average** | **0.14** | **0.63** | **0.33** | **1.41** |

One major surprise: prisons appear to be paying incarcerated people *less* today than they were in 2001. The average of the minimum daily wages paid to incarcerated workers for non-industry prison jobs is now 86 cents, down from 93 cents reported in 2001. The average maximum daily wage for the same prison jobs has declined more significantly, from $4.73 in 2001 to $3.45 today. What changed? At least seven states appear to have lowered their maximum wages, and South Carolina no longer pays wages for most regular prison jobs – assignments that paid up to $4.80 per day in 2001. With a few rare exceptions, regular prison jobs are still unpaid in Alabama, Arkansas, Florida, Georgia, and Texas.

Incarcerated people assigned to work for state-owned businesses earn between 33 cents and $1.41 per hour on average – roughly twice as much

How much do incarcerated people earn in each state? | Prison Policy Initiative
Case 3:20-cv-05309-CRB   Document 11   Filed 08/04/20   Page 71 of 278
7/30/20, 5:15 PM

as people assigned to regular prison jobs. Only about [6 percent](#) of people incarcerated in state prisons earn these "higher" wages, however. An even tinier portion of incarcerated workers are eligible for "prevailing local wages" working for private businesses that contract with states through the [PIE program](#). The vast majority spend their days working in custodial, maintenance, grounds keeping, or food service jobs for the institutions that confine them.

The wages listed above do not include any deductions, which in reality often leave incarcerated workers with less than half of their gross pay. In [Massachusetts](#), for example, at least half of each paycheck goes into a savings account to pay for expenses after release. "Any and all funds" can be used to pay court-assessed fines, court costs, victim witness assessments, etc. [New Mexico](#) deducts 15-50% of each paycheck for a Crime Victims Reparations Fund, discharge money, and family support. These policies arguably serve legitimate purposes, but such deductions also mean that $1 per day earned to make day-to-day life behind bars more bearable is really 50 cents (or even less).

The question of wages paid for prison labor is an important one, especially when we consider the *relative costs* of [fees charged](#) and [things sold](#) to incarcerated people. The value of a dollar is different when you earn pennies per hour. (And in six states, the wage is almost always zero pennies per hour.) In [Colorado](#), for example, it costs an incarcerated woman two weeks' wages to buy a box of tampons; maybe more if there's a [shortage](#). Saving up for a $10 phone card would take almost two weeks for an incarcerated person working in a [Pennsylvania](#) prison.

*With no savings, how can people possibly afford the immediate costs of food, housing, healthcare,*

*transportation, child support, and supervison fees once released?*

Making it hard for incarcerated people to earn real money hurts their chances of success when they are released, too. With little to no savings, how can they possibly afford the immediate costs of food, housing, healthcare, transportation, child support, and supervison fees? People with felony convictions are often ineligible for government benefit programs like welfare and food stamps, and face barriers to finding stable housing and employment. And they may leave prison with just a bus ticket and $50 of "gate money," if they have no other savings. So the meager earnings from prison work assignments can be essential to a person's success – and even survival – when they return to their community.

Most prison jobs teach incarcerated people very few skills relevant to the labor market they will rejoin upon release, so the wages they earn may be the only payoff they see. These perpetually low wages are especially frustrating when we consider the increasing expenses incarcerated people face, both inside and after release. Of course, raising wages is a tough sell politically, but policymakers and the public must acknowledge that almost everyone in prison will eventually be released. Their success and independence depends largely on financial stability, which is undermined by low wages, nickel-and-diming through "user fees," mandatory deductions, and work that does little to prepare them for work outside of prisons. Forward-thinking policymakers must consider the importance of earnings and relevant job training for people they hope will be independent one day.

For details about each state's wage policies, see the Appendix.

*Updated April 28, 2017 with information from a new source on Oklahoma's*

*regular prison jobs (non-industry). Originally, I included information based on a DOC website statement that these jobs pay up to $20 per month. According to DOC policy, however, most pay between $7.23 and $14.45 per month, and the highest possible wage for "special project pay" is 54 cents per hour. The averages have been updated to reflect these changes as well.*

# EXHIBIT 10

PRISON
POLICY INITIATIVE

# The Company Store:
# A Deeper Look at Prison Commissaries

By Stephen Raher
May 2018
Press release

Prison commissaries are an essential but unexamined part of prison life. Serving as the core of the prison retail market, commissaries present yet another opportunity for prisons to shift the costs of incarceration to incarcerated people and their families, often enriching private companies in the process. In some contexts, the financial exploitation of incarcerated people is obvious, evidenced by the outrageous prices charged for simple services like phone calls and email. When it comes to prison commissaries, however, the prices themselves are not the problem so much as forcing incarcerated people — and by extension, their families — to pay for basic necessities.

Understanding commissary systems can be daunting. Prisons are unusual retail settings, data are hard to find, and it's hard to say how commissaries "should" ideally operate. As the prison retail landscape expands to include digital services like messaging and games, it becomes even more difficult and more important for policymakers and advocates to evaluate the pricing, offerings, and management of prison commissary systems.

## The current study

To bring some clarity to this bread-and-butter issue for incarcerated people, we analyzed commissary sales reports from state prison systems in Illinois, Massachusetts, and Washington. We chose these states because we were able to easily obtain commissary data, but conveniently, these three states also represent a decent cross section of prison systems, encompassing a variety of sizes and different types of commissary management. [1]

We found that incarcerated people in these states spent more on commissary than our previous research suggested, and most of that money goes to food and hygiene products. We also discovered that even in state-operated commissary systems, private commissary contractors are positioned to profit, blurring the line between state and private control.

Lastly, commissary prices represent a significant financial burden for people in prison, even when they are comparable to those found in the "free world." Yet despite charging seemingly "reasonable" prices, prison retailers are able to remain profitable, which raises serious concerns about new digital products sold at prices far in excess of market rates.

## How much do incarcerated people spend in the commissary?

In Illinois and Massachusetts, incarcerated people spent an average of over $1,000 per person at the commissary during the course of a year. Annual per capita sales in Washington were about half as much. [2]

| | Illinois | Massachusetts | Washington | Average |
|---|---|---|---|---|
| Annual Commissary Sales | $48,416,118 | $11,713,446 | $8,696,721 | |
| Avg Daily Prison Pop | 43,199 | 9,703 | 16,943 | |
| Per-person Annual Sales | $1,121 | $1,207 | $513 | $947 |
| Commissary operator | State DOC | Contractor (Keefe) | State DOC | |

*Table 1.* Incarcerated people spent an average of $947 per person, per year, in the three sampled states. Spending did not seem to vary based on whether the commissary operator was private (as in Massachusetts) or state-run (in Illinois and Washington). See Footnote 2 and Footnote 4 for details about the data sources.

Per-person commissary sales for the three sampled states amounted to $947, well over the typical amount incarcerated people earn working regular prison jobs in these states ($180 to $660 per year). The per-person sales were also higher than a previous survey had suggested.[3] In 2016, we estimated that prison and jail commissary sales amount to $1.6 billion per year nationwide, based in part on data from a 34-state survey by the Association of State Correctional Administrators. But the more recent and more detailed data presented in this report suggest that commissary might be an even higher-grossing industry than we previously thought.

There were important state differences in commissary sales, however. Washington's per-person average was dramatically lower than the other two states'. The reason for this difference isn't entirely clear, but it seems that personal property policies issued by the Department of Corrections are at least partially responsible for this significant disparity.

## What are people buying?

Annual per-person sales averages only tell part of the story. We also wanted to look closely at what people were spending their money on. To do this, we obtained detailed inventory reports from the three commissary systems and categorized (when possible) each inventory item and its commensurate sales figures.[4]



Annual prison commissary sales in three states, per person

unappealing food. Another leading problem with prison food is inadequate nutritional content. While the commissary may help supplement a lack of calories in the cafeteria (for a price, of course), it does not compensate for poor quality. No fresh food is available, and most commissary food items are heavily processed. Snacks and ready-to-eat food are major sellers, which is unsurprising given that many people need more food than the prison provides, and the easiest — if not only — alternatives are ramen and candy bars.

These data contradict the myth that incarcerated people are buying luxuries; rather, most of the little money they have is spent on **basic necessities**. Consider: If your only bathing option is a shared shower area, aren't shower sandals a necessity? Is using more than one roll of toilet paper a week really a luxury (especially during periods of intestinal distress)? [5] Or what if you have a chronic medical condition that requires ongoing use of over-the-counter remedies (e.g., antacid tablets, vitamins, hemorrhoid ointment, antihistamine, or eye drops)? All of these items are typically only available in the commissary, and only for those who can afford to pay.

> *It's a myth that incarcerated people are buying luxuries; rather, most of the little money they have is spent on basic necessities.*

Bringing this discussion into the realm of the concrete, consider the following examples from Massachusetts. In FY 2016, people in Massachusetts prisons purchased over 245,000 bars of soap, at a total cost of $215,057. That means individuals paid an average of $22 each for soap that year, even though DOC policy supposedly entitles them to one free bar of soap per week. [6] Or to take a different example: the commissary sold 139 tubes of antifungal cream. Accounting for gross revenue of just $556, the commissary contractor is obviously not getting rich selling antifungal cream, no matter the mark-up—instead, the point is that it's hard to imagine why anyone would purchase antifungal cream other than to treat a medical condition. Yet Massachusetts has forced individual commissary customers to pay for their own treatment, at $4 per tube, which can represent four days' wages for an incarcerated worker. [7]

## How do incarcerated people afford commissary?

### Policies drive consumption: property ownership and prison pay rates

One thing that may encourage or suppress commissary sales are prison policies regarding property ownership. Washington, with its low per-capita sales, has a statewide personal property policy that strictly limits the types and number of items people can own. The intersection between the policy and the commissary is most clearly seen in the area of clothing: beyond the standard-issue wardrobe, males are allowed only four items (a hat, raingear, shoes, and sandals). Not surprisingly, given this parsimonious policy, clothing sales in the Washington DOC commissary are extremely low, at an average of $1 per person per year. But in Illinois, where property ownership rules vary from prison to prison, there are apparently more opportunities for people to purchase their own clothes, since annual spending on apparel averages $77 per person.

Another factor that may influence commissary spending habits is the pay rate for incarcerated labor. To be clear, not all incarcerated people are lucky enough to have jobs, no state pays even close to minimum wage to incarcerated workers, and most money spent in commissaries is probably traceable to funds transferred in from family members. [8]

For many people in prison, their meager earnings go right back to the prison commissary, not unlike the sharecroppers and coal miners who were forced to use the "company store." When their wages are not enough, they must rely on family members to transfer money to their accounts — meaning that families are effectively forced to subsidize the prison system. [9] Others in prison who lack such support systems simply can't afford the commissary at all.

| Item | Illinois | | Massachusetts | | Washington | | Amazon |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Commissary | Local Retail | Commissary | Local Retail | Commissary | Local Retail | |
| VO5 shampoo 12.5 oz. bottle | $1.25 (LIN) to $1.69 (VIE) | $0.99 (Jewel, Chicago) | $1.38 | $1.29 (Star Market, Cambridge) | $1.71 (no size specified) | $1.19 (Bartell's Drugstore, Seattle) | $4.88 |
| Bic twin razor (single) | $0.12 (HIL) to $0.18 (LIN) | $0.35 (based on $3.49 for pkg of 10) (Jewel) | $0.15 | Unable to locate; comparable product (Gillette) available @ $1.20 (based on $11.99/pk of 10) | $0.22 | $1.20 (based on 5.99 for pkg of 5) (Bartell's) | $0.57 (based on $5.72 for pkg of 10) |
| Maruchan beef ramen | $0.25 (multiple locations) | $0.34 (based on $1 for pkg of 3) (Jewel) | $0.40 | $0.59 (Star Market) | $0.25 or $0.29 (no brand specified) | $0.89 (IGA Seattle) | $0.71 (based on $16.99 for case of 24) |
| Mrs. Dash 2.5 oz. bottle | $2.98 (multiple) to $3.26 (multiple) | $2.99 (Jewel) | $2.40 | $3.49 (Star Market) | not available | $4.09 (IGA Seattle) | $2.94 |

*Table 3.* *While prices for some items are comparable or even lower than prices found in free-world stores, the costs are significant for incarcerated people and their families. (Note that in Illinois, commissary prices vary by facility, so the abbreviations for facilities charging the lowest and highest prices are given.) See Footnote 4 for data sources.*

The other thing to keep in mind when comparing commissary prices to the free world is that people in prison have drastically less money to spend. So, while $1.87 may sound like a fair price to pay for a month's worth of dental floss, the transaction feels very different from the perspective of someone in a Massachusetts prison who earns 14 cents per hour and has to work over 13 hours to pay off that floss. [12] Or, to consider a different scenario: the average person in the Illinois prison system spends $80 a year on toiletries and hygiene products — an amount that could easily represent almost half of their annual wages. [13]

## Privatization can take different forms

When a prison system's commissary is run by a private company, it raises logical concerns about fairness and coercion. In 2016, when one of the largest prison food service/commissary companies (Trinity Services Group) merged with another dominant commissary company (Keefe Group), we expressed concerns about the concentration of power and diminished competition — and quality — that would result. The passage of time has confirmed these fears: by 2017, maggots, dirt, and mold were reported in meals served by Trinity; these quality problems along with small portions led to multiple prison protests and $3.8 million in fines for contract violations in Michigan alone.

But exploitation can occur even if a system is not fully privatized. Of the three states we examined, only Massachusetts has a contractor-operated commissary system. It also has the highest per-person average commissary spending. It is tempting to conclude that the profit motive of commissary contractors leads to higher mark-ups and thus higher per capita spending, but we would need a larger sample size to test this hypothesis. What is notable in our three-state survey is that Illinois, with its state-run commissary, had per capita sales almost as high as Massachusetts' contractor-run system, so a state-run system is

# EXHIBIT 11

NEWS

# The Hidden Cost of Incarceration

*Prison costs taxpayers $80 billion a year. It costs some families everything they have.*



Telita Hayes has spent thousands of dollars keeping in touch with her ex-husband, William Reese, who is incarcerated at Louisiana State Penitentiary. OLIVIA PERILLO FOR THE MARSHALL PROJECT AND THE NEW YORK TIMES

By **NICOLE LEWIS** and **BEATRIX LOCKWOOD**

Every month, Telita Hayes adds nearly $200 to the commissary account for her ex-husband, William Reese, who has been in the Louisiana State Penitentiary for 28 years.

Each prisoner there is given three meals a day and some personal hygiene items, like soap and toothpaste. But when Reese gets hungry between meals, or when his state-issued supplies run out, the commissary money buys him extra food and other necessities.

That is not the only way his imprisonment drains her wallet. On top of the $2,161 she has put in his commissary account so far this year, Hayes has paid $3,586 in charges for talking to him on the

The Marshall Project is partnering with The New York Times <u>Race/Related newsletter</u> to present a weeklong series on families of the incarcerated. This is the first of five parts.

phone when she cannot make the hourlong drive to the prison, and even $419 for emails sent through the prison's email system.

The Bureau of Justice Statistics reckons that the United States spends more than $80 billion each year to keep roughly 2.3 million people behind bars. Many experts <u>say that figure is a gross underestimate</u>, though, because it leaves out myriad hidden costs that are often borne by prisoners and their loved ones, with women overwhelmingly shouldering the financial burden. These costs rise during the holiday season, relatives of people in prison say, as they make more visits, call more often and send more care packages.

National data is rarely gathered on how much prisoners' families pay into the corrections system. So to better understand the hidden costs of incarceration, The Marshall Project asked people to document their spending. Nearly 200 people responded. Many families said they shell out hundreds of dollars each month to feed, clothe and stay connected to someone behind bars, paying for health care, personal hygiene items and phone calls and other forms of communication.



Hayes pulled out a t-shirt with her ex-husband's photo on it that she made to attend a rodeo. OLIVIA PERILLO FOR THE MARSHALL PROJECT AND THE NEW YORK TIMES

Hayes said she spends an additional $200 on visits and phone calls around Christmastime. Prison is tough enough; surviving it alone is even harder—especially during the holidays.

"I think the biggest misconception that people have about prison is that 'the state' pays for everything," wrote Connie Martin, 50, from Hazel Park, Michigan. "No one realizes that it's the

friends and families of loved ones that pay."

The Prison Policy Initiative, an organization working to reduce mass incarceration, estimates that families spend $2.9 billion a year on commissary accounts and phone calls. Families are also often responsible for paying court fees, restitution and fines when a member goes to prison. According to a 2015 report by the Ella Baker Center for Human Rights, Forward Together, and Research Action Design, the average family paid roughly $13,000 in fines and fees.

Kae Boone, 52, says she spends $100 a month on her boyfriend, Charles Lee Isaac, 52, who is incarcerated at the Graceville Work Camp in Graceville, Florida, for failing a drug test, a violation of his parole for an earlier offense. Boone says the money mostly goes toward toiletries and food. The one hotel-sized bar of soap Isaac gets each week from the prison won't last through a full week of showers.

Keeping him clean and fed has forced Boone to make trade-offs in her own life. Sometimes she struggles to pay her own bills. "I had one of my cars repossessed because I would prefer to send him money and make sure he's taken care of," she said.

In many facilities, basic items are sold by private vendors, often with substantial markups or added service fees. Over the years, the cost to families has increased as prisons and jails across the country increasingly outsource many of the basic functions of running a correctional facility to private companies.

Hayes puts on her ex-husband's favorite shoes at her home as she prepares to go visit him at The Louisiana State Penitentiary. OLIVIA PERILLO FOR THE MARSHALL PROJECT AND THE NEW YORK TIMES

It is a trend that has accelerated since the 2008 recession, as state legislatures have looked for ways to bring down the rising cost of incarceration, according to Hadar Aviram, a professor at the University of California, Hastings College of the Law. "Public prisons are public only by name," she said. "These days, you pay for everything in prison."

Prison officials often say the switch to private vendors makes the prisons more secure and prevents contraband from being smuggled in with outside food or gifts. Many families say they're now paying more for the same goods they used to be able to purchase on their own.

"Back in the day, we could buy underwear and tennis shoes and jeans and have it shipped directly to the inmate," said Hayes, who is 50. Now, she said, she has to go through approved vendors.

"The price is jacked up on everything," she said. Over the two years since the couple reconnected after a 12-year separation, Hayes estimates that she has spent upward of $10,000 supporting him in prison. Her ex-husband is serving a life sentence for aggravated rape, so the costs of staying in touch could extend for many years.

When Dawn Hodges, 47, moved back to her hometown, she learned that her childhood friend T.J. Davis, also 47, was serving a two-year sentence for driving on a suspended license. Davis had been in and out of prison over the years as he struggled to overcome a drug addiction. Although he had been sober and out of trouble for nearly a decade, the driving charge violated the terms of his parole.

At first, Hodges wrote Davis letters. But when their exchanges rekindled old feelings, they wanted to stay in touch more often, so Hodges bought Davis a tablet device. The tablets, which cost $80, offer Florida prisoners more ways to connect with people back home, including email and video calls—but at a price.

Each email requires a digital "stamp," which costs $12 for a set of 30. Pictures and attachments require an additional stamp. Hodges says she emails Davis at least once a day, blowing through 30 to 40 stamps a month.

Jennifer Erschabek, executive director of the Texas Inmate Families Association, considers the money that people like Hodges spend an additional tax. The high prices are the result of contracts that are written with profits in mind, she said. Texas recently reduced the cost of telephone calls with prisoners to 6 cents a minute, from 23 cents, by negotiating a better deal with the provider.

In states where the rates are still exorbitant, it is perilously easy to binge on expensive services to stay in touch. As a result, people trade tips for saving money through numerous Facebook groups and chat rooms for families of the incarcerated.

The Louisiana State Penitentiary,
known as Angola Prison, in
December. OLIVIA PERILLO FOR THE
MARSHALL PROJECT AND THE NEW YORK TIMES

Whatever their workarounds, family members said the strain of finding the money to stay in touch and ease the burdens of incarceration exacts a continual emotional toll.

"At times I can't afford stamps, and my loved one feels forgotten about, but life is expensive out here," wrote Jestine Pudlo, 24, of Crystal River, Florida. "I can't afford to put money on the phone, either, so I have to decline calls, and it hurts my heart to do that."

In November and December, people incarcerated in federal prisons are allowed to receive an extra 100 minutes of phone calls. Family members say the extra time can feel like a lifeline because of restrictions on receiving gifts from outside prison.

Those limitations make calls and visits around the holidays extremely important, wrote Sheena Perron, 34, from St. Paul, Minnesota. "I find myself willing to put myself in a financial crunch just to make that communication happen!"

# EXHIBIT 12

# PRISON
## POLICY INITIATIVE

# Following the **Money** of Mass Incarceration

By Peter Wagner and Bernadette Rabuy
January 25, 2017

The cost of imprisonment — including who benefits and who pays — is a major part of the national discussion around criminal justice policy. But prisons and jails are just one piece of the criminal justice system and the amount of media and policy attention that the various players get is not necessarily proportional to their influence.

In this first-of-its-kind report, we find that the system of mass incarceration costs the government and families of justice-involved people at least $182 billion every year. In this report:

- we provide the significant ① costs of our globally unprecedented system of mass incarceration and over-criminalization,
- we give the relative importance of the various parts,
- we highlight some of the under-discussed yet costly parts of the system, and then
- we share all of our sources so that journalists and advocates can build upon our work.





Our goal with this report is to give a hint as to how the criminal justice system works by

agencies providing police protection, judicial, or correctional services, sheriffs'
expenditures are prorated by function to corrections, policing, and judicial and legal. ⑱

**Civil asset forfeiture:**  Our $4.5 billion figure reflects the net assets of the
Department of Justice and Treasury forfeiture funds in fiscal year 2014 as reported on
page 10 of the Institute for Justice's 2015 report, Policing for Profit: The Abuse of Civil
Forfeiture, 2nd Edition. According to the Institute for Justice, net assets are a more stable
metric than annual deposits into the forfeiture funds (over $5 billion) because net assets
measure the funds remaining after the government pays various obligations like payments
to victims. Notably, this figure is an undercount of the total because it does not include
state forfeiture revenue. According to the Institute of Justice, "Unfortunately, deriving
similar totals at the state level is impossible because most states require little to no public
reporting of forfeiture activity. However, of the [26] states from which the Institute for
Justice was able to obtain usable data, the totals are" more than $254 million. (page 11)

There is likely some overlap between the $4.5 billion net assets of the Department of
Justice and Treasury forfeiture funds and the expenditures reported for the policing and
judicial and legal systems. We didn't adjust the policing and judicial and legal system
figures because it is likely impossible to figure out how much overlap there is and to
determine how the money is distributed among the various government agencies. The
federal government and states vary in what percentage of the seized property can be kept
by the law enforcement agency that seized the property.

While this report adjusts policing and judicial and legal costs to focus on the *criminal*
parts of these systems and exclude the civil parts, we include *civil* asset forfeiture because
civil asset forfeiture is a mechanism by which law enforcement agencies can seize and
retain property on the suspicion that the property is connected to a *crime*.

**Bail fees:**   In its report, For Better or For Profit: How the Bail Bonding Industry
Stands in the Way of Fair and Effective Pretrial Justice, the Justice Policy Institute uses a
figure of $14 billion in bail bonds written every year, and cites its source as an email
from Dennis Bartlett from the American Bail Coalition (which lobbies on behalf of the
bail bondsman industry) in footnote 2 of the Executive Summary of the report. Since
defendants and their family members typically pay 10% to commercial bail bond
agencies as a nonrefundable fee, this comes out to $1.4 billion actually paid by the
families. To learn more about the high costs of money bail in the U.S., see our report
Detaining the Poor: How money bail perpetuates an endless cycle of poverty and jail
time.

**Commissary:**   For our calculations of the total value of commissary expenditures, see
Stephen Raher, Paging anti-trust lawyers: Prison commissary giants prepare to merge,

July 5, 2016. We assigned incarcerated people's commissary purchases to a section on money spent by families precisely because incarcerated people don't make very much money. Many people confined in jails don't work, and four state prison systems ⑲ don't pay at all. And the states that pay for work aren't much better. Looking at just the states that paid incarcerated people for non-industry work in 2001, the average minimum wage *per day* was 93 cents. Therefore, the majority of the money spent on commissary comes from the families of incarcerated people and not from the incarcerated people themselves.

As with the telephone industry (below), a portion of this cost to the families feeds back into the $81 billion correctional budgets via the corrupt commission system — where private companies provide commissary services for correctional facilities but share a percentage of the revenue with the government. In this way, it's possible we are counting these dollars twice in our total estimate, although our methodology of ignoring costs under a billion dollars more than makes up for any double counting in this respect.

**Telephone calls:**   Lee Petro, pro bono counsel for the Wright Petitioners analyzed the 2015 financial reports of 13 prison telephone companies, including the nation's largest, which were required to submit that information to Alabama state regulators. For one large company, CenturyLink, he used the 2014 figure because an accounting change at that company included its other, non-prison related, businesses in the 2015 figure, but he expects the telephone figure for CenturyLink to be generally unchanged from 2014 to 2015. Other companies not regulated by the state of Alabama are not included, so this is a slight under-estimate. In some locations these costs are physically paid by incarcerated people and in some cases by the families, but regardless of who makes the payment, the source of the funds is almost entirely the families.

A large portion of this cost to the families feeds back into the $81 billion correctional budgets via the corrupt commission system — where contracts are awarded not on the basis of the best price and service to the consumer but on the size of the revenue that is paid to the government authority that awards the monopoly contract. In this way, it's possible we are counting these dollars twice in our total estimate, although our methodology of ignoring costs under a billion dollars more than makes up for any double counting in this respect.

**Public Corrections Agencies:**   The Bureau of Justice Statistics reports that the combined total of federal, state and local expenditures on corrections — which includes prisons, jails, juvenile facilities, probation and parole, and immigration detention was $80.7 billion in 2012. Within this cost, we provide more detail:

- **Public employees:** We multiplied the March 2012 payroll amount of $3,199,078,000 for the 749,418 corrections employees at the federal, state, and

# EXHIBIT 13

Case 3:20-cv-05309-CRB Document 11 Filed 08/04/20 Page 91 of 278

San Quentin State Prison.

(Photo by Justin Sullivan/Getty Images)

**Juan Moreno Haines**

Apr 16, 2020

SHARE







# IN OVERCROWDED SAN QUENTIN, CORONAVIRUS SHELTER-IN-PLACE MEASURES MEAN DECREASED QUALITY OF LIFE

With programming paused and prison jobs reduced, people inside will not be able to earn good-time credits and are cut off from a means of supporting themselves.

*Juan Moreno Haines is an award-winning incarcerated journalist and a member of the Society of Professional Journalists.*

Before COVID-19 came to San Quentin, the state prison was already dangerously overcrowded. Now that the virus is here, crowding is making it difficult to maintain social distancing—keeping a distance of at least 6 feet between people, as recommended by the Centers for Disease Control and Prevention.

Programming has been cancelled, and prisoners will miss out on opportunities to earn good-time credits and may face longer prison stays as a result. Many can no longer work their jobs, cutting off the only means that some of San Quentin's older and longer-sentenced population, whose loved ones have passed away, have to support themselves.

On April 12, San Quentin's North Block was at 183 percent capacity, housing 757 prisoners in 414 cells. West Block was at 191 percent capacity, with 859 prisoners in 449 cells.

Each 4-by-10-foot cell has a metal sink and toilet that two prisoners share. The bunk beds are 2 1/2 feet wide and 6 feet, 5 inches long. There's about 3 feet of clearance between the bunks. Two 6-cubic-foot lockers are attached to the side and back wall. Additional storage space is found under the bottom bunk and on top of the back wall locker.

Overcrowding was deadly long before the pandemic. In 2011, the United States Supreme Court said that crowding in California's prisons created an inadequate medical care delivery system that caused unnecessary deaths. The conditions violated the U.S. Constitution's ban against cruel and unusual punishment. As a remedy, the California Department of Corrections and Rehabilitation (CDCR) was ordered to reduce the total prison population to 137.5 percent of the system's designed capacity. The court left it up to CDCR to figure out a plan, and gave prison officials leeway to keep some prisons above 137.5 percent of designed capacity so long as other prisons' populations were low enough to balance things out. The court appointed J. Clark Kelso as receiver to carry out the court order.

While the state has made some underlined overall reductions in its prison population since then, San Quentin's North and West Blocks have remained crowded.

Spokespersons from the Ella Baker Center for Human Rights wrote to San Quentin prisoners, "We and our allies continue to request for a reduction of prison capacity by releasing older folks and those with chronic health conditions."

On April 1, CDCR top administrator Ralph M. Diaz and Kelso issued a joint memorandum to prison employees. "In order to reduce the spread of COVID-19, and avoid the dangerous consequences of transmission, we have determined that it is necessary to accelerate the release of certain nonviolent inmates who are within 60 days of release, and some patients receiving hospice care," it read. "There may be further steps at population reduction which may need to be taken in the next days or weeks, and we will inform you of those decisions if and when they are made."

⬚ ⬚ ⬚

To prevent the spread of the virus, new restrictions have been added to daily life. North and West Blocks have alternated access to the prison yard, with segments of the blocks visiting in shifts.

During a March 13 meeting with prison officials, the San Quentin Inmate Advisory Council (IAC) asked to receive notifications and status reports "during quarantines or modified programs." IAC President Christopher Scull, who said he acts as a liaison "for policy issues and to dialogue between both parties," led the meeting.

The administration responded that "communication is very important during moments like this."

On March 20, a federal judge created a task force of lawyers, CDCR officials and others to address the COVID-19 pandemic's effect on California's prisons.

Prison officials report that since March 26, all individuals are screened every time they enter a facility or CDCR office. Persons showing any symptoms of respiratory illness are not permitted to enter.

On March 30, Diaz issued a memo to the prisoner population that partly read: "We have stopped programs, we have limited movement, and we are no longer allowing volunteers and program providers to come into our institutions."

"The families of incarcerated people have not gone untouched in these decisions," the memo continued. "We know the impact a support system has on an incarcerated person's success is immeasurable. With that in mind, I have asked our partners to brainstorm ways to increase opportunities for engagement between the incarcerated populations and their support systems."

The reduction in programming comes at a time when state lawmakers are considering a measure, introduced in late February, that would prevent disruptions to credits due to transfers, and ensure that "programming is offered even if the facility is on lockdown and that credits are received when the prison cancels a program."

Free telephone calls by Global Tel Link "will be available from 12:01 a.m. to 12:59 p.m. Tuesdays, Wednesdays and Thursdays through the end of April 2020," Diaz's March 30 message said. "JPay is now offering reduced-priced emails to registered users at its current pilot sites: High Desert State Prison, Kern Valley State Prison, California Institution for Women, Central California Women's Facility and Substance Abuse Treatment Facility. Free emails will be available for those who are unable to pay."

On March 31, a program status report read: "All inmates housed in North Block, West Block, East Block, Alpine Section and Donner Section Condemned and Reception, will remain on medical quarantine to manage exposure to influenza. All housing units are closed to intake. Only critical workers assigned to healthcare facilities maintenance (hospital janitors), prison industries authorities (mattress and furniture workers), food services (meals are served in the housing units) receiving and release (vendor packages are delivered to the housing units), canteen (social distancing is practiced at the prison store) shall be released to work assignments after being screened by medical staff."

Since April 6, those assigned to prison industries authorities have not returned to work.

"Phones, including non-confidential legal phone calls, shall continue with cleanings between uses," the program status report read. "Arrangements for confidential legal calls (reserved for actual BPH hearings and emergent issues involving important legal rights) shall be coordinated through the litigation coordinators' office." □

INCARCERATION   CALIFORNIA   CORONAVIRUS   PRISON CONDITIONS   PRISON OVERCROWDING
SAN QUENTIN

# More in Incarceration

**AFTER 78 DAYS, MICHIGAN TEEN WHO** | **CORONAVIRUS IN JAILS AND PRISONS**

# EXHIBIT 14



# Racial Disparities in Incarceration and Coronavirus

New data from states and cities around the United States shows that Black and Latino people are getting sick and dying from the novel coronavirus at alarming, and heavily disproportionate, rates. In Chicago, Black people account for almost three-quarters of virus-related fatalities, but less than a third of the city's population. In New York City, Latino and Black residents are dying at twice the rate of white residents when adjusted for age. Similar disparities, particularly for Black Americans, are repeated in other states and cities reporting infections or deaths by race, including Mississippi, Michigan, Louisiana, Las Vegas, and North and South Carolina, as well as a new report on hospitalizations from the Centers for Disease Control. Although there is not yet data on the impact on other racial and ethnic minority communities, including Native Americans, high rates of underlying health conditions could cause similar disparities as infections expand across the country. People of color in the United States are less likely to be insured, more likely to have existing health conditions, more likely to work in jobs that continue to expose them to the virus, and less likely to be tested and treated when ill.

All of these existing disparities are concentrated and compounded in America's system of mass incarceration. High rates of infection and death among people of color are likely to get even higher as the coronavirus spreads through the nation's jails and prisons.

- Black people make up 13% of the U.S. population but 33% of the prison and jail population, while Latinos make up 18% of the U.S. population and 23% of the prison population.

- This means that Black people are imprisoned at 6x the rate of white people in the United States while Latinos are imprisoned at 3x the rate.

- One in three Black men born today can expect to be incarcerated in his lifetime, compared to one in six Latino men and one in 17 white men. [1]

- Black people have higher bail set, and are more likely to be detained in jail pretrial, meaning while legally innocent. [2]

- Black defendants tend to be sentenced more severely than comparably situated white defendants for less serious crimes. [3]

- Long sentences have led to massive growth in older, more medically vulnerable populations in prison. In 2013 there were over 84,000 Black people and 36,000 Latino people 50 years or older in state prisons across the nation, up from 13,000 and 6,200 respectively in 1993.

- These disparities within the system lead to similar disparities in the community: Black adults are 50% more likely to have had a family member incarcerated than white people, but 3x more likely to have had a family member incarcerated for more than a year. This means that nearly 2 in 3 Black adults has had a family member spend at least a night in jail or prison and nearly 1 in 3 has had a family member spend more than a year in prison.

  - Latino people experience family incarceration at rates slightly higher than white people, but they are nearly twice as likely to have a family member in jail or prison for more than one year.

  - Native Americans also have very high rates of family incarceration—six out of 10 (63 percent) have had an immediate family member spend at least one night in jail or prison.

---

[1] The Sentencing Project, Trends in U.S. Corrections (Washington, DC: The Sentencing Project, 2017), 5, https://perma.cc/G3Y4-JE3L.

[2] Cynthia E. Jones, "'Give Us Free': Addressing Racial Disparities in Bail Determinations," New York University Journal of Legislation and Public Policy 16, no. 4 (2013), 919-62, 938-39, https://www.nyujlpp.org/wp-content/uploads/2014/01/Jones-Give-Us-Free-16nyujlpp919.pdf.

[3] Tushar Kansal, Racial Disparity in Sentencing: A Review of the Literature (Washington, DC: The Sentencing Project, 2005), 4-5, https://perma.cc/67L2-2C7S. Carlos Berdejó, "Criminalizing Race: Racial Disparities in Plea Bargaining," Boston College Law Review 59 (2018), 3, https://lawdigitalcommons.bc.edu/cgi/viewcontent.cgi?article=3659&context=bclr.

**FWD.us** is a bipartisan political organization that believes America's families, communities, and economy thrive when more individuals are able to achieve their full potential. To learn more, go to **www.fwd.us**.

# EXHIBIT 15

Case 3:20-cv-05309-CRB   Document 11   Filed 08/04/20   Page 97 of 278



# Center for American Progress

RACE AND ETHNICITY

# The Economic Fallout of the Coronavirus for People of Color

By Connor Maxwell and Danyelle Solomon  |  April 14, 2020, 9:20 am



Getty/Joe Raedle

A woman gives vouchers for groceries, provided by the food bank Feeding South Florida, to people lined up in their vehicles on April 6, 2020, in Sunrise, Florida.

The United States is in the midst of a major economic disaster. In recent weeks, public officials have closed schools, shuttered businesses, and restricted mobility in order to limit the spread of the

coronavirus, which as of April 14 has killed more than 23,500 Americans and infected hundreds of thousands more. These public health measures are essential, but they come at a cost: Millions of Americans have now lost their jobs, and countless businesses are predicting diminished revenues and experiencing profound financial uncertainty.

Nowhere are the effects of this current emergency more acute than in communities of color, which have long endured occupational segregation, economic exploitation, and employment discrimination. These factors put people of color at greater risk of unemployment and limit their ability to weather economic downturns. The coronavirus does not discriminate based on race, but without immediate action, its economic fallout will disproportionately affect communities of color.

Because social distancing is necessary to protect overall public health, federal and state governments must make it financially possible for people to stay home by expanding economic assistance programs, easing debt burdens, and protecting against predatory lending and employment discrimination. And as policymakers continue to pass policies and institute new practices, it's important that they avoid repeating the mistakes of their predecessors. Some of the boldest universal policies of the 20th century contained explicitly or implicitly discriminatory provisions that prevented people of color from obtaining the full benefits to which they were entitled. Today, new calls for a massive recovery and an urban revitalization plan evoke both hope and apprehension in communities of color. It is critical that lawmakers ensure a robust and equitable recovery by taking targeted and concrete steps to minimize inequality, remove entrenched structural racism, and promote economic fairness for all.

## Economic downturns and people of color: Lessons from the Great Recession

From December 2007 to June 2009, the United States experienced one of the longest and most severe economic downturns in living memory. Millions of Americans lost their jobs and homes, and household wealth plunged. Few communities were spared the effects of the Great Recession, but communities of color experienced the worst effects—and some never fully recovered.

Overall U.S. unemployment peaked at 10 percent during the Great Recession. But it soared even higher in communities of color: 16.8 percent for Black workers, 15.1 percent for American Indian and Alaska Native workers, and 13 percent for Hispanic workers—levels not

seen nationally since the Great Depression. Hispanic, Black, and Native American unemployment rates did not reach their pre-recession lows until 2017. Hispanic and Black families also endured the highest rates of foreclosure and lost the most wealth during this period. From 2007 to 2016, Black and Hispanic households lost 48 percent and 36 percent of their wealth, respectively. By contrast, white households lost 24 percent of their wealth during this period. Today, the ratio of median Black and Hispanic household wealth to median white household wealth is just 9.5 percent and 14.6 percent, respectively. Unlike unemployment rates, homeownership and wealth never fully rebounded in these communities.

Experts believe that occupational segregation, financial exploitation, and exclusion from federal programs increased the length and severity of the Great Recession in communities of color. Many of the factors that contributed to racial disparities in unemployment, homeownership, and wealth remain present today.

## Occupational segregation could worsen the unemployment gap during the pandemic

Long before the current health crisis, public policies restricted tens of millions of workers of color to jobs with few benefits, lower wages, and limited protections. (see Figure 1) Today, workers of color are overrepresented in the lowest-paid agricultural, domestic, and service vocations and have the least job security. Many of these workers, including restaurant and retail workers, have already been laid off due to public health guidance. Furthermore, even as unemployment rates reached historic lows nationally, Black workers and American Indian and Alaska Native workers remained twice as likely to be unemployed as their white counterparts. Workers of color, especially women of color, also receive lower wages and have less access to paid sick leave and paid leave for child care than white workers. For communities of color, the labor market is unsteady when the economy is strong and extremely hazardous when it is not.

**Figure 1**

# Workers of color are overrepresented in many of the low-wage jobs that are most vulnerable to potential layoffs during the coronavirus pandemic

Share of total employed people over 16 years old by detailed industry, race, and ethnicity, 2019

| | Black or African American | Asian | Hispanic or Latinx | Other |
|---|---|---|---|---|
| Total | 12.3% | | 17.6% | 63.6% |
| Restaurants and other food services | 13.2% | | 26.8% | 52.5% |
| Employment services | 19.6% | | 19.2% | 55.4% |
| Miscellaneous general merchandise stores | 19.1% | | 21.1% | 54.6% |
| Clothing stores | 12.1% | | 24.2% | 55.8% |
| Gasoline stations | 13.1% | 11.0% | 12.3% | 63.6% |
| Nail salons and other personal care services | 46.4% | | 9.4% | 38.0% |
| Dry-cleaning and laundry services | 14.0% | 17.0% | 31.9% | 37.1% |
| Traveler accommodation | 18.8% | 9.6% | 30.2% | 41.4% |

*Hover or click on bars to see values.*

Chart: Center for American Progress
• Source: U.S. Bureau of Labor Statistics, "Labor Force Statistics from the Current Population Survey: Employed persons by detailed industry, sex, race, and Hispanic or Latino ethnicity," available at https://www.bls.gov/cps/cpsaat18.htm (last accessed April 2020); U.S. Private Sector Job Quality Index, "Statement from the U.S. Private Sector Job Quality Index ('JQI') Team on Vulnerabilities of Jobs in Certain Sectors to the Covid-19 Economic Shutdown," available at https://d3n8a8pro7vhmx.cloudfront.net/prosperousamerica/pages/5561/attachments/original/1584703152/JQI_Team_Statement_on_COVID-19_Economic_Shutdown_Job_Impact_031920.pdf?1584703152 (last accessed April 2020).
• Get the data

In recent weeks, state and local lawmakers compelled many employers to close their doors to help limit the spread of the coronavirus, which causes the disease COVID-19. These measures are critical for public health, but they have also produced a surge in unemployment, especially in communities of color. Structural racism could worsen these trends in the coming weeks. Businesses in Black-majority neighborhoods, for instance, were already losing billions of dollars in revenue per year compared with similar businesses in non-Black-majority neighborhoods. A serious and sustained decrease in revenue may jeopardize the solvency of these firms and the jobs held by their employees. Many people of color, especially those without college degrees, are unable to work remotely and receive regular pay during this potentially lengthy period of social distancing. (see Figure 2) Furthermore, the Trump administration issued guidance that will prevent more than 75 percent of American workers from gaining access to paid family leave under a relief package passed

8/3/2020
Case 3:20-cv-05300-RBL Document 1-1 Filed 08/04/20 Page 101 of 278
The Economic Fallout of the Coronavirus for People of Color - Center for American Progress

by Congress just weeks ago, meaning workers will have difficulty caring for themselves or sick family members.

Back-of-the-envelope calculations from the Federal Reserve Bank of St. Louis suggest the COVID-19 pandemic could eventually produce unemployment levels of up to 32 percent nationally. Regardless of the level at which unemployment peaks nationally, it will be even higher for people of color because they are largely restricted to the most at-risk occupations.

**Figure 2**

## Workers of color are less likely to be able to telework

Share of workers by race who could work at home from 2017 to 2018



*Hover or click on dots to see values.*

*Note: The estimate for noncollege Asian or Pacific Islander workers has a relative standard error of greater than 25 percent.*

Chart: Center for American Progress
• Source: Authors' estimates based on Sandra L. Hofferth and others, "American Time Use Survey Data Extract Builder: Version 2.8" (College Park, MD: University of Maryland and Minneapolis: Integrated Public Use Microdata Series, 2020), available at https://www.atusdata.org/atus/index.shtml.
• Get the data

# People of color have fewer assets and less liquidity to respond to an emergency

Decades of structural racism in economic, educational, and housing policies have produced a stark racial wealth gap in the United States. Prior to this pandemic, the typical Black and Latinx households had net worths of just $17,100 and $20,765, compared with the $171,000 held by the typical white household. Black and Hispanic households also have far less liquidity than their white counterparts. More than 1 in 10 Asian American households and 1 in 4 American Indian and Alaska Native households live in poverty. Without wealth and liquidity, households may be unable to cover unexpected expenses and withstand long-term negative income shocks. Perhaps as a result, many families of color report that they would not be able "to pay their current month's bills" in the event of a $400 emergency expense. Without support, many families of color struggle to maintain their financial footing during economic downturns.

The current public health crisis has generated a wave of unexpected expenses and negative income shocks. Evidence suggests that structural racism may actually increase exposure and susceptibility to COVID-19 in communities of color. Decades of public policy have restricted people of color to areas with higher levels of pollution and limited access to affordable healthy food, as well as established structural barriers to the health system. These factors have compounded to create stark health disparities in serious chronic health conditions such as asthma and diabetes. Many people of color may have to undergo unanticipated treatment that could cost thousands of dollars. They are also more likely to lack health insurance than their white counterparts and face other structural barriers to treatment, further compounding the economic impact they face. As noted above, people of color are already bearing the brunt of the surge in unemployment. According to the Pew Research Center, 29 percent of Latino households have already experienced a layoff and 40 percent have had to take a pay cut. These factors could undermine the financial well-being of countless households, many of which already struggle to cover student loan payments, child care, and other expenses and are targeted by predatory lenders.

## Housing instability in the wake of the coronavirus

Many of the federal homeownership and housing affordability policies of the 20th century disproportionately benefited white households while excluding households of color. Today, 73 percent of white families own their own home, compared with just 41 percent of Black families, 49 percent of Latinx families, 58 percent of Native American families, and 63 percent of Asian American families, according to a CAP analysis of U.S. Census Bureau data.* Even when people of color are able to purchase their own homes, they often have to pay higher mortgage rates than their white neighbors. Renters of color are also at much higher risk of eviction. The COVID-19 pandemic will likely only exacerbate these disparities, as people of color are less likely to maintain steady incomes and to be able to depend on existing wealth to get through the current economic emergency.

# Discrimination will slow the economic recovery in communities of color

Despite the legislative achievements made during and after the civil rights movement, people of color continue to endure rampant racial discrimination. According to recent research, 27 percent of

Asian Americans, 31 percent of Native Americans, 33 percent of Latinos, and 56 percent of African Americans have experienced discrimination when applying for jobs. People of color also withstand high levels of discrimination when seeking promotions or equal pay and when trying to rent or buy housing. Women of color face the compounding effects of gender and racial discrimination when attempting to secure employment and housing.

The United States will eventually emerge from the COVID-19 pandemic and begin to rebuild its economy. However, evidence demonstrates that while workers of color are often the first to be fired during economic downturns, they are often the last to be rehired during recoveries. This recovery may be especially uneven due to the flood of xenophobia and anti-Asian hate incidents that have characterized the current crisis. Racial discrimination will prolong the economic fallout in communities of color unless lawmakers act now to prevent it.

As policymakers continue to put forward ideas to help Americans recover from this pandemic, they must provide targeted interventions for people of color, who are disproportionately affected by this virus.

# Recommendations for immediate coronavirus relief

In fewer than three months, the pandemic has exacted a terrible toll on the U.S. economy. Millions of Americans have lost their jobs, and countless businesses are struggling to sustain themselves. Thankfully, federal, state, and local lawmakers have demonstrated their eagerness to mitigate the economic effects of the pandemic. But policymakers should pursue the following measures to ensure that people of color are protected.

## Expand access to unemployment insurance benefits

Last month, federal lawmakers expanded unemployment insurance (UI) benefits ahead of the expected national increase in joblessness. In recent years, however, many states with high percentages of Black and Latinx residents have made it difficult to apply for and receive benefits. For example, less than 15 percent of unemployed people in Louisiana, Mississippi, and Georgia—the three states with the highest percentage of Black residents—were able to collect UI benefits in 2018. States should dismantle structural barriers to UI benefits to ensure all Americans can obtain the support they need to withstand the current economic crisis.

## Ensure low-income individuals have access to no-cost testing and treatment related to COVID-19

Recent relief packages have extended no-cost testing for COVID-19 but have yet to address the potential costs of treatment, especially for those who do not currently have health insurance. In 2018, more than 1 in 6 Black, Hispanic, Asian American, and American Indian and Alaska Native people were unable to see a doctor because of cost. Despite the intent of the Families First Coronavirus Response Act, shortly after its passage the federal government exempted a number of employers—which account for an estimated 75 percent of workers—from federal paid leave. Furthermore, there are a number of states—including Florida, Georgia, and Wisconsin—that have failed to expand Medicaid. Medicaid expansion would cover most or almost most of the treatment costs an individual may incur. More must be done to ensure that all Americans have access to safe, affordable treatment.

## Send additional cash and other financial assistance directly to households

The federal stimulus package known as the Coronavirus Aid, Relief, and Economic Security (CARES) Act provides much-needed cash assistance to American families. But it is insufficient to cover the unexpected medical costs and negative income shocks that will disproportionately hurt people of color in the coming weeks. Approximately 17 percent of Black households and 14 percent of Latinx households are unbanked, which means they will have to wait weeks or even months to receive a paper check from the federal government. For the duration of the crisis, lawmakers should provide additional rounds of assistance through a progressive formula that promotes equity.

## Provide targeted assistance to minority-owned businesses

Federal, state, and local lawmakers are already taking steps to protect small businesses. The CARES Act includes forgivable loans, tax credits and deferrals, and other measures to encourage small businesses to retain employees. Cities including Sacramento and New York have offered zero-interest loans and direct cash grants. But few jurisdictions have enacted legislation providing targeted assistance to minority-owned businesses. Lawmakers should substantially expand the resources and authority of the Minority Business Development Agency and allocate financial assistance specifically for minority-owned businesses.

## Prohibit evictions and foreclosures

With little to no liquid wealth and vulnerable job prospects, people of color are more likely to face housing insecurity during the current economic downturn, including exposure to eviction and foreclosure. The prohibition of foreclosures on all federally backed mortgages for 60 days through the CARES Act will not be enough for homeowners. Many Black homeowners are already in a precarious economic situation, and this pandemic will only exacerbate their financial difficulties. The

The Economic Fallout of the Coronavirus for People of Color - Center for American Progress

prohibition should be extended through the end of the year. Also, all evictions should be stayed until the end of the year.

## Ease the burden of student loan debt

Tens of millions of Americans, especially people of color, are struggling to pay down their student loans. While previous stimulus bills addressed the emergency needs of defaulted borrowers and suspended payments on federally held student loans, they neglected payments on Perkins and Federal Family Education Loans. Future packages should include these borrowers and ensure that all borrowers receiving temporary relief are not subject to capitalization in interest when this period elapses. In addition, $10,000 in federal student loan debt should be canceled.

## Strengthen the Consumer Financial Protection Bureau

With fewer assets and less liquidity, people of color are likely to struggle to withstand the economic fallout of the COVID-19 pandemic. This anxiety puts them at greater risk of financial exploitation by predatory lenders. Federal lawmakers should expand the resources and authority of the Consumer Financial Protection Bureau to combat deceptive financial tactics and other forms of pandemic profiteering.

## Suspend negative credit reporting

The CARES Act neglected to include any substantial protections for consumer credit scores. Countless American families are currently experiencing severe financial shocks through no fault of their own. At least 16 million workers filed for unemployment in just the past three weeks. Americans should not be penalized for depending more heavily on consumer credit in these uncertain times. This is especially important for people of color, who have less wealth, depend more heavily on credit during emergencies, and are more likely to experience unemployment during economic downturns. Future relief packages should temporarily restrict the effect that high balance-to-limit ratios, new credit, and delinquencies have on credit scores.

## Enact and fully enforce employment discrimination statutes

The U.S. Equal Employment Opportunity Commission is charged with enforcing federal laws that make it illegal to discriminate against job applicants and employees, but it lacks the funding and staff necessary to hold bad actors accountable. States have also neglected to enact and fully enforce their own civil rights statutes to protect workers of color, especially women of color, from hiring and wage discrimination. Lawmakers should provide civil rights attorneys with the resources they need to ensure a robust, equitable economic recovery.

# Ensuring a robust and equitable recovery

Previous recoveries, especially those of the 20th century, created bold new policies and programs but exacerbated racial inequality. Federal mortgage insurance, the national minimum wage, overtime requirements, and collective bargaining rights are all examples of measures that are meant to assist struggling families and expand access to economic mobility, but people of color have been explicitly or implicitly excluded from those benefits. This should not happen again.

Structural racism in federal, state, and local policymaking produced and has sustained stark inequities in economic well-being in the United States. People of color—who have long endured financial exploitation, occupational segregation, and employment discrimination—remain among the most vulnerable Americans during times of economic hardship. As policymakers start devising plans to help American communities' recovery, it is essential that they center people of color, who are not only the growing majority of Americans but also the backbone of American society. Not only will these actions strengthen the country's overall economy immediately, but they will also prevent the unequal burden communities of color face during future economic crises.

*Connor Maxwell is a senior policy analyst for Race and Ethnicity Policy at the Center for American Progress. Danyelle Solomon is the vice president of Race and Ethnicity Policy at the Center.*

*\* Authors' notes: The authors used the U.S. Census Bureau's American Community Survey (ACS) from IPUMS USA to generate estimates of homeownership rates by race and ethnicity. This analysis utilized data from the 2013–2017 ACS five-year estimates. The authors weighted the percentages to reflect population characteristics.*

*CAP uses "Black" and "African American" interchangeably throughout many of our products. We chose to capitalize "Black" in order to reflect that we are discussing a group of people and to be consistent with the capitalization of "African American."*

**To find the latest CAP resources on the coronavirus, visit our coronavirus resource page.**



© 2020 - Center for American Progress

# EXHIBIT 16

# News Release

Connect with DOL at
https://blog.dol.gov



TRANSMISSION OF MATERIALS IN THIS RELEASE IS EMBARGOED UNTIL
**8:30 A.M. (Eastern) Thursday, July 23, 2020**

---

**COVID-19 Impact**

The COVID-19 virus continues to impact the number of initial claims and insured unemployment. This report includes information on claimants filing Pandemic Unemployment Assistance and Pandemic Emergency Unemployment Compensation claims.

---

**UNEMPLOYMENT INSURANCE WEEKLY CLAIMS**

### SEASONALLY ADJUSTED DATA

In the week ending July 18, the advance figure for seasonally adjusted **initial claims** was 1,416,000, an increase of 109,000 from the previous week's revised level. The previous week's level was revised up by 7,000 from 1,300,000 to 1,307,000. The 4-week moving average was 1,360,250, a decrease of 16,500 from the previous week's revised average. The previous week's average was revised up by 1,750 from 1,375,000 to 1,376,750.

The advance seasonally adjusted **insured unemployment rate** was 11.1 percent for the week ending July 11, a decrease of 0.7 percentage point from the previous week's revised rate. The previous week's rate was revised down by 0.1 from 11.9 to 11.8 percent. The advance number for seasonally adjusted **insured unemployment** during the week ending July 11 was 16,197,000, a decrease of 1,107,000 from the previous week's revised level. The previous week's level was revised down by 34,000 from 17,338,000 to 17,304,000. The 4-week moving average was 17,505,250, a decrease of 758,500 from the previous week's revised average. The previous week's average was revised down by 8,500 from 18,272,250 to 18,263,750.



**UNADJUSTED DATA**

The advance number of actual initial claims under state programs, unadjusted, totaled 1,370,947 in the week ending July 18, a decrease of 141,816 (or -9.4 percent) from the previous week. The seasonal factors had expected a decrease of 247,115 (or -16.3 percent) from the previous week. There were 196,382 initial claims in the comparable week in 2019. In addition, for the week ending July 18, 49 states reported 974,999 initial claims for Pandemic Unemployment Assistance.

The advance unadjusted insured unemployment rate was 11.2 percent during the week ending July 11, a decrease of 0.7 percentage point from the prior week. The advance unadjusted number for persons claiming UI benefits in state programs totaled 16,390,919, a decrease of 930,294 (or -5.4 percent) from the preceding week. The seasonal factors had expected an increase of 190,343 (or 1.1 percent) from the previous week. A year earlier the rate was 1.2 percent and the volume was 1,697,505.



The total number of people claiming benefits in all programs for the week ending July 4 was 31,802,715, a decrease of 200,615 from the previous week. There were 1,725,953 persons claiming benefits in all programs in the comparable week in 2019.

During the week ending July 4, Extended Benefits were available in the following 52 states: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Virgin Islands, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

Initial claims for UI benefits filed by former Federal civilian employees totaled 1,732 in the week ending July 11, an increase of 409 from the prior week. There were 1,245 initial claims filed by newly discharged veterans, an increase of 168 from the preceding week.

There were 15,098 former Federal civilian employees claiming UI benefits for the week ending July 4, an increase of 952 from the previous week. Newly discharged veterans claiming benefits totaled 14,052, an increase of 1,260 from the prior week.

During the week ending Jul 4, 48 states reported 13,179,880 individuals claiming Pandemic Unemployment Assistance benefits and 45 states reported 940,113 individuals claiming Pandemic Emergency Unemployment Compensation benefits.

The highest insured unemployment rates in the week ending July 4 were in Puerto Rico (26.0), Nevada (21.3), Hawaii (20.7), Georgia (18.0), California (16.9), Louisiana (16.6), New York (16.1), Connecticut (15.4), the Virgin Islands (15.2), and Massachusetts (15.0).

The largest increases in initial claims for the week ending July 11 were in Florida (+65,890), Georgia (+33,292), California (+20,123), Washington (+16,116), and Indiana (+6,258), while the largest decreases were in Maryland (-13,728), Texas (-11,583), New Jersey (-8,577), Michigan (-6,882), and Louisiana (-5,066).

## UNEMPLOYMENT INSURANCE DATA FOR REGULAR STATE PROGRAMS

| WEEK ENDING | July 18 | July 11 | Change | July 4 | Prior Year[1] |
|---|---|---|---|---|---|
| Initial Claims (SA) | 1,416,000 | 1,307,000 | +109,000 | 1,310,000 | 211,000 |
| Initial Claims (NSA) | 1,370,947 | 1,512,763 | -141,816 | 1,395,081 | 196,382 |
| 4-Wk Moving Average (SA) | 1,360,250 | 1,376,750 | -16,500 | 1,435,000 | 215,250 |

| WEEK ENDING | July 11 | July 4 | Change | June 27 | Prior Year[1] |
|---|---|---|---|---|---|
| Insured Unemployment (SA) | 16,197,000 | 17,304,000 | -1,107,000 | 17,760,000 | 1,682,000 |
| Insured Unemployment (NSA) | 16,390,919 | 17,321,213 | -930,294 | 16,516,869 | 1,697,505 |
| 4-Wk Moving Average (SA) | 17,505,250 | 18,263,750 | -758,500 | 19,010,000 | 1,698,000 |
| Insured Unemployment Rate (SA)[2] | 11.1% | 11.8% | -0.7 | 12.2% | 1.2% |
| Insured Unemployment Rate (NSA)[2] | 11.2% | 11.9% | -0.7 | 11.3% | 1.2% |

## INITIAL CLAIMS FILED IN FEDERAL PROGRAMS (UNADJUSTED)

| WEEK ENDING | July 18 | July 11 | Change | July 4 |
|---|---|---|---|---|
| Pandemic Unemployment Assistance | 974,999 | 955,272 | +19,727 | 1,046,433 |

| WEEK ENDING | July 11 | July 4 | Change | Prior Year[1] |
|---|---|---|---|---|
| Federal Employees (UCFE) | 1,732 | 1,323 | +409 | 680 |
| Newly Discharged Veterans (UCX) | 1,245 | 1,077 | +168 | 535 |

## PERSONS CLAIMING UI BENEFITS IN ALL PROGRAMS (UNADJUSTED)

| WEEK ENDING | July 4 | June 27 | Change | Prior Year[1] |
|---|---|---|---|---|
| Regular State | 17,188,772 | 16,410,059 | +778,713 | 1,700,328 |
| Federal Employees | 15,098 | 14,146 | +952 | 6,902 |
| Newly Discharged Veterans | 14,052 | 12,792 | +1,260 | 5,420 |
| Pandemic Unemployment Assistance[3] | 13,179,880 | 14,282,999 | -1,103,119 | NA |
| Pandemic Emergency UC[4] | 940,113 | 936,431 | +3,682 | NA |
| Extended Benefits[5] | 22,904 | 2,181 | +20,723 | 0 |
| State Additional Benefits[6] | 2,534 | 2,056 | +478 | 4,994 |
| STC / Workshare [7] | 439,362 | 342,666 | +96,696 | 8,309 |
| TOTAL[8] | 31,802,715 | 32,003,330 | -200,615 | 1,725,953 |

FOOTNOTES
SA - Seasonally Adjusted Data, NSA - Not Seasonally Adjusted Data

1. Prior year is comparable to most recent data.
2. Most recent week used covered employment of 146,125,989 as denominator.
3. Information on the Pandemic Unemployment Assistance (PUA) program can be found in UIPL 16-20: PUA Program information
4. Information on the Pandemic Emergency Unemployment Compensation (PEUC) program can be found in Unemployment Insurance Program Letter (UIPL) 17-20: PEUC Program information
5. Information on the EB program can be found here: EB Program information
6. Some states maintain additional benefit programs for those claimants who exhaust regular benefits, and when applicable, extended benefits. Information on states that participate, and the extent of benefits paid, can be found starting on page 4-4 of this link: Extensions and Special Programs PDF
7. Information on STC/Worksharing can be found starting on page 4-8 of the following link: Extensions and Special Programs PDF
8. Totals include PUA Unemployment for the appropriate corresponding week.

## Advance State Claims - Not Seasonally Adjusted

| STATE | Initial Claims Filed During Week Ended July 18 | | | Insured Unemployment For Week Ended July 11 | | |
|---|---|---|---|---|---|---|
| | Advance | Prior Wk | Change | Advance | Prior Wk | Change |
| Alabama | 22,967 | 20,563 | 2,404 | 98,044 | 117,388 | -19,344 |
| Alaska | 6,912 | 9,572 | -2,660 | 41,208 | 43,225 | -2,017 |
| Arizona | 22,380 | 28,695 | -6,315 | 222,990 | 227,419 | -4,429 |
| Arkansas | 15,384 | 14,155 | 1,229 | 96,617 | 99,083 | -2,466 |
| California | 292,673 | 284,914 | 7,759 | 2,729,281 | 2,946,807 | -217,526 |
| Colorado | 8,307 | 10,554 | -2,247 | 239,966 | 228,224 | 11,742 |
| Connecticut | 11,559 | 9,955 | 1,604 | 252,524 | 254,461 | -1,937 |
| Delaware | 2,593 | 3,167 | -574 | 46,117 | 42,194 | 3,923 |
| District of Columbia | 3,013 | 3,300 | -287 | 71,360 | 72,525 | -1,165 |
| Florida | 105,410 | 132,831 | -27,421 | 691,886 | 914,801 | -222,915 |
| Georgia | 120,281 | 138,452 | -18,171 | 695,827 | 792,717 | -96,890 |
| Hawaii | 7,733 | 7,668 | 65 | 131,676 | 128,502 | 3,174 |
| Idaho | 5,424 | 5,458 | -34 | 26,311 | 28,766 | -2,455 |
| Illinois | 35,938 | 38,261 | -2,323 | 655,116 | 664,763 | -9,647 |
| Indiana | 17,938 | 28,360 | -10,422 | 189,816 | 190,169 | -353 |
| Iowa | 9,505 | 10,653 | -1,148 | 116,810 | 134,284 | -17,474 |
| Kansas | 11,197 | 13,368 | -2,171 | 97,971 | 81,561 | 16,410 |
| Kentucky | 24,240 | 24,544 | -304 | 145,786 | 158,659 | -12,873 |
| Louisiana | 31,155 | 26,351 | 4,804 | 303,540 | 312,893 | -9,353 |
| Maine | 2,183 | 4,696 | -2,513 | 58,900 | 60,623 | -1,723 |
| Maryland | 16,389 | 19,463 | -3,074 | 224,235 | 233,850 | -9,615 |
| Massachusetts | 18,313 | 24,131 | -5,818 | 513,234 | 537,302 | -24,068 |
| Michigan* | 21,836 | 27,720 | -5,884 | 506,099 | 604,846 | -98,747 |
| Minnesota | 18,332 | 21,637 | -3,305 | 333,663 | 332,040 | 1,623 |
| Mississippi | 11,718 | 12,223 | -505 | 153,539 | 100,191 | 53,348 |
| Missouri | 11,588 | 16,883 | -5,295 | 174,325 | 197,311 | -22,986 |
| Montana | 2,564 | 2,990 | -426 | 35,371 | 39,084 | -3,713 |
| Nebraska | 3,989 | 7,911 | -3,922 | 51,242 | 56,954 | -5,712 |
| Nevada | 18,775 | 14,666 | 4,109 | 303,657 | 295,994 | 7,663 |
| New Hampshire | 3,305 | 2,930 | 375 | 71,005 | 72,523 | -1,518 |
| New Jersey | 25,606 | 38,825 | -13,219 | 474,427 | 491,296 | -16,869 |
| New Mexico | 8,135 | 6,381 | 1,754 | 97,980 | 92,108 | 5,872 |
| New York | 88,260 | 91,546 | -3,286 | 1,541,735 | 1,520,832 | 20,903 |
| North Carolina | 28,323 | 28,108 | 215 | 319,057 | 365,770 | -46,713 |
| North Dakota | 2,084 | 1,532 | 552 | 30,156 | 27,625 | 2,531 |
| Ohio | 29,764 | 35,755 | -5,991 | 403,051 | 434,257 | -31,206 |
| Oklahoma | 8,579 | 9,680 | -1,101 | 118,589 | 131,932 | -13,343 |
| Oregon | 9,688 | 11,713 | -2,025 | 217,747 | 206,756 | 10,991 |
| Pennsylvania | 37,238 | 44,798 | -7,560 | 674,152 | 815,282 | -141,130 |
| Puerto Rico | 6,890 | 7,945 | -1,055 | 209,780 | 223,340 | -13,560 |
| Rhode Island | 3,314 | 3,133 | 181 | 64,054 | 65,377 | -1,323 |
| South Carolina | 14,346 | 19,272 | -4,926 | 197,799 | 201,097 | -3,298 |
| South Dakota | 698 | 1,216 | -518 | 16,594 | 18,722 | -2,128 |
| Tennessee | 25,794 | 22,060 | 3,734 | 253,668 | 268,220 | -14,552 |
| Texas | 86,821 | 105,516 | -18,695 | 1,268,945 | 1,313,086 | -44,141 |
| Utah | 4,514 | 4,792 | -278 | 68,048 | 69,999 | -1,951 |
| Vermont | 1,560 | 1,830 | -270 | 39,864 | 38,335 | 1,529 |
| Virgin Islands | 39 | 70 | -31 | 5,334 | 5,574 | -240 |
| Virginia | 40,188 | 32,292 | 7,896 | 358,065 | 372,070 | -14,005 |
| Washington | 34,639 | 45,622 | -10,983 | 448,620 | 387,558 | 61,062 |
| West Virginia | 3,544 | 4,070 | -526 | 71,364 | 64,342 | 7,022 |
| Wisconsin | 25,132 | 29,051 | -3,919 | 219,369 | 224,765 | -5,396 |
| Wyoming | 2,190 | 1,485 | 705 | 14,405 | 13,711 | 694 |
| US Total | 1,370,947 | 1,512,763 | -141,816 | 16,390,919 | 17,321,213 | -930,294 |

Note: Advance claims are not directly comparable to claims reported in prior weeks. Advance claims are reported by the state liable for paying the unemployment compensation, whereas previous weeks reported claims reflect claimants by state of residence. In addition, claims reported as "workshare equivalent" in the previous week are added to the advance claims as a proxy for the current week's "workshare equivalent" activity.

*Denotes state estimate.

5

Seasonally Adjusted US Weekly UI Claims (in thousands)

| Week Ending | Initial Claims | Change from Prior Week | 4-Week Average | Insured Unemployment | Change from Prior Week | 4-Week Average | IUR |
|---|---|---|---|---|---|---|---|
| July 13, 2019 | 217 | 6 | 218.50 | 1,682 | -12 | 1,698.00 | 1.2 |
| July 20, 2019 | 211 | -6 | 215.25 | 1,699 | 17 | 1,698.00 | 1.2 |
| July 27, 2019 | 216 | 5 | 213.75 | 1,692 | -7 | 1,691.75 | 1.2 |
| August 3, 2019 | 214 | -2 | 214.50 | 1,719 | 27 | 1,698.00 | 1.2 |
| August 10, 2019 | 218 | 4 | 214.75 | 1,687 | -32 | 1,699.25 | 1.2 |
| August 17, 2019 | 215 | -3 | 215.75 | 1,699 | 12 | 1,699.25 | 1.2 |
| August 24, 2019 | 215 | 0 | 215.50 | 1,683 | -16 | 1,697.00 | 1.2 |
| August 31, 2019 | 219 | 4 | 216.75 | 1,683 | 0 | 1,688.00 | 1.2 |
| September 7, 2019 | 208 | -11 | 214.25 | 1,675 | -8 | 1,685.00 | 1.2 |
| September 14, 2019 | 211 | 3 | 213.25 | 1,672 | -3 | 1,678.25 | 1.2 |
| September 21, 2019 | 215 | 4 | 213.25 | 1,667 | -5 | 1,674.25 | 1.2 |
| September 28, 2019 | 218 | 3 | 213.00 | 1,698 | 31 | 1,678.00 | 1.2 |
| October 5, 2019 | 212 | -6 | 214.00 | 1,689 | -9 | 1,681.50 | 1.2 |
| October 12, 2019 | 218 | 6 | 215.75 | 1,691 | 2 | 1,686.25 | 1.2 |
| October 19, 2019 | 213 | -5 | 215.25 | 1,700 | 9 | 1,694.50 | 1.2 |
| October 26, 2019 | 217 | 4 | 215.00 | 1,695 | -5 | 1,693.75 | 1.2 |
| November 2, 2019 | 212 | -5 | 215.00 | 1,702 | 7 | 1,697.00 | 1.2 |
| November 9, 2019 | 222 | 10 | 216.00 | 1,697 | -5 | 1,698.50 | 1.2 |
| November 16, 2019 | 223 | 1 | 218.50 | 1,665 | -32 | 1,689.75 | 1.2 |
| November 23, 2019 | 211 | -12 | 217.00 | 1,697 | 32 | 1,690.25 | 1.2 |
| November 30, 2019 | 206 | -5 | 215.50 | 1,700 | 3 | 1,689.75 | 1.2 |
| December 7, 2019 | 237 | 31 | 219.25 | 1,725 | 25 | 1,696.75 | 1.2 |
| December 14, 2019 | 229 | -8 | 220.75 | 1,716 | -9 | 1,709.50 | 1.2 |
| December 21, 2019 | 218 | -11 | 222.50 | 1,728 | 12 | 1,717.25 | 1.2 |
| December 28, 2019 | 220 | 2 | 226.00 | 1,775 | 47 | 1,736.00 | 1.2 |
| January 4, 2020 | 212 | -8 | 219.75 | 1,759 | -16 | 1,744.50 | 1.2 |
| January 11, 2020 | 207 | -5 | 214.25 | 1,735 | -24 | 1,749.25 | 1.2 |
| January 18, 2020 | 220 | 13 | 214.75 | 1,704 | -31 | 1,743.25 | 1.2 |
| January 25, 2020 | 212 | -8 | 212.75 | 1,753 | 49 | 1,737.75 | 1.2 |
| February 1, 2020 | 201 | -11 | 210.00 | 1,678 | -75 | 1,717.50 | 1.2 |
| February 8, 2020 | 204 | 3 | 209.25 | 1,729 | 51 | 1,716.00 | 1.2 |
| February 15, 2020 | 215 | 11 | 208.00 | 1,693 | -36 | 1,713.25 | 1.2 |
| February 22, 2020 | 220 | 5 | 210.00 | 1,720 | 27 | 1,705.00 | 1.2 |
| February 29, 2020 | 217 | -3 | 214.00 | 1,699 | -21 | 1,710.25 | 1.2 |
| March 7, 2020 | 211 | -6 | 215.75 | 1,702 | 3 | 1,703.50 | 1.2 |
| March 14, 2020 | 282 | 71 | 232.50 | 1,784 | 82 | 1,726.25 | 1.2 |
| March 21, 2020 | 3,307 | 3,025 | 1,004.25 | 3,059 | 1,275 | 2,061.00 | 2.1 |
| March 28, 2020 | 6,867 | 3,560 | 2,666.75 | 7,446 | 4,387 | 3,497.75 | 5.1 |
| April 4, 2020 | 6,615 | -252 | 4,267.75 | 11,914 | 4,468 | 6,050.75 | 8.2 |
| April 11, 2020 | 5,237 | -1,378 | 5,506.50 | 15,819 | 3,905 | 9,559.50 | 10.9 |
| April 18, 2020 | 4,442 | -795 | 5,790.25 | 18,011 | 2,192 | 13,297.50 | 12.4 |
| April 25, 2020 | 3,867 | -575 | 5,040.25 | 22,377 | 4,366 | 17,030.25 | 15.4 |
| May 2, 2020 | 3,176 | -691 | 4,180.50 | 22,548 | 171 | 19,688.75 | 15.5 |
| May 9, 2020 | 2,687 | -489 | 3,543.00 | 24,912 | 2,364 | 21,962.00 | 17.1 |
| May 16, 2020 | 2,446 | -241 | 3,044.00 | 20,841 | -4,071 | 22,669.50 | 14.3 |
| May 23, 2020 | 2,123 | -323 | 2,608.00 | 21,268 | 427 | 22,392.25 | 14.6 |
| May 30, 2020 | 1,897 | -226 | 2,288.25 | 20,606 | -662 | 21,906.75 | 14.1 |
| June 6, 2020 | 1,566 | -331 | 2,008.00 | 20,289 | -317 | 20,751.00 | 13.9 |
| June 13, 2020 | 1,540 | -26 | 1,781.50 | 19,231 | -1,058 | 20,348.50 | 13.2 |
| June 20, 2020 | 1,482 | -58 | 1,621.25 | 18,760 | -471 | 19,721.50 | 12.9 |
| June 27, 2020 | 1,408 | -74 | 1,499.00 | 17,760 | -1,000 | 19,010.00 | 12.2 |
| July 4, 2020 | 1,310 | -98 | 1,435.00 | 17,304 | -456 | 18,263.75 | 11.8 |
| July 11, 2020 | 1,307 | -3 | 1,376.75 | 16,197 | -1,107 | 17,505.25 | 11.1 |
| July 18, 2020 | 1,416 | 109 | 1,360.25 | | | | |

## Pandemic Unemployment Assistance Claims - Not Seasonally Adjusted

| STATE | PUA Initial Claims Filed During Week Ended July 18 | | | PUA Continued Claims For Week Ended Jul 4 | | |
|---|---|---|---|---|---|---|
| | Advance | Prior Wk | Change | Jul 4 | Jun 27 | Change |
| Alabama | 2,644 | 6,387 | -3,743 | 44,321 | 45,963 | -1,642 |
| Alaska | 557 | 873 | -316 | 16,633 | 19,007 | -2,374 |
| Arizona | 0 | 0 | 0 | 0 | 2,270,171 | -2,270,171 |
| Arkansas | 11,165 | 11,231 | -66 | 88,579 | 100,545 | -11,966 |
| California | 163,525 | 126,780 | 36,745 | 2,253,420 | 1,572,438 | 680,982 |
| Colorado | 9,233 | 5,402 | 3,831 | 93,079 | 94,637 | -1,558 |
| Connecticut | 2,419 | 2,882 | -463 | 63,854 | 49,218 | 14,636 |
| Delaware | 279 | 442 | -163 | 10,343 | 10,600 | -257 |
| District of Columbia | 525 | 755 | -230 | 13,316 | 13,103 | 213 |
| Florida | 23,694 | 10,519 | 13,175 | 0 | 0 | 0 |
| Georgia | 37,138 | 31,812 | 5,326 | 166,810 | 67,249 | 99,561 |
| Hawaii | 3,423 | 3,952 | -529 | 86,594 | 92,086 | -5,492 |
| Idaho | 308 | 892 | -584 | 2,727 | 2,774 | -47 |
| Illinois | 74,414 | 57,157 | 17,257 | 142,913 | 112,891 | 30,022 |
| Indiana | 7,565 | 41,088 | -33,523 | 267,770 | 105,809 | 161,961 |
| Iowa | 1,710 | 1,522 | 188 | 13,658 | 15,484 | -1,826 |
| Kansas | 4,156 | 4,528 | -372 | 136,546 | 118,650 | 17,896 |
| Kentucky | 2,956 | 2,586 | 370 | 56,969 | 36,848 | 20,121 |
| Louisiana | 10,283 | 9,506 | 777 | 148,322 | 154,047 | -5,725 |
| Maine | 1,649 | 3,357 | -1,708 | 23,852 | 24,687 | -835 |
| Maryland | 15,670 | 17,594 | -1,924 | 503,235 | 712,097 | -208,862 |
| Massachusetts | 12,402 | 12,832 | -430 | 437,247 | 428,570 | 8,677 |
| Michigan | 23,609 | 26,558 | -2,949 | 996,849 | 886,607 | 110,242 |
| Minnesota | 664 | 649 | 15 | 65,187 | 63,882 | 1,305 |
| Mississippi | 8,874 | 0 | 8,874 | 51,332 | 56,913 | -5,581 |
| Missouri | 11,888 | 5,263 | 6,625 | 98,059 | 91,964 | 6,095 |
| Montana | 2,298 | 2,315 | -17 | 44,136 | 46,429 | -2,293 |
| Nebraska | 1,556 | 1,628 | -72 | 27,589 | 29,158 | -1,569 |
| Nevada | 19,557 | 26,999 | -7,442 | 135,727 | 157,196 | -21,469 |
| New Hampshire | 32,095 | 15,729 | 16,366 | 23,481 | 0 | 23,481 |
| New Jersey | 9,711 | 19,530 | -9,819 | 396,381 | 387,853 | 8,528 |
| New Mexico | 3,438 | 2,864 | 574 | 62,449 | 57,619 | 4,830 |
| New York | 58,826 | 51,576 | 7,250 | 1,060,127 | 1,104,345 | -44,218 |
| North Carolina | 19,821 | 20,563 | -742 | 197,123 | 192,944 | 4,179 |
| North Dakota | 13 | 1,231 | -1,218 | 8,112 | 7,153 | 959 |
| Ohio | 72,584 | 92,636 | -20,052 | 412,034 | 438,320 | -26,286 |
| Oklahoma | 0 | 1,966 | -1,966 | 0 | 0 | 0 |
| Oregon | 10,609 | 5,648 | 4,961 | 28,450 | 20,354 | 8,096 |
| Pennsylvania | 195,224 | 209,036 | -13,812 | 3,421,264 | 3,073,064 | 348,200 |
| Puerto Rico | 23,412 | 26,176 | -2,764 | 529,714 | 617,061 | -87,347 |
| Rhode Island | 8,177 | 6,334 | 1,843 | 49,085 | 47,016 | 2,069 |
| South Carolina | 10,414 | 11,570 | -1,156 | 66,515 | 70,734 | -4,219 |
| South Dakota | 121 | 138 | -17 | 4,123 | 3,506 | 617 |
| Tennessee | 10,407 | 12,078 | -1,671 | 142,896 | 139,324 | 3,572 |
| Texas | 33,555 | 33,556 | -1 | 184,253 | 184,229 | 24 |
| Utah | 1,486 | 1,487 | -1 | 10,776 | 10,481 | 295 |
| Vermont | 619 | 522 | 97 | 9,296 | 9,485 | -189 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia | 20,000 | 14,560 | 5,440 | 381,215 | 351,287 | 29,928 |
| Washington | 6,860 | 9,422 | -2,562 | 145,759 | 164,538 | -18,779 |
| West Virginia | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin | 3,128 | 2,875 | 253 | 54,379 | 22,283 | 32,096 |
| Wyoming | 338 | 266 | 72 | 3,381 | 2,380 | 1,001 |
| US Total | 974,999 | 955,272 | 19,727 | 13,179,880 | 14,282,999 | -1,103,119 |

Note: Information on the Pandemic Unemployment Assistance (PUA) program can be found in UIPL 16-20: PUA Program information .  Backdated claims may be included in these figures.

## Pandemic Emergency Unemployment Compensation Claims - Not Seasonally Adjusted

| | PEUC Claims Filed During Weeks Ended: | | | | |
|---|---|---|---|---|---|
| STATE | July 4 | June 27 | Change | June 20 | June 13 |
| Alabama | 43,666 | 31,334 | 12,332 | 24,279 | 19,452 |
| Alaska | 2,945 | 3,478 | -533 | 20 | 0 |
| Arizona | 11,296 | 9,583 | 1,713 | 0 | 6,924 |
| Arkansas | 5,712 | 7,483 | -1,771 | 7,251 | 7,067 |
| California | 228,541 | 228,594 | -53 | 251,012 | 208,089 |
| Colorado | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 10,882 | 15,499 | -4,617 | 15,101 | 16,067 |
| Delaware | 1,780 | 2,046 | -266 | 1,981 | 1,919 |
| District of Columbia | 1,881 | 1,919 | -38 | 1,770 | 1,659 |
| Florida | 0 | 0 | 0 | 0 | 0 |
| Georgia | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 |
| Idaho | 5,004 | 4,787 | 217 | 4,409 | 3,967 |
| Illinois | 35,951 | 36,561 | -610 | 39,265 | 32,604 |
| Indiana | 7,671 | 10,893 | -3,222 | 11,280 | 12,192 |
| Iowa | 9,356 | 9,572 | -216 | 9,070 | 9,384 |
| Kansas | 2,030 | 1,905 | 125 | 0 | 1,402 |
| Kentucky | 0 | 0 | 0 | 0 | 0 |
| Louisiana | 3,453 | 3,609 | -156 | 3,432 | 3,367 |
| Maine | 1,979 | 1,603 | 376 | 125 | 127 |
| Maryland | 11,347 | 11,781 | -434 | 11,699 | 10,579 |
| Massachusetts | 36,640 | 35,765 | 875 | 34,024 | 31,078 |
| Michigan | 25,180 | 39,067 | -13,887 | 22,033 | 37,471 |
| Minnesota | 21,396 | 21,558 | -162 | 19,817 | 18,436 |
| Mississippi | 4,571 | 4,123 | 448 | 4,093 | 4,591 |
| Missouri | 11,346 | 19,842 | -8,496 | 14,814 | 13,198 |
| Montana | 2,685 | 2,345 | 340 | 2,187 | 1,991 |
| Nebraska | 1,830 | 1,644 | 186 | 1,590 | 1,605 |
| Nevada | 10,457 | 9,405 | 1,052 | 8,561 | 7,817 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 60,125 | 68,872 | -8,747 | 73,018 | 72,750 |
| New Mexico | 4,506 | 4,400 | 106 | 4,027 | 3,797 |
| New York | 78,651 | 75,980 | 2,671 | 73,072 | 71,696 |
| North Carolina | 144,716 | 115,952 | 28,764 | 78,038 | 35,360 |
| North Dakota | 3,168 | 2,572 | 596 | 2,122 | 1,868 |
| Ohio | 17,331 | 17,113 | 218 | 16,702 | 15,653 |
| Oklahoma | 648 | 564 | 84 | 694 | 0 |
| Oregon | 10,954 | 9,486 | 1,468 | 0 | 0 |
| Pennsylvania | 38,418 | 61,587 | -23,169 | 39,955 | 67,549 |
| Puerto Rico | 7,722 | 8,151 | -429 | 9,143 | 8,690 |
| Rhode Island | 3,144 | 3,377 | -233 | 3,085 | 2,946 |
| South Carolina | 15,399 | 13,181 | 2,218 | 15,363 | 9,988 |
| South Dakota | 327 | 294 | 33 | 344 | 670 |
| Tennessee | 5,088 | 4,843 | 245 | 4,797 | 4,782 |
| Texas | 7,304 | 7,242 | 62 | 7,166 | 7,053 |
| Utah | 4,680 | 4,031 | 649 | 3,557 | 2,898 |
| Vermont | 1,319 | 1,173 | 146 | 1,165 | 1,143 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 |
| Virginia | 17,445 | 0 | 17,445 | 0 | 0 |
| Washington | 7,058 | 8,114 | -1,056 | 6,812 | 7,070 |
| West Virginia | 4,641 | 4,641 | 0 | 4,487 | 4,256 |
| Wisconsin | 9,870 | 10,462 | -592 | 19,101 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 |
| US Total | 940,113 | 936,431 | 3,682 | 850,461 | 769,155 |

Note: Information on the Pandemic Emergency Unemployment Compensation (PEUC) program can be found in Unemployment Insurance Program Letter (UIPL) 17-20: PEUC Program information

| | INITIAL CLAIMS FILED DURING WEEK ENDED JULY 11 | | | | | INSURED UNEMPLOYMENT FOR WEEK ENDED JULY 4 | | | | | | ALL PROGRAMS EXCLUDING RAILROAD RETIREMENT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CHANGE FROM | | | | | | CHANGE FROM | | | | |
| STATE NAME | STATE | LAST WEEK | YEAR AGO | UCFE[1] | UCX[1] | STATE | (%)[2] | LAST WEEK | YEAR AGO | UCFE[1] | UCX[1] | |
| Alabama | 20,563 | 1,507 | 16,270 | 47 | 18 | 117,388 | 6.1 | -20,884 | 96,948 | 131 | 96 | 117,615 |
| Alaska | 9,572 | 3,448 | 8,876 | 25 | 3 | 43,225 | 14.0 | 1,115 | 37,963 | 157 | 68 | 43,450 |
| Arizona | 28,695 | 2,921 | 22,972 | 38 | 10 | 227,419 | 7.8 | 10,816 | 200,019 | 360 | 237 | 228,016 |
| Arkansas | 14,155 | 3,323 | 12,398 | 2 | 0 | 99,083 | 8.3 | -5,609 | 85,227 | 129 | 93 | 99,305 |
| California | 284,914 | 20,123 | 245,853 | 270 | 245 | 2,946,807 | 16.9 | 188,333 | 2,645,363 | 1,614 | 1,914 | 2,950,335 |
| Colorado | 10,554 | 2,626 | 8,745 | 16 | 39 | 228,224 | 8.5 | -17,884 | 211,250 | 196 | 371 | 228,791 |
| Connecticut | 9,955 | -2,312 | 6,700 | 24 | 3 | 254,461 | 15.4 | 2,535 | 217,541 | 173 | 123 | 254,757 |
| Delaware | 3,167 | 376 | 2,502 | 2 | 6 | 42,194 | 9.4 | -3,404 | 36,981 | 11 | 30 | 42,235 |
| District of Columbia | 3,300 | 442 | 2,730 | 63 | 0 | 72,525 | 12.5 | -277 | 65,339 | 835 | 14 | 73,374 |
| Florida | 132,831 | 65,890 | 125,121 | 59 | 84 | 914,801 | 10.5 | 332,849 | 874,187 | 427 | 357 | 915,585 |
| Georgia | 138,452 | 33,292 | 129,387 | 90 | 64 | 792,717 | 18.0 | 172,770 | 761,899 | 884 | 838 | 794,439 |
| Hawaii | 7,668 | 20 | 6,348 | 9 | 19 | 128,502 | 20.7 | 5,031 | 121,180 | 275 | 185 | 128,962 |
| Idaho | 5,458 | 534 | 4,686 | 5 | 2 | 28,766 | 3.9 | -324 | 23,557 | 20 | 29 | 28,815 |
| Illinois | 38,261 | -754 | 31,012 | 8 | 5 | 664,763 | 11.2 | -2,697 | 579,094 | 480 | 255 | 665,498 |
| Indiana | 28,360 | 6,258 | 24,833 | 33 | 24 | 190,169 | 6.2 | 6,201 | 176,577 | 101 | 133 | 190,403 |
| Iowa | 10,653 | 696 | 8,018 | 7 | 3 | 134,284 | 8.8 | 69 | 118,090 | 163 | 56 | 134,503 |
| Kansas | 13,368 | 1,910 | 10,711 | 3 | 1 | 81,561 | 6.0 | -1,133 | 73,245 | 81 | 76 | 81,718 |
| Kentucky | 24,544 | 1,262 | 19,102 | 1 | 2 | 158,659 | 8.4 | 7,911 | 140,798 | 169 | 170 | 158,998 |
| Louisiana | 26,351 | -5,066 | 23,941 | 38 | 26 | 312,893 | 16.6 | -264 | 295,485 | 130 | 79 | 313,102 |
| Maine | 4,696 | 1,757 | 3,988 | 1 | 2 | 60,623 | 10.0 | -3,012 | 56,322 | 33 | 23 | 60,679 |
| Maryland | 19,463 | -13,728 | 16,361 | 53 | 29 | 233,850 | 9.2 | -12,587 | 204,369 | 305 | 249 | 234,404 |
| Massachusetts | 24,131 | -2,920 | 19,226 | 39 | 33 | 537,302 | 15.0 | -20,403 | 478,269 | 315 | 212 | 537,829 |
| Michigan | 27,720 | -6,882 | 19,662 | 18 | 9 | 604,846 | 14.0 | 75,699 | 562,082 | 177 | 259 | 605,282 |
| Minnesota | 21,637 | 2,275 | 17,542 | 12 | 5 | 332,040 | 11.6 | 5,795 | 301,897 | 189 | 169 | 332,398 |
| Mississippi | 12,223 | 957 | 10,507 | 2 | 2 | 100,191 | 9.0 | -37,139 | 87,907 | 186 | 79 | 100,456 |
| Missouri | 16,883 | -802 | 12,361 | 23 | 1 | 197,311 | 7.2 | -7,809 | 172,988 | 141 | 132 | 197,584 |
| Montana | 2,990 | 202 | 2,288 | 9 | 5 | 39,084 | 8.5 | 52 | 33,765 | 88 | 40 | 39,212 |
| Nebraska | 7,911 | 2,108 | 7,365 | 6 | 0 | 56,954 | 5.9 | -1,245 | 52,376 | 13 | 49 | 57,016 |
| Nevada | 14,666 | 2,182 | 12,183 | 3 | 1 | 295,994 | 21.3 | 8,026 | 277,180 | 123 | 171 | 296,288 |
| New Hampshire | 2,930 | -2,846 | 2,440 | 7 | 4 | 72,523 | 11.0 | -1,953 | 68,832 | 22 | 22 | 72,567 |
| New Jersey | 38,825 | -8,577 | 29,915 | 76 | 52 | 491,296 | 12.2 | -482 | 392,513 | 346 | 583 | 492,225 |
| New Mexico | 6,381 | 715 | 5,558 | 5 | 1 | 92,108 | 11.4 | -4,282 | 83,269 | 180 | 76 | 92,364 |
| New York | 91,546 | -2,194 | 66,130 | 19 | 36 | 1,520,832 | 16.1 | -77,835 | 1,378,781 | 501 | 637 | 1,521,970 |
| North Carolina | 28,108 | 171 | 24,711 | 77 | 71 | 365,770 | 8.3 | -46,583 | 345,188 | 463 | 680 | 366,913 |
| North Dakota | 1,532 | -188 | 1,197 | 14 | 0 | 27,625 | 6.7 | 604 | 25,199 | 198 | 30 | 27,853 |
| Ohio | 35,755 | 1,925 | 28,252 | 8 | 34 | 434,257 | 8.1 | 390 | 386,607 | 212 | 386 | 434,855 |
| Oklahoma | 9,680 | 257 | 7,680 | 23 | 13 | 131,932 | 8.4 | 898 | 116,699 | 115 | 101 | 132,148 |
| Oregon | 11,713 | 1,370 | 6,741 | 25 | 22 | 206,756 | 10.8 | 3,156 | 179,118 | 375 | 145 | 207,276 |
| Pennsylvania | 44,798 | 712 | 29,922 | 228 | 71 | 815,282 | 14.0 | 164,122 | 700,921 | 1,655 | 650 | 817,587 |
| Puerto Rico | 7,945 | -3,312 | 5,971 | 3 | 2 | 223,340 | 26.0 | -5,699 | 203,420 | 282 | 99 | 223,721 |
| Rhode Island | 3,133 | -303 | 2,272 | 0 | 0 | 65,377 | 13.8 | -927 | 55,973 | 56 | 36 | 65,469 |
| South Carolina | 19,272 | 3,257 | 15,765 | 56 | 21 | 201,097 | 9.6 | 13,815 | 185,040 | 65 | 119 | 201,281 |
| South Dakota | 1,216 | 381 | 1,012 | 12 | 2 | 18,722 | 4.5 | 2,780 | 17,527 | 222 | 23 | 18,967 |
| Tennessee | 22,060 | -2,860 | 19,354 | 37 | 26 | 268,220 | 8.1 | -5,595 | 246,486 | 159 | 156 | 268,535 |
| Texas | 105,516 | -11,583 | 89,372 | 156 | 199 | 1,313,086 | 10.6 | 75,155 | 1,185,007 | 1,150 | 2,176 | 1,316,412 |
| Utah | 4,792 | -10 | 3,843 | 24 | 8 | 69,999 | 4.7 | -640 | 63,287 | 64 | 42 | 70,105 |
| Vermont | 1,830 | -46 | 1,446 | 1 | 0 | 38,335 | 12.6 | -754 | 34,851 | 5 | 3 | 38,343 |
| Virgin Islands | 70 | 32 | 27 | 0 | 0 | 5,574 | 15.2 | 936 | 5,110 | 8 | 4 | 5,586 |
| Virginia | 32,292 | 467 | 29,109 | 9 | 6 | 372,070 | 9.9 | -6,537 | 351,316 | 553 | 626 | 373,249 |
| Washington | 45,622 | 16,116 | 39,310 | 28 | 19 | 387,558 | 11.5 | 6,583 | 343,428 | 343 | 789 | 388,690 |
| West Virginia | 4,070 | 740 | 2,809 | 1 | 2 | 64,342 | 9.7 | -1,214 | 54,961 | 69 | 78 | 64,489 |
| Wisconsin | 29,051 | 1,666 | 23,576 | 15 | 14 | 224,765 | 7.9 | 6,212 | 194,956 | 136 | 80 | 224,981 |
| Wyoming | 1,485 | 147 | 1,042 | 2 | 1 | 13,711 | 5.1 | -337 | 12,081 | 13 | 4 | 13,728 |
| Totals | 1,512,763 | 117,682 | 1,269,142 | 1,732 | 1,245 | 17,321,213 | 11.8 | 804,344 | 15,618,468 | 15,098 | 14,052 | 17,350,363 |

Figures appearing in columns showing over-the-week changes reflect all revisions in data for prior week submitted by state agencies.

1. The Unemployment Compensation program for Federal Employees (UCFE) and the Unemployment Compensation for Ex-servicemembers (UCX) exclude claims filed jointly under other programs to avoid duplication.
2. Rate is not seasonally adjusted. The source of U.S. total covered employment is BLS.

**UNADJUSTED INITIAL CLAIMS FOR WEEK ENDED JULY 11, 2020**

STATES WITH AN INCREASE OF MORE THAN 1,000

| State | Change | State Supplied Comment |
| --- | --- | --- |
| FL | +65,890 | Increase in initial claims due to COVID-19. |
| GA | +33,292 | Layoffs in the health care and social assistance, manufacturing, administrative and support and waste management and remediation services, and accommodation and food services assistance industries. |
| CA | +20,123 | Layoffs in the service industry. |
| WA | +16,116 | Layoffs in the manufacturing, art, entertainment, and recreation, accommodation and food services, and other services industries. |
| IN | +6,258 | No comment. |
| AK | +3,448 | No comment. |
| AR | +3,323 | No comment. |
| SC | +3,257 | No comment. |
| AZ | +2,921 | No comment. |
| CO | +2,626 | No comment. |
| MN | +2,275 | No comment. |
| NV | +2,182 | No comment. |
| NE | +2,108 | No comment. |
| OH | +1,925 | No comment. |
| KS | +1,910 | No comment. |
| ME | +1,757 | No comment. |
| WI | +1,666 | No comment. |
| AL | +1,507 | No comment. |
| OR | +1,370 | No comment. |
| KY | +1,262 | No comment. |

STATES WITH A DECREASE OF MORE THAN 1,000

| State | Change | State Supplied Comment |
| --- | --- | --- |
| MD | -13,728 | No comment. |
| TX | -11,583 | No comment. |
| NJ | -8,577 | No comment. |
| MI | -6,882 | No comment. |
| LA | -5,066 | No comment. |
| PR | -3,312 | No comment. |
| MA | -2,920 | No comment. |
| TN | -2,860 | No comment. |
| NH | -2,846 | No comment. |
| CT | -2,312 | No comment. |
| NY | -2,194 | Fewer layoffs in the health care and social assistance, educational services, and accommodations and food services industries. |

**TECHNICAL NOTES**

This news release presents the weekly unemployment insurance (UI) claims reported by each state's unemployment insurance program offices. These claims may be used for monitoring workload volume, assessing state program operations and for assessing labor market conditions. States initially report claims directly taken by the state liable for the benefit payments, regardless of where the claimant who filed the claim resided. These are the basis for the advance initial claims and continued claims reported each week. These data come from ETA 538, Advance Weekly Initial and Continued Claims Report. The following week initial claims and continued claims are revised based on a second reporting by states that reflect the claimants by state of residence. These data come from the ETA 539, Weekly Claims and Extended Benefits Trigger Data Report.

**A. Initial Claims**

An initial claim is a claim filed by an unemployed individual after a separation from an employer. The claimant requests a determination of basic eligibility for the UI program. When an initial claim is filed with a state, certain programmatic activities take place and these result in activity counts including the count of initial claims. The count of U.S. initial claims for unemployment insurance is a leading economic indicator because it is an indication of emerging labor market conditions in the country. However, these are weekly administrative data which are difficult to seasonally adjust, making the series subject to some volatility.

**B. Continued Weeks Claimed**

A person who has already filed an initial claim and who has experienced a week of unemployment then files a continued claim to claim benefits for that week of unemployment. Continued claims are also referred to as insured unemployment. The count of U.S. continued weeks claimed is also a good indicator of labor market conditions. Continued claims reflect the current number of insured unemployed workers filing for UI benefits in the nation. While continued claims are not a leading indicator (they roughly coincide with economic cycles at their peaks and lag at cycle troughs), they provide confirming evidence of the direction of the U.S. economy.

**C. Seasonal Adjustments and Annual Revisions**

Over the course of a year, the weekly changes in the levels of initial claims and continued claims undergo regularly occurring fluctuations. These fluctuations may result from seasonal changes in weather, major holidays, the opening and closing of schools, or other similar events. Because these seasonal events follow a more or less regular pattern each year, their influence on the level of a series can be tempered by adjusting for regular seasonal variation. These adjustments make trend and cycle developments easier to spot. At the beginning of each calendar year, the Bureau of Labor Statistics provides the Employment and Training Administration (ETA) with a set of seasonal factors to apply to the unadjusted data during that year. Concurrent with the implementation and release of the new seasonal factors, ETA incorporates revisions to the UI claims historical series caused by updates to the unadjusted data.

**Weekly Claims Archives**
**Weekly Claims Data**

U.S. Department of Labor news materials are accessible at http://www.dol.gov. The Department's Reasonable Accommodation Resource Center converts Departmental information and documents into alternative formats, which include Braille and large print. For alternative format requests, please contact the Department at (202) 693-7828 (voice) or (800) 877-8339 (federal relay).

U.S. Department of Labor
Employment and Training Administration
Washington, D.C. 20210
Release Number: USDL 20-1453-NAT

Program Contacts:
Thomas Stengle:      (202) 693-2991
Media Contact:       (202) 693-4676

# EXHIBIT 17

CORONAVIRUS • PUBLISHED 03.17.2020
UPDATED 3:25 P.M. 07.22.2020

# How Prisons in Each State Are Restricting Visits Due to Coronavirus

As COVID-19 spread earlier this year, prison facilities across the country suspended visits from family and lawyers. Several months into the pandemic, some states are easing those restrictions. We're rounding up the changes as they occur.

Some states are gradually resuming in-person court proceedings, though reopening plans can differ greatly between districts. Visit the National Center for State Courts, which is tracking the court opening policies in detail.

Have you tried to visit a person in prison or jail recently? Tell us about it here.



| | corrections systems have |
|---|---|
| **18** | suspended all visitation |
| **26** | corrections systems have suspended normal |
| **8** | corrections systems have resumed visitation with |

visitation but allow legal
visits

additional precautions and
limits

## All visits suspended



| ALABAMA | ▼ |
| ALASKA | ▼ |
| ARIZONA | ▼ |
| ARKANSAS | ▼ |
| CALIFORNIA | ▼ |
| DISTRICT OF COLUMBIA | ▼ |
| GEORGIA | ▼ |
| LOUISIANA | ▼ |
| MONTANA | ▼ |
| NEVADA | ▼ |
| NEW HAMPSHIRE | ▼ |
| NEW MEXICO | ▼ |
| OREGON | ▼ |



RHODE ISLAND ▼

TENNESSEE ▼

TEXAS ▼

VIRGINIA ▼

FEDERAL ▼

## Regular visits suspended, but legal visits allowed



COLORADO ▼

CONNECTICUT ▼

DELAWARE ▼

FLORIDA ▼

HAWAII ▼

IDAHO ▼

ILLINOIS ▼

INDIANA ▼

IOWA ▼



KANSAS

KENTUCKY

MARYLAND

MICHIGAN

MISSISSIPPI

NEW JERSEY

NEW YORK

NORTH CAROLINA

PENNSYLVANIA

SOUTH CAROLINA

SOUTH DAKOTA

UTAH

VERMONT

WASHINGTON

WEST VIRGINIA



**WISCONSIN** ▼

**WYOMING** ▼

## Visits resumed with limitations



**MAINE** ▼

**MASSACHUSETTS** ▼

**MINNESOTA** ▼

**MISSOURI** ▼

**NEBRASKA** ▼

**NORTH DAKOTA** ▼

**OHIO** ▼

**OKLAHOMA** ▼

This is produced in partnership with the Associated Press.

**Sources**

State prison systems

**Graphic by**

Katie Park

**Reporting by**

Cary Aspinwall, Keri Blakinger, Jake Bleiberg, Andrew R. Calderón, Maurice Chammah, Andrew DeMillo, Eli Hager, Jamiles Lartey, Claudia Lauer, Nicole Lewis, Weihua Li, Humera Lodhi, Colleen Long, Tom Meagher, Joseph Neff, Alysia Santo, Beth Schwartzapfel, Damini Sharma, Colleen Slevin, Christie Thompson, Abbie VanSickle and Andrew Welsh-Huggins

**Additional development by**

Gabe Isman

# EXHIBIT 18

Case 3:20-cv-05309-CRB  Document 1-1  Filed 08/04/20  Page 127 of 278



## Just In...

**Pelicans, Jazz kneel during anthem at opening of NBA's restarted season**
IN THE KNOW — 2M 11S AGO

**DHS compiled intelligence reports on journalists reporting on protests in Portland: report**
ADMINISTRATION — 7M 57S AGO

**Congress should consider the evidence in funding college students' success**
OPINION — 18M 32S AGO

**GOP lawmakers comply with Pelosi's mask mandate for House floor**
HOUSE — 19M 36S AGO

**FBI officials hid copies of Russia probe documents fearing Trump interference: book**
NATIONAL SECURITY — 25M 6S AGO

**Experts dismiss Trump claim that it could take 'years' to declare election winner**
COURT BATTLES — 36M 41S AGO

**If the immigration agency shuts down, how will we welcome aspiring Americans?**
OPINION — 48M 31S AGO

# Prison phone companies are profiting from a pandemic, here how the FCC can help

BY MIGNON CLYBURN, OPINION CONTRIBUTOR — 04/21/20 05:30 PM EDT
THE VIEWS EXPRESSED BY CONTRIBUTORS ARE THEIR OWN AND NOT THE VIEW OF THE HILL

**58** SHARES

 SHARE     TW


© Getty Images

These days, most of us are staying in touch with our loved ones by phone calls or video chats. A single phone call costs us nearly nothing, a video chat requires only a Wi-Fi connection.

But for millions of people, it isn't so easy. As jails and prisons suspend in-person visits, most incarcerated people and their families are paying outrageously high costs to simply stay connected. The Federal Bureau of Prisons just made voice and video visitation free in its 122 prisons, and while noteworthy, this isn't enough to ensure that the majority of families can remain in touch at such a crucial time. The majority of the incarcerated population, upwards of 1.7 million people, are in state prisons and local jails, where they will probably face excessive fees to call home. The Federal Communications Commission (FCC) needs to push prison phone companies to lower their rates so every family can maintain a connection during the COVID-19 pandemic.

Incarcerated people, their families and other allies have been fighting for phone justice for years, but a pandemic like COVID-19 reminds us once again how cruel and unjust these exorbitant call rates are and why rate relief is needed immediately. Prison call rates can cost over $1 a minute and on average, an in-state phone call from jail costs three times as much as one from prison. The national average for a 15-minute call from jail is $5.74. Thanks to a helpful tool from the Prison Policy

Prison phone companies are profiting from a pandemic. Here's how the FCC can | TheHill

**EPA cancels subscription to news outlet dedicated to covering it**

**ENERGY & ENVIRONMENT** — 56M 2S AGO

**VIEW ALL**

**View Latest Opinions >>**

Related News    by    |ᴵ▷



Is Ilhan Omar one and done? Why she could



A pandemic is no time to undermine public



Portland: The Pentagon should step up or pipe



Gwyneth Paltrow Owns One of the Most

Sponsored | Investing.com

Institute, I know that by the time it takes you to read this op-ed, a call from New York's Allegheny County Jail for this amount of time would cost about $7.50, just shy of New York's tipped wage for a single hour of work.

These exorbitant prices for a simple phone call are an annoyance to some, but a barrier for most. People who enter the criminal justice system are overwhelmingly poor. Two-thirds of people detained in jails report annual incomes of under $12,000 prior to their arrest and as more people lose their jobs due to the pandemic, their ability to maintain a connection lessens with each passing day. In March, over 10 million Americans filed for unemployment insurance leaving more families to make the unthinkable choice between putting food on their table or having regular contact with their loved ones.

Prison phone rates are currently high because of two primary reasons. One, a commission structure that incentivizes jails and prisons to contract with phone providers that charge higher rates so they can reap a percentage of the profits. Two, there is a lack of competition between phone provider companies: the market is basically dominated by two phone companies.

While some progress has been made over the last decade, the ability of incarcerated people to communicate with their families remains out of reach for too many. Help for the over two million incarcerated should come in the following ways:

> **3 in 4 say companies have been more reliable than federal government...**
>
> **Poll: Americans view all but two industries more favorably since...**

1. The FCC should request prison telephone companies offer free phone and video calls with no fees to incarcerated and detained individuals immediately for the next 60 days.

2. The FCC should press the entire prison phone industry to commit to the Keep Americans Connected Pledge. Over 700 communications companies have agreed to waive late fees and not terminate service to help ensure that Americans can stay connected during COVID-19.

3. The FCC should deny all companies' request to stop paying into the Universal Service Fund (USF). The USF helps low-income families, schools, libraries and rural healthcare providers stay online and maintain voice service. These companies need to continue paying into this important fund in order for more families who qualify for programs like Lifeline (a discount program for low-income telephone consumers) to maintain a connection.

Some facilities are offering limited and temporary relief, such as one or two free calls each week but as the coronavirus spreads through America's prisons and jails, families deserve to regularly hear directly from their incarcerated loved ones on how they are being treated and protected from the virus.

Being able to make phone calls and visit by video is more important than ever. With nearly half of the people in the United States are reporting that coronavirus is harming their mental health, experts recommend we "stay connected to one another" and "communicate our fears and worries to



another caring person" in order to cope. Incarcerated people and their families deserve access and opportunity to stay connected. Unless FCC Chairman Ajit Pai intervenes, incarcerated people and their families will either be denied outright or charged a premium just to check in on one another during this pandemic.

*Mignon Clyburn is a former FCC Commissioner and current Board Chair of Full Color Future, a think tank and advocacy organization committed to changing the narrative about people of color in media, tech and innovation.*

**TAGS   TELECOMMUNICATIONS   INCARCERATION IN THE UNITED STATES   PRISON   UNIVERSAL SERVICE FUND   PENOLOGY**

**f   SHARE**     **TWEET**     ➤



**THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX**
**THE CONTENTS OF THIS SITE ARE ©2020 CAPITOL HILL PUBLISHING CORP., A SUBSIDIARY OF NEWS COMMUNICATIONS, INC.**

Do Not Sell My Data

# EXHIBIT 19

# State of Phone Justice:
## Local jails, state prisons and private phone providers

by Peter Wagner and Alexi Jones
February 2019
Press release

At a time when the cost of a typical phone call is approaching zero, people behind bars in the U.S. are often forced to pay astronomical rates to call their loved ones or lawyers. Why? Because phone companies bait prisons and jails into charging high phone rates in exchange for a share of the revenue.

The good news is that, in the last decade, we've made this industry considerably fairer:

- The Federal Communications Commission (FCC) capped the cost of out-of-state phone calls from both prisons and jails at about 21 cents a minute;
- The FCC capped many of the abusive fees that providers used to extract extra profits from consumers; and
- Most state prison systems lowered their rates even further and *also* lowered rates for in-state calls. ①

However, the vast majority of our progress has been in **state-run prisons**. In **county- and city-run jails** — where predatory contracts get little attention — instate phone calls can still cost $1 per minute, or more. Moreover, phone providers continue to extract additional profits by charging consumers hidden fees ② and are taking aggressive steps to limit competition in the industry.

These high rates and fees can be disastrous for people incarcerated in local jails. Local jails are very different from state prisons: On a given day, 3 out of 4 people held in jails under local authority have not even been convicted, much less sentenced. The vast majority are being held pretrial, and many will remain behind bars unless they can make bail. Charging pretrial defendants high prices for phone calls punishes people who are legally innocent, drives up costs for their appointed counsel, and makes it harder for them to contact family members and others who might help them post bail or build their defense. It also puts them at risk of losing their jobs, housing, and custody of their children while they are in jail awaiting trial.

map below show just how much more local jails are charging in each state than state prisons for the same 15 minute in-state phone call:

| State | Highest cost of a 15 minute in-state call from a jail (2018) | Average cost of a 15 minute in-state call from a jail (2018) | Cost of a 15 minute in-state call from a state prison (2019) | How many times higher the average jail rate is compared to the state prison's rate |
|---|---|---|---|---|
| Arkansas | $24.82 | $14.49 | $4.80 | 3.0 |
| California | $17.80 | $5.70 | $2.03 | 2.8 |
| Illinois | $15.52 | $7.01 | $0.14 | 51.9 |
| Michigan | $22.56 | $11.89 | $2.40 | 5.0 |
| New York | $9.95 | $7.54 | $0.65 | 11.6 |
| Texas | $17.25 | $6.50 | $0.90 | 7.2 |
| | | ↕ Show all states ↕ | | |
| Wyoming | $14.22 | $7.77 | $1.65 | 4.7 |



*As of November 2018, in more than half of states, the highest in-state 15 minute call costs more than $10, and in 15 states it costs over $15. (Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont do not have jails and are therefore not displayed). (For the names of the facilities that charge the most in each state, see Appendix Table 3.*

# EXHIBIT 20

# The Family
# AND RECIDIVISM



RYAN SHANAHAN AND SANDRA VILLALOBOS AGUDELO

**Incarcerated men and women who maintain contact with sup-**
portive family members are more likely to succeed after their release.
Although corrections practitioners and policymakers often under-
stand the positive role families can play, they may not know how to
involve the inmate's loved ones as a resource within a correctional
setting. Research on people returning from prison shows that family
members can be valuable sources of support during incarceration
and after release. For example, prison inmates who had more contact
with their families and who reported positive relationships overall
are less likely to be re-incarcerated (Martinez & Christian, 2009).
Families can motivate formerly incarcerated relatives to seek or con-
tinue drug treatment or mental health care, and they most frequently
provide housing for newly released family members.

To date, most of the research and programming that discusses the use of family resources to aid reentry has focused on prisons. Because jails are substantially different, it is not clear which policies and practices can be applied successfully. To determine the effectiveness of family-support strategies for people in jail, the Vera Institute of Justice (Vera) launched the Close to Home project, which provided training and technical assistance to two jails in Maryland and one jail in Wisconsin.

The project's name, Close to Home, reflects that jails are often located geographically close to the family and friends of inmates, and thus they can easily stay in contact with their families and friends. With funding from the Bureau of Justice Assistance, Vera initiated a pilot study of the Relational Inquiry Tool (RIT) in the three jails and provided complementary communication techniques intended to help the inmates plan for their return to society. It was developed with support from the National Institute of Corrections and in partnership with Safer Foundation and the Department of Corrections of Massachusetts, Michigan, Ohio, and Oklahoma.

**Relational Inquiry Tool**

The staff of Vera's Family Justice Program created RIT to help corrections staff identify the family resources of their inmates. (*Note*: The Family Justice Program interprets "family" broadly to include immediate, extended, and elected family members, such as romantic partners, friends, neighbors, and clergy.) RIT is a series of eight questions designed to introduce inmates to the idea of involving supportive family members as a resource. In particular, it was developed for case management and reentry planning, and as a complement to standard corrections risk and needs assessments. Case managers use the information from the eight questions to connect with family members who

**Table 1. Characteristics of Jails Participating in the Close to Home Project.**

| Facility | Location | Capacity | Average Daily Population | Category |
|---|---|---|---|---|
| Green Lake County Correctional Facility, Green Lake, Wisconsin | Rural | 108 | 66 | Small (1–49 beds) |
| Montgomery County Pre-Release Center, Rockville, Maryland | Urban | 177 | 170 | Medium (50–249 beds) |
| Montgomery County Correctional Facility, Boyds, Maryland | Urban | 1,028 | 760 | Large (250+ beds) |

could help them meet some of the inmate's reentry needs. Those with family-based reentry resources may require fewer social service referrals. Moreover, conversations spurred by RIT could build rapport between staff and inmates. The aim was to improve long-term outcomes for former inmates, their families, and their communities.

**Close to Home Project**

Close to Home, launched in October 2009 and concluded in April 2011, proceeded along two tracks:

1. Personnel in three jails (two in Maryland and one in Wisconsin) were trained by Vera to provide the jail version of RIT to their inmates.

2. During RIT training, Vera staff conducted qualitative and quantitative research to gauge inmate and staff attitudes toward RIT.

**Research**

Vera staff had two goals for their research. The first goal was to assess RIT's utility in facilities of varying size and location. The partnering jails were the Montgomery County Correctional Facility (MCCF) and the Montgomery County Pre-Release Center (Pre-Release Center) in Maryland, and the Green Lake County Correctional Facility (GLCCF) in Wisconsin. The three facilities differed in terms of size and setting (see Table 1).

The second research goal was to gather information about the inmates' families and other sources of social support, their experience maintaining contact with family members while in jail, their thoughts about returning to the community, and the impact of their incarceration on loved ones. Vera staff conducted surveys with incarcerated men and women and gathered more in-depth information during interviews. Family members were surveyed with similar questions to learn about family members' perspectives and opinions.

**Implementation**

Vera trained participating jail staff to use RIT to query incarcerated people about their strengths, challenges, and the supportive people in their lives. Jail staff were also trained on the benefits of family support for inmates, how to introduce the tool, and ways to follow up on the information that participants shared.

Before implementing the tool at each site, Vera held work group meetings of staff ranging from case managers to parole officers to identify policies and practices that could be more supportive of incarcerated people's relationships. Vera staff gathered information about the utility of RIT by conducting interviews of randomly selected inmates who completed RIT. They also surveyed and interviewed jail personnel about the implementation and use of RIT.

## Project Participants

MCCF was the largest jail that participated in the Close to Home project. Located in an urban Maryland county less than 20 miles outside Washington, D.C., it houses men and women awaiting trial and those who are serving sentences of up to 18 months. Ninety-five percent of people in the jurisdiction's facilities are from the county and are not transferred to a State prison. People of color are overrepresented, and most individuals are under maximum-security supervision.

MCCF has created an environment that emphasizes what Warden Robert Green calls "reentry for all." This ambitious goal signals a commitment to prepare everyone at the facility for reentry, even though some inmates will be transferred from MCCF to State and Federal prisons. MCCF provides educational and vocational opportunities, as well as programming and treatment for mental health and substance use. In addition, MCCF has a dedicated reentry case manager. Inmates who expect to be released within three months can voluntarily participate in case management services to prepare for reentry.

Like MCCF, the Pre-Release Center is located in an urban setting. People incarcerated at the 171-bed facility are scheduled for release within 12 months. The average length of stay is between three and five months, and most of the inmates return to the nearby community.

The environment at the Pre-Release Center is more like a residential step-down program than a jail. The Pre-Release Center provides a continuum of programming, has an open campus, and allows contact visits. Visiting is offered seven days a week, and as individuals achieve privileges, they can have unlimited visits. Case managers typically have caseloads of 18 to 25 men or women, allowing them to meet with inmates as needed. Families are included in case planning and can be trained as "sponsors."

**Table 2. Comparing Results from Vera's Research in Jails and Prisons.**

| "Which people do you plan to rely on when you return to the community?" | Respondents in Jails | Respondents in Prisons |
|---|---|---|
| Family | 82.1% | 92% |
| Friends | 73.8% | 66% |

GLCCF was the smallest jail in the Close to Home project. The jail is located in a small, rural county in east-central Wisconsin with a population of about 19,000. GLCCF has an average daily population of 60, and the majority of incarcerated individuals are Caucasian. During the Close to Home project, the jail moved from a 40-plus-bed, linear-style courthouse jail to a state-of-the-art facility with a 108-bed capacity. At the former facility, staff functioned merely as custodians; the education, mental-health, and substance-use needs of incarcerated men and women were not addressed. The sheriff and corrections administration used the change of facilities as an occasion to change the culture.

## Findings

As noted earlier, information was gathered from the inmates through surveys and interviews, whereas information about families and staff came from surveys alone. The following three sections describe findings that pertain to each of these groups. The final section discusses the findings related to the implementation of RIT and corresponding training.

**Inmate Reponses.** Among the inmates surveyed, 84 percent reported that their families were supportive during their incarceration. Most inmates planned to rely on their family (82%) and friends (74%) to help them meet their needs, with a much smaller percentage (40%) planning to rely on services from government agencies or non-profit organizations. In comparing the findings to similar project work with prison facilities, Vera staff found that a greater percentage of

people in jail than in prison reported that they rely on friends (diZerega & Agudelo, 2011).

Sixty-seven percent of incarcerated survey respondents were parents. Almost all of their children (97%) lived with a family member, and 66 percent of those children were living with their other parent. Eighty percent of respondents in jail reported having visitors, and 40 percent said they had a visit at least once a month. These visitation rates were higher than what Vera found in similar surveys of people in prison (diZerega & Agudelo, 2011). Among people incarcerated for up to two years, those in prison were visited an average of 9.5 times a year, whereas those in jail received an average of 16 visits a year (diZerega & Agudelo, 2011). Respondents who reported having close relationships with their mothers, fathers, and significant others also had higher numbers of visits. Table 2 shows a comparison of the results from Vera's research in jails and prisons.

Vera also found that 59 percent of men and women inmates welcomed the opportunity to discuss their families with jail staff. This noteworthy finding runs counter to a common perception among corrections personnel that inmates are unwilling to discuss personal matters with them.

**Family Responses.** The majority of family members (85%) reported visiting at least once a week. Visiting family members listed numerous barriers to staying in contact with their loved one, including distance (29%); costs—such as gas, tolls, and for some, renting a car—(24%); and facility rules (23%). Family members drove an average of 30 miles each way to visit and also reported the

cost of phone calls as a significant barrier to communication (39%).

While a large majority of visiting family members reported that staff welcomed them when they visited (78%), almost as many said they did not receive any information about their loved one from staff (76%), and some said staff did not reach out to family members with concerns or questions they had about the incarcerated family member (68%).

**Staff Responses.** Most personnel (99%) said that families are an important resource for reentry, and that families can help find stable housing and employment, improve drug treatment outcomes, and reduce recidivism. However, only 64 percent of staff reported involving family members in case management or reentry planning, and 58 percent reported that families were involved in their facility's programming.

**Facility Responses to RIT Project**

The three facilities participating in Close to Home had different responses to RIT project. These responses stemmed from administrative challenges at the time of implementation, concurrent programming that complemented RIT, and the existence or implementation of a more family-focused culture at the facility. The two sites in Maryland chose case managers to pilot RIT. In Wisconsin, corrections officers were trained to administer RIT. Unexpectedly, the corrections officers—not case managers—had the most success integrating RIT into their standard case flow. Staff unanimously reported that RIT gave them a better understanding of the inmates at GLCCF. Further, 93 percent of staff reported that they would recommend RIT to other jail professionals. The inmates interviewed at GLCCF felt their experience completing RIT with corrections officers was beneficial. Because of the overwhelmingly positive response to the project, correctional officers at GLCCF will con-

tinue to use RIT with inmates who are held for more than two weeks.

Practitioners and policymakers who want to involve inmates' families in their programs should note that GLCCF leadership consistently expressed support for a family-focused approach and envisioned corrections staff as role models. Lt. Joel Gerth says this about RIT at GLCCF:

> At GLCCF, RIT was originally administered by mental health staff. The enthusiasm and buy-in staff displayed during Vera's training, as well as the introduction of a new avenue of communication between staff and the men and women incarcerated in the facility, were key factors in the decision to shift this responsibility away from mental health practitioners. Vera's training and technical assistance helped staff feel confident in discussing these topics with incarcerated individuals and allowed staff to see positive changes in the incarcerated individuals they work with—a departure from the usual atmosphere of a correctional facility…. The more they understand why they do the job and the impact they are capable of having on another person's life, the greater the impact on morale.

Stefan LoBuglio, Chief of Pre-release and Reentry at Montgomery County's Pre-Release Center, believes wholeheartedly in a family-focused approach. "The commitment to work with families leads to an institutional culture that promotes respect and drives the rehabilitative focus of a facility," says LoBuglio. "The respect we show family members leads to cooperation and compliance with program rules."

The positive perception of family at the Pre-Release Center creates a markedly different environment from traditional correctional settings because the policies and procedures in place foster a family-oriented

environment that emphasizes people's strengths. The inmates at the Pre-Release Center welcomed RIT because it helped them create lists of potential visitors and reflect on people who had been supportive as well as those who are not invested in their success or may not influence them in a positive way.

In addition, RIT program revealed a need for corrections personnel to build rapport with residents. However, because of various constraints on the facility, the case managers were assigned to pilot RIT. Though corrections staff were trained by Vera on the value of integrating family information into their work, they have not yet administered RIT.

The size of MCCF made implementation of RIT more difficult than in the smaller facilities. Because of fiscal constraints, MCCF case managers were working on multiple housing units with caseloads of more than 100 people. These large caseloads hindered their ability to implement RIT effectively. Case managers reported feeling overwhelmed, resisted additional work (such as RIT), and often did not follow the recommended directions for administering the tool. For example, Vera staff trained case managers to use a script that explained the purpose of RIT and described the importance of family in reentry planning. During interviews, some inmates who had completed RIT told Vera staff that certain case managers rushed through the questions, did not explain how information about their families would be used, and complained about being forced to use the tool.

When MCCF staff administered RIT according to Vera's guidelines, incarcerated people responded positively. For example, a man motivated by his young daughter to deal with his drug addiction told researchers that completing RIT "helped pick me up and change my attitude," adding that the conversation changed his perception of his case manager and perhaps her perception of him.

He noted that after the conversation, she completed paperwork to transfer him to a unit where he could participate in drug treatment and return to the community—and his daughter—sooner.

Given the challenges at MCCF, it is notable that the reentry case manager, Wendy Miller-Cochran, chose to continue using RIT after the Close to Home project concluded. She says:

The Relational Inquiry Tool is a welcome addition to the reentry social work assessment procedures at MCCF, especially since family involvement complements the professional and community services available to individuals returning home. Family relationships can be the most powerful resource available to men and women in jail, and this tool enables me to explore family relationships and identify other supportive people in the client's life. RIT allows me to assess the level of support available to the client, and, if appropriate, seek to involve the support person [or people] as part of an individual's reentry planning.

## Conclusion

The overall results from this project suggest that inmates in jails, like those in prisons, rely on family members to support them during their incarceration, and also as they reenter the community. Because thousands of people cycle in and out of jail every year, it may be possible to reduce these numbers by testing and implementing ways for families to help reduce the negative impact of short-term incarceration on their loved ones and to help them reenter society successfully.

Moreover, it reveals that, at least in some jails, corrections personnel as well as case managers can be assigned to help incarcerated people connect with social supports. However, to access this potential, a shift in organizational culture toward a family-focused orientation may need to occur, as evidenced by the varying degrees of RIT acceptance in the three jail facilities. More work is needed to determine the most effective strategies for implementing RIT and whether proper implementation will yield the desired outcomes of positive behavioral change, a reduction in disciplinary infractions in facilities, and lower recidivism rates. The present results suggest, however, that jails are indeed a promising arena for developing family-focused reentry planning. ■

### References

diZerega, M., & Agudelo, S. V. (2011). *Piloting a tool for reentry: A promising approach to engaging family members*. New York, NY: Vera Institute of Justice.

Martinez, D. J. & Christian, J. (2009). The familial relationships of former prisoners: Examining the link between residence and informal support mechanisms. *Journal of Contemporary Ethnography*, *38*(2), 201–224.

**Ryan Shanahan,** a senior program associate at the Vera Institute of Justice's Family Justice Program, works with criminal and juvenile justice agencies and community-based organizations. She holds a master's degree from the University of Maryland, where she is working toward a doctorate. For more information, please contact Ms. Shanahan at 212–376–3071 or *rshanahan@vera.org.*

**Sandra Villalobos Agudelo,** a Vera research associate, evaluates the Family Justice Program's work and studies the roles families play for incarcerated people. She holds a master's degree in psychology from Universidad de los Andes in Bogotá and a master's degree in urban policy analysis and management from Milano, The New School for Management and Urban Policy.

For more information about the Vera Institute, visit *www.vera.org.*

## Additional Resources

**Mental Health Treatment**
- Center for Substance Abuse Treatment. (2004). *Substance abuse treatment and family therapy*. Treatment Improvement Protocol (TIP) Series, No. 39. DHHS Publication No. (SMA) 04-3957. Rockville, MD: Substance Abuse and Mental Health Services Administration.

**Family Motivation**
- Dalton, K. S. (May/June 2004). Beyond transition—Working with inmate families. *American Jails, 18*(2), 48–53.

**Housing**
- La Vigne, N. G., Visher, C., & Castro, J. (2004). *Chicago prisoners' experiences returning home*. Washington, DC: The Urban Institute.
- Nelson, Deess, P., & Allen, C. (1999). The first month out: Post-incarceration experiences in New York City. New York, NY: Vera Institute of Justice.
- Sullivan, E., Mino, M., Nelson, K., & Pope, J. (2002). Families as a resource in recovery from drug abuse: An evaluation of La Bodega de la Familia. New York, NY: Vera Institute of Justice.
- Naser, R. L., & Visher, C. A. (2006). Family members' experiences of incarceration and reentry. *Western Criminology Review, 7*(2), 20–31.

**Child Care**
- Glaze, L., & Maruschak, L. M. (2008). Parents in prison and their minor children. *Bureau of Justice Statistics Special Report*.

**Overrepresentation of Minorities**
- Schiraldi, V., & Ziedenberg, J. (2003). *Race and incarceration in Maryland, A policy analysis by the Justice Policy Institute commissioned by Maryland's Legislative Black Caucus*. Washington, DC: Justice Policy Institute.

# EXHIBIT 21

N A T I O N A L   P O L I C Y   C O N F E R E N C E

**From Prison to Home:**
**The Effect of Incarceration and Reentry on**
**Children, Families and Communities**

January 30–31, 2002
U.S. Department of Health and Human Services
The Urban Institute

# The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment

**Craig Haney**

University of California, Santa Cruz

December 2001

## The Psychological Impact of Incarceration:
## Implications for Post-Prison Adjustment

## Abstract

This paper examines the unique set of psychological changes that many prisoners are forced to undergo in order to survive the prison experience. It argues that, as a result of several trends in American corrections, the personal challenges posed and  psychological harms inflicted in  the course of incarceration have grown over the last several decades in the United States. The trends include increasingly harsh policies and conditions of confinement as well as the much discussed de-emphasis on rehabilitation as a goal of incarceration. As a result, the ordinary adaptive process of institutionalization or "prisonization" has become extraordinarily prolonged and intense. Among other things, these recent changes in prison life mean that prisoners in general (and some prisoners in particular) face more difficult and problematic transitions as they return to the freeworld. A range of structural and programmatic changes are required to address these issues. Among other things, social and psychological programs and resources must be made available in the immediate, short, and long-term. That is, modified prison conditions and practices as well as new programs are needed as preparation for release, during transitional periods of parole or initial reintegration, and as long-term services to insure continued successful adjustment.

This paper addresses the psychological impact of incarceration and its implications for post-prison freeworld adjustment. Nearly a half-century ago Gresham Sykes wrote that "life in the maximum security prison is depriving or frustrating in the extreme,"[1] and little has changed to alter that view. Indeed, as I will suggest below, the observation applies with perhaps more force now than when Sykes first made it. Moreover, prolonged adaptation to the deprivations and frustrations of life inside prison—what are commonly referred to as the "pains of imprisonment"—carries a certain psychological cost. In this brief paper I will explore some of those costs, examine their implications for post-prison adjustment in the world beyond prison, and suggest some programmatic and policy-oriented approaches to minimizing their potential to undermine or disrupt the transition from prison to home.

One important caveat is important to make at the very outset of this paper. Although I approach this topic as a psychologist, and much of my discussion is organized around the themes of psychological changes and adaptations, I do *not* mean to suggest or imply that I believe criminal behavior can or should be equated with mental illness, that persons who suffer the acute pains of imprisonment necessarily manifest psychological disorders or other forms of personal

---

1 Gresham Sykes, *The Society of Captives: A Study of a Maximum Security Prison.* Princeton: Princeton University Press (1958), at 63.

pathology, that psychotherapy should be the exclusive or even primary tool of prison rehabilitation, or that therapeutic interventions are the most important or effective ways to optimize the transition from prison to home. I am well aware of the excesses that have been committed in the name of correctional psychology in the past, and it is not my intention to contribute in any way to having them repeated.

The paper will be organized around several basic propositions—that prisons have become more difficult places in which to adjust and survive over the last several decades; that especially in light of these changes, adaptation to modern prison life exacts certain psychological costs of most incarcerated persons; that some groups of people are somewhat more vulnerable to the pains of imprisonment than others; that the psychological costs and pains of imprisonment can serve to impede post-prison adjustment; and that there are a series of things that can be done both in and out of prison to minimize these impediments. Each of these propositions is presented in turn below.

## I. The State of the Prisons

Prisoners in the United States and elsewhere have always confronted a unique set of contingencies and pressures to which they were required to react and adapt in order to survive the prison experience. However, over the last several decades —beginning in the early 1970s and continuing to the present time—a combination of forces have transformed the nation's criminal justice system and modified the nature of imprisonment.[2]  The challenges prisoners now face in order to both survive the prison experience and, eventually, reintegrate into the freeworld upon release have changed and intensified as a result.

Among other things, these changes in the nature of imprisonment have included a series of inter-related, negative trends in American corrections. Perhaps the most dramatic changes have come about as a result of the unprecedented increases in rate of incarceration, the size of the U.S. prison population, and the widespread overcrowding that has occurred as a result. Over the past 25 years, penologists repeatedly have described U.S. prisons as "in crisis" and have characterized each new level of overcrowding as "unprecedented." By the start of the 1990s, the United States incarcerated more persons per capita than any other nation in the modern world, and it has retained that dubious distinction for nearly every year since. The international disparities are most striking when the U.S. incarceration rate is contrasted to those of other nations to whom the United States is often compared, such as Japan, Netherlands, Australia, and the United Kingdom.

---

2 For a more detailed discussion of this issue, see, for example: Haney, C., "Riding the Punishment Wave: On the Origins of Our Devolving Standards of Decency," *Hastings Women's Law Journal*, *9*, 27-78 (1998), and Haney, C., & Zimbardo, P., "The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment," *American Psychologist*, *53*, 709-727 (1998), and the references cited therein.

In the 1990s, as Marc Mauer and the Sentencing Project have effectively documented—the U.S. rates have consistently been between four and eight times those for these other nations.[3]

The combination of overcrowding and the rapid expansion of prison systems across the country adversely affected living conditions in many prisons, jeopardized prisoner safety, compromised prison management, and greatly limited prisoner access to meaningful programming. The two largest prison systems in the nation—California and Texas—provide instructive examples. Over the last 30 years, California's prisoner population increased *eightfold* (from roughly 20,000 in the early 1970s to its current population of approximately 160,000 prisoners). Yet there has been no remotely comparable increase in funds for prisoner services or inmate programming. In Texas, over just the years between 1992 and 1997, the prisoner population more than doubled as Texas achieved one of the highest incarceration rates in the nation. Nearly 70,000 additional prisoners added to the state's prison rolls in that brief five-year period alone. Not surprisingly, California and Texas were among the states to face major lawsuits in the 1990s over substandard, unconstitutional conditions of confinement. Federal courts in both states found that the prison systems had failed to provide adequate treatment services for those prisoners who suffered the most extreme psychological effects of confinement in deteriorated and overcrowded conditions.[4]

Paralleling these dramatic increases in incarceration rates and the numbers of persons imprisoned in the United States was an equally dramatic change in the rationale for prison itself. The nation moved abruptly in the mid-1970s from a society that justified putting people in prison on the basis of the belief that incarceration would somehow facilitate productive re-entry into the freeworld to one that used imprisonment merely to inflict pain on wrongdoers ("just deserts"), disable criminal offenders ("incapacitation"), or to keep them far away from the rest of society ("containment"). The abandonment of the once-avowed goal of rehabilitation certainly decreased the perceived need and availability of meaningful programming for prisoners as well as social

---

3 Mauer, M., "Americans Behind bars: A Comparison of International Rates of Incarceration," in W. Churchill and J.J. Vander Wall (Eds.), *Cages of Steel: The Politics of Imprisonment in the United States* (pp. 22-37). Washington, D.C.: Maisonneuve Press (1992); Mauer, M., "The International Use of Incarceration," *Prison Journal*, *75*, 113-123 (1995).

4 In California, for example, see: *Dohner v. McCarthy* [United States District Court, Central District of California, 1984-1985; 635 F. Supp. 408 (C.D. Cal. 1985) (examining the effects of overcrowded conditions in the California Men's Colony); *Coleman v. Wilson*, 912 F. Supp. 1282 (N.D. Cal. 1995) (challenge to grossly inadequate mental health services in the throughout the entire state prison system). In Texas, see the long-lasting *Ruiz* litigation in which the federal court has monitored and attempted to correct unconstitutional conditions of confinement throughout the state's sprawling prison system for more than 20 years now. Current conditions and the most recent status of the litigation are described in *Ruiz v. Johnson* [United States District Court, Southern District of Texas, 37 F. Supp. 2d  855 (S.D. Texas 1999).]
But these two states were not alone. According to the ACLU's National Prison Project, in 1995 there were fully 33 jurisdictions in the United States under court order to reduce overcrowding or improve general conditions in at least one of their major prison facilities. Nine were operating under court orders that covered their entire prison system. National Prison Project, *Status Report: State Prisons and the Courts* (1995).

and mental health services available to them both inside and outside the prison. Indeed, it generally reduced concern on the part of prison administrations for the overall well-being of prisoners.

The abandonment of rehabilitation also resulted in an erosion of modestly protective norms against cruelty toward prisoners. Many corrections officials soon became far less inclined to address prison disturbances, tensions between prisoner groups and factions, and disciplinary infractions in general through ameliorative techniques aimed at the root causes of conflict and designed to de-escalate it. The rapid influx of new prisoners, serious shortages in staffing and other resources, and the embrace of an openly punitive approach to corrections led to the "de-skilling" of many correctional staff members who often resorted to extreme forms of prison discipline (such as punitive isolation or "supermax" confinement) that had especially destructive effects on prisoners and repressed conflict rather than resolving it. Increased tensions and higher levels of fear and danger resulted.

The emphasis on the punitive and stigmatizing aspects of incarceration, which has resulted in the further literal and psychological isolation of prison from the surrounding community, compromised prison visitation programs and the already scarce resources that had been used to maintain ties between prisoners and their families and the outside world. Support services to facilitate the transition from prison to the freeworld environments to which prisoners were returned were undermined at precisely the moment they needed to be enhanced. Increased sentence length and a greatly expanded scope of incarceration resulted in prisoners experiencing the psychological strains of imprisonment for longer periods of time, many persons being caught in the web of incarceration who ordinarily would not have been (e.g., drug offenders), and the social costs of incarceration becoming increasingly concentrated in minority communities (because of differential enforcement and sentencing policies).

Thus, in the first decade of the 21st century, more people have been subjected to the pains of imprisonment, for longer periods of time, under conditions that threaten greater psychological distress and potential long-term dysfunction, and they will be returned to communities that have already been disadvantaged by a lack of social services and resources.

## II. The Psychological Effects of Incarceration:
## On the Nature of Institutionalization

The adaptation to imprisonment is almost always difficult and, at times, creates habits of thinking and acting that can be dysfunctional in periods of post-prison adjustment. Yet, the psychological effects of incarceration vary from individual to individual and are often reversible. To be sure, then, not everyone who is incarcerated is disabled or psychologically harmed by it. But few people are completely unchanged or unscathed by the experience. At the very least,

prison is painful, and incarcerated persons often suffer long-term consequences from having been subjected to pain, deprivation, and extremely atypical patterns and norms of living and interacting with others.

The empirical consensus on the most negative effects of incarceration is that most people who have done time in the best-run prisons return to the freeworld with little or no permanent, clinically-diagnosable psychological disorders as a result.[5] Prisons do not, in general, make people "crazy." However, even researchers who are openly skeptical about whether the pains of imprisonment generally translate into psychological harm concede that, for at least some people, prison can produce negative, long-lasting change.[6] And most people agree that the more extreme, harsh, dangerous, or otherwise psychologically-taxing the nature of the confinement, the greater the number of people who will suffer and the deeper the damage that they will incur.[7]

Rather than concentrate on the most extreme or clinically-diagnosable effects of imprisonment, however, I prefer to focus on the broader and more subtle psychological changes that occur in the routine course of adapting to prison life. The term "institutionalization" is used to describe the process by which inmates are shaped and transformed by the institutional environments in which they live. Sometimes called "prisonization" when it occurs in correctional

---

5 For a more detailed discussion of these issues, see, for example: Haney, C., "Psychology and the Limits to Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law," *Psychology, Public Policy, and Law*, *3*, 499-588 (1997), and the references cited therein.

6 Among the most unsympathetic of these skeptical views is: Bonta, J., and Gendreau, P., "Reexamining the Cruel and Unusual Punishment of Prison Life," *Law and Human Behavior*, *14*, 347 (1990). However, even these authors concede that: "physiological and psychological stress responses… were very likely [to occur] under crowded prison conditions"; "[w]hen threats to health come from suicide and self-mutilation, then inmates are clearly at risk"; "[i]n Canadian penitentiaries, the homicide rates are close to 20 times that of similar-aged males in Canadian society"; that "a variety of health problems, injuries, and selected symptoms of psychological distress were higher for certain classes of inmates than probationers, parolees, and, where data existed, for the general population"; that studies show long-term incarceration to result in "increases in hostility and social introversion… and decreases in self-evaluation and evaluations of work and father"; that imprisonment produced "increases in dependency upon staff for direction and social introversion," a tendency for prisoners to prefer "to cope with their sentences on their own rather than seek the aid of others," "deteriorating community relationships over time," and "unique difficulties" with "family separation issues and vocational skill training needs"; and that some researchers have speculated that "inmates typically undergo a 'behavioral deep freeze'" such that "outside-world behaviors that led the offender into trouble prior to imprisonment remain until release." Bonta & Gendreau, pp. 353-359.

7 Again, precisely because they define themselves as skeptical of the proposition that the pains of imprisonment produce many significant negative effects in prisoners, Bonta and Gendreau are instructive to quote. They concede that: there are "signs of pathology for inmates incarcerated in solitary for periods up to a year"; that higher levels of anxiety have been found in inmates after eight weeks in jail than after one; that increases in psychopathological symptoms occur after 72 hours of confinement; and that death row prisoners have been found to have "symptoms ranging from paranoia to insomnia," "increased feelings of depression and hopelessness," and feeling "powerlessness, fearful of their surroundings, and… emotionally drained." Bonta & Gendreau, pp. 361-362.

settings, it is the shorthand expression for the negative psychological effects of imprisonment.[8] The process has been studied extensively by sociologists, psychologists, psychiatrists, and others, and involves a unique set of psychological adaptations that often occur—in varying degrees—in response to the extraordinary demands of prison life. In general terms, the process of prisonization involves the incorporation of the norms of prison life into one's habits of thinking, feeling, and acting.

It is important to emphasize that these are the natural and normal adaptations made by prisoners in response to the unnatural and abnormal conditions of prisoner life. The dysfunctionality of these adaptations is not "pathological" in nature (even though, in practical terms, they may be destructive in effect). They are "normal" reactions to a set of pathological conditions that become problematic when they are taken to extreme lengths, or become chronic and deeply internalized (so that, even though the conditions of one's life have changed, many of the once-functional but now counterproductive patterns remain).

Like all processes of gradual change, of course, this one typically occurs in stages and, all other things being equal, the longer someone is incarcerated the more significant the nature of the institutional transformation. When most people first enter prison, of course, they find that being forced to adapt to an often harsh and rigid institutional routine, deprived of privacy and liberty, and subjected to a diminished, stigmatized status and extremely sparse material conditions is stressful, unpleasant, and difficult.

However, in the course of becoming institutionalized, a transformation begins. Persons gradually become more accustomed to the restrictions that institutional life imposes. The various psychological mechanisms that must be employed to adjust (and, in some harsh and dangerous correctional environments, to survive) become increasingly "natural," second nature, and, to a degree, internalized. To be sure, the process of institutionalization can be subtle and difficult to discern as it occurs. Thus, prisoners do not "choose" do succumb to it or not, and few people who have become institutionalized are aware that it has happened to them. Fewer still consciously decide that they are going to willingly allow the transformation to occur.

The process of institutionalization is facilitated in cases in which persons enter institutional settings at an early age, before they have formed the ability and expectation to control their own life choices. Because there is less tension between the demands of the institution and the autonomy of a mature adult, institutionalization proceeds more quickly and less problematically

---

8 A distinction is sometimes made in the literature between institutionalization—psychological changes that produce more conforming and institutionally "appropriate" thoughts and actions—and prisonization—changes that create a more oppositional and institutionally subversive stance or perspective. Here I use the terms more or less interchangeably to denote the totality of the negative transformation that may place before prisoners are released back into free society.

*The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment*
C. Haney

with at least some younger inmates. Moreover, younger inmates have little in the way of already developed independent judgment, so they have little if anything to revert to or rely upon if and when the institutional structure is removed. And the longer someone remains in an institution, the greater the likelihood that the process will transform them.

Among other things, the process of institutionalization (or "prisonization")  includes some or all of the following psychological adaptations:

## A. Dependence on institutional structure and contingencies.

Among other things, penal institutions require inmates to relinquish the freedom and autonomy to make their own choices and decisions and this process requires what is a painful adjustment for most people. Indeed, some people never adjust to it. Over time, however, prisoners may adjust to the muting of self-initiative and independence that prison requires and become increasingly dependent on institutional contingencies that they once resisted. Eventually it may seem more or less natural to be denied significant control over day-to-day decisions and, in the final stages of the process, some inmates may come to depend heavily on institutional decisionmakers to make choices for them and to rely on the structure and schedule of the institution to organize their daily routine. Although it rarely occurs to such a degree, some people do lose the capacity to initiate behavior on their own and the judgment to make decisions for themselves. Indeed, in extreme cases, profoundly institutionalized persons may become extremely uncomfortable when and if their previous freedom and autonomy is returned.

A slightly different aspect of the process involves the creation of dependency upon the institution to control one's behavior. Correctional institutions force inmates to adapt to an elaborate network of typically very clear boundaries and limits, the consequences for whose violation can be swift and severe. Prisons impose careful and continuous surveillance, and are quick to punish (and sometimes to punish severely) infractions of the limiting rules. The process of institutionalization in correctional settings may surround inmates so thoroughly with external limits, immerse them so deeply in a network of rules and regulations, and accustom them so completely to such highly visible systems of constraint that internal controls atrophy or, in the case of especially young inmates, fail to develop altogether. Thus, institutionalization or prisonization renders some people so dependent on external constraints that they gradually lose the capacity to rely on internal organization and self-imposed personal limits to guide their actions and restrain their conduct. If and when this external structure is taken away, severely institutionalized persons may find that they no longer know how to do things on their own, or how to refrain from doing those things that are ultimately harmful or self- destructive.

## B. Hypervigilance, interpersonal distrust and suspicion.

In addition, because many prisons are clearly dangerous places from which there is no exit or escape, prisoners learn quickly to become hypervigilant and ever-alert for signs of threat or personal risk. Because the stakes are high, and because there are people in their immediate

*The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment*
C. Haney

environment poised to take advantage of weakness or exploit carelessness or inattention, interpersonal distrust and suspicion often result. Some prisoners learn to project a tough convict veneer that keeps all others at a distance. Indeed, as one prison researcher put it, many prisoners "believe that unless an inmate can convincingly project an image that conveys the potential for violence, he is likely to be dominated and exploited throughout the duration of his sentence."[9]

McCorkle's study of a maximum security Tennessee prison was one of the few that attempted to quantify the kinds of behavioral strategies prisoners report employing to survive dangerous prison environments. He found that "[f]ear appeared to be shaping the life-styles of many of the men," that it had led over 40% of prisoners to avoid certain high risk areas of the prison, and about an equal number of inmates reported spending additional time in their cells as a precaution against victimization. At the same time, almost three-quarters reported that they had been forced to "get tough" with another prisoner to avoid victimization, and more than a quarter kept a "shank" or other weapon nearby with which to defend themselves. McCorkle found that age was the best predictor of the type of adaptation a prisoner took, with younger prisoners being more likely to employ aggressive avoidance strategies than older ones.

## C. Emotional over-control, alienation, and psychological distancing.

Shaping such an outward image requires emotional responses to be carefully measured. Thus, prisoners struggle to control and suppress their own internal emotional reactions to events around them. Emotional over-control and a generalized lack of spontaneity may occur as a result. Admissions of vulnerability to persons inside the immediate prison environment are potentially dangerous because they invite exploitation. As one experienced prison administrator once wrote: "Prison is a barely controlled jungle where the aggressive and the strong will exploit the weak, and the weak are dreadfully aware of it."[10]  Some prisoners are forced to become remarkably skilled "self-monitors" who calculate the anticipated effects that every aspect of their behavior might have on the rest of the prison population, and strive to make such calculations second nature.

Prisoners who labor at both an emotional and behavioral level to develop a "prison mask" that is unrevealing and impenetrable risk alienation from themselves and others, may develop emotional flatness that becomes chronic and debilitating in social interaction and relationships, and find that they have created a permanent and unbridgeable distance between themselves and other people. Many for whom the mask becomes especially thick and effective in prison find that the disincentive against engaging in open communication with others that prevails there has led

---

9 Richard McCorkle, "Personal Precautions to Violence in Prison," *Criminal Justice and Behavior*, *19*, 160-173 (1992), at 161.

10 Paul Keve, *Prison Life and Human Worth*. Minneapolis, MN: University of Minnesota Press (1974), at 54.

them to withdrawal from authentic social interactions altogether.[11]  The alienation and social distancing from others is a defense not only against exploitation but also against the realization that the lack of interpersonal control in the immediate prison environment makes emotional investments in relationships risky and unpredictable.

## D. Social withdrawal and isolation.

Some prisoners learn to find safety in social invisibility by becoming as inconspicuous and unobtrusively disconnected from others as possible. The self-imposed social withdrawal and isolation may mean that they retreat deeply into themselves, trust virtually no one, and adjust to prison stress by leading isolated lives of quiet desperation. In extreme cases, especially when combined with prisoner apathy and loss of the capacity to initiate behavior on one's own, the pattern closely resembles that of clinical depression. Long-term prisoners are particularly vulnerable to this form of psychological adaptation. Indeed, Taylor wrote that the long-term prisoner "shows a flatness of response which resembles slow, automatic behavior of a very limited kind, and he is humorless and lethargic."[12]  In fact, Jose-Kampfner has analogized the plight of long-term women prisoners to that of persons who are terminally-ill, whose experience of this "existential death is unfeeling, being cut off from the outside… (and who) adopt this attitude because it helps them cope."[13]

## E. Incorporation of exploitative norms of prison culture.

In addition to obeying the formal rules of the institution, there are also informal rules and norms that are part of the unwritten but essential institutional and inmate culture and code that, at some level, must be abided. For some prisoners this means defending against the dangerousness and deprivations of the surrounding environment by embracing all of its informal norms, including some of the most exploitative and extreme values of prison life. Note that prisoners typically are given no alternative culture to which to ascribe or in which to participate. In many institutions the lack of meaningful programming has deprived them of pro-social or positive activities in which to engage while incarcerated. Few prisoners are given access to gainful employment where they can obtain meaningful job skills and earn adequate compensation; those

11 For example, see Jose-Kampfner, C., "Coming to Terms with Existential Death: An Analysis of Women's Adaptation to Life in Prison," *Social Justice, 17*, 110 (1990) and, also, Sapsford, R., "Life Sentence Prisoners: Psychological Changes During Sentence," *British Journal of Criminology, 18*, 162 (1978).

12 Taylor, A., "Social Isolation and Imprisonment," *Psychiatry, 24*, 373 (1961), at p. 373. See, also, Hanna Levenson, "Multidimensional Locus of Control in Prison Inmates," *Journal of Applied Social Psychology, 5*, 342 (1975) who found not surprisingly that prisoners who were incarcerated for longer periods of time and those who were punished more frequently by being placed in solitary confinement were more likely to believe that their world was controlled by "powerful others." Such beliefs are consistent with an institutional adaptation that undermines autonomy and self-initiative.

13 Jose-Kampfner, *supra* note 10, at 123.

who do work are assigned to menial tasks that they perform for only a few hours a day. With rare exceptions—those very few states that permit highly regulated and infrequent conjugal visits—they are prohibited from sexual contact of any kind. Attempts to address many of the basic needs and desires that are the focus of normal day-to-day existence in the freeworld—to recreate, to work, to love—necessarily draws them closer to an illicit prisoner culture that for many represents the only apparent and meaningful way of being.

However, as I noted earlier, prisoner culture frowns on any sign of weakness and vulnerability, and discourages the expression of candid emotions or intimacy. And some prisoners embrace it in a way that promotes a heightened investment in one's reputation for toughness, and encourages a stance towards others in which even seemingly insignificant insults, affronts, or physical violations must be responded to quickly and instinctively, sometimes with decisive force. In extreme cases, the failure to exploit weakness is itself a sign of weakness and seen as an invitation for exploitation. In men's prisons it may promote a kind of hypermasculinity in which force and domination are glorified as essential components of personal identity. In an environment characterized by enforced powerlessness and deprivation, men and women prisoners confront distorted norms of sexuality in which dominance and submission become entangled with and mistaken for the basis of intimate relations.

Of course, embracing these values too fully can create enormous barriers to meaningful interpersonal contact in the free world, preclude seeking appropriate help for one's problems, and a generalized unwillingness to trust others out of fear of exploitation. It can also lead to what appears to be impulsive overreaction, striking out at people in response to minimal provocation that occurs particularly with persons who have not been socialized into the norms of inmate culture in which the maintenance of interpersonal respect and personal space are so inviolate. Yet these things are often as much a part of the process of prisonization as adapting to the formal rules that are imposed in the institution, and they are as difficult to relinquish upon release.

*F. Diminished sense of self-worth and personal value.*

Prisoners typically are denied their basic privacy rights, and lose control over mundane aspects of their existence that most citizens have long taken for granted. They live in small, sometimes extremely cramped and deteriorating spaces (a 60 square foot cell is roughly the size of king-size bed), have little or no control over the identify of the person with whom they must share that space (and the intimate contact it requires), often have no choice over when they must get up or go to bed, when or what they may eat, and on and on. Some feel infantalized and that the degraded conditions under which they live serve to repeatedly remind them of their compromised social status and stigmatized social role as prisoners. A diminished sense of self-worth and personal value may result. In extreme cases of institutionalization, the symbolic meaning that can be inferred from this externally imposed substandard treatment and

circumstances is internalized; that is, prisoners may come to think of themselves as "the kind of person" who deserves only the degradation and stigma to which they have been subjected while incarcerated.

## G. Post-traumatic stress reactions to the pains of imprisonment.

For some prisoners, incarceration is so stark and psychologically painful that it represents a form of traumatic stress severe enough to produce post-traumatic stress reactions once released. Moreover, we now understand that there are certain basic commonalities that characterize the lives of many of the persons who have been convicted of crime in our society.[14] A "risk factors" model helps to explain the complex interplay of traumatic childhood events (like poverty, abusive and neglectful mistreatment, and other forms of victimization) in the social histories of many criminal offenders. As Masten and Garmezy have noted, the presence of these background risk factors and traumas in childhood increases the probability that one will encounter a whole range of problems later in life, including delinquency and criminality.[15] The fact that a high percentage of persons presently incarcerated have experienced childhood trauma means, among other things, that the harsh, punitive, and uncaring nature of prison life may represent a kind of "re-truamatization" experience for many of them. That is, some prisoners find exposure to the rigid and unyielding discipline of prison, the unwanted proximity to violent encounters and the possibility or reality of being victimized by physical and/or sexual assaults, the need to negotiate the dominating intentions of others, the absence of genuine respect and regard for their well being in the surrounding environment, and so on all too familiar. Time spent in prison may rekindle not only the memories but the disabling psychological reactions and consequences of these earlier damaging experiences.

The dysfunctional consequences of institutionalization are not always immediately obvious once the institutional structure and procedural imperatives have been removed. This is especially

---

14 The literature on these issues has grown vast over the last several decades. For representative examples, see: Dutton, D., Hart, S., "Evidence for Long-term, Specific Effects of Childhood Abuse and Neglect on Criminal Behavior in Men," *International Journal of Offender Therapy & Comparative Criminology*, 36, 129-137 (1992); Haney, C., "The Social Context of Capital Murder: Social Histories and the Logic of Capital Mitigation," 35 *Santa Clara Law Review* 35, 547-609 (1995); Craig Haney, "Psychological Secrecy and the Death Penalty: Observations on 'the Mere Extinguishment of Life,'" *Studies in Law, Politics, and Society*, *16*, 3-69 (1997); Haney, C., "Mitigation and the Study of Lives: The Roots of Violent Criminality and the Nature of Capital Justice," in James Acker, Robert Bohm, and Charles Lanier, *America's Experiment with Capital Punishment: Reflections on the Past, Present, and Future of the Ultimate Penal Sanction* (pp. 343-377). Durham, NC: Carolina Academic Press (1997).Huff-Corzine, L., Corzine, J., & Moore, D., "Deadly Connections: Culture, Poverty, and the Direction of Lethal Violence," *Social Forces 69*, 715-732 (1991); McCord, J., "The Cycle of Crime and Socialization Practices," *Journal of Criminal Law & Criminology*, *82*, 211-228 (1991); Sampson, R., and Laub, J. *Crime in the Making: Pathways and Turning Points Through Life*. Cambridge, MA: Harvard University Press (1993); and Widom, C., "The Cycle of Violence," *Science*, *244*, 160-166 (1989).

15 Masten, A., & Garmezy, N., Risk, Vulnerability and Protective Factors in Developmental Psychopathology. In F. Lahey & A Kazdin (Eds.) *Advances in Clinical Child Psychology* (pp. 1-52). New York: Plenum (1985), at 3.

---

true in cases where persons retain a minimum of structure wherever they re-enter free society. Moreover, the most negative consequences of institutionalization may first occur in the form of *internal* chaos, disorganization, stress, and fear. Yet, institutionalization has taught most people to cover their internal states, and not to openly or easily reveal intimate feelings or reactions. So, the outward appearance of normality and adjustment may mask a range of serious problems in adapting to the freeworld.

This is particularly true of persons who return to the freeworld lacking a network of close, personal contacts with people who know them well enough to sense that something may be wrong. Eventually, however, when severely institutionalized persons confront complicated problems or conflicts, especially in the form of unexpected events that cannot be planned for in advance, the myriad of challenges that the non-institutionalized confront in their everyday lives outside the institution may become overwhelming. The facade of normality begins to deteriorate, and persons may behave in dysfunctional or even destructive ways because all of the external structure and supports upon which they relied to keep themselves controlled, directed, and balanced have been removed.

## III. Special Populations and Pains of Prison Life

Although everyone who enters prison is subjected to many of the above-stated pressures of institutionalization, and prisoners respond in various ways with varying degrees of psychological change associated with their adaptations, it is important to note that there are some prisoners who are much more vulnerable to these pressures and the overall pains of imprisonment than others. Either because of their personal characteristics—in the case of "special needs" prisoners whose special problems are inadequately addressed by current prison policies[16]—or because of the especially harsh conditions of confinement to which they are subjected—in the case of increasing numbers of "supermax" or solitary confinement prisoners[17]—they are at risk of making the transition from prison to home with a more significant set of psychological problems and challenges to overcome.  The plight of several of these special populations of prisoners is briefly discussed below.

---

16 For a more detailed discussion of these issues, see, for example: Haney, C., & Specter, D., "Vulnerable Offenders and the Law: Treatment Rights in Uncertain Legal Times," in J. Ashford, B. Sales, & W. Reid (Eds.), *Treating Adult and Juvenile Offenders with Special Needs* (pp. 51-79). Washington, D.C.: American Psychological Association (2001), and the references cited therein.

17 See Haney, C., & Lynch, M., "Regulating Prisons of the Future: The Psychological Consequences of Supermax and Solitary Confinement," *New York University Review of Law and Social Change*, *23*, 477-570 (1997), for a discussion of this trend in American corrections and a description of the nature of these isolated conditions to which an increasing number of prisoners are subjected.

*The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment*
C. Haney

## A. Mentally Ill and Developmentally Disabled Prisoners

Perhaps not surprisingly, mental illness and developmental disability represent the largest number of disabilities among prisoners. For example, a national survey of prison inmates with disabilities conducted in 1987 indicated that although less than 1% suffered from visual, mobility/orthopedic, hearing, or speech deficits, much higher percentages suffered from cognitive and psychological disabilities.[18]   A more recent follow-up study by two of the same authors obtained similar results: although less than 1% of the prison population suffered visual, mobility, speech, or hearing deficits, 4.2% were developmentally disabled, 7.2% suffered psychotic disorders, and 12% reported "other psychological disorders."[19]   It is probably safe to estimate, then, based on this and other studies,[20] that upwards of as many as 20% of the current prisoner population nationally suffers from either some sort of significant mental or psychological disorder or developmental disability.

As my earlier comments about the process of institutionalization implied, the task of negotiating key features of the social environment of imprisonment is far more challenging than it appears at first. And it is surely far more difficult for vulnerable, mentally-ill and developmentally-disabled prisoners to accomplish. Incarceration presents particularly difficult adjustment problems that make prison an especially confusing and sometimes dangerous situation for them. For mentally-ill and developmentally-disabled inmates, part of whose defining (but often undiagnosed) disability includes difficulties in maintaining close contact with reality, controlling and conforming one's emotional and behavioral reactions, and generally impaired comprehension and learning, the rule-bound nature of institutional life may have especially disastrous consequences. Yet, both groups are too often left to their own devices to somehow survive in prison and leave without having had any of their unique needs addressed.

Combined with the de-emphasis on treatment that now characterizes our nation's correctional facilities, these behavior patterns can significantly impact the institutional history of vulnerable or special needs inmates. One commentator has described the vicious cycle into which mentally-ill and developmentally-disabled prisoners can fall:

> The lack of mental health care for the seriously mentally ill who end up in segregation units has worsened the condition of many prisoners incapable of understanding their condition. This is especially true in cases where prisoners are placed in levels of mental health care that are not intense enough, and begin to refuse taking their medication. They then enter a vicious cycle in which their mental disease takes over, often causing hostile and aggressive behavior to the

---

18 Veneziano, L., Veneziano, C., & Tribolet, C., The special needs of prison inmates with handicaps: An assessment. *Journal of Offender Counseling, Services & Rehabilitation*, *12*, 61-72 (1987).

19 Veneziano, L., & Veneziano, C., Disabled inmates. In M. McShane & F. Williams (Eds.), *Encyclopedia of American Prisons* (pp. 157-161). New York: Garland (1996). See, also, Long, L., & Sapp, A., Programs and facilities for physically disabled inmates in state prisons. *Journal of Offender Rehabilitation*, *18*, 191-204 (1992).

20 For example, according to a Department of Justice census of correctional facilities across the country, there were approximately 200,000 mentally ill prisoners in the United States in midyear 2000. This represented approximately 16% of prisoners nationwide. Bureau of Justice Statistics, *Mental Health Treatment in State Prisons*, 2000. (NCJ 188215), July, 2001.

*The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment*
C. Haney

point that they break prison rules and end up in segregation units as management problems. Once in punitive housing, this regression can go undetected for considerable periods of time before they again receive more closely monitored mental health care. This cycle can, and often does, repeat.[21]

## B. Prisoners in "Supermax" or Solitary Confinement

In addition, there are an increasing number of prisoners who are subjected to the unique and more destructive experience of punitive isolation, in so-called "supermax" facilities, where they are kept under conditions of unprecedented levels of social deprivation for unprecedented lengths of time. This kind of confinement creates its own set of psychological pressures that, in some instances, uniquely disable prisoners for freeworld reintegration.[22]  Indeed, there are few if any forms of imprisonment that produce so many indicies of psychological trauma and symptoms of psychopathology in those persons subjected to it. My own review of the literature suggested these documented negative psychological consequences of long-term solitary-like confinement include: an impaired sense of identity; hypersensitivity to stimuli; cognitive dysfunction (confusion, memory loss, ruminations); irritability, anger, aggression, and/or rage; other-directed violence, such as stabbings, attacks on staff, property destruction, and collective violence; lethargy, helplessness and hopelessness; chronic depression; self-mutilation and/or suicidal ideation, impulses, and behavior; anxiety and panic attacks; emotional breakdowns; and/or loss of control; hallucinations, psychosis and/or paranoia; overall deterioration of mental and physical health.[23]

Human Rights Watch has suggested that there are approximately 20,000 prisoners confined to supermax-type units in the United States.[24]  Most experts agree that the number of such units is increasing. In many states the majority of prisoners in these units are serving "indeterminate" solitary confinement terms, which means that their entire prison sentence will be served in isolation (unless they "debrief" by providing incriminating information about other prisoners). Few states provide any meaningful or effective "decompression" program for prisoners, which means that many prisoners who have been confined in these supermax units—some for considerable periods of time—are released directly into the community from these extreme conditions of confinement.

---

21 Streeter, P., "Incarceration of the mentally ill: Treatment or warehousing?" *Michigan Bar Journal*, *77*, 166 (1998), at p. 167.

22 For a more detailed discussion of these issues, see, for example: Haney, C., & Lynch, M., "Regulating Prisons of the Future: The Psychological Consequences of Supermax and Solitary Confinement," *New York University Review of Law and Social Change*, *23*, 477-570 (1997), and the references cited therein.

23 See Haney & Lynch, *supra* note 21.

24 Human Rights Watch, *Out of Sight: Super-Maximum Security Confinement in the United States*. Feburary, 2000.

## IV. Implications for the Transition From Prison to Home

The psychological consequences of incarceration may represent significant impediments to post-prison adjustment. They may interfere with the transition from prison to home, impede an ex-convict's successful re-integration into a social network and employment setting, and may compromise an incarcerated parent's ability to resume his or her role with family and children. The range of effects includes the sometimes subtle but nonetheless broad-based and potentially disabling effects of institutionalization prisonization, the persistent effects of untreated or exacerbated mental illness, the long-term legacies of developmental disabilities that were improperly addressed, or the pathological consequences of supermax confinement experienced by a small but growing number of prisoners who are released directly from long-term isolation into freeworld communities. There is little or no evidence that prison systems across the country have responded in a meaningful way to these psychological issues, either in the course of confinement or at the time of release. Over the next decade, the impact of unprecedented levels of incarceration will be felt in communities that will be expected to receive massive numbers of ex-convicts who will complete their sentences and return home but also to absorb the high level of psychological trauma and disorder that many will bring with them.

The implications of these psychological effects for parenting and family life can be profound. Parents who return from periods of incarceration still dependent on institutional structures and routines cannot be expected to effectively organize the lives of their children or exercise the initiative and autonomous decisionmaking that parenting requires. Those who still suffer the negative effects of a distrusting and hypervigilant adaptation to prison life will find it difficult to promote trust and authenticity within their children. Those who remain emotionally over-controlled and alienated from others will experience problems being psychologically available and nurturant. Tendencies to socially withdraw, remain aloof or seek social invisibility could not be more dysfunctional in family settings where closeness and interdependency is needed. The continued embrace of many of the most negative aspects of exploitative prisoner culture is likely to doom most social and intimate relations, as will an inability to overcome the diminished sense of self-worth that prison too often instills. Clearly, the residual effects of the post-traumatic stress of imprisonment and the retraumatization experiences that the nature of prison life may incur can jeopardize the mental health of persons attempting to reintegrate back into the freeworld communities from which they came. Indeed, there is evidence that incarcerated parents not only themselves continue to be adversely affected by traumatizing risk factors to which they have been exposed, but also that the experience of imprisonment has done little or nothing to provide them with the tools to safeguard their children from the same potentially destructive experiences.[25]

---

25 Greene, S., Haney, C., and Hurtado, A., "Cycles of Pain: Risk Factors in the Lives of Incarcerated Women and Their Children," *Prison Journal*, *80*, 3-23 (2000).

The excessive *and* disproportionate use of imprisonment over the last several decades also means that these problems will not only be large but concentrated primarily in certain communities whose residents were selectively targeted for criminal justice system intervention. Our society is about to absorb the consequences not only of the "rage to punish"[26] that was so fully indulged in the last quarter of the 20th century but also of the "malign neglect"[27] that led us to concentrate this rage so heavily on African American men. Remarkably, as the present decade began, there were more young Black men (between the ages of 20-29) under the control of the nation's criminal justice system (including probation and parole supervision) than the total number in college.[28]  Thus, whatever the psychological consequences of imprisonment and their implications for reintegration back into the communities from which prisoners have come, we know that those consequences and implications are about to be felt in unprecedented ways in these communities, by these families, and for these children, like no others. Not surprisingly, then, one scholar has predicted that "imprisonment will become the most significant factor contributing to the dissolution and breakdown of African American families during the decade of the 1990s"[29] and another has concluded that "[c]rime control policies are a major contributor to the disruption of the family, the prevalence of single parent families, and children raised without a father in the ghetto, and the 'inability of people to get the jobs still available' . "[30]

## V. Policy and Programmatic Responses to the Adverse Effects of Incarceration

An intelligent, humane response to these facts about the implications of contemporary prison life must occur on at least two levels. We must simultaneously address the adverse prison policies and conditions of confinement that have created these special problems, and at the same time provide psychological resources and social services for persons who have been adversely affected by them. Both things must occur if the successful transition from prison to home is to occur on a consistent and effective basis.

There are three areas in which policy interventions must be concentrated in order to address these two levels of concern:

---

26 Lois Forer, *A Rage to Punish: The Unintended Consequences of Mandatory Sentencing.* New York: W. W. Norton (1994).

27 Michael Tonry, *Malign Neglect: Race, Crime, and Punishment in America*. New York: Oxford University Press (1995).

28 Mauer, M. (1990). More Young Black Males under Correctional Control in US than in College. Washington: The Sentencing Project.

29 King, A., "The Impact of Incarceration on African American Families: Implications for Practice," *Families in Society: The Journal of Contemporary Human Services*, *74*, 145-153 (1993), p. 145..

30 Chambliss, W., "Policing the Ghetto Underclass: The Politics of Law and Law Enforcement," *Social Problems*, *41*, 177-194 (1994), p. 183.

## A. Prison Conditions, Policies, and Procedures

No significant amount of progress can be made in easing the transition from prison to home until and unless significant changes are made in the normative structure of American prisons. Specifically:

- The goal of penal harm must give way to a clear emphasis on prisoner-oriented rehabilitative services.

- The adverse effects of institutionalization must be minimized by structuring prison life to replicate, as much as possible, life in the world outside prison. A useful heuristic to follow is a simple one: "the less like a prison, and the more like the freeworld, the better."

- Prisons that give inmates opportunities to exercise pockets of autonomy and personal initiative must be created.

- Safe correctional environments that remove the need for hypervigilance and pervasive distrust must be maintained, ones where prisoners can establish authentic selves, and learn the norms of interdependence and cooperative trust.

- A clear and consistent emphasis on maximizing visitation and supporting contact with the outside world must be implemented, both to minimize the division between the norms of prison and those of the freeworld, and to discourage dysfunctional social withdrawal that is difficult to reverse upon release.

- Program rich institutions must be established that give prisoners genuine alternative to exploitative prisoner culture in which to participate and invest, and the degraded, stigmatized status of prisoner transcended. Prisoners must be given opportunities to engage in meaningful activities, to work, and to love while incarcerated.

- Adequate therapeutic and habilitative resources must be provided to address the needs of the large numbers of mentally ill and developmentally disabled prisoners who are now incarcerated.

- The increased use of supermax and other forms of extremely harsh and psychologically damaging confinement must be reversed. Strict time limits must be placed on the use of punitive isolation that approximate the much briefer periods of such confinement that once characterized American corrections, prisoners must be screened for special vulnerability to isolation, and carefully monitored so that they can be removed upon the first sign of adverse reactions.

## B. Transitional Services to Prepare Prisoners for Community Release

No significant amount of progress can be made in easing the transition from prison to home until and unless significant changes are made in the way prisoners are prepared to leave prison and re-enter the freeworld communities from which they came. Specifically:

*The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment*
C. Haney

- Prison systems must begin to take the pains of imprisonment and the nature of institutionalization seriously, and provide all prisoners with effective decompression programs in which they are re-acclimated to the nature and norms of the freeworld.

- Prisoners must be given some insight into the changes brought about by their adaptation to prison life. They must be given some understanding of the ways in which prison may have changed them, the tools with which to respond to the challenge of adjustment to the freeworld.

- The process must begin well in advance of a prisoner's release, and take into account all aspects of the transition he or she will be expected to make. This means, among other things, that all prisoners will need occupational and vocational training and pre-release assistance in finding gainful employment. It also means that prisoners who are expected to resume their roles as parents will need pre-release assistance in establishing, strengthening, and/or maintaining ties with their families and children, and whatever other assistance will be essential for them to function effectively in this role (such as parenting classes and the like).

- Prisoners who have manifested signs or symptoms of mental illness or developmental disability while incarcerated will need specialized transitional services to facilitate their reintegration into the freeworld. These would include, where appropriate, pre-release outpatient treatment and habilitation plans.

- No prisoner should be released directly out of supermax or solitary confinement back into the freeworld. Supermax prisons must provide long periods of decompression, with adequate time for prisoners to be treated for the adverse effects of long-term isolation and reacquaint themselves with the social norms of the world to which they will return.

## C. Community-Based Services to Facilitate and Maintain Reintegration

No significant amount of progress can be made in easing the transition from prison to home until and unless significant changes are made in the way ex-convicts are treated to in the freeworld communities from which they came. Specifically:

- Clear recognition must be given to the proposition that persons who return home from prison face significant personal, social, and structural challenges that they have neither the ability nor resources to overcome entirely on their own. Post-release success often depends on the nature and quality of services and support provided in the community, and here is where the least amount of societal attention and resources are typically directed. This tendency must be reversed.

- Gainful employment is perhaps the most critical aspect of post-prison adjustment. The stigma of incarceration and the psychological residue of institutionalization require active and prolonged agency intervention to transcend. Job training, employment counseling, and employment placement programs must all be seen as essential parts of an effective reintegration plan.

---

*The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment*
C. Haney

- A broadly conceived family systems approach to counseling for ex-convicts and their families and children must be implemented in which the long-term problematic consequences of "normal" adaptations to prison life are the focus of discussion, rather than traditional models of psychotherapy.

- Parole and probation services and agencies need to be restored to their original role of assisting with reintegration. Here too the complexity of the transition from prison to home needs to be fully appreciated, and parole revocation should only occur after every possible community-based resource and approach has been tried.

# EXHIBIT 22

# Covid-19's Impact on People in Prison

*Updated*   05.21.20

   



People who are incarcerated are at great risk of sickness and death as a result of the Covid-19 pandemic and more must be done to release people who are imprisoned and are not a threat to public safety or are elderly or infirm. The inability to quarantine or practice social distancing, together with overcrowding, imperils the lives of many people incarcerated in jails and prisons.

Nationwide, the known infection rate for Covid-19 in jails and prisons is about 2½ times higher than in the general population. More than 44,000 incarcerated people and staff have coronavirus infections and 462 have died.

Seven of the 10 largest outbreaks in the country have been at correctional facilities, including two Ohio prisons—Marion Correctional Institution, with 2,439 cases, and Pickaway Correctional Institution, with 1,791 cases. Widespread testing at a federal prison in Lompoc, California, has revealed another large cluster of 1,020 cases. Nearly 70% of people incarcerated at Federal Correctional Institution Lompoc tested positive.

The biggest hot spot in the country is at Trousdale Turner Correctional Center, a private prison in Tennessee run by CoreCivic, where 1,384 of 2,444 incarcerated people tested positive for the coronavirus. The state has committed to testing of all state prison inmates and staff after widespread testing at Trousdale and another prison, Bledsoe County Correctional Complex, found large numbers of positive cases.

The virus is spreading rapidly in prisons across the country, and the examples continue to mount. Seventy percent of Texas prisoners tested have the coronavirus. The virus has infected more than 1,600 incarcerated people and prison employees. At least 25 have died. But testing has been limited to only 1,700 people—about 1% of the state's prison population.

Many of these prisoners will die, as will thousands of other incarcerated people in the U.S. because of mass incarceration and our carceral policies. The pandemic has exposed serious problems with American incarceration that need to be addressed.

## Overcrowding

At year-end 2018, the prison custody population in 25 states and the federal Bureau of Prisons had a total number of prisoners in custody that met or exceeded their minimum number of beds.

Because prisons have more people incarcerated than they were designed to hold, incarcerated people are crammed into dorms and warehoused in rooms with bunks sometimes three beds high and only inches apart.

Social distancing is not an option under these conditions. And at Lakeland and many other prisons, it's impossible to quarantine large numbers of infected prisoners. As a result, the risk of infection for imprisoned people and correctional staff is extremely high.

## Vulnerable Populations

After decades of extreme sentencing, older adults today make up a larger share of the state prison population than people age 18 to 24. Older people are at a higher risk of serious complications from Covid-19. Older people in prison are more likely to be in poor health and have limited access to quality medical services, which increases the risk of death in a public health crisis.

"Tough on crime" policies including three-strikes laws and truth-in-sentencing schemes have dramatically increased sentences for people convicted of felonies and significantly reduced eligibility for parole. Accordingly, the percentage of people in state prisons who are 55 and older more than tripled between 2000 and 2016—to nearly 150,000 older people incarcerated in state correctional facilities in 2016.

Generally, people in prison—where a lot of time is spent sitting around and food is typically poor quality—tend to be in worse health than those outside prison, The Lancet reports. Lack of access to quality medical care means that older people in prison suffer more often from chronic health conditions like hypertension, asthma, and diabetes that increase the risk of serious complications from the coronavirus.

## Violence and Abuse

The Covid-19 crisis has reduced the number of correctional staff, and in many places states are unable to provide adequate security, which leads to more violence and abuse within jails and prisons.

In Alabama, which has the highest rate of prison homicide in the nation, two incarcerated men died violently in two different prisons in less than one week in March, and a third was killed in April. Their murders bring the death toll in Alabama prisons to 10 homicides in the past eight months and 26 in the past two years.

## Jails

Jails are filled with people who have not been convicted of a crime,[1] many of whom need medical care and social services that jails consistently fail to provide. Even without a public health crisis, too many people in jail are denied adequate medical care.

Cook County Jail in Chicago, one of the nation's largest jails, reported a rate of coronavirus infection that was higher than almost anywhere else in the country, with more than 1,018 people testing positive so far.

| | |
|---|---|
| Related Resource |  |
| **Responses to the Covid-19 Pandemic** | |
| Prison Policy Initiative is tracking what state and local governments are doing to protect incarcerated people. | |

Unlike prisons, local governments across the U.S. have significantly reduced their jail populations to slow the spread of the coronavirus in recent weeks.

## Early Release for At-Risk Populations

Advocates, family members, and prosecutors have called for prisons to release the most vulnerable people, especially the elderly and infirm, who are at the greatest risk from Covid-19.



For the most part, states are not even taking the simplest and least controversial steps, like refusing admissions for technical violations of probation and parole rules, and to release those that are already in confinement for <u>those same technical violations.</u> (In <u>2016, 60,000 people</u> were returned to state prison for behaviors that, for someone not on probation or parole, would not be a crime.) Similarly, other obvious places to start are releasing people nearing the end of their sentence, those who are in minimum security facilities and on work-release, and those who are medically fragile or older.

Tags:   **Prison Conditions**

## Related Resources

Tracking the Spread of Coronavirus in Prisons
The Marshall Project

Prisons Are in No Way Equipped to Deal with COVID-19
The Lancet

'A Terrible Price': The Deadly Racial Disparities of Covid-19 in America
The New York Times Magazine

Covid-19 in Juvenile Facilities
The Sentencing Project

## Recent News



Alabama State Representative Honors KKK Founder
07.30.20



Another Prisoner Found Dead in an Alabama Prison
07.30.20







Alabama Corrections Officers Indicted for Excessive Force and Obstruction of Justice

07.29.20

As Family Protests Police Killing of Dana Fletcher, City Planned to Honor Officers Who Shot Him

07.28.20

 **More news**

# Follow EJI

   

Home

Museum and Memorial

News

About

Contact

Get Involved

Donate

Shop

122 Commerce Street Montgomery, AL 36104

(334) 269-1803 contact_us@eji.org

Subscribe to our newsletter

© Equal Justice Initiative 2020

# EXHIBIT 23

Sign Up For Newsletters | Battleground Tracker | Coronavirus Updates | John Lewis Funeral | Amazon Earnings | Trump On Delaying Election | Herman Cain Dies From COVII

≡                          CBS NEWS                                    LIVE

# Inmates share what life is like inside prison during the coronavirus pandemic

MAY 20, 2020 / 12:58 PM / CBS NEWS

CBS News has been reporting on how the coronavirus pandemic is impacting the nation's prison system, and here, shares the perspectives of inmates, as told by them. Key details of their accounts have been verified by CBS News. They have been edited for length and clarity.

## Marybeth Hill, 33

- *Hill is serving 36-months for possession with intent to distribute. FCI Greenville, Illinois: zero confirmed virus cases. As told to Justin Carissimo.*

The first few weeks were very chaotic. We've been on lockdown since April 1. Tensions are running high. There's a lot of uncertainty, especially being incarcerated and not knowing if your loved ones are safe and constantly not knowing from day-to-day whether or not the virus is going to get into our facility.

We spend our days trying to stay as positive as possible, cleaning as much as we can with what we have and trying to uplift each other rather than tear each other down.

Inmates share what life is like inside prison during the coronavirus pandemic - CBS News

7/30/20, 6:06 PM

**Get Breaking News Delivered to Your Inbox**

enter your email    Sign Up

By signing up, you agree to the CBS Terms of Use and acknowledge the data practices in our Privacy Policy.

☐ Receive updates, offers & other information from the CBS family of companies & our partners. Opt out through the unsubscribe link in any marketing email.

I happen to be in a unit with some really God-fearing women and women who are very conscious about trying to maintain some kind of mental health and stability while we're in here. Every morning we wake up, we work out together. We spend a lot of time reading, we pray. That's the one thing I can say about this whole experience that I have been blessed to be with some women who really have strong faith. We try to keep each other encouraged, as much as possible.

We're human, and we make mistakes, and just because we make mistakes, does not mean that our lives are any less valuable than the next person lives. We deserve a fighting chance, too. We want to come home to our families healthy and not have to worry each day whether it's going to be our last.

I was one of the people that were called in the second round for <u>home confinement</u>. They called us in there to let me know that I did qualify. We filled out our re-entry paperwork, just to have new criteria released from the BOP, not even five days later. Since that point on, I have not heard anything else back about home confinement.



| inmates have died from coronavirus | Alabama inmates are subjected to excessive force | times more likely to get virus than others, study says | after victims' family raises virus concerns |

I have three small kids and my babies are aways coloring these pictures and they send mail and so I hold on to those things – they keep me motivated to want to come home healthy.

Inmates share what life is like inside prison during the coronavirus pandemic - CBS News                    7/30/20, 6:06 PM

## Chad O'Handley, 44

- *O'Handley is serving 70 years for second-degree murder and robbery. Buckingham Correctional Center, Virginia: 111 confirmed cases. He wrote the following letter to his wife and has since tested positive for the virus.*

Guys are walking around sounding congested and coughing, I just have a headache. We had one more high temperature taken out last night. If you reach a hundred you are out. I am still under 98, with the headache.

They are feeding us an emergency menu, as they call it. It's like eating your meals from a vending machine. We get a bag of chips with lunch and dinner, we get these gummy fruit snack things for lunch, and maybe a side of vegetables – mostly junk, though.
That swab up the nose was terrible. A few guys got bloody noses.

Sitting here obsessing over the temperature has taken its toll on me. I'm stressed beyond my limits right now not being able to talk to you about this s***. If you have a temperature or your test comes back positive, they are putting us in the gym, where they set up bunk beds. Just leave me in my cell. It's where I am safest and I have all my stuff. In the gym, we will have nothing.

## Stephanie DiCarlo, 35

- *DiCarlo is serving a 12-year sentence for robbery and firearms charges. FSL Danbury, Connecticut: zero confirmed cases. As told to Justin Carissimo.*

I've been in quarantine for six days. The virus has changed everything here. There's no structure, there's no anything anymore. We are now kind of like specimens and lab rats. The attention we get is very minimal because it's chaos up here. We can't communicate with our families like normally. It's very hard.

We don't have computers. We have a telephone, which was just installed a couple of days ago. Everything is shut down here. There's no staff, everybody is sick. All of the

inmates are being tested in quarantine day-by-day. We're stuck in rooms, we're stuck in kitchens. We can't even get fresh air.

I thought doing time was hard – this is hard. I don't know if I'm going to call home one day, and one of my family members are going to be gone or if something's going to happen to them. I don't know what's happening moment-to-moment in here – being that we're so limited with communication, I just want my family to keep themselves safe.

I get up every morning when everyone else is sleeping at about 6 a.m. and I read my Bible. Whatever exercise I can do to keep my mind and keep my endorphins moving – it's like a medication for me. My prayer is, at this moment, all I have at this time.

I have a little bit of coffee. One of the officers drops off a breakfast bag with milk and a piece of fruit and – let's call it some sort of liquid eggs. Later, from the window in the kitchen, we're watching all of the men getting shackled and sent down to the men's prison or we're watching them pass by to go to medical to be quarantined.

On April 7, I was called into the lieutenant's office and they told me that I was accepted for home confinement. They told me I have an hour to pack my stuff. The next morning, my case manager came in and the lieutenant came in and told me that I have to leave because I was under review, because I have a violent charge. They said that I have to be pulled and I'm going back to the unit.

My freedom was pulled from me because they feel that I don't qualify – I have clear conduct in seven and a half years. I'm an asset to society, I'm not a threat to society. My case manager told me he doesn't have time to look at my file because he has too much casework and, unfortunately, I'm gonna have to sit in prison until the rest of my time is finished.

## Phillip Hill, 63

- *Hill is serving a 28-year sentence for conspiracy and fraud. FCI Oakdale I, Louisiana: 33 confirmed cases.*

I have never been in a war zone before, until now. This has been a most devastating, destructive thing – as you can't see the enemy but you know that it is always around. From every cough that you hear, the sneeze that you see is like a gun firing, at war, you cringe and run to your bunker.

As we sleep 3-feet apart from each other and with our cellmate sick, or our neighbor sick, we are just sitting time bombs waiting for when this is going to happen to me. To that point, we watch our neighbors, in one case, literally our neighbor, in the next cubicle being taken out by medical – only to see on the local news a few days later that he had died.

Seven men have died from here, so far, with untold numbers sick, untold because there is no testing. Many have not complained about having been sick as they did not want to bear having to pack up and go to isolation/quarantine where they would be removed from what little freedom they did have.

We have been on lockdown for over a month now. We only get a few minutes of fresh air a day by walking up to the dining hall to pick up a clamshell hot meal and return to the unit to eat it. We watch the local news to get reports of the dead and to listen for their names to see if we know them. It has been truly tragic. One of the dead was an older guy, 57 years old, who would come up to the chapel, before we went on lockdown, and have me pick out inspiring movies for him to watch.

There is no one here that was sentenced to a death sentence by their judge, yet we are living as if we have a death sentence. One day at a time, faith over fear.

## Leonard Black, 51

- *Black is serving 32 years for bank robbery. Fort Dix FCI, New Jersey: 23 confirmed cases. As told to Justin Carissimo.*

The virus has brought a lot of fear in here. I'm in a lower security institution and for the most part, guys here have an out date. It's scaring people, seeing the numbers on the

news about the deaths and the cases that are going up, it's making guys worry if they're going to make it out of here after doing their time. If it gets in here, it's like a fire to dry grass.

We've been cleaning up a whole lot. I'm an orderly in the unit and I help clean. We keep spraying some disinfectant-type cleaner around and wipe down the phones.

I'm in a unit with roughly 300 people and social distancing is out the question. It's gotten to the point where staff are scared. They're coming to work because it's an essential job but nobody wants to get the virus.

People need to understand that everybody with what are called violent offenses, they need steps in order to better themselves. A lot of these guys that have violent offenses, they need a chance as well. I've been incarcerated, I haven't had any incident reports. All of us don't have life sentences or death penalties, we want to come home, too.

I'm a volunteer tutor, I help facilitate black history classes, self-esteem classes and health job fairs. With those things that I've learned, I tell new guys that come in, the positives are far better than the negatives that you're trying to get. I'm making this into a positive situation. Certain guys call me the prototype for violent offenders, in terms of what you need to do to get results inside.

---

*If you or your loved ones are living or working in a correctional facility and want to share your story, contact: Clare Hymes at [hymesc@cbsnews.com](mailto:hymesc@cbsnews.com) and Justin Carissimo at [justin@cbsnews.com](mailto:justin@cbsnews.com).*

*First published on May 19, 2020 / 3:54 PM*

*© 2020 CBS Interactive Inc. All Rights Reserved.*

CCPA Notice

**This CGM Is a Game Changer. Get Personalized Results**



**These SUVs Are So Cool It's Hard to Believe They Cost Less Than $25K! Search For 2020 Best SUVs**

PAID   SUV

**These SUVs Are So Cool It's Hard to Believe They Cost Less Than $25K! Research Best 2020 SUV**

PAID   SUV

**How to shop at Best Buy without paying Best Buy prices**

PAID   WIKIBUY

**Dog Owners Watch Out. This Is The Best Dog Harness 2020**

PAID   DOGKING

**Dog Owners In Alameda Are Snapping Up This Dog Harness**

PAID   DOGGYKINGDOM

## Sign up for Breaking News Alerts

Be in the know. Get the latest breaking news delivered straight to your inbox.

See All Newsletters  ›



Copyright © 2020 CBS Interactive Inc. All rights reserved.

Privacy Policy   CA Privacy/Info We Collect   CA Do Not Sell My Info   Ad Choice   Terms of Use   Mobile User Agreement   About   Advertise
Closed Captioning   CBS News Store   Site Map   Contact Us   Help

# EXHIBIT 24

Case 3:20-cv-05309-CRB   Document 11   Filed 08/04/20   Page 174 of 278



# Pandemic and prison policies combine to stress families of Nevada's incarcerated

By **Breanna Boppre** | **Meghan Novisky**   -   July 12, 2020



*Inmates at Florence McClure Women's Correctional Center are tested for COVID-19. (Photo: Nevada Department of Corrections via Twitter)*

Across the U.S., cases of the novel coronavirus inside correctional facilities are a growing concern. The Equal Justice Initiative has found the COVID-19 infection rate in jails and prisons is about 2.5 times higher than in the general population. The relatively few tests that are available have identified more than 72,473 incarcerated people and corrections workers have tested positive. Thus far, 663 incarcerated people and 40 staff have died from the disease.

While the effects of COVID-19 on incarcerated individuals is being documented, far less is known about the impacts related to familial incarceration. The potential consequences are vast as 1 in 2 adults in the U.S. has had a family member incarcerated. Families already face distinct financial, emotional and mental health consequences when a relative is incarcerated. These effects are undoubtedly heightened during a global pandemic given the increased risk of infection and decreased access to communication in correctional facilities.

We are conducting a nationwide survey and follow-up interviews with families of incarcerated persons. Over 300 family members from 40 states across the U.S. have filled out the survey and 35 have completed in-depth interviews thus far. One of our preliminary findings is that the response to the

Pandemic and prison policies combine to stress families of Nevada's incarcerated

pandemic has varied greatly across states. Of our 300 participants, 27 had family members incarcerated in Nevada, three of which completed in-depth interviews.

The majority of survey participants were unsatisfied with Nevada Department of Corrections' (NDOC) response to the pandemic (70%). Some of the reasons in open-ended comments included a lack of adequate preventative measures (i.e, no PPE for their loved ones, staff not wearing masks, no cleaning supplies) and lack of testing for COVID-19. Respondents also noted a lack of transparent information and resources for families provided by NDOC.

As of mid-June 2020, no participants in the study indicated their incarcerated loved ones had been tested for COVID-19. However, the state recently began widespread testing of those incarcerated with a testing rate of 86-90 percent.

Also, all 27 family members in our study indicated their loved one in Nevada had not been given PPE as of mid-June 2020. This reflects Nevada Department of Corrections' (NDOC) previous policy (accessed 6/19/20) prohibiting incarcerated individuals from wearing masks due to "safety and security reasons" as "staff must be able to identify offenders by face at all times, especially during an incident" or because "offenders wearing masks can more easily blend in with staff wearing masks, which increases the risk of escape." This policy directly contradicted the Centers for Disease Control and Prevention (CDC) guidelines for correctional agencies.

The policy has since been revised, with a recent distribution of 22,000 masks. However, families reported that although staff had access to masks since March, they have not been consistently wearing them.

Families also reported decreased communication during the pandemic. Understandably NDOC is limiting movement in facilities to prevent the spread of COVID-19. This includes increased lockdowns and the suspension of in-person visits. However, families describe anxiety and worry when they do not know when their loved one will be able to call home. Two family members indicated their loved one is let out of their cell for an hour every three days and must choose between calling home or showering. Virtual visits, which are being used more by other states during the pandemic to keep families connected, are currently not an option in Nevada.

Additionally, families reported programming has been halted during the pandemic. Limiting external contractors into facilities is a safety precaution. However, families note that time is added onto their incarcerated loved ones' release date each month they are not in programming.

As a result of the pandemic, families indicate increased mental health symptoms related to anxiety and depression, worry, and fear. Families noted that these adverse effects could be mitigated if NDOC takes the appropriate steps to follow the CDC guidelines and communicate with the public. "Treat us like human beings. We have loved ones inside and we're worried they might die," said one family member. Family members noted difficulties trying to contact NDOC to obtain updates. One interviewee indicated the Family Liaison's line was always busy every time she called.

NDOC must strengthen communication with the public, and families more specifically. Relatives on the outside should be updated often on safety conditions, changing protocols and steps they can take to stay in regular contact. NDOC should also freeze fees associated with family communications, to ease the financial burden.

Communication with families can be improved through tablet devices, which are allowed in other states. Other states allow for virtual visits, email, and phone calls through the tablets. Also, access to programming through tablets would prevent disruptions in rehabilitation and extended release dates.


Accessibility

Pandemic and prison policies combine to stress families of Nevada's incarcerated Nevada Current



We've noticed throughout our study that families' anxiety and level of satisfaction is dependent on how correctional agencies respond to the pandemic. While Nevada has missed opportunities for early prevention measures, it is not too late for NDOC to implement steps to detect and prevent further cases while increasing transparency to the public.

### Breanna Boppre

Breanna Boppre is an assistant professor in the School of Criminal Justice at Wichita State University.

### Meghan Novisky

Meghan Novisky is an assistant professor in Criminology, Anthropology & Sociology at Cleveland State University.

# EXHIBIT 25

## In the News | COVID-19



# COVID-19 Pandemic Poses Challenge for Jails and Prisons

**Joan Stephenson, PhD**[1]

**Author Affiliations**

April 7, 2020



RELATED

**COVID-19 Cases and Deaths in Federal and State Prisons**

SEE MORE: CORONAVIRUS (COVID19) | INFECTIOUS DISEASES | PUBLIC HEALTH

Addressing the threat COVID-19 poses specifically for detainees and corrections employees is challenging governments as the pandemic sweeps across the globe. The problem has become increasingly urgent as a growing number of incarcerated individuals and prison workers test positive for coronavirus infection.

The United States incarcerates nearly 2.2 million people in jails or prisons—more than any other nation—and reports of detainees and jail and prison workers who have contracted COVID-19 are becoming increasingly frequent. In Chicago, for example, the **Cook County**

Our website uses cookies to enhance your experience. By continuing to use our site, or clicking "Continue," you are agreeing to our Cookie Policy | Continue

_Times_ **reported** that in New York City's jails, including the Rikers Island complex, 167 inmates, 23 health workers, and 114 corrections staff (2 of whom have died) had tested positive.

## Vulnerability of Incarcerated Populations

Jail and prison populations are exceptionally vulnerable to COVID-19 for a variety of reasons, **including older age and health status**, as well as conditions such as overcrowding and limited access to or poor quality of health care while incarcerated. **More than 10% of inmates** of US state and federal prisons are 55 years or older, and many have **chronic or life-limiting illnesses**. **Approximately 15% of inmates of state prisons reported ever having asthma and 10% reported ever having a heart disorder**—conditions that put individuals at high risk for severe illness with COVID-19.

In addition to physical vulnerability, **overcrowding** and sanitation issues in many jail and prison settings heighten the risk of disease spread and are in stark contrast to the recommendations of public health officials for social distancing, frequent handwashing, and [...] prevention.



According to a **2019 report on global prison trends**, there are more than 10 million men, women, and children in jails and prison, and such facilities are overcrowded in at least 121 countries. Space for social distancing is inadequate or nonexistent. Limited access to soap and water may make frequent handwashing impossible, and hand sanitizer may be off limits because of its high alcohol content. **Inmates in some facilities must pay** for their own soap and personal hygiene items and may be charged copays for medical visits that they may not be able to afford.

Addressing the situation is crucial because of the risks COVID-19 poses not only to incarcerated people but also to the general population. Jails, which by their nature are transient facilities, have the potential to accelerate spread because of their enormous turnover, as people are locked up and then released again into the community. In an

Our website uses cookies to enhance your experience. By continuing to use our site, or clicking "Continue," you are agreeing to our _Cookie Policy_ | **Continue**

*New York Times* found that, based on 2017 data, <u>**approximately 200 000 people typically flow into and out of jails every week**</u>.

## Quarantines and Releases

In response to the growing number of quarantine and isolation cases in federal facilities, the <u>US Bureau of Prisons announced</u> that to mitigate COVID-19 exposure and spread, all 146 000 persons incarcerated in federal facilities would be under quarantine (that is, confined to their cells), effective April 1, for 14 days. The Bureau said that to "the extent practicable," inmates would still have access to programs and services that are normally offered, such as mental health and educational services, and that they would be able to access communal areas (such as for showers and telephone and computer access).

However, Rep Jerrold Nadler (D, New York) and others urged <u>**more aggressive measures to address the problem**</u>, including releasing older and medically vulnerable or pregnant prisoners. Last Friday, US Attorney General William P. Barr directed the Bureau of Prisons <u>**to expand the group of inmates at federal prisons eligible for early release**</u>, particularly  Louisiana, Connecticut, and Ohio, where the largest numbers have tested positive for COVID-19.

Facilities in California, New York, Ohio, Texas, and elsewhere have also granted early release to thousands of inmates, such as lower-level, nonviolent offenders and elderly or medically fragile individuals, from state and local facilities. In many cases, the released inmates are homeless, and authorities are scrambling for alternatives. California and New York City are <u>**leasing hotel rooms**</u> so homeless people released from jail don't accelerate the pandemic.

Although the United States is unique with respect to the size of its incarcerated population, the threat COVID-19 poses to prison populations and staff is universal, and other countries are similarly <u>**working to mitigate risk**</u>. For example, jails and prisons in Australia, Canada, England, France, Ireland, Germany, Northern Ireland, Scotland, and Wales have

Our website uses cookies to enhance your experience. By continuing to use our site, or clicking "Continue," you are agreeing to our *Cookie Policy* | **Continue**

**Guidelines** released last month by the World Health Organization outline measures that prisons and other detention facilities (such as immigration detention settings) should take. These guidelines include considering noncustodial measures at all stages of the criminal justice process as well as screening all individuals upon admission for fever and lower respiratory tract symptoms—and possibly medically isolating them pending further evaluation.

"Efforts to control COVID-19 in the community are likely to fail if strong infection prevention and control (IPC) measures, adequate testing, treatment and care are not carried out in prisons and other places of detention as well," the guidelines note.

See More

CORONAVIRUS (COVID19) | INFECTIOUS DISEASES | PUBLIC HEALTH

**Comment**



**Joan Stephenson, PhD**

Joan Stephenson, PhD, is Consulting Editor for the Forum and *JAMA* and an award-winning independent writer and editor based in Chicago. She joined *JAMA* as a writer and editor for *JAMA*'s Medical News & Perspectives department and subsequently served...

## MOST VIEWED

**Mask Exemptions During the COVID-19 Pandemic—A New Frontier for Clinicians**

Doron Dorfman, LLB, JSD; Mical Raz, MD, PhD, MSHP

Our website uses cookies to enhance your experience. By continuing to use our site, or clicking "Continue," you are agreeing to our Cookie Policy | **Continue**

The COVID-19 Pandemic Underscores the Need to Address Structural Challenges of the US Health Care System | Health Care Reform | JAMA Health Forum | JAMA Network

# The COVID-19 Pandemic Underscores the Need to Address Structural Challenges of the US Health Care System

Andy Slavitt, MBA



Our website uses cookies to enhance your experience. By continuing to use our site, or clicking "Continue," you are agreeing to our Cookie Policy | **Continue**

# EXHIBIT 26

# Prisons And Jails Change Policies To Address Coronavirus Threat Behind Bars

Jimmy Jenkins



A picture of a cell at the state prison in Florence, Ariz., where attorneys for the Prison Law Office and ACLU found what they called "squalid" and "filthy" conditions on a recent tour.

*PACER*

As the Coronavirus spreads across the nation, it has exposed potentially dire health care conditions in some prisons and jails. That's forced many to change the way they operate.

Arizona and [Minnesota prison officials](#) waived copays charged to inmates

for medical visits and waived fees for personal hygiene supplies. Some are changing visitation policies. At county jails, there are calls to release inmates early so they can reduce overcrowding.

Health and prison officials have been sounding the alarm about the risks posed behind bars. With so many people bunched together in the small spaces, jails and prisons are considered perfect incubators for the coronavirus to potentially take hold.

"There are over 42,000 people incarcerated in Arizona and the environment of prisons are fertile for an outbreak – closed quarters, lack of resources, and a significant population who have a higher risk of contraction," said Becca Fealk, from the American Friends Service Committee of Arizona. The group advocates for prison reform.

County jails are also taking steps to minimize the risk. Alameda County plans to release nearly 250 inmates from its county jail after sentencing modifications, according to the county's sheriff's office. Additionally, 67 people were released by courts on their own recognizance. In Los Angeles, the county has also begun releasing inmates early and is encouraging fewer arrests, using citations when possible.

At least one U.S. senator is advocating for a nationwide plan to release inmates early who meet certain criteria.

Sen. Kamala Harris, D-Calif., tweeted that she is pushing the Bureau of Prisons to release "all low-risk inmates, including those who are in pretrial detention because they can't afford to make bail." She noted that people "in detention are especially vulnerable to the spread of coronavirus."

State prisons share that vulnerability, but some administrators have been slow to respond to the threat.

Arizona prisons, like many others around the country, limit access to some hygiene products out of safety concerns. Prison officials say hand sanitizer, for example, could be misused because of its high alcohol content.

There also is the question of fees. Arizona prisons force men and women to pay for their own personal hygiene supplies like soap and toothpaste. If they need medical attention, such as being seen by a nurse, it's a $4 copay.

But some people can't always afford to pay, leaving them vulnerable. Attorneys from the Prison Law Office and the ACLU asked a federal judge to intervene, alleging unsafe conditions given the threat posed by the coronavirus pandemic.

An Arizona federal judge pressured the Arizona Department of Corrections to change state prison health and hygiene policies. The department announced it is now waiving copays for inmates with cold and flu symptoms, and making soap available for free.

"The health and safety of our staff and inmates at the Arizona Department of Corrections, Rehabilitation and Reentry is our paramount concern," David Shinn, director of ADCRR, said in a statement. "In managing this situation, our two top priorities are safety and public health as we work to mitigate the potential spread of COVID–19 within our prisons."

## Copays and soap

Prison Law Office attorney Corene Kendrick said Arizona is one of 40 state prison systems in the U.S. that charges incarcerated people a copay every time they seek health care.

"The state's decision to temporarily suspend the $4 copay — the equivalent of a week's worth of work at the prisoner minimum wage of 10 cents an

hour — for people reporting cold and flu-like symptoms is a step in the right direction," Kendrick said, "but it exposes how counterproductive it is to have such a barrier to seeking care."

Kendrick and her team interviewed more than 500 inmates at the state prison in Florence, Ariz., and she says many expressed concern over lack of basic necessities.

"Unfortunately, prior to the COVID-19 crisis, we regularly heard from incarcerated people that there were shortages of hygiene supplies such as toilet paper and menstrual products," Kendrick said.

She said most Arizona prison bathrooms are not equipped with soap or hand sanitizer.

According to a 2019 department policy, even the poorest inmates have to pay for personal hygiene products: "All indigent inmates shall be charged for indigent supplies. Charges shall remain as a debt on the inmates' (sic) account until the balance is paid in full or partially paid. After one calendar year, the debt balance will be retired."

Nishi Kumar, a staff attorney for The Promise of Justice Initiative, said a similar system for indigent inmates is in place at the Louisiana State Penitentiary.

"There is a 'prison soap' that people can get if they are indigent," Kumar said. "If you have debt on your books from being indigent, half of any future money that you get goes to paying off your debt."

So far, the prison has not waived the fee.

## Burden falls on families

The burden of paying for hygiene products often falls on the families of incarcerated families. One woman, whose daughter is incarcerated at the Perryville women's prison in Arizona, estimated she spends about $500 each month on commissary items just to keep her daughter fed and healthy.

The woman, who asked to remain anonymous for fear of retribution, said her daughter was worried that the virus was already in the women's prison, noting that many inmates were displaying symptoms. "She was up all night listening to the entire bay cough," the woman said.

As of Wednesday, Arizona prison officials say there are no confirmed cases.

Carmen Hreniuc, whose son is incarcerated at the state prison in Eyman, Ariz., said the costs of supporting her son are steep.

"We learned that we are all being sentenced as the financial impact on the family is outrageous," Hreiuc said. "Weekly purchase of additional food, hygiene, and personal items cost around $350 monthly."

Hreniuc said while they may get relief with the recent temporary fee waiver, she is worried about the families that are not able to afford this additional expense.

"It's a weekly struggle to manage the food and other expenses," she said. "What's going to happen now with everyone's work schedule being cut or nonexistent? Indirectly, this will create more hardship on the inmates, resulting in less food, less communication, and less personal hygiene items."

## Calls for more action

The Vera Institute of Justice has [issued guidance](#) for better hygiene in prisons and jails, recommending facilities "provide free hand sanitizer and

antibacterial soap to all people in custody and replenish several times a week."

Becca Fealk, program coordinator with the American Friends Service Committee of Arizona, said it is unfortunate that it took a viral pandemic to force the Department of Corrections to provide basic hygiene and medical care.

"Here in Arizona and across the U.S. we have built a system of punishment that is traumatic, and this is only increased with the coronavirus," Fealk said. "ADC must do more than just provide soap to reduce the chance of an outbreak. They need to release people, including older/aging adults who can be cared for by their loved ones."

Fealk said her group is recommending the Department of Corrections stop admissions "until this situation is under control."

While temporary fee waivers and other changes are a positive step, "it's really just rearranging deck chairs on the Titanic" says David Fathi, director of the ACLU National Prison Project.

Prisons are extremely high risk environments, he says, because there are large numbers of older and medically fragile people living in close quarters.

"The only effective response is to reduce the population density by releasing people," Fathi says, "starting with those who are most at risk of severe injury or death if they were to contract the virus."

# EXHIBIT 27

# Inadequate Access: Reforming Reproductive Health Care Policies for Women Incarcerated in New York State Correctional Facilities

Kate Walsh*

*In February 2015, the Correctional Association of New York released a report studying the quality of and access to reproductive health care for incarcerated women and found that "[o]verall . . . reproductive health care for women in New York State prisons is woefully substandard, with women routinely facing poor-quality care and assaults on their basic human dignity and reproductive rights."[1]  The findings of this and other studies provide concrete evidence of the poor quality of reproductive health care available to incarcerated women and signal to legislatures that these policies should be changed.*

*Incarcerated women face three issues of particular concern relating to reproductive health care: access to gynecological examinations, sanitary supplies, and contraception.  The purpose of this Note is to examine New York State policies addressing reproductive health care for incarcerated women, identify problems with them, and make recommendations for reform.  This Note will examine current policies and practices of New York State correctional facilities that address gynecological examinations, sanitary supplies, and contraception, and assess why these policies are problematic from both legal and medical perspectives.  Furthermore, it will recommend bringing New York's policies in line with legal, medical, and international standards as a strategy for reform.  Finally, it will advocate*

---

    *   Executive Notes Editor, Colum. J.L. & Soc. Probs., 2016–2017.  J.D. Candidate 2017, Columbia Law School.  The author would like to thank Professor Philip Genty for his invaluable insight and guidance, and the staff of the *Columbia Journal of Law and Social Problems* for their hard work and support in preparing this piece for publication.
    1.   Corr. Ass'n of N.Y., Reproductive Injustice: The State of Reproductive Health Care for Women in New York State Prisons 4 (2015), *available at* http://www.correctionalassociation.org/wp-content/uploads/2015/03/Reproductive-Injustice-FULL-REPORT-FINAL-2-11-15.pdf [https://perma.cc/YPX8-DZ4E].

The lack of specificity in all state policies regulating the availability of sanitary products for incarcerated women creates barriers to proper care: "[t]he vast majority of women the CA [Correctional Association] interviewed reported that the monthly supply of sanitary napkins DOCCS gives them does not meet their needs."[59]  In practice, DOCCS distributes twenty-four sanitary napkins to incarcerated women each month,[60] and in order to obtain more, women need a special permit from the medical department or need to be financially able to purchase them on their own through the commissary.[61]  Procedures to obtain a medical permit were sometimes difficult and degrading.[62]  For example, at one New York prison (which has since closed), women were required to bring their used sanitary products to the health services unit in order to receive more.[63]

The New York City Council recently enacted legislation that increases incarcerated women's access to sanitary products in the city's jails.  This important piece of legislation provides that "[a]ll female inmates in the custody of the department shall be provided, at the department's expense, with feminine hygiene products as soon as practicable upon request."[64]  The rest of the state has yet to update its policies but this could be used as a model for future reform, which will be discussed further in Parts IV and V.

## C. CONTRACEPTION

Access to contraception is also lacking in important respects.  In a national survey of correctional health providers, 70% of the respondents stated that their institution had no formal policy on contraception.[65]  In line with this national assessment, New

---

59.    CORR. ASS'N OF N.Y., *supra* note 1, at 66.

60.    *See id.* ("DOCCS distributes 24 sanitary napkins to women in general population each month.").

61.    *See id.* at 66, 67 ("The challenges women face in obtaining additional sanitary napkins on their own only add to the problem.  Prices for pads and tampons in prison commissaries vary widely and are prohibitive for women with few financial resources and outside support.").

62.    *E.g. id.* at 66 ("At Taconic, prison medical staff reported to the CA that only a woman who can prove she is anemic can get a permit . . . .").

63.    *See id.* at 67 ("The process for getting a permit at Bayview when it was open was even more degrading.  The prison required women to bring in their used sanitary napkins to prove they needed more supplies.").

64.    N.Y.C. ADMIN. CODE § 9-141 (2016).

65.    *See* Carolyn B. Sufrin et al., *Contraception services for incarcerated women: a national survey of correctional health providers*, 80 CONTRACEPTION 561, 562 (2009),

# EXHIBIT 28





# The Unequal Price of Periods

Menstrual Equity in the United States

## Introduction

On any given day, there are 800,000,000 people on the planet who are menstruating, of whom at least 500,000,000 lack adequate resources — basic supplies, facilities, information, and support — for managing their periods.[1]

Until very recently this issue had been given little consideration in U.S. policies and laws. It is an omission that affects everyone, but hits hardest the populations for whom access and agency is most compromised:

- For the nearly one in five American teenagers who live in poverty,[2] lack of menstrual products and support can lead to lost educational opportunity.

- Those experiencing homelessness report infection caused by using tampons and pads for longer than recommended or by improvising with items such as paper towels or newspapers.[3]

- Incarcerated individuals and those caught in the criminal justice system often beg or bargain with staff for basic hygiene needs, part of a degrading and dehumanizing power imbalance.[4]

Among the policies that have kept menstruation at the margins: Tampons and pads are rarely designated as allowable budgetary expenses for publicly funded schools, shelters, or crisis and emergency centers. They are not provided in a consistent or fully accessible way in correction and detention facilities. Menstrual products are not covered by public health and nutritional benefits programs, nor made uniformly available in schools or workplaces. And in 33 states, menstrual products are not exempt from sales taxes.[5]

Equity-based arguments — and the term "menstrual equity," coined by author Jennifer Weiss-Wolf — yield the most powerful narrative for countering the inconsistencies and oversights that currently exist in American law and public policy. Indeed, this is the heart of the formal definition of menstrual equity set forth in her book, "Periods Gone Public":

> *In order to have a fully equitable and participatory society, we must have laws and policies that ensure menstrual products are safe and affordable for everyone who needs them. The ability to access these items affects a person's freedom to work, study, stay healthy, and engage in the world with basic dignity. And if anyone's access is compromised, whether by poverty or stigma or lack of education and resources, it is in our societal interest to ensure those needs are met.[6]*

The potential medical harms resulting from lack of access to menstrual products can be lasting, too.

# Momentum for Change

Advocates have successfully worked to raise awareness and advance menstrual equity on a number of fronts.

## Legislation

Overall, there are very few current legal protections to ensure menstrual equity. However, jurisdictions are beginning to recognize the injustice of menstrual inequity, particularly to those who are impoverished or incarcerated and in some places, real change has been effected. Still, much more needs to be done.

In 2016, New York City passed the first menstrual equity legislation in the country. It requires the city's public schools, correctional facilities, and homeless shelters to provide menstrual products.[52] That law has served as a foundation for advocates across the country at both the state and federal levels. Legislation has become an important way to achieve menstrual equity across the U.S.

### *Federal*

Only one federal law addresses menstrual equity. In 2018, as part of the First Step Act, Congress codified an existing Bureau of Prisons regulation requiring the provision of free menstrual products in federal women's facilities.[53] The Office of the Inspector General had previously determined that, despite the regulation, many facilities were not providing sufficient access, even though free and unlimited provision would not create any security concerns.[54] Codification of this regulation into federal statute should result in broader adoption and greater enforcement by the Federal Bureau of Prisons. However, without strong accountability measures, this remains to be seen.

### *State*

In order to determine the status of state menstrual equity laws, we assessed every U.S. state and the District of Columbia for four types of statutes related to menstrual equity:

- Menstrual equity in correctional institutions: These laws generally require such institutions to provide as many freely available menstrual products as necessary to detained people who menstruate.

- Menstrual equity in schools: These laws ensure public school students have access to menstrual products in school. The laws require menstrual products to be freely available, generally in restrooms, although they do not

## FIGURE 1: U.S. STATES WITH MENSTRUAL EQUITY LAWS

Number of states (including DC) with laws addressing menstrual equity issues in institutionsor via tax exemptions for menstrual products



*Note:* Tax exemptions only includes states with specific laws exempting menstrual products. An additional five states do not impose sales taxes on any products, including menstrual products

# TABLE 1: MENSTRUAL EQUITY LAWS BY STATE
(inclusive of District of Columbia)

| | Correctional Facilities | Schools | Shelters | Tax Exemption |
|---|---|---|---|---|
| **Alabama** | X | | | |
| **Alaska** | | | | NA |
| **Arizona** | | | | |
| **Arkansas** | | | | |
| **California*** | X | X | | † |
| **Colorado** | X | | | |
| **Connecticut** | X | | | X |
| **Delaware** | | | | NA |
| **D.C.** | X | | | X |
| **Florida** | X | | | X |
| **Georgia** | | | | |
| **Hawaii** | | | | |
| **Idaho** | | | | |
| **Illinois** | | X | | X |
| **Indiana** | | | | |
| **Iowa** | | | | |
| **Kansas** | | | | |
| **Kentucky** | X | | | |
| **Louisiana** | X | | | |
| **Maine** | | | | |
| **Maryland**** | X | | X | X |
| **Massachusetts** | | | | X |
| **Michigan** | | | | |
| **Minnesota** | | | | X |
| **Mississippi** | | | | |
| **Missouri** | | | | |
| **Montana** | | | | NA |
| **Nebraska** | | | | |
| **Nevada** | | | | X |
| **New Hampshire** | | X | | NA |
| **New Jersey** | | | | X |
| **New Mexico** | | | | |
| **New York** | X | X | | X |
| **North Carolina** | | | | |
| **North Dakota** | | | | |
| **Ohio** | | | | X |
| **Oklahoma** | | | | |
| **Oregon** | | | | NA |
| **Pennsylvania** | | | | X |
| **Rhode Island** | | | | X |
| **South Carolina** | | | | |
| **South Dakota** | | | | |
| **Tennessee** | X | | | |
| **Texas** | X | | | |
| **Utah** | | | | |
| **Vermont** | | | | |
| **Virginia** | X | | | |
| **Washington** | | | | |
| **West Virginia** | | | | |
| **Wisconsin** | | | | |
| **Wyoming** | | | | |
| | **13** | **4** | **1** | **12** |

NA: These states do not impose sales taxes on any products, including menstrual products.

\* California has temporarily suspended the tax on menstrual products, but only for the next two years. The law allows menstrual products to be taxed, and unless the legislature and governor act, the products will be taxed again starting in 2021. See Taryn Luna, Newsom Faces Criticism for Not Delivering on Grand Promises, THE LOS ANGELES TIMES (May 13, 2019).

\*\* Maryland has a state law that applies to schools, however, it is specific in that it only requires free menstrual products to be provided to students who are homeless, not to all students who may need them. Thus, for the purposes of this analysis, Maryland's law as it applies to schools is not considered broad enough to qualify as a menstrual equity law for schools.

# EXHIBIT 29

JOURNAL OF CRIME AND JUSTICE
2020, VOL. 43, NO. 1, 36–48
https://doi.org/10.1080/0735648X.2019.1619614





Check for updates

# Who gets the biggest bang for the buck? A review of minimum wage and purchasing power in prison commissaries versus superstores

Kristen M. Zgoba[a], Richard Tewksbury[b] and Elizabeth Mustaine[c]

[a]Department of Criminology & Criminal Justice, Florida International University, Miami, FL, USA; [b]School of Criminal & Criminal Justice, Arizona State University, Tempe, AZ, USA; [c]Department of Sociology, University of Central Florida, Orlando, FL, USA

**ABSTRACT**

One of the often-noted 'pains of imprisonment' is the deprivation of good and services. One of the few ways that prisoners can acquire additional amenities is to purchase items at the prison commissary. As such, the commissary represents a small amount of control that inmates have over their lives with regard to food, clothing, and methods to pass the time. To use the commissary, however, inmates must have money in their accounts; typically from their institutional job or via family members or friends. The present study seeks to examine the prices of commissary items along with typical institutional minimum wage salaries of inmates, to determine the likelihood of inmates purchasing from the commissary. In addition, items of similar size and convenience from the commissary are compared with prices found online in a large superstore and federal and state minimum wages are compared to examine buying power. The authors find that contrary to common belief, prices of items in the commissary are similar to superstores in the free community; however, in-prison wages are so low that it is unlikely inmates can afford to purchase many, if any amenities without supplemental financing from families and friends. Implications of these findings are discussed.

**ARTICLE HISTORY**
Received 28 May 2018
Accepted 30 April 2019

**KEYWORDS**
Commissary; minimum wage; prison salary; inmate wages

## Introduction

Incarceration is one of the primary strategies by which Americans respond to and sanction law-breakers. The goals of incarceration are to remove offenders from society, to provide means for effecting rehabilitation, and to serve as punishment. Part of the punishment aspect of incarceration includes the five major pains of imprisonment (Sykes 1958). These include the loss of liberty, goods, and services, heterosexual relationships, autonomy, and security. Regarding the loss of goods and services, most inmates are provided with only their basic needs by correctional institutions, including food, medications, clothing, and some forms of physical activity and recreation. However, in keeping with the principle of least eligibility, inmates are provided with only what is needed and necessary, and hardly any amenities (Applegate 2001; Tewksbury and Mustaine 2005). Inmates are able, however, to supplement their provisions by purchasing food, entertainment, clothing, and other amenities through an inmate commissary. Those with the means can purchase (within institutionally established limits) foods and goods that are highly desired, but not provided by the institution.

**CONTACT** Kristen M. Zgoba  kzgoba@fiu.edu Department of Criminology & Criminal Justice, Florida International University, Miami, FL, USA

© 2019 Midwestern Criminal Justice Association

of internal policy in the majority of county, state, and federal prisons. The operation of a commissary is slightly different than a local supermarket, however. First, commissaries carry only a limited number of items for sale, usually no more than 400–500 different items (compared to a typical grocery store with over 30,000 items) (Food Marketing Institute 2018). Commissary items include food, clothing items, small appliances, stamps, greeting cards, and other miscellaneous items you might find at the local grocery store or department store; items that have an extensive shelf life or no expiration of shelf life are most commonly found. It is important to note that restrictions on what is sold in a commissary are determined by security concerns; anything deemed to be a potential threat to custody and security is likely to be disallowed. According to Alvarado (2014), there are three primary differences between prison commissaries and community grocery stores. The first difference includes the items sold in both locations. The most common items sold in commissaries are ramen noodles, sweets, and coffee. In community grocery stores the four most commonly sold items are milk, bread, eggs, and fresh vegetables (Shareranks 2018). Second, making purchases at a commissary is deemed a privilege while incarcerated; loss of commissary privileges is not an uncommon sanction for misbehavior. Third, whereas community grocery stores are open essentially every day, usually at least 18 (and in some locations 24) hours a day, in prison, a commissary is open to individual inmates on a limited basis – typically once a week and for one limited (by individual institutions' policies) order. Inmates typically work their way up through custody levels, thereby earning increases in both the frequency at which they may shop at the commissary and the amount of money they may spend. This creates a hierarchical system within the prison, as inmates who present with less disciplinary charges, have less serious criminal charges, or have been incarcerated within the institution longer may have greater access to purchasing and purchasing more or better items within the commissary.

The commissary is a highly valued part of prison life. It allows inmates to supplement their meager or low quality provided provisions, and it brings a small sense of normalcy and autonomy to their lives while in prison. As one of the oft-mentioned frustrations and pains of imprisonment, food is not only a valued commodity but also an aspect of their lives over which inmates seek to control. As explained by Godderis (2006, p. 258), 'Simple everyday choices about when they would eat, where they consumed their food and what they could wear during meal times were constant and recurring reminders of the lack of control the participants had over their lives.' In addition, even though the commissary affords a minute amount of control over inmate food and amenities, it represents only a small portion of inmate life and offers no real choices. This is seen by Smith (2016) who suggests that 'The prison commissary is heaven-sent for prisoners who want to have a sense of normalcy in the dismal environment of correctional facilities. Although you have a limited number of choices, and the money you can use is usually not enough, you at least get a say about the items that you receive.' As such, commissaries in correctional institutions may help inmates retain a semblance of life on the outside and provide them opportunities and choices when seeking to improve and have more control over their circumstances.

Commissaries may also be essential for some inmates. Inmates with allergies often find prison commissary food is the only available food they can eat. Allergies to foods are not uncommon; the Bureau of Prisons estimates that as many as 3.5% of all American inmates (or, approximately 77,000 individuals) suffer from some form of food allergy (Longazel and Archer 2015). Included here are undoubtedly many inmates who do not know of, or well understand, their food allergies. When recognized, alternative diets may be necessary. While the provision of special diets for religious purposes and dietary and medical need are set by law, food choices based on allergies that do not rise to a medical need may be difficult to obtain. Furthermore, many, if not most, correctional institutions discourage testing for allergies (Longazel and Archer 2015), and subsequently may not provide adequate access to alternative diets. In these instances, then, it is necessary for inmates to obtain their own food, with the only option being the institutional commissary.

The ACLU National Prison Project reported that many inmates rely on commissary food to survive because substantial food is not provided by the institution, leaving many inmates hungry each day. In particular, the ACLU notes that in Mississippi, the average inmate had a weight loss of

20 pounds (https://www.aclu.org/other/aclu-national-prison-project). Within a prison visited by one author of this study, some inmates indicated that they regularly avoided the mess/dining hall because the majority of altercations/fights took place in that location, lending more importance to purchases at the commissary. Other inmates discussed how they had to become creative with the provisions purchased – they made grilled sandwiches using irons in the upholstery room (a vocational education program), barbequed meat using Slim Jims and an illegal match or lighter, and boiled ramen noodles made by fermenting noodles in the sink of their cells with hot water. With these examples, it becomes clear that the commissary is an integral part of sustenance in the lives of prisoners who, whether or not they eat the meals in the mess/dining hall, may feel the need to purchase additional food to supplement a special diet, avoid confrontation or stave off hunger.

In terms of finances, the profits institutions realize by selling items in the commissary are typically re-invested in the prison, usually through an Inmate Welfare Fund. This is a savings account in which the institution deposits the profits from the commissary and subsequently uses the money to fund inmate programs, activities and other 'special' amenities. In this way, all inmates in an institution benefit from the profits. However, this also means that many programs and services for inmates are dependent on funding from commissary profits. If the commissary does not earn much, then there will be fewer funds for programs and other amenities. However, recent research has shown that most prison commissaries, in actuality, maintain very large sales. According to the Prison Policy Initiative, the industry generates more than $1.6 billion in sales annually, and this is assumed to possibly be an underestimation due to the privacy of the contracts (Markowitz 2016).

As such, it is likely not a surprise that in recent years many institutions, especially jails, have started to also draw off of commissary profits for other expenses, including staff uniforms, repairing equipment and even paying for services such as substance abuse programming (Smith 2016; Wagner and Rabuy 2017). This could provide a motive for raising prices in the commissary; as funding issues become increasingly problematic in many jurisdictions, means to increase operating funds are welcomed and often sought after by correctional administrators.

In the end, the prison commissary business is a highly desirable one for prison officials and inmates, particularly for the inmates who have the necessary financial resources. It is important for their sense of control and autonomy, and it may be imperative for inmates with dietary concerns or for the avoidance of conflict. It is also a lucrative industry for those who run the commissary. Profits are high because these businesses have the ideal market: private contracts, a captive audience, no competition and the ability to charge whatever prices they see fit to charge. The importance of the commissary for inmates and the unregulated situation of the commissary makes a difficult situation arise: inmates can only use the commissary if they have money to spend. Unfortunately, most inmates' families or friends are not likely to be able to provide much in the way of money in their accounts as they too are often living in poverty. Research by Christian, Mellow, and Thomas (2006) highlight the burden of family/friends attempting to provide financial support to incarcerated loved ones can be quite substantial. Expenditures of $200 or more for packages, phone calls, visits and money transfers are not uncommon, and often constitute a third or more of a family's resources. According to the Prison Policy Initiative (Rabuy and Kopf 2015), prior to incarceration inmates typically earned 41% less than non-incarcerated persons of similar demographics. As a result, many inmates are forced to rely on their wages in order to afford items from the commissary.

## Inmate wages

The idea of paying prison or jail inmates for work they do while incarcerated may seem anathema to some. Inmates are incarcerated as punishment, so compensating them for their efforts and production appears to some as convoluted and confused. But, as early as 1920 institutional observers were arguing in favor of paying prison inmates for their institutional labor, all the while noting that there were numerous structural difficulties associated with paying wages (Weyand 1920). The advantages offered

# EXHIBIT 30

# The Prison and the Gallows

*The Politics of Mass Incarceration in America*

**Marie Gottschalk**

University of Pennsylvania



**CAMBRIDGE**
UNIVERSITY PRESS

Gottschalk, Marie. *The Prison and the Gallows: the Politics of Mass Incarceration In America.*
E-book, Cambridge, [U.K.]: Cambridge University Press, 2006, https://hdl.handle.net/2027/heb.07801. Accessed 31 Jul 2020.
Downloaded on behalf of Stanford University

The results of the 2004 election were not entirely bleak for penal reformers in California. Voters in Los Angeles rejected a half-cent increase in the sales tax that would have raised $560 million per year to pay for 5,000 additional police officers. At the same time they approved a $500 million bond measure to improve the city's drainage system. John E. Dannenberg, "Los Angeles Voters Reject 5,000 More Cops; Invest in Clear Ocean Instead," *Prison Legal News*, January 2005, p. 23.

34. Marc L. Miller, "Cells vs. Cops vs. Classrooms," ed. Lawrence Friedman and George Fisher, *The Crime Conundrum: Essays on Criminal Justice* (Boulder, CO: Westview Press, 1997), p. 128.

35. Miller, "Cells vs. Cops vs. Classrooms," p. 152.

36. Bell Gale Chevigny, "Prison Activists Come of Age," *The Nation*, July 24/31, 2000, pp. 27–30; Annette Fuentes, "Unchained: From the Bay Area to the Big Apple, Youth Activists Target Juvenile Jails," *In These Times*, July 8, 2002, pp. 16–17; and Sasha Abramsky, "Incarceration, Inc.," *The Nation*, July 19/26, 2004, pp. 22–25.

37. Wilhelm and Turner, *Is the Budget Crisis Changing the Way We Look at Sentencing and Incarceration?*, pp. 7–8; Ronald F. Wright, "Flexibility in North Carolina Structured Sentencing, 1995–1997," in *Penal Reform in Overcrowded Times*, ed. Michael Tonry (Oxford: Oxford University Press, 2001); and Ronald F. Wright, "North Carolina Prepares for Guidelines Sentencing," in *Penal Reform in Overcrowded Times*.

38. Wilhelm and Turner, *Is the Budget Crisis Changing the Way We Look at Sentencing and Incarceration?*, p. 10.

39. Wilhelm and Turner, *Is the Budget Crisis Changing the Way We Look at Sentencing and Incarceration?*, p. 3.

40. Wool and Stemen, *Changing Fortunes or Changing Attitudes?*, p. 7.

41. Joan Petersilia, *When Prisoners Come Home: Parole and Prisoner Reentry* (New York: Oxford University Press, 2003); and Jeremy Travis and Christy Visher, eds., *Prisoner Reentry and Crime in America* (Cambridge: Cambridge University Press, 2005).

42. Wool and Stemen, *Changing Fortunes or Changing Attitudes?*, p. 4.

43. Lonnie Burton, "The Deadly Health Services of Naphcare in Alabama," *Prison Legal News*, October 2003, pp. 1–5; Ira P. Robbins, "Managed Health Care in Prisons as Cruel and Unusual Punishment," *Journal of Criminal Law and Criminology* 90, no. 1 (Fall 1999); and Paul von Zielbauer, "As Health Care in Jail Goes Private, 10 Days Can Be a Death Sentence," *The New York Times*, February 27, 2005, sec. 1, p. 1.

44. Prisons are serving fewer fresh vegetables and fruits and substituting cheaper processed meats, starches, and powdered milk. Some states have reduced the number of daily calories budgeted for each prisoner and have even cut back to two meals a day on weekends and holidays. Food is a very small budget item for prisons. About 80 percent of prison costs go for guards' salaries. Butterfield, "With Cash Tight, States Reassess Long Jail Terms"; and "Budget Cuts to Include Food Service Programs," *Correctional News*, 9 no. 5 (July/August 2003), p. 1.

45. Butterfield, "With Cash Tight, States Reassess."

46. Wool and Stemen, *Changing Fortunes or Changing Attitudes?*, p. 8; and Paul von Zielbauer, "Company's Troubled Answer for Fragile Alabama Inmates," *The New York Times*, August 1, 2005, p. A-1.

Gottschalk, Marie. *The Prison and the Gallows: the Politics of Mass Incarceration In America.*
E-book, Cambridge, [U.K.]: Cambridge University Press, 2006, https://hdl.handle.net/2027/heb.07801. Accessed 31 Jul 2020.
Downloaded on behalf of Stanford University

# EXHIBIT 31

Qual Sociol (2018) 41:199–220
https://doi.org/10.1007/s11133-018-9376-0



# Ramen Politics: Informal Money and Logics of Resistance in the Contemporary American Prison

Michael Gibson-Light[1]

Published online: 11 May 2018
© Springer Science+Business Media, LLC, part of Springer Nature 2018

**Abstract**  This article explores an unexpected yet pervasive arena in which changes to security may alter lived experiences of and responses to punishment. Namely, amidst changes in the quality of care behind U.S. prison walls and resultant prisoner insecurities in the face of neoliberal penology, the nation's prisoners have adapted informal prison markets to address unmet needs and pursue autonomy. Where cigarettes once reigned as the de facto token of exchange in the underground economy, the contemporary American prison is now home to a new form of informal money: cheap, reliable food items like ramen noodles. Drawing on 18 months of ethnographic fieldwork within a U.S. men's state prison and 82 in-depth interviews with prisoners and institutional staff, this paper explores this change in the form of informal prison money and what it reveals about the nation's prisons and prisoners. It contends that prison money reflects changing logics of prisoner resistance in particular political-economic and penal contexts. As prison administrative practices, institutional conditions, and legal environments change with time, prisoners adapt expressions of autonomy accordingly. While cigarettes symbolized withdrawal from the rigors of prison life and individualized treatment—the dominant logic of resistance of the prior era—the new ramen currency reflects a growing emphasis on prison "foodways" in opposition to cost-shifting and deteriorating services behind bars.

**Keywords**  Prison · Informal economy · Money · Neoliberalism · Resistance

Accounts of prison life throughout the 20th and into the twenty-first century overwhelmingly report that U.S. prisoners rely on cigarettes as the de facto informal money behind bars in the absence of access to formal currency (e.g., U.S. dollars) and markets (Irwin 2005; Richmond et al. 2009; Yardley and Wilson 2013). Tobacco products have thrived as prison money in part because they are durable, portable, highly valued, and divisible into

✉ Michael Gibson-Light
mgibson@email.arizona.edu

[1]  University of Arizona, Social Sciences Building Room 400, 1145 E. South Campus Drive, Tucson, AZ 85721, USA



The natural emergence of prison service issues and responses to them speaks to their saliency. I approached these emergent themes *abductively*, drawing on past research to direct ongoing fieldwork (Timmermans and Tavory 2012). That is, rather than anticipating such findings and imposing an analytic framework from the start, or allowing my understandings to emerge purely from empirical data, I instead returned to the literature to contextualize what emerged during fieldwork. Questions regarding services and informal monies were broached informally in the field and occasionally in interviews. I sought to triangulate findings through questioning prisoners and staff as well as seeking confirmations or refutations through further observation.

Fieldwork was not underway before or during the time of the move from tobacco to ramen currency, which was negotiated over the course of years predating my work in the institution. As such, questions regarding specific details of how this change was first initiated are beyond the scope of my research. Instead, I explore how the use of ramen as money maps on to broader prisoner insecurities stemming from political-economic and penal trends. Further, I illustrate economic practices at SSP, participant understandings of the transition to the ramen economy, and implications for prisoner outlooks and roles behind bars.

## Punitive Frugality and Prisoner Perceptions of Nutrition

At Sunbelt State Penitentiary, practices of "punitive frugality" (Lynch 2010) were readily apparent. Amongst other instances of cost-shifting and service cutbacks, food service costs had been reduced through purchasing ever-cheaper provisions, shrinking serving sizes, and limiting the number of prisoner meals per week. A major change occurred in the 2000s when a new private firm took over food services. Before then, prisoners at SSP received three hot meals daily, but, only a few years later, the second meal was reduced in size and changed to cold cut sandwiches and a small bag of chips. Lunch was removed from weekend menus and portion sizes in every meal were reportedly reduced.

Employees of the private firm confirmed these reductions. One day during fieldwork in the food prep work program, I met a staff member who was temporarily visiting the site. His primary responsibility, he told me, was cost reduction through the portioning of meals and purchasing of ingredients. "The prison used to control their own food," he said, shaking his head. "They were spending two dollars a *tray* [per meal, per prisoner]. Now that we're in charge, we only charge the client one-point-two-four-nine-one dollars per tray—basically a dollar twenty-five."

SSP prisoners frequently discussed receiving food that they deemed either inedible or too little to sustain them for a day. According to one prisoner on the housing yard, "The chow is really bad. They give you little kid meals like *that's* enough calories for a grown man." Shaking his head, he added, "It's *terrible*, this food." If you fail to secure additional food on your own, one man said, "you're gonna starve." Such an environment of deprivation negatively impacts prisoners' sense of self, resulting in feeling ignored, reviled, or generally uncared for (Smoyer and Lopes 2017). Participants reported feeling like children or, at the extreme, subhuman. As one participant contended, "They treat us worse than the [K9 Unit] dogs. They feed the dogs better."

The unappetizing nature of prison food is a traditional facet of carceral punishment (e.g., Sykes 1958). Yet, prisoners regarded the quality food as having reached a new low. Recent



GZJ KDKV'54''''

B | Economic Studies
at BROOKINGS



THE BROOKINGS INSTITUTION | MARCH 2018

# Work and opportunity before and after incarceration

**Adam Looney**

THE BROOKINGS INSTITUTION

**Nicholas Turner**

FEDERAL RESERVE BOARD

Case 3:20-cv-05309-CRB   Document 11   Filed 08/04/20   Page 209 of 278

# I. Introduction

More than 2.2 million individuals are incarcerated in the United States and more than 620,000 are released from prison annually. Among individuals released from prison, one third will return to prison at some point (Rhodes et al. 2014). Research suggests the mark of a criminal record imposes impediments to employment, exacerbating economic disparities and contributing to recidivism (Pager 2003, Mueller-Smith 2015). Based in part on the belief that successful reintegration requires employment and economic opportunities in the formal workplace, the tax code provides subsidies for employers that hire ex-felons. The tax code also provides broad-based incentives intended to encourage economic opportunity and formal employment that may benefit ex-prisoners, including the earned income tax credit (EITC) and place-based subsidies for disadvantaged neighborhoods, like Empowerment Zones. However, targeted incentives have low rates of take-up and high administrative burdens, and there are few broadly available incentives for childless adults.

We examine the labor market outcomes and economic characteristics of the incarcerated population using data maintained by the Internal Revenue Service (IRS) in an effort to improve tax policies to aid the re-integration of ex-prisoners. Starting in 2012, the Federal Bureau of Prisons and the heads of State prison agencies were required to submit identifying information and incarceration dates annually to the IRS to facilitate tax audits. The resulting sample of about 2.9 million individuals (at the time of our analysis) represents the only national census of administrative prisoner records. We match these data to earnings and tax filing records from 1999 to 2014, providing information on pre-and post-incarceration employment, earnings, and certain demographic information. For 497,000 incarcerated individuals born in 1980-1986, we also identify their childhood neighborhood and parent's income and marital status.

While our primary motivation is to understand and improve tax policies aimed at re-integrating ex-prisoners, our analysis suggests that policy interventions focused on improving the lives of poor children and less-skilled adults may also have a positive impact on labor market outcomes for the population studied here.

The data show that ex-prisoners struggle in the labor market after their period of incarceration. In the first full calendar year after their release, only 55 percent have any reported earnings. Among those with jobs, their median annual earnings is $10,090 and only 20 percent earn more than $15,000 that year—an amount roughly equivalent to the earnings of a full-time worker at the federal minimum wage. Overall, the outcomes of ex-prisoners are poor despite the fact that the vast majority appear eligible for tax incentives that promote employment for low-income workers, including provisions that specifically target ex-felons.

The struggles of ex-prisoners after leaving prison are mirrored by their struggles prior to being incarcerated. Three years prior to incarceration, only 49 percent of prime-age men are employed, and, when employed, their median earnings were only $6,250. Only 13 percent earned more than $15,000. Tracking prisoners over time and comparing employment and earnings before and after incarceration we find surprisingly little difference in labor market outcomes like employment and earnings. This doesn't necessarily mean that incarceration has no effect on their earnings, which might otherwise have been increasing as workers age and as the economy emerged from recession or have been previously impaired by a prior conviction. Hence, we interpret this pattern less as evidence that incarceration has little effect on employment but rather as an indication that the challenges ex-prisoners face in the labor market start well before the period of incarceration we observe.

# IV. Labor market outcomes of the incarcerated population

After leaving prison, ex-felons have poor employment outcomes, low earnings when working, and little attachment to the formal sector. Figure 1 (and the top panel of Table 1) illustrates the average employment rate and Figure 2 shows the distribution of earnings for the population of incarcerated individuals both before and after incarceration for individuals age 18-64 who were sentenced to at least 1 year in prison. (Year 0 denotes years of incarceration, year -1 is the calendar year of entry into prison, year 1 is the calendar year leaving prison, year 2 is the first full calendar year after release.)[9]

## FIGURE 1. EMPLOYMENT BEFORE AND AFTER INCARCERATION



Note: Figure shows the share of prisoners with any reported earnings by calendar year relative to incarceration. (Individuals are incarcerated at year zero, enter and leave prison in years -1 and 1, etc.). Sample includes individuals age 18-64, in prison between 2009-2013 and linked to earnings records 1999-2014.

**BROOKINGS**

Overall, the figure demonstrates that the incarcerated fare poorly in the formal labor market after they are released. In the first full year after release (year 2 in the figure), about 49 percent of ex-prisoners earn less than $500—as reported on a W2 or tax return (on Schedule C) —32 percent earn between $500 and $15,000, and only 20 percent earn more than $15,000. Table 1 shows that among those with earnings, the median ex-prisoner earns $10,090 and the average reported earned income is $13,890. By comparison, the employment-to-population ratio of individuals with less than a high school diploma was about 41 percent in 2014, their median weekly earnings, working full-time, was $488 (about $25,000 a year if working 50 weeks), and the median annual earnings for an individual with less than a high school degree was $19,492 (BLS 2014; U.S. Census Bureau, 2006-2010 American Community Survey).

. . .

9.   Because of the sampling frame, the panel is unbalanced. For all individuals incarcerated in 2012 and serving less than 13-year sentences we observe their earnings and outcomes prior to incarceration. However, we only observe outcomes for individuals released after state reporting starts, which is generally between 2010 and 2014. While the outcomes are thus representative of pre- and post-incarceration outcomes of individuals incarcerated or released in these years, they are not necessarily the same individuals. The appendix provides calendar year-by-incarceration year employment and earnings.

in the bottom 10 percent are 17 times more likely to end up in jail in our sample compared to girls from families in the top 10 percent.

Additional data included in the appendix shows that youths from single-parent households are about twice as likely to be incarcerated in their early 30s than youths from married households, conditional on family income. Among families in the bottom 10 percent of family income, about 11.0 percent of boys from single-parent households are incarcerated in their early 30s, compared to about 5.2 percent of low-income boys of married parents. Within the top 10 percent of family income, the corresponding rates are 1.1 percent and 0.5 percent. For girls, while overall incarceration rates are much lower, the differences by income and family structure remain apparent with girls raised in the bottom ten percent having a 1.1 percent chance of being incarcerated if from a single parent family versus a 0.7 percent chance if in a married-parent family.

These differences in incarceration rates by income imply that the incarcerated population is concentrated among individuals—mostly boys—from low-income, single parent families. About 15 percent of the individuals incarcerated at around age 30 come from families in the bottom 5 percent of family income, 47 percent grew up in families in the bottom 20 percent of the income distribution, and 82 percent are from the bottom half of families. Taking into account both income and family structure, about 20 percent of all prisoners in 2012 were boys from single-parent families in the bottom 10 percent of the income distribution—a group that makes up only 3.7 percent of the overall population. An additional 14 percent are from single-parent families from the second-lowest income decile (families earning between $14,000 and $23,000 per year) and 10 percent are from the third-lowest decile (earning between $23,000 and $33,000 per year). Hence, men in the bottom 30 percent and growing up in single-parent families make up almost half (46 percent) of the male prison population, but represent only 19 percent of all men. At the other end of the income distribution, boys who grow up in the top 50 percent of the income distribution and have married parents—a group that represents about 46 percent of boys—accounts for only 14 percent of men in prison.

The concentration of incarceration among children raised in poor families appears to be true within each state, not just at the national level. As illustrated in the appendix, the share of the incarcerated population from the bottom 20 percent of each state's income distribution is very similar across states despite substantial variation in incarceration rates. In almost all states, between 40 and 50 percent of the prison population grew up in families in the bottom quintile of the income distribution.

The incarceration rates depicted in Figure 2 show only the point-in-time incarceration rate, not the lifetime likelihood of incarceration. Bucknor and Barber's (2016) estimates imply that for each male incarcerated between the age of 30-34, there are about 2.75 former prisoners in the same age group. If that ratio applied equally across the family income and family structure distribution, it would imply that boys born in bottom 10 percent of families would have a one in four chance of being incarcerated or a former prisoner by their early 30s.

A policy-relevant implication of these facts is that a large share of non-working men are either incarcerated or were previously, especially among individuals from lower-income households. Figure 4 illustrates the non-employment rate (the share with zero wages or self-employment earnings) among 30-year-old men by parent income percentile. Low-income men are substantially less likely to be employed (the light blue line). The dark blue line shows the share in prison at age 30, which indicates that a large share of non-working, low-income men are out of the labor force simply because they are incarcerated. The medium-blue line adds to this share the number of men who are likely to have been incarcerated earlier, are in the labor market, but who have a 50 percent non-employment rate. Under these assumptions, the figure shows that a large-share—about 31 percent—of non-working men at age 30 are not employed either because they are in prison or had been in the past. Among men in the bottom third of the income distribution, about half

# EXHIBIT 33

# Recidivism among Participants of a Reentry Program for Prisoners Released without Supervision

*Nora Wikoff, Donald M. Linhorst, and Nicole Morani*

As higher numbers of individuals are released from prison and rejoin society, reentry programs can help former offenders reintegrate into society without continuing to engage in crime. This quasi-experimental study examined whether participation in reentry programming was associated with reduced recidivism among offenders who were no longer under criminal justice supervision. Offenders who completed their sentences in prison were invited to participate in Project Re-Connect (PRC), a six-month, voluntary prisoner reentry program. Following participants' release from prison, PRC provided case management and direct monetary support to participants for up to six months. Survival analysis was used to compare recidivism rates between 122 PRC participants and 158 eligible non-participants. Cox regression coefficients indicated that program participation and having a high school diploma or its equivalent were associated with reduced likelihood of new convictions, whereas substance abuse was associated with higher risk of subsequent convictions. The implications for social work policy and practice are discussed.

KEY WORDS: *case management; former offenders; prisoner reentry; program evaluation*

The U.S. prison population has grown exponentially over the past 30 years, at great cost to taxpayers and offenders alike. Between 1980 and 2008, the prison population expanded by 475%, reaching 1,518,559 in 2008 (Bureau of Justice Statistics, 2010). Policy changes fueled this rapid growth, as many states adopted mandatory and determinant sentencing guidelines that resulted in more individuals serving longer prison terms. Meanwhile, stricter parole requirements returned more ex-offenders to prison on technical parole violations (Seiter & Kadela, 2003; Zhang, Roberts, & Callanan, 2006). Parole violators who complete their sentences in prison are no longer subject to supervision once released from prison, thereby restricting society's ability to monitor and assist these individuals during reentry (Braga, Piehl, & Hureau, 2009; O'Brien, 2009; Seiter & Kadela, 2003).

The number and the rate of inmates released without parole supervision have increased even over the last decade, as the number of unsupervised releases grew from 118,886 in 2000 (20.4% of all released) to 165,568 in 2008 (24.2% of all releases) (Sabol, West, & Cooper, 2009; Seiter & Kadela, 2003). Former offenders commit crimes at higher rates than the general population, so in combination with technical parole violations, many ex-offenders recidivate and return to prison within the first few years of release (Braga et al., 2009). As of 1994, more than two-thirds of state prisoners were rearrested for one or more serious crimes within three years of release. Almost half of those released returned to prison during that time frame for parole violations or new convictions (Langan & Levin, 2002).

Prisoner reentry has become a critical topic as communities prepare to absorb increasing numbers of returning former offenders; 683,106 inmates were released from state or federal prisons in 2008, an increase of nearly 20% over the number released in 2000 (Petersilia, 2003; Roman & Travis, 2006; Sabol et al., 2009; Seiter & Kadela, 2003; Wilson & Davis, 2006). Reentry programs have been developed nationwide to address offender needs and smooth the transition from prison into the community.

## RISK FACTORS FOR REENTRY, CURRENT PRACTICE, AND EMPIRICAL EVIDENCE

Several risk factors increase the likelihood that ex-offenders will return to prison on new charges.

| Table 2: Continued | | |
|---|---|---|
| Variable | Conviction | No Conviction |
| Moderate dependence or substance abuse | 42.11 | 47.83 |
| Severe dependence or substance abuse | 23.68 | 7.83 |
| *M** | 3.76 | 3.42 |
| *SD* | 0.16 | 0.06 |

Notes: *N* = 280. HS = high school; GED = general equivalency diploma; DOC = Department of Corrections; MH = mental health.
**p* < .05. ***p* < .01.

| Table 3: Cox Regression Analysis: Factors Associated with Recidivism | | | | | |
|---|---|---|---|---|---|
| Variable | Hazard ratio | *SE* | *z* | 95% CI | $\chi^2$ |
| Client status | 0.42 | 0.18 | –2.08* | 0.19, 0.95 | 21.11* |
| Age at release | 1.00 | 0.02 | 0.05 | 0.96, 1.04 | |
| Male | 3.35 | 3.51 | 1.16 | 0.43, 26.07 | |
| African American | 0.66 | 0.26 | –1.07 | 0.31, 1.42 | |
| Less than HS diploma | 2.05 | 0.77 | 1.91 | 0.98, 4.28 | |
| Violent offense | 0.71 | 0.28 | –0.88 | 0.32, 1.54 | |
| Institutional risk score | 1.16 | 0.14 | 1.20 | 0.91, 1.47 | |
| Substance abuse score | 1.47 | 0.29 | 1.96* | 1.00, 2.15 | |
| Mental health score | 0.90 | 0.23 | –0.41 | 0.55, 1.49 | |

Note: *N* = 268. CI = confidence interval; HS = high school.
**p* < .05.

significant differences in observed baseline characteristics of participants and nonparticipants. The quasi-experimental research design, and resulting significant differences between groups, means that we cannot rule out the influence of personal motivation on reentry outcomes, but the results do suggest that reentry assistance may significantly reduce recidivism among offenders who complete their sentences in prison. The personalized case management and cash assistance may have reduced recidivism among participants by helping them navigate the reentry process. This replicates findings from other reentry evaluations that have shown that reentry assistance reduces recidivism among participants (Bouffard & Bergeron, 2006; Braga et al., 2009; Seiter & Kadela, 2003).

This analysis also found that substance abuse was associated with increased risk of reconviction at the bivariate and multivariable levels, as individuals who had some history of substance abuse were more likely to be convicted on new charges. None of the non-substance-abusing individuals were convicted of new crimes, whereas higher substance abuse scores were associated with receiving a new conviction during the study period. When we controlled for other variables, the rate of new conviction was elevated for individuals with a history of substance abuse. Although illicit substance use itself could explain offenders' increased risk of new convictions, substance abuse might also have fostered criminal engagement. For example, substance-abusing offenders might have been more likely to commit crimes while under the influence of, or as a strategy by which to obtain, drugs (French, Fang, & Fretz, 2010; Lipton, 1995).

At the bivariate level, this analysis found that individuals with less education and those with higher institutional risk or substance abuse scores were more likely to be convicted on new charges. Those with less than high school education were nearly 1.5 times as likely to be convicted on a new charge during the study time frame as those with at least a high school diploma or its equivalent. This association remained marginally significant when other variables were controlled for. It may have been that in contrast with less educated offenders, those who had higher education enjoyed more legitimate employment opportunities upon release, perhaps weakening their attachment to illicit activities (Harrison & Schehr, 2004).

A higher percentage of those who were not convicted had adjusted appropriately to institutional conditions, whereas those with a moderate number of conduct violations were much more likely to be convicted again during the observation period. Individuals who had higher institutional risk assessment scores may have been more likely to engage in ongoing antisocial behavior after release, thereby impeding their reentry prospects (Miller, 2006).

**Limitations and Areas for Future Research**

This quasi-experimental study design compared eligible participants with eligible nonparticipants, so we cannot rule out the possibility that self-selection into treatment explains the lower rate of new convictions among participants. Future studies, when possible, should use randomized or matched research designs to minimize the chance that self-selection bias will result in differences between the

GZJ KDKV'56''''

# HHS Public Access

Author manuscript

*Soc Serv Rev.* Author manuscript; available in PMC 2018 June 01.

Published in final edited form as:
 *Soc Serv Rev.* 2017 June ; 91(2): 293–318. doi:10.1086/692357.

# Incarceration and Relative Poverty in Cross-National Perspective: The Moderating Roles of Female Employment and the Welfare State

**Aaron Gottlieb**
University of Illinois at Chicago

## Abstract

A growing body of scholarship explores how incarceration contributes to inequality. The majority of this scholarship focuses on individual-level outcomes or aggregate outcomes within the United States. Despite substantial cross-national variation in incarceration rates, we know little about whether these differences contribute to cross-national variation in inequality outcomes. Using data from the period 1971–2010 from 15 advanced democracies, this study begins to fill this gap by exploring whether cross-national differences in incarceration rates help to explain cross-national differences in relative poverty rates. Although this research finds no average association, this null association obscures the important moderating role of country context. The association between incarceration and relative poverty is contingent upon a country's female employment rate and welfare state generosity.

## Introduction

Rich democratic countries vary substantially in the degree to which they successfully minimize relative poverty. Liberal democratic states (characterized by great emphasis on means-tested assistance) tend to have the highest relative poverty rates, followed by conservative democratic states (those characterized by more generous benefits than liberal democracies but with little redistribution), with social democratic states (characterized by universal benefits that greatly redistribute income) performing the best (Esping-Andersen, 1990). For instance, in the year closest to 2000 (the most recent time period for which there is poverty data for the entire sample), the relative poverty rate was 14.26 percent in liberal democratic countries, 8.06 percent in conservative democratic countries, and 5.98 percent in social democratic countries (LIS, 2014b).

A long line of research has proposed possible reasons for this variation (Brady, 2003b; Kenworthy, 1999; Moller, Huber, Stephens, Bradley, and Nielsen, 2003). Previous scholarship has pointed to the importance of institutions for understanding why some countries mitigate relative poverty better than others. Specifically, scholars have found that differences in the welfare state, unions, and the strength of left political parties all play a role in explaining cross-national variation in relative poverty (Brady, 2003b; Kenworthy, 1999; Moller et al., 2003). One commonality among the institutions emphasized is that they

Case 3:20-cv-05309-CRB   Document 11   Filed 08/04/20   Page 217 of 278

## Incarceration and Poverty

A growing body of literature shows that incarceration has important implications for inequality outcomes on the individual level in the United States (Geller, Garfinkel, & Western, 2011; Gottlieb, 2016; Western, 2006; Wildeman, Schnitker, & Turney, 2012). However, much less is known about whether incarceration rates have an impact on inequality outcomes in the aggregate, particularly in a cross-national context (Western & Muller, 2013; Wildeman, 2016). In the one study that has explored the cross-national implications of incarceration, Wildeman (2016) found that countries with high rates of incarceration tended to have worse health outcomes in the aggregate, but that finding was driven solely by the United States.

Although no research has explored whether incarceration rates are associated with relative poverty rates on a cross-national level, prior scholarship provides some insight into the nature of this relationship. Existing theory and research do not, however, provide a clear indication of the direction of the average association: some evidence suggests that higher rates of incarceration may be associated with higher rates of relative poverty, while other evidence suggests the opposite. Furthermore, existing scholarship suggests that both a country's female employment rate and welfare state generosity likely moderate the association between incarceration and relative poverty rates.

### Why increases in incarceration may be associated with higher poverty rates on average

Prior scholarship points to several mechanisms that suggest that higher rates of incarceration may be associated with higher rates of relative poverty. Each of these mechanisms operates primarily by harming those at the bottom of the distribution[1]. One mechanism through which higher incarceration rates may lead to higher relative poverty rates is by reducing income on the individual/family level. When a person is in prison and incapacitated, he/she is unable to meaningfully contribute to family income (DeFina & Hannon, 2013). Furthermore, even after exiting prison, a formerly incarcerated person's earnings may be reduced. Scholarship suggests that it is more difficult for people with a criminal record to find employment, and that individuals with a criminal record earn lower wages when employed due to stigma, skill erosion, the weakening of social networks, and the acquisition of traits (during their incarceration spell) not conducive to good job performance (DeFina & Hannon, 2010; Pager, 2003; Western, 2006).

Additionally, incarceration may reduce the earnings of non-incarcerated family members, particularly in families where adults care for children or the elderly. If one caregiver is unable to provide care because he/she is incarcerated, the other caregivers are likely to have to take on a greater caregiving role, making it more difficult for them to find or keep a decent-paying job (DeFina & Hannon, 2013). Lastly, families who experience incarceration may, as a result, have less access to financial support (private financial transfers) from family members (Turney, Schnitker, & Wildeman, 2012). Since private financial transfers have been found to be an important source of income for low-income families, this may have a

---

[1]Relative poverty increases when income levels at the bottom decrease or when income levels at the middle increase faster than those at the bottom.

Author Manuscript     Author Manuscript     Author Manuscript     Author Manuscript

# EXHIBIT 35

# WHO PAYS?

## The True Cost of Incarceration on Families

A national community-driven report led by the Ella Baker Center for Human Rights, Forward Together, and Research Action Design

September 2015



# EXECUTIVE SUMMARY

Each year, the United States spends $80 billion[1] to lock away more than 2.4 million people in its jails and prisons[2]—budgetary allocations that far out-pace spending on housing, transportation, and higher education.[3]

But costs run deeper than budget line items and extend far beyond the sentences served. These costs are rarely quantified and measured and pri-marily impact incarcerated populations and the families and communities from whom they are separated, the same people who are already stig-matized, penalized, and punished.

Families pay both the apparent and hidden costs while their loved ones serve out sentences in our jails and prisons. Because families are formed in diverse ways and take many forms, the definition used in this report encompasses families built across generations and borders and within and beyond blood relations. The families in this report and those who support loved ones bear the burden to help those individuals re-acclimate to society after serving time. Four decades of unjust criminal justice policies have created a legacy of collateral impacts that last for generations and are felt most deeply by women, low-income families, and com-munities of color.

In March 2014, the Ella Baker Center for Human Rights, Forward Together, and Research Action Design launched a collaborative participatory research project with 20 community-based orga-nizations across the country to address this unjust legacy.

Trained community researchers reached direct-ly into communities in 14 states, probing into the financial costs faced when a family member goes to jail or prison, the resulting effects on physical and mental health, and the challenges and barri-ers encountered by all when an individual returns home. The research included surveys with 712 for-merly incarcerated people, 368 family members of the formerly incarcerated, 27 employers, and 34 focus groups with family members and individuals

impacted by incarceration. The project revealed that many of the costs and penalties associated with incarceration continue long after incarceration ends and reach far beyond the individual being punished, with negative impacts for families and communities.

The findings show that the long-term costs extend beyond the significant sums already paid by indi-viduals and their families for immediate and myriad legal expenses, including cost of attorney, court fees and fines, and phone and visitation charges. In fact, these costs often amount to one year's total household income for a family and can force a family into debt. Latent costs include, but are not limited to, mental health support, care for untreat-ed physical ailments, the loss of children sent to foster care or extended family, permanent declines in income, and loss of opportunities like education and employment for both the individuals incarcer-ated and their family members, opportunities that could lead to a brighter future.

Specifically, the research group learned:

**People with convictions are saddled with copious fees, fines, and debt at the same time that their economic opportunities are diminished, resulting in a lack of economic stability and mobility.** Forty-eight percent of families in our survey overall were unable to afford the costs associated with a convic-tion, while among poor families (making less than $15,000 per year), 58% were unable to afford these costs. Sixty-seven percent of formerly incarcerat-ed individuals associated with our survey were still unemployed or underemployed five years after their release.

**Many families lose income when a family mem-ber is removed from household wage earning and struggle to meet basic needs while paying fees, supporting their loved one financially, and bear-ing the costs of keeping in touch.** Nearly 2 in 3 families (65%) with an incarcerated member were unable to meet their family's basic needs. Forty-nine percent struggled with meeting basic food

Case 3:20-cv-05309-CRB   Document 11   Filed 08/04/20   Page 221 of 278

Who Pays? The True Cost of Incarceration on Families

needs and 48% had trouble meeting basic housing needs because of the financial costs of having an incarcerated loved one.

**Women bear the brunt of the costs—both financial and emotional—of their loved one's incarceration.** In 63% of cases, family members on the outside were primarily responsible for court-related costs associated with conviction. Of the family members primarily responsible for these costs, 83% were women.

**In addition, families incur large sums of debt due to their experience with incarceration.** Across respondents of all income brackets, the average debt incurred for court-related fines and fees alone was $13,607, almost one year's entire annual income for respondents who earn less than $15,000 per year.

**Despite their often-limited resources, families are the primary resource for housing, employment, and health needs of their formerly incarcerated loved ones, filling the gaps left by diminishing budgets for reentry services.** Two-thirds (67%) of respondents' families helped them find housing. Nearly one in five families (18%) involved in our survey faced eviction, were denied housing, or did not qualify for public housing once their formerly incarcerated family member returned. Reentry programs, nonprofits, and faith-based organizations combined did not provide housing and other support at the levels that families did.

**Incarceration damages familial relationships and stability by separating people from their support systems, disrupting continuity of families, and causing lifelong health impacts that impede families from thriving.** The high cost of maintaining contact with incarcerated family members led more than one in three families (34%) into debt to pay for phone calls and visits alone. Family members who were not able to talk or visit with their loved ones regularly were much more likely to report experiencing negative health impacts related to a family member's incarceration.

**The stigma, isolation, and trauma associated with incarceration have direct impacts across families and communities.** Of the people surveyed, about one in every two formerly incarcerated persons and one in every two family members experienced negative health impacts related to their own or a loved one's incarceration. Families, including their incarcerated loved ones, frequently reported Post-Traumatic Stress Disorder, nightmares, hopelessness, depression, and anxiety. Yet families have little institutional support for healing this trauma and becoming emotionally and financially stable during and post incarceration.

These impacts hit women of color and their families more substantially than others, deepening inequities and societal divides that have pushed many into the criminal justice system in the first place. Almost one in every four women and two of five Black women are related to someone who is incarcerated.[4]

Poverty, in particular, perpetuates the cycle of incarceration, while incarceration itself leads to greater poverty. Estimates report that nearly 40% of all crimes are directly attributable to poverty[5] and the vast majority (80%) of incarcerated individuals are low-income.[6] In fact about two-thirds of those in jail report incomes below the poverty line.[7] The research in this report confirms that the financial costs of incarceration and the barriers to employment and economic mobility upon release further solidify the link between incarceration and poverty.

Most of all, this report's collaborative research found that while supportive families and communities can help reduce recidivism rates, these bedrocks of support lack the necessary resources to help incarcerated individuals serve out their sentences and reenter society successfully. It is not enough to reform the criminal justice system without considering its purpose and impact on communities. Institutions with power must acknowledge the disproportionate impacts the current system has on women, low-income communities, and communities of color and address and redress the policies that got us here. Additionally, society as a whole must rethink our approach to accountability and rehabilitation, shift perceptions, and remove barriers that prevent formerly incarcerated individuals and their families from getting another chance at life.

the majority of survey participants reported that their families had difficulty meeting basic needs, including food, housing, utilities, transportation, and clothing. Sixty-five percent of families had difficulty meeting basic needs as the result of a loved one's incarceration. Of those the top five identified most often include:

| Basic Needs Family Had Difficulty Meeting | |
|---|---|
| Food | 49% |
| Housing | 48% |
| Utilities | 45% |
| Transportation | 40% |
| Clothing | 37% |

The debts accrued prior to and during incarceration add up to challenges that would be insurmountable even if new challenges were not imposed when people return home. Unfortunately, many key opportunities, such as education loans or housing assistance, are limited or prohibited for formerly incarcerated people. The impact of many of these restrictions is to imperil the economic stability of formerly incarcerated people and the families that support them.

## CHALLENGES TO BUILDING ECONOMIC STABILITY

**Key Findings:** While studies have shown that stable housing and employment increase community well-being by reducing individual vulnerability to recidivism, many policies restrict access for those individuals who were formerly incarcerated.[34] Respondents in this study identified education, job training and employment opportunities, financial stability, and affordable housing as the most important priorities for building vibrant, healthy communities and families. Instead formerly incarcerated individuals and their families face significant barriers to accessing any of these opportunities.

In many ways, family support is our national reentry program. Yet the people tasked with facilitating reentry—the families—reported little or no support, leaving them to grapple unassisted with the barriers and burdens imposed on their formerly incarcerated loved ones and themselves as family members. According to the National Institute of Justice Collateral Consequences Inventory, there are more than 44,000 federal, state, and local restrictions placed on people with a criminal conviction.[35] Even where explicit prohibitions are not in place, stigma and discrimination create barriers just as difficult to overcome as legal barriers.

*"When you spend billions a year on incarceration, you would think that you could give subsidized housing, help with tuition or some type of financial support to help a person reenter society and get a leg up in life. It costs more to keep them in jail. You spend a lot of money on incarceration, but it would cost a lot less to help people out so they can start back in life again."*

*—Formerly incarcerated person, Oakland*

GZJ KDKV'58''''

Case 3:20-cv-05309-CRB Document 11 Filed 08/04/20 Page 224 of 278

FEATURE

# For Men in Prison, Child Support Becomes a Crushing Debt

*New regulations would give parents in prison the right to pause child support payments, but opponents say it undercuts welfare reform.*



A meeting at the Fathers' Support Center in Wellston, Mo., in September. WHITNEY CURTIS FOR THE WASHINGTON POST

By **ELI HAGER**

FERGUSON, MO. —

Earl L. Harris did not owe child support when he was sent to prison in 1997 for selling marijuana. He now concedes that dealing drugs may have been a stupid move for a new father.

But Harris, then 19, had grown up poor and dropped out of school, and the only legitimate work available to young, black men like him, he says, was a temp job without benefits.

"Nobody was hiring," he said. "I got into hustling because I wanted to support my baby."

Related Update: <u>Child Support Relief Coming for Incarcerated Parents</u>

The state of Missouri sent Harris to the penitentiary in Boonville, 250 miles from his home and baby daughter. His girlfriend moved on, later marrying someone else. After just two months in prison, Harris started getting the letters.

Child support. You owe: $168.

They came once a month, piling up debt.

Child support. You owe: $168. Arrears: $336. Arrears: $504. Arrears: $672. Plus interest and other fees.

Of the 2.2 million people incarcerated in the United States, about half are parents, and at least 1 in 5 has a child support obligation. For most, the debt will keep piling up throughout their imprisonment: By law or by practice, child support agencies in much of the country consider incarceration a form of "voluntary impoverishment." Parents like Harris, the logic goes, have only themselves to blame for not earning a living.

But that may be about to change. The Obama administration has authorized a new set of regulations that would reclassify incarceration as "involuntary," giving parents the right to push the pause button on child support payments. The regulations are set to be published early next year and implemented by states by 2017.

# Child Support Bills Far Exceed Prisoner Income

A father with two kids serving a 10-year prison sentence would end up owing far more in child support than he would earn working for 20 cents per hour, the median wage in state prisons, for 40 hours a week.



\* = BASED ON FULL-TIME MINIMUM WAGE EARNINGS IN MISSOURI. DOES NOT INCLUDE INTEREST.

SOURCE: LISL WILLIAMS, AMERICAN PROSPECT ANALYSIS OF BUREAU OF JUSTICE STATISTICS DATA

THE WASHINGTON POST / THE MARSHALL PROJECT

Congressional Republicans oppose the new policy. They argue that it would undercut the 1996 welfare reform act, which pressed states to locate missing fathers and bill them for child support so taxpayers wouldn't bear the full burden of their children's welfare.

"I am fundamentally opposed to policies that allow parents to abdicate their responsibilities, which, in turn, results in more families having to go on welfare," Senate Finance Committee Chairman Orrin G. Hatch (R-Utah) said in a speech in June on the Senate floor. Obama's new

regulations, he said, "would undermine a key feature of welfare reform, which is that single mothers can avoid welfare if fathers comply with child-support orders."

Frances Pardus-Abbadessa, head of child support enforcement for New York City, said: "The complaint we often hear is, 'Why should incarcerated fathers, of all people, be the ones to get a break from their obligations - and at a cost to the taxpayer?' "

Administration officials and their supporters counter that billing fathers while they're in prison does little but dig them deeper into debt.

"Billing poor fathers doesn't help poor mothers and kids become less poor," said Jacquelyn Boggess, a poverty expert with the Center for Family Policy and Practice.

"All it creates," she said, "is a highly indebted individual."

# Aggressive prosecution

For Earl Harris, the problem was keeping up. He had a job in prison, cleaning the kitchen, but it paid only $7.50 a month - well short of the $168 the state of Missouri was billing him.

"Didn't they know I was in prison?" he asks. "Weren't they the ones that put me in there?"

When he got out in 2001, the unpaid amount was listed on his credit report - and pursued by an agency with the power to garnish 65 percent of his wages, intercept his tax returns, freeze his bank account, suspend his driver's license and, if he failed to pay, lock him up again.

By then, his debt had surged to more than $10,000.

Harris entered barbering school but soon returned to drug dealing and was thrown back into prison for nearly a decade. Meanwhile, his child-support debt swelled to more than $25,000.

Harris's plight is not unusual. The Marshall Project interviewed nearly three dozen noncustodial parents in 10 states; they all left prison owing between $10,000 and $110,000 in child support. Mostly fathers who are disproportionately black and poor, these parents faced prosecution for not repaying the debt, even after their children were grown.

And what they were able to pay did not necessarily go to their children or the mother. The state often kept their money as repayment for welfare, child care or Medicaid benefits that had been

provided to the family while the dad was locked up.

To address the issue, the Obama administration began drafting new rules about four years ago. As currently written, the rules would forbid state child support agencies from classifying incarceration as "voluntary," granting parents the legal right to a reduction in payments while they're in prison, a right that does not exist in 14 states.

The rules would require agencies to inform incarcerated parents of this right and would encourage agencies to provide a reduction in payments automatically. And they would urge states to transfer all payments directly to custodial parents - mostly mothers - and their children.

The administration proposal would provide about $35 million over the next five years to modernize the child support system and to provide job training, job placement, bus fare, and other services to fathers facing prosecution for nonpayment.

The rule "will make sure that arrears don't accumulate endlessly while a parent is incarcerated," said Vicki Turetsky, President Obama's commissioner of child support enforcement. "Our goal is to collect, month by month, for kids. We can do that when parents are employed, not in debt."

Hatch and House Ways and Means Committee Chairman Paul Ryan (R-Wis.) have introduced legislation to block the new rules, though neither lawmaker has pushed to advance the measure.

Ron Haskins, a child support expert at the Brookings Institution, said he and other conservatives actually support parts of the new regulations. But they worry, he said, that the policy "could begin a long process of undermining the child support concept, which they strongly believe in."

Corey Mason said he accrued child support debt while he was in prison and is struggling to pay off the debt while working at a hotel in downtown St. Louis.
WHITNEY CURTIS FOR THE WASHINGTON POST

# Stuck in debt

Back in North St. Louis, Earl Harris, now 38, has put in his hours as an apprentice barber and is one written test away from getting his license. In the meantime, he is living in a halfway house and

working at a factory across the river in Illinois, packaging Febreze canisters and Swiffer mops.

His hours are 4 p.m. to midnight, though he arrives an hour early to make sure he doesn't lose his spot to another temp worker waiting outside the building in hopes of getting a shift. After work, he typically gets a cousin to drive him back to his dorm room, where he sleeps from 2 a.m. to 6 a.m. before heading to his daily support group for fathers.

By 8 a.m. the dads are circled up, talking about having kids and debt. They have come because the program helps them find a job, develop strategies for handling their arrears and work on their parenting skills. They also get free legal help. Many of them were incarcerated, almost exclusively for selling drugs, and everyone is wearing a jacket and tie, the uniform of employment.

One father, Louis Moore, said his debt soared to almost $60,000 while he was inside. Allan Newcomer's is more than $68,000.

"Everybody in the penitentiaries was getting the letters," Newcomer said.

Lisl Williams, a former judge who now works with the fathers, said even if they spend their money on food, clothes or toys for their children, it does not reduce their debt. In many cases, she said, the whole family - the mother, aunts, uncles, cousins - chips in to help pay it, and then the money they pay goes to the government as repayment for welfare they received long ago.

Because the fathers don't have large incomes to garnish, bank accounts to tap or property to seize, she adds, they are more likely to face re-incarceration for not paying their arrears.

Another dad, Corey Mason, said he was incarcerated and already racking up child support debt when he got a notice saying he might have another child by a different mother. He was instructed to go to the medical wing, get a DNA swab and send it to the agency. When they confirmed his paternity, he started getting a new set of child support bills.

Mason sent several handwritten letters to the agency explaining that he was in prison. He said he never got a response.

Now that he's out, Mason has a job at the Marriott hotel downtown. He works the graveyard shift, cleaning, shutting down the bar, providing towels to customers who ask for extra. Because the child support agency garnishes well over half his weekly paycheck, he turned down a recent promotion.

"I want to grow in the company. But I don't want to work that much harder if they're just going to take all of it to pay for history," Mason said.

Case 3:20-cv-05309-CRB Document 11 Filed 08/04/20 Page 230 of 278

"I know I'm the bad man. But I'm working harder now than I ever have, and it's like this is designed to keep me behind, backed up against the wall, in debt for the rest of my life."

# Evading responsibility

Obama has frequently scolded the same absentee fathers who now stand to benefit from his regulations. "Too many fathers are M.I.A., too many fathers are AWOL, missing from too many lives and too many homes," he told a Chicago audience in 2008 as a candidate for president.

Some fathers interviewed for this story had multiple children - one man said he had 12 - by different mothers. Many seemed less than eager to find employment. A few served time for domestic violence.

Some mothers say these men do not deserve to be freed of their debt.

### Most Overdue Child Support Went Unpaid Last Year

Only 6.8 percent of the $112.5 billion owed in late child support payments in 2014 was paid. About a quarter of the total debt was owed to the government as reimbursement for welfare.



SOURCE: OFFICE OF CHILD SUPPORT ENFORCEMENT

THE WASHINGTON POST / THE MARSHALL PROJECT

"There's a real tension here, as a matter of public policy," said Joan Entmacher, an expert on family poverty at the National Women's Law Center. "There are absolutely fathers who evade their responsibilities, saying, 'Oh, I can't pay that,' and not even trying. We don't want to simply reward that attitude."

Even if a father is a deadbeat, however, the evidence is clear: Noncustodial fathers are far more likely to pay child support, and otherwise reengage with their families, if payments are manageable.

In a 2012 study by the Center for Policy Research, a private nonprofit research organization, fathers paid a much higher percentage of their monthly obligations when offered relief from unpayable state-owed debt. In studies in Maryland, Illinois and California, fewer than 15 percent remained noncompliant once the old debts were reduced and they were given a schedule of regular payments. And the fathers most likely to abide by "debt compromise" agreements were those who had been incarcerated.

Boggess, the child support analyst, said that trying to collect the accumulated debt is "like squeezing an empty bottle and hoping something comes out.

"These fathers are poor, period. Their arrears are uncollectible, period," she said. "They've never even met anyone who had $30,000."

# 'The debt will be permanent'

Many states have already taken action. In 36 states and the District, incarceration is no longer officially considered "voluntary" impoverishment, and an imprisoned father is legally entitled to have his monthly child support bill modified to as little as $50 a month or, in rare cases, stopped altogether.

But it is still up to the father to prove he is incarcerated, and then to file for the reduction. This involves navigating a maze of paperwork from prison, usually with no lawyer, irregular access to phones and, in many cases, an eighth- or ninth-grade education.

The most common pitfall, said Bo Twiggs, the director of UpNext, a program in New York City that helps recently incarcerated fathers, is that the incarcerated dad has no idea his child support is

piling up because he isn't getting the notices. The debt keeps compounding - and federal law prohibits the reduction of child support bills retroactively.

"It's hard for these fathers to understand that they can't wait, they can't adjust to life in prison before dealing with child support, that they need to take action immediately because the debt will be permanent," Twiggs said. "That's really counterintuitive."

When these fathers get out of prison, they often don't notice the debt until the state begins pursuing it, "which forces them to go underground instead of rejoining the formal economy," said Turetsky, Obama's commissioner of child support enforcement.

Tessie Amos III, a group facilitator, speaks to men during a Fathers' Support Center session on Sept. 30, 2015 in Wellston, Mo. WHITNEY CURTIS FOR THE WASHINGTON POST

Indeed, research shows that the two most important factors in a former prisoner's successful reentry into the community are employment and positive relationships with family. Both of these are hindered by the aggressive pursuit of child support arrears: Garnishing 65 percent of a father's paycheck, so he is tempted to earn cash off the books; suspending his driver's license so he can't get to work; sending him bills that are so far beyond his capacity to pay that he keeps his distance from his family.

"I see it all the time," Twiggs said: "Not reengaging with the family. Noncompliance with parole and child support. Under-the-table efforts at income. Self-defeat, high anxiety, general institutional distrust. All of that is triggered by this absolutely overwhelming, impossible feeling of debt."

# Focusing on parenthood

Just a few months out of prison, Earl Harris is not sure whether his debt has been written off as uncollectible. He hasn't received any communication from the child support agency in more than a year.

For the time being, he is focused on being a dad. He phones his daughter, now 21, asking her about her job. He has a 13-year-old son, now, too.

"The boy is very shy," he said. "I mean, I was away for so long. . . . He doesn't know me how he should."

The other day, they went bowling, Harris and his son. He tried to get the conversation rolling, asking questions about Black Ops, one of the boy's favorite video games, and about the upcoming school year.

"Hopefully, when I get a paycheck, I'll be able to buy him school clothes," Harris said.

One night, after a day of work at the factory, Harris couldn't reach his cousin for a ride. If he didn't make it back to the halfway house in time, he would get a violation - which could delay his plans to move in with his child.

It was midnight. He'd been standing for eight hours, and he was across the river in Illinois.

He started walking, as fast as he could, in the direction of St. Louis.   ⊪

# EXHIBIT 37

**Child Support Orders and the Incarceration of Noncustodial Parents**

Daniel R. Meyer and Emily Warren
Institute for Research on Poverty and School of Social Work
University of Wisconsin–Madison

December 2011

The research reported in this paper was supported by the Child Support Research Agreement between the Wisconsin Department of Children and Families and the Institute for Research on Poverty. The views expressed here are those of the authors alone. The authors also thank Jennifer Noyes.

Substantial policy attention and some research attention has recently been paid to the way the child support system interacts with the criminal justice system. Interest in this topic comes from a variety of directions. One factor leading to renewed interest has been a growing awareness of the high rates of incarceration in the United States, and the especially high rates for young African American men, many of whom are noncustodial parents. Simultaneously, the child support system has become more aware that the level of arrears is quite high, and that much of it may be uncollectable. This awareness has led to increased attention to factors related to nonpayment, and the high rate of incarceration of noncustodial parents has become a prevalent explanation for why nonpayment is so high. Finally, there has been an increased interest in the way various social policies interact with each other, as well as a desire to understand whether policies in different areas are mutually inconsistent.

This cluster of issues led the Wisconsin Department of Workforce Development to commission a paper by Jennifer Noyes, titled "Review of Child Support Policies for Incarcerated Payers" (2006).[1] The report covered estimates of the number of child support cases affected by incarceration, a review of how various states were handling child support orders when noncustodial parents were incarcerated, and more specific information on six states. Policy and practice issues were discussed. The paper by Noyes was used to help design a project in Milwaukee in which child support orders were suspended during incarceration. This project's most recent evaluation, an interim evaluation completed in December 2009, found limited short-term effects of the reform but some suggestions that there could be longer-term effects (Cancian, Noyes, Chung, Kaplan, and Thornton, 2009). The final evaluation of this project is underway and is expected in spring 2012.

---

[1] http://www.irp.wisc.edu/research/childsup/cspolicy/pdfs/Noyes-Task5A-2006.pdf

2

This brief report updates and extends the previous work by Noyes, and is similar in that it focuses on national issues, rather than those specific to Wisconsin or the Milwaukee project. In particular, we examine the more recent literature for updated national estimates of the extent of overlap between the child support and criminal justice systems; we explore information about how the child support system in other states is responding when obligors are incarcerated; and we review recent estimates of the effects of different types of policy responses (with a particular focus on the level of arrears). This brief report provides background and context for any examinations of whether the child support guidelines should specifically address modifications to orders when obligors are incarcerated.

UPDATED ESTIMATES OF THE EXTENT OF OVERLAP BETWEEN THE CHILD
    SUPPORT AND CRIMINAL JUSTICE SYSTEMS

In 2006, Noyes noted that a majority of prisoners have minor children, and reviewed estimates of the number of incarcerated non-custodial parents. While national data on this topic remains difficult to find, the most recent figures estimate that 53 percent of those incarcerated in state or federal prison in 2007 were parents of minor children (Glaze and Maruschak, 2008). Further, an estimated one-quarter of inmates in federal or state prison have open child support cases (CLASP, 2003). As of 2007, an estimated 1.7 million children had an incarcerated noncustodial parent (Glaze and Maruschak, 2008). Studies of new births in large cities using Fragile Families data put incarceration rates of noncustodial parents even higher, and highlight the racial disparities in incarceration rates. For example, 40 percent of African American fathers had been incarcerated by their child's first birthday, compared to 18 percent of white fathers (Geller, Garfinkel, and Western, 2011). While the estimates have some limitations, the high numbers of incarcerated noncustodial parents clearly make this a significant policy issue.

POLICIES REGARDING ORDERS DURING INCARCERATION

A difficult and sometimes contentious issue has been whether, and at what level, a child support order should be set if a noncustodial parent is incarcerated. While the issue can be conceptually divided into (1) policies surrounding initial orders when a noncustodial parent is incarcerated and (2) policies surrounding whether existing orders should be modified when a noncustodial parent becomes incarcerated, the issues are quite similar and we focus most of our discussion on the issues surrounding modification. Often the issue has been framed in terms of whether incarceration is voluntary unemployment (so an initial order should be based on imputed income and a current order should not be modified) or involuntary (so an initial order should be set in the same way other initial orders are for zero-income, involuntarily unemployed cases, and any existing order should be modified to take into account the new, lower income).

In the past, many states treated incarceration as voluntary unemployment, and, as a result, orders were not modified when obligors became incarcerated. This practice began to change in the 1990s, and by the mid-2000s, there was substantial variation across states in whether incarceration was seen as voluntary or involuntary unemployment (Pearson, 2004; Noyes, 2006). As of the Noyes report in 2006, no state automatically lowered a child support obligation when the noncustodial parent became incarcerated. Some states considered incarceration as a change in circumstance that would permit a reduced order, but the burden was almost always on the incarcerated parent to be aware of the possibility of a revised order, and to then actually make the request. Since 2006, states have overall become somewhat more inclined to allow modifications for incarcerated non-custodial parents, though it remains the case that no state automatically reduces an order based on incarceration. For this report we have updated the information on each state's policy through web-based descriptions of policy and practice in each state. Table 1 shows

**Table 1: State Policies on Whether Orders Can Be Modified Upon Incarceration**

| A: Incarceration is not a justification for order modification | B: Incarceration is one factor that can be considered in order modification | C: Incarceration in and of itself can be a justification for order modification |
|---|---|---|
| Arkansas | Alabama | California |
| Delaware | Alaska | Connecticut |
| Florida | Arizona** | Hawaii |
| Georgia | Colorado | Idaho |
| Kansas | Illinois | Maine |
| Kentucky* | Indiana** | Maryland*** |
| Louisiana | Iowa | Massachusetts |
| Montana | Missouri* | Michigan |
| New Hampshire | Nebraska** | Minnesota |
| New York | Nevada | Mississippi |
| North Dakota* | New Mexico | New Jersey |
| Ohio | Pennsylvania** | North Carolina |
| Oklahoma* | Rhode Island | Oregon |
| South Carolina | Texas | Tennessee |
| South Dakota* | Wisconsin | Vermont |
| Utah | | Washington |
| Virginia | | West Virginia |
| | | Wyoming |

*imputes income based on prior earnings or full-time minimum wage work
**approach changed since 2006 from Type A to Type B
***approach changed since 2006 from Type A to Type C
Updated from tables found in Pearson (2004) and Turetsky (2008), using state statutes and relevant court cases.

our best estimate of the current policy in each state, as well as whether this has changed since 2006. We divide states into three types: Type A states are the most restrictive—incarceration is not stated as a reason to modify an order; Type B states consider incarceration as one possible factor that could lead to modification; and Type C states consider incarceration in and of itself as a reason to consider modifying an order. The table shows that seventeen states fit Type A, fifteen states are considered Type B, and eighteen states are Type C. Although only 46 states were categorized in 2006, the table still reflects movement away from Type A (21 states in 2006, down to 17 currently), toward Type B (11 in 2006, up to 15 currently) and toward Type C (14 in 2006, up to 18 currently). In cases where modification rules have changed, the adjustment was usually the result not of a legislative change, but rather of court cases brought by incarcerated non-custodial parents challenging the law or tradition of no modification in that state (Turetsky, 2008). These cases had various outcomes, some resulting in states affirming their decision to not allow modifications based on incarceration (Kentucky's *Avery v. Cabinet for Health and Family Services)*, and others resulting in a reversal of previous state policy with incarceration now being considered as grounds for order modification (Indiana's *Lambert v. Lambert,* Pennsylvania's *Nash v. Herbster)* (Levingston and Turetsky, 2007; Turetsky, 2008). Still, in general the trend is toward more modifications being possible during incarceration.

EFFECTS OF CHILD SUPPORT RESPONSES TO INCARCERATION

The historical approach of not modifying orders has been linked to substantial amounts of arrears, as no (or very few) noncustodial parents make payments during incarceration. By the time of the Noyes report, arrears that accrued during incarceration were receiving increased attention. Today, this concern continues due to evidence that the amount of child support arrears is growing and becoming increasingly concentrated among a small proportion of obligors with

the least ability to pay, often due to previous or current incarceration. While there is little national data on the extent of arrears that accumulate during incarceration, basic data on arrears help set the context of the seriousness of this issue. As of 2010, the arrears owed in six states (California, Florida, Michigan, New York, Ohio, and Texas) accounted for half of the total arrears owed nationally (DHHS, 2011). Moreover, a small number of non-custodial parents increasingly owe a disproportionate amount of child support arrears (McLean and Thompson, 2007). In the nine states with the most arrears, 11 percent of the non-custodial parents with child support orders collectively owed 54 percent of the total arrears in those states (Sorensen, Sousa, and Schaner, 2007). Arrears accumulated during incarceration are often exacerbated by the fact that noncustodial parents often have other substantial debts after release from prison, including court costs, fines, and victim restitution (McLean and Thompson, 2007).

Three of the states with the largest balance of arrears (Florida, New York, Ohio) do not permit orders to be modified during incarceration because incarceration is considered to be a voluntary change in circumstances. Some states in which incarceration is not considered to be a complete justification for order modification will impute income based on the obligor's pre-incarceration wages, if they were employed, or based on full-time minimum-wage earnings in that state (Turetsky, 2008). It is perhaps not surprising, then, that states that impute income for orders during incarceration have cases with higher arrears per obligor than states that do not use that practice (Sorensen, Sousa, and Schaner, 2007). While at least five states still impute income for incarcerated parents, this practice is increasingly uncommon, and is considered to be excessively punitive and ineffective in getting obligors to pay either during or post-incarceration (Turetsky, 2000).

Because states with the highest levels of arrears are also states that do not typically modify orders, this suggests that policies of not modifying orders during incarceration may lead to higher arrears. There have also been several demonstration projects testing strategies to decrease incarcerated obligor debt, and several of these projects focused on more explicitly informing obligors of their right to request a modification. Noyes (2006) found that most projects related to order modification were more process- than outcome-based, and thus provided little evidence as to best practices for addressing child support orders for incarcerated parents. Additionally, studies often were of very short duration or conducted with such a small treatment group as to provide little or no generalizability. Noyes (2006) also noted that a wide variation of preferences for handling orders for incarcerated obligors is permitted under federal law, and these preferences can vary or change based on judicial outcomes, which can in turn impact relevant strategies.

The issues raised by Noyes regarding the relative absence of evidence-based research on child support orders for incarcerated parents remain relevant today, although a few demonstration projects have tested some of the currently popular strategies. Again, demonstration projects are often conducted for only a small treatment group and over a limited period of time. Current strategies have focused on two main areas for intervention—strategies for modifying orders during the incarceration period, and those for adjusting orders upon release.

Strategies for addressing child support obligations during incarceration have included movement toward incarceration as involuntary unemployment to allow for modification (as described above), automatic modification of child support payments at the time of incarceration, and speeding up and simplifying the modification process for incarcerated parents to encourage them to seek a modified order. There are some demonstration projects focused on these

interventions, although few have been subject to rigorous evaluation. Because most modification policies are intended to avoid the accumulation of arrears during incarceration, modified orders are generally reduced to zero or a minimum level such as $50 per month (DHHS, 2007). Another strategy being used to reduce arrears is to target incarcerated obligors who have significant state-owed arrears prior to incarceration, and develop procedures for forgiving or reducing the debt. This approach is being tested in Washington and Colorado (DHHS 2007).

The most common strategy is expedited order modification wherein states that allow modifications for incarcerated parents speed up or simplify the modification process to encourage obligors to seek a modification. The normal process for modifying an order takes an average of three to seven months to complete, and the application process is often cumbersome (Pearson 2004; DHHS, 2007). To expedite the process, some jurisdictions such as Los Angeles County have implemented a passive approval method for order modifications, with a hearing held only if either party objects to the modification. Minnesota and Illinois have created simplified paperwork for obligors, and a child support enforcement official will visit the incarcerated obligor in prison in order to assist with the process (DHHS 2007). So far, the results of demonstration projects that focus on either simplifying or expediting procedures for modifying orders for incarcerated obligors indicate that the extra intervention is time-intensive for child support workers, and many obligors still do not follow through with order modification (Center for Policy Research, 2009). Perhaps with this concern in mind, Colorado has implemented a two year pilot project (2009–2011) in which non-custodial parents being incarcerated for two or more years have their orders automatically reduced to $50 per month during their sentence (DHHS, 2011).

One notable project occurred in Milwaukee County. In this project, incarcerated obligors had their child support orders reduced to zero during the period of their incarceration (Cancian et al., 2009). An evaluation of this Milwaukee prison project is currently underway. When this evaluation is completed in 2012, it will substantially increase what is known about the effects of modifying orders during incarceration. In contrast to the demonstrations described above, the Milwaukee project has a substantial number of cases affected as well as a sophisticated evaluation plan that compares cases with modified orders to comparable cases without modified orders.

CHILD SUPPORT POLICIES AFTER RELEASE FROM INCARCERATION

A few strategies have been pursued in order to motivate an obligor to begin paying child support after release, as well as to make those payments more financially feasible. These strategies have included implementing a grace period on child support payments after release from prison, reentry programs focusing on eliminating barriers to finding employment and housing, and programs that allow for forgiveness of arrears accrued during incarceration (or otherwise) as long as certain conditions are met.

Strategies aimed to encourage payments from the obligor after release from prison are usually focused primarily on common reentry issues, but one strategy related to order modification after release is a grace period for payments. In 2003, Oregon amended its child support review guidelines so that modified orders for obligors set at zero during incarceration extended to 60 days after release, giving the obligor more time to re-establish himself and find housing and employment (McLean and Thompson, 2007). The Office of Child Support Enforcement has highlighted this strategy as a means of reducing arrears accumulation, in conjunction with modifying an obligor's order during the incarceration period (DHHS, 2006).

Reentry groups have also promoted this strategy, based on either a 60- or 90-day grace period, as has the Council of State Governments (2005), but this policy remains largely unimplemented. Most other efforts related to newly released obligors have addressed employment and housing barriers common among this population (DHHS, 2006). Thus, there is currently little evidence base on best practices for child support order modification post-release.

A final policy area relevant to those released from incarceration involves programs to reduce or forgive a portion of arrears that have accumulated during incarceration. Policies in this area have not usually focused specifically on arrears that resulted from incarceration, but rather more generally on cases with high levels of arrears; for a review of these policies, and the program in Racine County, see Heinrich, Burkhardt and Shager (2010). In general, there is some evidence of positive effects for policies that forgive arrears in response to payments.

SUMMARY

In summary, the most recent figures continue to show substantial overlap between the prison population and child support cases. Child support guidelines in most states do not explicitly address how the order is to be set during a period of incarceration. Most of the policy discussion has been about whether orders should be modified during incarceration, and whether the modification should be automatic or not. While there have been a variety of demonstrations and exploration of different types of policies, there is at this point no research consensus that could guide best practice. Thus, although changes to the guidelines to explicitly address incarceration could be considered, there is little empirical evidence on which to base a change.

## References

Cancian, M., Noyes, J. L., Chung, Y., Kaplan, R., and Thornton, K. (2009). "Holding Child Support Orders of Incarcerated Payers in Abeyance." Interim evaluation report, Institute for Research on Poverty, University of Wisconsin–Madison.

Center for Law and Social Policy. (2003). *Every Door Closed: Facts about Parents with Criminal Records*. Retrieved from http://www.clasp.org/admin/site/publications_archive/files/0139.pdf.

Center for Policy Research. (2009). *Colorado Early Intervention and Simplified Modification Project: Final Report*. Retrieved from https://childsupport.state.co.us/siteuser/do/home/publications.

Council of State Governments. (2005). *Report of the Reentry Policy Council: Charting the safe and successful return of prisoners to the community*. New York: Reentry Policy Council. Retrieved from http://reentrypolicy.org/publications/1691;file.

Department of Health and Human Services, Office of Child Support Enforcement. (2006). *Incarceration, Reentry, and Child Support Issues: National and State Research Overview.*

Department of Health and Human Services, Office of Child Support Enforcement. (2007). *Working with Incarcerated and Released Parents: Lessons from OCSE Grants and State Programs.*

Department of Health and Human Services, Office of Child Support Enforcement. (2011). Fiscal year 2010 preliminary report. Retrieved from http://www.acf.hhs.gov/programs/cse/pubs/2011/reports/preliminary_report_fy2010/.

Geller, A., Garfinkel, I., and Western, B. (2011). "Paternal Incarceration and Support for Children in Fragile Families." *Demography* 48: 25–47.

Glaze, L. E., and Maruschak, L. M. (2008). *Parents in Prison and their Minor Children*. Washington DC: U.S. Department of Justice, Bureau of Justice Statistics. Retrieved from http://www.bjs.gov/content/pub/pdf/pptmc.pdf.

Heinrich, C. J., Burkhardt, B. C., and Shager, H. M. (2010). *Reducing Child Support Debt and its Consequences: Can Forgiveness Benefit All?* Institute for Research on Poverty, University of Wisconsin–Madison. http://www.irp.wisc.edu/research/childsup/cspolicy/pdfs/2007-09/FamiliesForward_3_19_10.pdf.

Levingston, K. D., and Turetsky, V. (2007). Debtor's Prison—Prisoners' Accumulation of Debt as Barrier to Reentry. *Journal of Poverty Law and Policy* 41(3): 187–197.

McLean, R. L., and Thompson, M. D. (2007). *Repaying Debts*. New York: Council of State Governments Justice Center. Retrieved from http://justicecenter.csg.org/files/RepayingDebts_Guide_final.pdf.

Noyes, J. L. (2006). *Review of Child Support Policies for Incarcerated Payers*. Institute for Research on Poverty, University of Wisconsin–Madison.

Pearson, J. (2004). "Building Debt While Doing Time: Child Support and Incarceration." *Judges' Journal* 43(1): 5–12. Retrieved from http://peerta.acf.hhs.gov/uploadedFiles/BuildingDebt.pdf.

Sorensen, E., Sousa, L., and Schaner, S. (2007). *Assessing Child Support Arrears in Nine Large States and the Nation*. Washington DC: The Urban Institute. Retrieved from http://www.urban.org/UploadedPDF/1001242_child_support_arrears.pdf.

Turetsky, V. (2000). *Realistic Child Support Policies for Low Income Fathers*. Washington DC: Center for Law and Social Policy. Retrieved from http://www.policyarchive.org/handle/10207/bitstreams/13984.pdf.

Turetsky, V. (2008). *'Voluntary Unemployment' and other Reentry Policies*. Washington DC: Center for Law and Social Policy.

# EXHIBIT 38

**Review of Child Support Policies for Incarcerated Payers**

Jennifer L. Noyes
Institute for Research on Poverty
University of Wisconsin–Madison

December 2006

This report has been prepared under a contractual agreement between the Wisconsin Department of Workforce Development and the Institute for Research on Poverty. Any views expressed in this paper are those of the author and not necessarily those of the sponsoring institutions. The author thanks Angela Witt and Marci Ybarra for research assistance and Deborah Johnson for editorial advice.

2

BACKGROUND

There is no national database regarding the extent to which incarcerated parents have child support orders. However, available statistics provide some indication of the extent to which the potential for such orders exists. For example, of those incarcerated in 1999 who were parents, 48 percent were never married and 28 percent were divorced or separated. In addition, 64 percent of parents did not live with their children prior to admission (Mumola, 2000).

Research completed at the state and local levels provides some additional insight (see, e.g., Griswold and Pearson, 2003; Pearson 2004; Administration of Children and Families, 2006a). For example:

- 21.7 percent of inmates under the jurisdiction of the Massachusetts Department of Corrections and 22.5 percent of inmates within the Suffolk County House of Corrections were part of the child support caseload, based on a data match completed in 2001 (Griswold and Pearson, 2003).

- 26 percent of inmates in state prison facilities and 28 percent of parolees were involved in the child support system based on a data match completed in Colorado in 2001 (Griswold, Pearson, and Davis, 2001).

In sum, while there is no single definitive estimate, the available information suggests that a majority of prisoners have minor children, and that a majority of incarcerated parents were not living with their children prior to their incarceration. Since not all NCPs have an order to pay support, the state estimates of 22 to 28 percent of inmates or parolees involved in the child support system are not inconsistent with these estimates of parental status among the incarcerated population.

As reflected in the literature, the incarceration of NCPs can have several consequences. First, in most instances, it substantially decreases the income available from which child support can be paid. Second, this lack of payment leads to the accumulation of arrears, which are often added to those existing prior to incarceration. Third, interest and penalties further add to the debt. The accumulated effect of this process is reflected in the often cited findings of several studies, including:

- A 2001 study completed in Massachusetts, which looked at the experience of 650 incarcerated NCPs (Thoennes, 2002), found that they entered prison with an average of $10,543 in unpaid

# EXHIBIT 39



# Congressional Record

### United States of America

## PROCEEDINGS AND DEBATES OF THE 116th CONGRESS, SECOND SESSION

*Vol. 166*    WASHINGTON, TUESDAY, MARCH 24, 2020    *No. 58*

# House of Representatives

The House met at noon and was called to order by the Speaker pro tempore (Mr. CLAY).

## DESIGNATION OF THE SPEAKER PRO TEMPORE

The SPEAKER pro tempore laid before the House the following communication from the Speaker:

WASHINGTON, DC,
*March 24, 2020.*

I hereby appoint the Honorable WILLIAM LACY CLAY to act as Speaker pro tempore on this day.

NANCY PELOSI,
*Speaker of the House of Representatives.*

## PRAYER

Reverend William Gurnee, St. Joseph's Catholic Church, Washington, D.C., offered the following prayer:

Almighty God, because our human weakness leads us sometimes to glamorize our elected leaders as symbols of power or status or wealth, we must rely on You more fervently in this moment of crisis in our Nation's healthcare, that we may all together arrive at the truth.

The Members of this body know that they have been tasked with a tremendous responsibility to care not for the trappings of this world, but for the real treasure of our Nation: her people.

You have given each public official gifts for the building up of Your kingdom. Guide them by Your holy spirit with wisdom and humility to make the compromises and choices that are necessary for the good of all.

Grant us this day Your blessings, and may we praise You always. We make this prayer in Your holy name.

Amen.

## THE JOURNAL

The SPEAKER pro tempore. Pursuant to section 7(a) of House Resolution 891, the Journal of the last day's proceedings is approved.

## PLEDGE OF ALLEGIANCE

The SPEAKER pro tempore. Will the gentleman from Texas (Mr. GREEN) come forward and lead the House in the Pledge of Allegiance.

Mr. GREEN of Texas led the Pledge of Allegiance as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

## ADJOURNMENT

The SPEAKER pro tempore. Pursuant to section 7(b) of House Resolution 891, the House stands adjourned until 10 a.m. tomorrow.

Thereupon (at 12 o'clock and 2 minutes p.m.), under its previous order, the House adjourned until Wednesday, March 25, 2020, at 10 a.m.

## EXECUTIVE COMMUNICATIONS, ETC.

Under clause 2 of rule XIV, executive communications were taken from the Speaker's table and referred as follows:

4165. A letter from the General Counsel, Federal Housing Finance Agency, transmitting the Agency's final rule — Stress Testing of Regulated Entities (RIN: 2590-AB05) received March 17, 2020, pursuant to 5 U.S.C. 801(a)(1)(A); Public Law 104-121, Sec. 251; (110 Stat. 868); to the Committee on Financial Services.

4166. A letter from the Deputy Chief, Disability Rights Office, Federal Communications Commission, transmitting the Agency's final rule — Structure and Practices of the Video Relay Service Program; Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities, Order on Reconsideration and Order Suspending Compliance Deadline, [CG Docket Nos.: 10-51 and 03-123] received March 12, 2020, pursuant to 5 U.S.C. 801(a)(1)(A); Public Law 104-121, Sec. 251; (110 Stat. 868); to the Committee on Energy and Commerce.

4167. A letter from the Secretary, Department of the Treasury, transmitting a six-month periodic report on the national emergency with respect to the threat of foreign interference in United States elections that was declared in Executive Order 13848 of September 12, 2018, pursuant to 50 U.S.C. 1641(c); Public Law 94-412, Sec. 401(c); (90 Stat. 1257) and 50 U.S.C. 1703(c); Public Law 95-223, Sec. 204(c); (91 Stat. 1627); to the Committee on Foreign Affairs.

## PUBLIC BILLS AND RESOLUTIONS

Under clause 2 of rule XII, public bills and resolutions of the following titles were introduced and severally referred, as follows:

By Mr. GREEN of Texas (for himself, Ms. GARCIA of Texas, Mr. MEEKS, Mr. CLEAVER, and Mrs. BEATTY):

H.R. 6380. A bill to temporarily provide for Federal insurance of transaction accounts during the COVID-19 emergency; to the Committee on Financial Services.

By Mr. GREEN of Texas (for himself, Ms. GARCIA of Texas, Mr. MEEKS, Mr. CLEAVER, and Mrs. BEATTY):

H.R. 6381. A bill to require the Board of Governors of the Federal Reserve System to provide zero-interest loans to minority depository institutions and community development financial institutions to combat COVID-19, and for other purposes; to the Committee on Financial Services.

By Mr. GREEN of Texas (for himself, Mr. MEEKS, and Mr. CLEAVER):

H.R. 6382. A bill to provide assistance for fair housing enforcement activities associated with the COVID-19 pandemic, and for other purposes; to the Committee on Financial Services, and in addition to the Committee on the Judiciary, for a period to be subsequently determined by the Speaker, in each case for consideration of such provisions as fall within the jurisdiction of the committee concerned.

By Ms. CLARKE of New York (for herself, Ms. KELLY of Illinois, Mrs. WATSON COLEMAN, Mr. DAVID SCOTT of Georgia, Ms. LEE of California, Ms. PLASKETT, Ms. FUDGE, Ms. JOHNSON of Texas, Mr. RUSH, Mr. BROWN of Maryland, Ms. PRESSLEY, Mr. DANNY

---

□ This symbol represents the time of day during the House proceedings, e.g., □ 1407 is 2:07 p.m.

Matter set in this typeface indicates words inserted or appended, rather than spoken, by a Member of the House on the floor.



Printed on recycled paper.

tried to impeach the President of the United States for allegedly withholding aid from Ukraine, and now they withhold aid from the American people. Whatever gloss they put on it, we could have finished this up on Sunday, and now we are stretching it out to their political advantage.

I believe that was the allegation against the President: To his political advantage, he was using aid that was to go to the Ukrainians. Now we see two people—again, the Speaker of the House and the Democratic minority leader—both of whom are from States that have been hard-hit; my State of Louisiana and theirs, being New York and California, have been hard-hit—who are using that misery as leverage to their political advantage.

I am sorry to be so worked up, but I have people calling me, asking: Do I have to lay somebody off?

Oh, my gosh. I have lost my job. Will I have unemployment benefits? You say there is a check coming. When will this legislation pass?

I realize it could have been done on Sunday until two people saw an opportunity that was to their political advantage. In their political advantage, they withhold aid from the American people, but they tried to impeach the President for such an allegation against another people.

I hope they answer to the voters. I understand that the people who support them might not be touched by this, but my people are touched by it, and my State is affected by it. As a physician, I don't care where you live in the country, for I feel, as a physician, that we should be doing everything we can for those who are in distress right now and not using it to our political advantage or using it in a way to extract a little bit more—maybe in requiring airlines to do this or that or maybe in sneaking a sweetheart deal in for a friend because we will get that language and have to vote on it 2 hours later.

This is not how our Founding Fathers had imagined. It is, unfortunately, how it has become—not to the benefit of the American people, to the benefit of two people, and I find that outrageous.

I yield the floor.

(Ms. McSALLY assumed the chair.)
(Mr. CASSIDY assumed the chair.)
(Ms. McSALLY assumed the chair.)
(Mr. SASSE assumed the chair.)

The PRESIDING OFFICER (Ms. McSALLY). The majority leader.

Mr. McCONNELL. Madam President, I have an update for the information of all the Senators and for the information of the American people, and it is good news. It is good news for the doctors and nurses in emergency rooms around the country who are waiting for more masks and more funding. It is good news for families all across America. At last we have a deal.

After days of intense discussions, the Senate has reached a bipartisan agreement on a historic relief package for this pandemic. It will rush new resources onto the frontlines of our Nation's healthcare fight, and it will inject trillions of dollars of cash into the economy as fast as possible to help American workers, families, small businesses, and industries make it through this disruption and emerge on the other side ready to soar.

The bipartisan CARES Act will squarely address each of the four big priorities that I laid out in my legislation at the beginning of the process about a week ago. It will rush financial assistance to Americans through direct checks to households from the middle class on down and through a significant and creative expansion of unemployment insurance during this emergency.

It will deliver historic relief to Main Street America through hundreds of billions of dollars in emergency loans so more small businesses can survive this and keep paying their workers.

It will help secure our economic foundations and stabilize key national industries to prevent as many layoffs as possible, while keeping big companies accountable, as both sides have sought to do.

And, of course, it will push major relief to hospitals and healthcare providers, invest in new medicines and vaccines so we can beat this virus faster, and help get more equipment and masks to the frontline heroes who put themselves at risk to care for patients.

In effect, this is a wartime level of investment into our Nation. The men and women of the greatest country on Earth are going to defeat this coronavirus and reclaim our future, and the Senate is going to make sure they have the ammunition they need to do it.

I am thrilled that we are finally going to deliver for the country that has been waiting for us to step up.

I am relieved that my distinguished Democratic colleagues are ready to take yes for an answer. This has been a long week for the Senate, but it has been a much longer week for the hundreds of millions of Americans who find themselves in this strange new reality, where every morning brings new worries about their health, about their loved ones, and about whether their job or their small business will still exist at this time next week.

So, Madam President, help is on the way. The American people are already rising to this grave challenge, and the Senate is about to follow suit. We are going to pass this legislation later today.

The PRESIDING OFFICER. The Democratic leader.

Mr. SCHUMER. Madam President, after 5 days of arduous negotiations, after sleep-deprived nights, and marathon negotiating sessions, we have a bipartisan agreement on the largest rescue package in American history. This is not a moment of celebration but one of necessity. We have the anguish of the American people, their wondering about the future of their health, the health of their loved ones, and the economy. It necessitates us to do all we can to help them and help our country.

From the very beginning, the Democrats have had two primary goals: a Marshall Plan for public health workers and hospitals on the frontlines and of putting workers first. The agreement now, after these 5 days, reflects those Democratic priorities, and we are proud that they are now part of this legislation.

Like all compromises, this bill is far from perfect, but we believe the legislation has been improved significantly to warrant its quick consideration and passage. Because many Democrats and Republicans were willing to do the serious and hard work, the bill is much better off than where it started. The Democrats have succeeded in making the bill substantially better on many counts.

Here are four major pillars of the bill.

First, a Marshall Plan for our hospitals and medical needs—there is much more money for our hospitals, for our nurses and physicians, for our nursing homes and our community health centers to do the jobs they need to do, over $130 billion.

Second, workers first—so many people are being put out of work through no fault of their own. They don't know what their futures are going to be like. How are they going to pay the bills? Well, we come to their rescue, and the most significant part of that is something we are proud to have devised. We call it unemployment compensation on steroids. All American workers who are laid off will have their salaries remunerated by the Federal Government so they can pay their bills. Because so many of them will be furloughed rather than fired, if they have benefits, they will continue, and—extremely important—they stay with the company or small business. That means that company or small business can reassemble once this awful plague is over, and our economy can get going quickly.

Third, strict oversight, transparency, and accountability of all loans made to corporate America—we need oversight. We need transparency. Every loan document will be public and be made available to Congress very quickly so we can see where the money is going, what the terms are, and if it is fair to the American people. There will be an oversight board, as well as an IG, to make sure things are done on the level.

Fourth, real resources for our State and local governments—that was one of the last decisions we had to make. There is $150 billion that will go to States and localities that are so hard-pressed because of all the new expenses that COVID-19 puts upon them, and because they are not getting the resources they usually get, taxes will be delayed until June.

Finally, there is real, real help for small businesses. My dad was a small

EXHIBIT 21

# Congressional Record Extensions of Remarks Articles | Congress.gov

🇺🇸 **congress.gov**/congressional-record/2020/3/31/extensions-of-remarks-section/article/e339-1

## March 31, 2020 - Issue: Vol. 166, No. 63 — Daily Edition 116th Congress (2019 - 2020) - 2nd Session

Entire Issue (PDF)Browse By Date

All in Extensions of Remarks section

## MIDDLE CLASS HEALTH BENEFITS TAX REPEAL ACT OF 2019; Congressional Record Vol. 166, No. 63
## (Extensions of Remarks - March 31, 2020)

## Text available as:

- TXT
- PDF
- View TXT in new window

Formatting necessary for an accurate reading of this text may be shown by tags (e.g., <DELETED> or <BOLD>) or may be missing from this TXT display. For complete and accurate display of this text, see the PDF.

[Extensions of Remarks]
[Pages E339-E341]
From the Congressional Record Online through the Government Publishing Office [www.gpo.gov]

MIDDLE CLASS HEALTH BENEFITS TAX REPEAL ACT OF 2019

_____

speech of

HON. PRAMILA JAYAPAL

of washington

in the house of representatives

Friday, March 27, 2020

Ms. JAYAPAL. Mr. Speaker, I rise in support of <u>H.R. 748</u>, the Coronavirus Aid, Relief, and Economic Security (CARES) Act. On Thursday, the United States gained the unfortunate distinction of being the country with the largest number of known COVID-19 cases in the world. As people across the country struggle to stem the COVID-19 pandemic, this bill is an urgently needed $2 trillion disaster-relief package that delivers immediate support to individuals, families, and small businesses across the country, while also providing worker-centered relief for some industries.

My home state of Washington has been reeling from the spread of COVID-19, with over 3,200 cases and 147 deaths as of last night. I am so proud that we have one of the finest public health systems in the country, but it is under siege--as are our healthcare institutions, our economy, and my constituents. I have been focusing my efforts wholly and completely on ensuring that we in Congress do everything in our power to deliver a response from the Federal government that matches the enormous scale of this crisis.

This bill is an important step in that direction, though we will certainly need to do even more. The CARES Act puts $100 billion into ensuring hospitals and healthcare providers can cover COVID-19-related costs and $200 million to prevent the spread of COVID-19 in nursing homes. Importantly, after years of disinvestment in the Strategic National Stockpile, the CARES Act adds $16 billion to the Stockpile to provide essential personal protective equipment for our frontline workers and emergency responders.

This bill also includes a critical priority for me: the largest expansion of unemployment insurance in decades to ensure that most workers get nearly 100 percent of their pre-layoff wage without traditional restrictions. It also creates a special Pandemic Unemployment Assistance program to provide relief to those who may be ineligible for regular unemployment benefits, like gig workers and people who are self-employed.

Because people are suffering right now, I believe we must include direct cash support to individuals. I had advocated for double the amount that is in the bill, for monthly instead of a one-time payment, and for everyone to be included. We were not able to get that. However, the CARES Act delivers $1,200 per adult and $500 per child in cash relief to the vast majority of everyday people to immediately help put cash in people's pockets to pay those mounting bills.

[[<u>Page E340</u>]]

To keep people in their homes, the bill provides $3 billion in rental assistance. It enacts a 120-day moratorium on evictions for properties receiving federal assistance as well as a 60-day foreclosure moratorium on federally backed mortgages and up to 180 days of forbearance. The bill also includes crucial funding to the Emergency Services Grant to ensure we are providing care to people experiencing homelessness.

However, we still need a real response to the surge of homelessness in this time of crisis. My Housing is a Human Right Act, introduced last week, puts important measures on the table to ensure that we address homelessness in the short and longer-term.

One of the most important things I heard from my district was the pain and suffering of small business owners and non-profits of all sizes. The CARES Act creates a Payment Protection Program that helps businesses keep workers on payroll, through $350 billion in forgivable loans that can also be used for payroll, rent, utilities, and other necessary costs that will help small businesses weather the crisis. Small businesses will also have some opportunity to receive direct grants of $10,000 as an emergency bridge loan. The bill creates safeguards to protect against employers gaming the program. It also recognizes that some employers will be forced to do temporary furloughs, but then bring their employees back on. This is a pro-worker provision that will incentivize employers to avoid layoffs. It is crucial that we in Congress ensure that these loans are carefully managed and scrutinized to prevent predatory lenders from taking advantage of desperate times to force unfair or exploitative loan terms on small businesses, and to prevent bundling or repackaging in ways that would create expanded economic inequality or lead to the unstable market conditions that caused the last major recession.

On education, the bill invests over $30 billion for states, school districts, and institutions of higher education to help alleviate the challenges educators, students, and families are struggling with in light of school and childcare center closures. This is especially acute for students with disabilities, English language learners, and students experiencing homelessness. However, as state budgets decline due to the pandemic response, it will be critical for Congress to step in and ensure equity for our nation's students. Specifically, Congress must take further steps to address the ``homework gap'' and ensure the tens of millions of students at home have the technology they need to ensure they do not fall behind.

The CARES Act also helps borrowers facing insurmountable student loan payments during the pandemic. It suspends payments for all federally-held student loans through September 30, 2020, during which time interest will not accrue, and borrowers will continue to receive credit toward Public Service Loan Forgiveness, Income-Driven Repayment forgiveness, and loan rehabilitation. It also prohibits forced collections such as garnishment of wages, tax refunds, and Social Security benefits, and negative credit reporting during this time period. While the bill does require the Education Secretary to keep borrowers apprised of when normal payments will resume after the pandemic ends, Congress will need to exert strong oversight over servicers and Department of Education to ensure that students aren't penalized for taking advantage of this program. I am disappointed that millions of borrowers holding over $300 billion in private student loans, federal Perkins loans, and commercially held federal student loans are left out of the relief this bill provides. There is no doubt that Congress must take significant additional steps to expand student debt relief during this pandemic to avoid another crisis that followed

the last financial meltdown. Adopting pieces of my College for All Act
and, at a minimum, cancelling student loan debt for the duration of
this crisis would not only provide enormous relief and avoid fiscal
cliffs for student loan borrowers, it would also contribute to
stimulating the economy as we move into recovery. I will be pushing for
this in the next package.

  It is critically important that we immediately address the unique
funding delays that Native American tribes have faced in the COVID-19
response and supports chronically underfunded programs in the Indian
Health Service. I'm proud that this bill begins to do that. It ensures
Native American Tribes, Tribally owned businesses and Native American
owned business have equal access to federal COVID-19 economic recovery
resources by establishing an $8 billion Tribal Coronavirus Relief fund
and ensuring parity in access to other crucial programs to help Native
American communities across the country.
  There is no question that this bill is not perfect. There are many
things in our Democratic House bill that reflect the urgency and scale
of the crisis that did not make it into this bill. There are also
things in the bill that Republicans insisted on--such as a $500 billion
``slush fund'' for the Treasury Secretary--that allow for giant
corporations to get enormous amounts of taxpayer dollars with little
oversight or accountability. We must immediately work to strengthen
those accountability provisions and ensure that there is real authority
for the Oversight Panel that was established as a last-minute
concession to Republicans. We should use the kinds of worker-centered
conditions that we were able to include in the provisions on airline
industry assistance as a model: ensuring that funds go to support the
payroll and benefits of employees, prohibiting stock buybacks and
dividends, as well as real limitations on executive compensation for
corporations that receive taxpayer assistance. That will ensure that
corporations and CEOs are not getting blank checks while millions of
people remain unemployed, without paid leave or health care during this
crisis and the subsequent recovery period.
  Nor is this package sufficient. Unfortunately, the scale of this
crisis is enormous and we are only beginning to see the devastation it
will wreak on our families, communities, and economy. I will
immediately begin drafting priorities for the next package. These will
include: more money for states and localities, our health care system,
and a strong and robust safety net that includes everyone. We must
ensure health care--from testing to treatment to recovery--for everyone
without costs. We have to immediately fix the fact that too many
immigrants--including those who are working right now to guarantee food
is put into food banks and on tables across the country--are excluded
from any relief we have passed, simply because they are undocumented,
DACA and TPS recipients, or legal permanent residents who have been
here for less than five years. This is immoral. COVID-19 does not
discriminate based on country of origin or immigration status and our
relief packages cannot discriminate either.
  Our next package must include strong protections against price-
gouging, including a specific mandate that the Federal Trade Commission

prioritize and proactively prosecute cases of COVID-related price gouging, and safeguards to prevent large corporate mergers from taking place while oversight bodies are distracted by this pandemic. And all federal agencies must temporarily halt all rulemaking that is unrelated to COVID-19 as our states and municipalities struggle to respond to urgent community needs.

  In addition, we must ensure that robust paid leave provisions apply to all workers in this time of crisis, including at companies that employ 500 or more workers. These large companies are best situated to implement leave policies that will be most impactful in preventing the spread of COVID. It is vitally important that they play their part during this pandemic and meet, at minimum, the paid leave standards we laid out in our second relief package for small businesses. We also must protect seniors and people with disabilities who rely on homecare and direct care workers to live independently by continuing to add Medicaid FMAP increases that specifically allow for higher wages, paid leave, and safety equipment for this crucial workforce. In this time when so many working parents are struggling to both care for children and work, we must also ensure that the childcare providers funded through Childcare Development Block Grants are paid living wages and have access to paid leave. Further, large on-demand companies that benefit from the labor of low-wage workers, but classify those workers as independent contractors, must pay their fair share and put money into the unemployment insurance state system.

  Our next package must immediately enact strong OSHA emergency standards to protect our frontline health care workers. This was stripped out by Republicans and that is unconscionable. Failure to include these protections will devastate our frontline workers in health care and other critical functions that we need to keep our communities functioning even during Stay Home orders. As our nation depends on health care workers and other essential employees to help and protect all of us from the spread of COVID-19, the very least we can do is require employers to take the necessary steps to mitigate hazards that jeopardize worker safety and health.

  Finally, we must also protect the health and safety of people in the criminal justice and immigration detention systems. These people are dependent on the government for everything; and it is incumbent on us to ensure their safety. People should not have to go on hunger strike to get soap simply so they can follow public health guidance and wash their hands--one of the most basic protections to guard against the spread of COVID-19. These jails, prisons, and detention centers are so crowded, it is nearly impossible to practice social distancing in congregate settings. We must immediately take basic steps to reduce the risk of what would be a catastrophic outbreak in institutional settings. First, we must release as many people as we can, starting with those who are most vulnerable to contracting COVID-19, such as people who are age 50 and over and people with medical conditions. The criminal justice and immigration

[[Page E341]]

detention systems have a broad menu of alternatives to detention to facilitate release--we have a duty to use them. Second, for those who remain in custody, these facilities must do the essential work to prevent the spread of COVID-19 in close consultation with public health officials.

  I am proud of House Democrats who fought very hard to include many of these protections and issues in our House bill. It is unfortunate that Republicans fought us on so much. However, at the end of the day, this is still a bold, bipartisan, and urgently necessary bill to deliver critically timed relief to individuals, families, businesses, and communities across the country who are suffering and I am proud to cast my vote for its passage. This is a crisis of epic proportions and we must continue to do everything we can to respond with the scale sufficient to address the suffering of people across our country. I am also proud to represent a district and a state that has responded with so much compassion, caring, and commitment, and I will continue to fight for all my constituents as we weather this together.

_____

All in Extensions of Remarks section

# EXHIBIT 41

# Congressional Record Senate Articles | Congress.gov

congress.gov/congressional-record/2020/3/23/senate-section/article/s1929-1

## March 23, 2020 - Issue: Vol. 166, No. 57 — Daily Edition 116th Congress (2019 - 2020) - 2nd Session

Entire Issue (PDF)Browse By Date

All in Senate section

## MIDDLE CLASS HEALTH BENEFITS TAX REPEAL ACT OF 2019--Motion to Proceed; Congressional Record Vol. 166, No. 57 (Senate - March 23, 2020)

## Text available as:

- TXT
- PDF
- View TXT in new window

Formatting necessary for an accurate reading of this text may be shown by tags (e.g., <DELETED> or <BOLD>) or may be missing from this TXT display. For complete and accurate display of this text, see the PDF.

[Pages S1929-S1969]
From the Congressional Record Online through the Government Publishing Office [www.gpo.gov]


  MIDDLE CLASS HEALTH BENEFITS TAX REPEAL ACT OF 2019--Motion to Proceed

  The PRESIDING OFFICER. Under the previous order, the Senate will resume consideration of the motion to proceed to H.R. 748, which the clerk will report.
  The bill clerk read as follows:

    Motion to proceed to Calendar No. 157, H.R. 748, a bill to amend the Internal Revenue Code of 1986 to repeal the excise tax on high cost employer-sponsored health coverage.

  The PRESIDING OFFICER. The majority leader.
  Mr. McCONNELL. Mr. President, for the information of our colleagues on both sides, as a result of this procedural obstruction, let me explain where we are.

By refusal to allow us to take this first step, which would have still given them plenty of time to negotiate, we have put the Senate in the following position: If any 1 of the 100 of us chooses to object, we can't deal with this until Friday or Saturday at the earliest. If any 1 of the 100 of us objects to some of the procedural hurdles we have to overcome as a result of this mindless obstruction--absolutely mindless obstruction going on on the other side, while the public is waiting for us to act, while people are losing their jobs, losing their income, and shutting down the economy, which we have had to do to deal with this public health crisis, they are fiddling around with Senate procedure that could, if 1 Senator objected, take us all the way to the end of the week to solve this problem.

I am beginning to think our Democratic colleagues don't understand the procedure in the Senate. I am not sure you understand the position your leader has put you in. He loses nothing--nothing--in terms of negotiating leverage by letting us get through these procedural hoops sooner rather than later--sooner rather than later.

The American people have had enough of this nonsense. They wonder where we are. They are looking to us to solve this problem.

The Secretary of the Treasury keeps going into the Democratic leader's office, and the list keeps getting longer and longer and longer. The bazaar is apparently open on the other side. Never let a crisis go to waste, one former President's Chief of Staff famously said.

So, look, I hope my colleagues will come out here and express themselves in the course of the afternoon. The American people would like to hear from us. They would like to know what is going on here. So let's tell them.

I yield the floor.

Mr. SASSE. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. LANKFORD. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. LANKFORD. Mr. President, we are at an odd spot right now not just as a Senate but as a nation. We have millions of people who are gathered in their own homes, trying to figure out what is going to happen next, waiting for a virus to die down. We have people in a hospital who are afraid because there is no tested treatment yet. We have firefighters; we have law enforcement; we have hospital workers all with not enough personal protection equipment because they do not know who is a citizen without the virus and who is a citizen with the virus.

The most basic elements of decision making of how you take care of your neighbor have become a distraction across the country as Americans have become afraid of a stranger and of a friend. This is a huge shift in where we are as a country. What this demands is immediate action. Three weeks ago, the Senate and the House passed $8.3 billion, and we did it with an overwhelming bipartisan support, to add additional funding for diagnostics, for testing, and for rapid work on a vaccine.

All of that work is advancing quickly. We have human trials on a
vaccine happening right now because we came together, and there weren't
extra things added to it. We focused in on the problem, which is the
virus.

   This body has a lot of things we disagree on, there is no question.
There are lots of moments to debate the things we disagree on, but this
is a time we need to focus in on what is the problem, and the problem
is dealing with COVID-19. There was a bipartisan bill that was put
together in the Senate.

   A week ago today, Senator Schumer released a 10-page list of--here
are the things the Democrats would like from the Senate. It was a 10-
page, very detailed list. Twenty-eight of those items on that list are
included in this bipartisan bill--28 items from it, of that 10-page
list of items. So much of that list that was released a week ago is
included in this bipartisan bill.

   Republican chairmen and Democratic ranking members of the committees
of jurisdiction met and talked about this. The chairman and the ranking
member of Appropriations worked together on an appropriations package
for a quarter of a trillion dollars on just that one section that they
worked on together to get resolution. Put all of those items together,
and let me tell you what I mean by that: $250 billion dealing with
things as distant to believe as things like getting Peace Corps
volunteers back home, away from where they are now. We have to get them
back home and away from harm's way. There is funding in there for that
as well as $88 billion for hospitals, trying to help them through this;
help for nursing homes; help for individual firefighters and their
departments; $10 billion for community development block grants to help
cities as they are rapidly trying to work through this process--$250
billion allocated just to things like that to help people get testing,
personal equipment, travel and additional expenses, teleworking
capabilities that have to be done for cities and communities and
Federal entities. All of those things were put together and agreed
upon.

   There is a lot of work on the medical side, rightfully so. Testing
makes a world of difference on this. Getting access to a vaccine--there
are billions of dollars in that particular area. All of that is
included in this proposal.

   In addition to that, there are direct payments that we had agreed
upon to send out, literally, to every American. We had set up $1,200
for every American to receive. That is a stopgap method to help folks
who are having trouble with their utilities or whatever it may be, or
extra expenses so they will have something.

   It was not just that for the individuals. It was also unemployment
insurance. This is something the Republicans and Democrats had worked
on together, to do a plus-up of unemployment insurance because we have
millions of people suddenly unemployed with no advanced warning at all.

   There is a significant increase of unemployment insurance that is
built

[[Page S1930]]

into this, about $250 billion additional that is put into that amount.
Small businesses--the goal is not to have people on unemployment; the
goal is to have people employed. A very creative thing was built into
this that I happen to be a part of in the design, and that was small
businesses--a business with 500 or fewer employees--could actually
apply for a rapid loan. That loan would be given to them quickly. If
they used it for payroll, it would be forgiven entirely. If they used
it for their lease, it would be forgiven entirely. The goal was to not
have small business go out of business and to keep employees currently
connected to their company, not to put them out on unemployment but to
keep them employed so they have the same system. So when we get through
this virus, which we hope we do soon--they still have the same job,
they are not on unemployment and later looking for a job. They are able
to keep their same job. We thought that was very significant. It is a
brandnew strategy for how to do this. It is a much better idea than
just pushing people on unemployment--although, we do have great aid for
unemployment. That program is $350 billion.

  As I have already laid out: healthcare, hospital, first responders--
that is the first piece of this--working on testing, vaccines. The
second piece is direct payments to individuals, direct payments for
unemployment insurance, and then assistance for small businesses to
stay in business and help their employees stay connected to their
business, and then, on top of that, loans for the largest businesses in
America. It is not a bailout--loans for the largest businesses in
America.

  My Democratic colleagues keep saying over and over again that this is
a bailout for the biggest companies. It is loans for the largest
companies because--you know what--they employ a lot of people, and we
would like those businesses to also stay in business.


  All of that seemed to be going well and negotiating well until the
last 36 hours when it suddenly blows up. Here is what I heard first: It
is not enough. It is $2 trillion. It is $2 trillion. It is suddenly:
Well, it is not enough. We need to plus this up to be even bigger.

  And then suddenly it has become this whole transition into the most
random of things: Well, if a corporation gets a loan from the Federal
Government, then someone here in Washington, DC, should determine how
that corporation is run. We should have a member on their board or a
union representative on their board. We should have some kind of stake
in their board to do that. This was my favorite one. We should be able
to tell the board, if they are considering layoffs, someone here in DC
should be able to go to the company, evaluate the rest of their
portfolio and tell them other ways they can do their business besides
laying people off. Are you kidding me? We are now going to create a
whole new Federal bureaucracy that goes to every company, and if they
take out a loan in this program, they are able to tell them how to
manage the day-to-day operations of their company.

  There was a requirement that every company had to do a $15 minimum
wage for their company. There was a requirement they couldn't do stock
buybacks. By the way, I have no problem with prohibiting the use of
these loan dollars to use for stock buybacks, but that is not the

concept. The concept was for the next 10 years, you can't ever do stock buybacks on anything, regardless if it is with these loan funds.

It became this bizarre shift into--oh, we have an opportunity to run every company in America and tell them how to operate, and that became the goal. Then it became--we need to also add solar grants. The latest proposal that just came out today was $600 million for the National Endowment for the Arts and the National Endowment for Humanity--$600 million. It is not connected to anything COVID; it was just that they need a plus-up of an additional $600 million for the National Endowment for the Arts, National Endowment for the Humanities.

The other one was that we need to have a forgiveness of all debt for the post office, ever--all post office debt. That was just released today.

The list is going on and on. My frustration is that I have people at home who are suffering, with small businesses teetering on the edge, about to go out of business, trying to figure out if there is going to be a proposal to come out of the Senate while folks are discussing whether we need to do more solar grants and if we are going to take over corporate boards and require a $15 minimum wage at the end of this.

Can we just deal with COVID-19? Can we just deal with one thing, with COVID-19, to say, Let's help businesses and workers and families who are struggling? That is what I thought we were trying to do with this bill, but now suddenly it seems to be everything but. Let's just do that, and then there is plenty of time to argue about the other issues. We can do those in the future. We will have the debate on solar panels, I promise, but let's deal with COVID-19 and the families and individuals who are struggling and stop holding everything up, trying to add one more thing in to say: It is a really big bill. I am going to try to get my one piece.

One thing we worked on in a bipartisan way--Senator Coons and I--was this one area of not-for-profits. The not-for-profits are part of our social safety net. Our communities are put together by our families, and the people who walk alongside our families are local nonprofits. When those can't meet the needs, then government steps in to meet the needs. Our nonprofits are teetering on the edge right now. This bill allows the nonprofits to be a part of this whole focus on small businesses being able to get a loan and sustain their personnel. It also allows individuals who want to donate to local nonprofits to write that off as an incentive for folks to be more engaged in that. This is a reasonable proposal on how to help. It is a bipartisan solution that Senator Coons and I have, but we can't get to it and vote on it because we being held up by some bizarre new thing that is thrown in every couple of hours that is unrelated to COVID-19 or the perpetual statement of: It is only $2 trillion. It is not enough.

This government is not even set up to distribute $2 trillion. Let's get this out the door. Let's get something started, and let's keep the battle going for the other things. But for the sake of our nonprofits, for the sake of our small businesses, for the sake of people who want to stay employed, the people who are small business and restaurant owners and coffee shop owners and retailers--for the sake of them, why

do we not just go ahead and get this vote on and stop delaying it, trying to add one more special interest something into it?

I move that we get going and get this done. I encourage my colleagues on the other side to stop trying to renegotiate everything we have already negotiated and to stop adding one more thing. Let's make the one more thing a vote.

With that, I yield the floor.

The PRESIDING OFFICER. The Senator from North Dakota.

Mr. HOEVEN. Mr. President, earlier, I was on the floor and talked about how important it is--along with my fellow colleagues--that we move this bill and get it done now. I mean, it is very important that we get it done now. We talked about a lot of different things, but one of the points I wanted to make--I work with it so much, as do some of my colleagues who are going to join me here--is making sure we are also addressing rural America: our farmers, our ranchers, agriculture, rural America. That is the food supply everyone depends on every single day. It is so critically important all the time but particularly at a time like this when we are faced with a pandemic that we keep that food supply working and moving--the whole food chain--all the way from the farmer and rancher, all the way up to the consumer.

As a result of what our farmers and ranchers do, every single American benefits from the lowest cost, highest quality food supply in the history of the world, and they can count on it. They can count on it.

As we pass this phase 3 bill, which is now, I think, about $1.8 trillion, we cannot leave the farmers and ranchers of America out of the bill. It is that simple. Every single American depends on them every single day--and not just Americans but people around the globe. It is so important that we include agriculture in this bill. That is what we have worked to do. We have worked to make sure there is a provision in there so whether it is our cattle producers or whether it is our farmers raising crops

[[Page S1931]]

across this great Nation, they can continue to do what they do every day on behalf of all Americans.

I talked about that a little bit earlier, but some of my colleagues want to join in, emphasizing how critically important it is that our farmers and ranchers and rural America are part of this legislation. You see on television the cities every day and what is going on in the cities.

In New York or San Francisco or wherever it may be, we get it. There are a lot of people there, and they are close together. It is a huge challenge.

Yet the food, the sustenance--the food, fuel, and fiber--they get every day comes from the heartland. It comes from the rural areas. It doesn't just come from the grocery store. It comes from rural America, and we have to be there for them and keep them going so that they can supply people across this Nation in communities large and small.

I would like to turn to my good friend, the Senator from the State of

GZJ KDKV'64''''



# Congressional Record

**United States of America**

**PROCEEDINGS AND DEBATES OF THE** *116th* **CONGRESS, SECOND SESSION**

---

*Vol. 166*     WASHINGTON, MONDAY, MARCH 23, 2020     *No. 57*

# House of Representatives

The House met at 11:30 a.m. and was called to order by the Speaker pro tempore (Mr. Trone).

## DESIGNATION OF THE SPEAKER PRO TEMPORE

The SPEAKER pro tempore laid before the House the following communication from the Speaker:

Washington, DC,
*March 23, 2020.*

I hereby appoint the Honorable David J. Trone to act as Speaker pro tempore on this day.

Nancy Pelosi,
*Speaker of the House of Representatives.*

## PRAYER

Reverend Michael Wilker, Lutheran Church of the Reformation, Washington, D.C., offered the following prayer:

God our shepherd, You provide all we need: green pasture, safe waters, and protected paths. Even though we move through the valley of the shadow of death, we shall fear no evil, You are with us, You protect and comfort us.

Thank You for the shepherds among us, especially for healthcare workers whose care for others puts them at risk. Grant them wisdom, clarity and rest.

When our anxiety about disease turns into fear of our neighbors, forgive us. When fear constricts our hearts and compassion dries up, renew us. When exhaustion and scarcity cloud our judgment, lead us.

Encourage us to protect those most vulnerable, especially those who are sick, isolated, imprisoned, unemployed, or without shelter.

Shepherd the House of Representatives. Guide the Members along right pathways. Always alert to the reality of the threats facing us, give our leaders calm assurance and abiding trust in You.

Amen.

## THE JOURNAL

The SPEAKER pro tempore. Pursuant to section 7(a) of House Resolution 891, the Journal of the last day's proceedings is approved.

## PLEDGE OF ALLEGIANCE

The SPEAKER pro tempore. The Chair will lead the House in the Pledge of Allegiance.

The SPEAKER pro tempore led the Pledge of Allegiance as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

## ANNOUNCEMENT BY THE SPEAKER PRO TEMPORE

The SPEAKER pro tempore. Pursuant to clause 4 of rule I, the following enrolled bill was signed by Speaker pro tempore Brown of Maryland on Friday, March 20, 2020:

S. 3503, a bill to authorize the Secretary of Veterans Affairs to treat certain programs of education converted to distance learning by reason of emergencies and health-related situations in the same manner as programs of education pursued at educational institutions, and for other purposes.

## RECESS

The SPEAKER pro tempore. Pursuant to clause 12(a) of rule I, the Chair declares the House in recess subject to the call of the Chair.

Accordingly (at 11 o'clock and 33 minutes a.m.), the House stood in recess.

□ 2015

## AFTER RECESS

The recess having expired, the House was called to order by the Speaker pro tempore (Mr. Trone) at 8 o'clock and 15 minutes p.m.

## SENATE ENROLLED BILL SIGNED

The Speaker pro tempore, Mr. Brown of Maryland, on Friday, March 20, 2020, announced his signature to an enrolled bill of the Senate of the following title:

S. 3503.—A bill to authorize the Secretary of Veterans Affairs to treat certain programs of education converted to distance learning by reason of emergencies and health-related situations in the same manner as programs of education pursued at educational institutions, and for other purposes.

## BILLS PRESENTED TO THE PRESIDENT

Cheryl L. Johnson, Clerk of the House, reported that on March 9, 2020, she presented to the President of the United States, for his approval, the following bills:

H.R. 5214. To amend title 5, United States Code, to prevent fraud by representative payees.

H.R. 5671. To award a Congressional Gold Medal, collectively, to the United States Merchant Mariners of World War II, in recognition of their dedicated and vital service during World War II.

Cheryl L. Johnson, Clerk of the House, further reported that on March 16, 2020, she presented to the President of the United States, for his approval, the following bills:

H.R. 1365. To make technical corrections to the Guam World War II Loyalty Recognition Act.

H.R. 4334. To amend the Older Americans Act of 1965 to authorize appropriations for fiscal years 2020 through 2024. and for other purposes.

H.R. 4803. To facilitate the automatic acquisition of citizenship for lawful permanent resident children of military and Federal

---

□ This symbol represents the time of day during the House proceedings, e.g., □ 1407 is 2:07 p.m.

Matter set in this typeface indicates words inserted or appended, rather than spoken, by a Member of the House on the floor.


Printed on recycled paper.

logistics so that when parts are found or equipment is found in one area, it can be coordinated to get to an area where it is needed—not so much because we always have all the supplies that we need available right now but because we want the supplies that we do have to get to where they are needed as quickly as possible. That is in operation today.

Now, there are other pieces to this that are also really important. One of the reasons you have seen the frustration on the Republican side of this discussion is that there are men and women right now who don't have a paycheck coming in; they have been laid off through no fault of their own. They are being laid off because of COVID–19 and because their businesses have been asked—or in some cases, directed—to close. And when that happens, we feel an obligation to try to at least allow them the opportunity to make it through the next few months, to get ready for the recovery that we are convinced can happen if we properly manage the emergency before us.

I would like to just go through them briefly so that after an entire day of discussion, there is at least an understanding of what is in the bill today just for men and women who are hurting today.

On a per-person basis, we are offering about $250 billion in additional resources. For a child, there is $500 for every child in a family, but that is on top of $1,200 for a mother and a father. What we are suggesting with that is, it doesn't mean that you have to have made that much. This is a refundable tax credit, and it is available to individuals regardless of if they even made that much or paid taxes on that in the last couple of years.

This is really important because this is an immediate, upfront payment from the Internal Revenue Service, the IRS, back to individuals. And the sooner we pass this legislation, the sooner those dollars can get out to people who, right now, are hurting, and they need this additional assistance at this time, not a month and a half or 2 months from now, but as soon as we can get it to them.

Additionally, we have an unemployment proposal that increases the amount of money that goes into the unemployment funds in the amount of about $250 billion as well.

How does that break out and what does that mean to an individual? If an individual is on unemployment today, what we are offering, besides what they are getting from the State is, first of all, first dollar coverage with no 1-week wait period. Second of all, we are adding an additional $600 per week—per week—for the first 9 weeks that they are eligible for.

Now, that doesn't mean that unemployment stops at that point, but there is $600 additional during that 9-week period of time. This is very important for individuals who have no place else to go and have already been laid off of work because we have told those businesses that they have to shut down.

Another piece of this product right now I think is an excellent piece, one that not only offers emotional support for men and women who are struggling, but it also shares through small businesses an amount—about $350 billion—that goes to small businesses, businesses that are under—that are under—500 employees in size. When we define an employee, we are talking about an FTE or full-time equivalent of 40 hours. So if you have two half-times, you have one FTE.

But what we have offered to small businesses in this is a very simple loan and loan forgiveness program for which they can go down to their local lender and apply. The local lender is the person who puts the papers together and so forth, but what it allows them to do is to go down and say: Look, I have just been told that my business is shut down. I don't want to lose my employees. What they can do is borrow the money to continue to pay the payroll and benefits for those individuals they would be laying off otherwise. And if they keep them on for a period of up to 8 weeks, we forgive the loan. It becomes a grant. But the reason for that is if we don't do that, those same individuals are going to be on the unemployment rolls, so why make them go through that emotional distress and why have them in such a position that they may not get the benefits back that the small business is offering today.

We have done something else as well. We have said for that small business owner: We know many of you have mortgages; you have ongoing payments. So we will also let you include your mortgage payments, as well, and your ongoing rent, lights, and so forth. And if you keep open, you can also apply to have that part forgiven, as well, up to a grand total of $10 million per business. Why? Because we want stability in the marketplace, and we think that is what a lot of employees want.

We would like to have that out this week. That is one of the reasons you see the frustrations and the irritation on the Republican side of the aisle here—because we really thought we were negotiating on these items in good faith with Members of the other side in working groups that had both included in such a fashion that we could move through this fairly quickly. In fact, I think you have heard Members on the other side of the aisle talk about the fact that they are not disagreeing with those things.

There is another part too. There are the larger businesses, over 500 in size. When we have businesses that are bigger than 500 in size, what we have said is: Look, we are not going to give you a grant program. We are not going to be in the position of bailing you out. But what we do want to do is to make liquidity and loans available to you—loans that you can afford.

We are going to ask for some conditions on that, yes, but the idea here is to allow them to survive and to be ready to go back into business.

This seems to be the place where we have the most dissension and disagreement between the two parties because, while we are proposing that they can't use this to buy stock back, I think some of our Democratic colleagues thought we had to strengthen it. Fine. That shouldn't take 2 days to work out. They think we should have some more guidelines. Fine. But that shouldn't take 2 days to work out.

The goal here is to keep as many people employed and to keep those businesses operational so that as we move through this health emergency, those businesses continue to do business in the future.

There is a larger portion in this that we also talk about, which is for the airlines and so forth. We have a frustration, as well, with our Democratic colleagues because of some of the suggestions that have been made. We don't think they should have to remake their board of directors if they are going to get a loan.

We think the airlines are critical—not just to save the airlines but because business relies on airlines and people rely on airlines now to get from one place to another throughout the United States.

We have also included about $17 billion to take care of those separate industries on which we have national defense-specific issues. We think this has been well thought out.

It doesn't mean that there isn't room for more negotiations, but time is of the essence. As we sit here this evening, more people will die; more people will get sick; more men and women will find themselves wondering where they are going to get their next paycheck. Every single day matters.

So our request to the Members on the other side of the aisle, who have twice now said "No, we don't want to take the first procedural step to get onto the bill," what we say is: Look, you have to push hard on your leadership to come to a consensus. And, please, this is emergency legislation. This should not be a Christmas tree. It should not be a piece of legislation that, since it needs to pass, we can now put a wish list of other things that one party or the other has been trying to get into law but does not have consensus on. This is where the areas of contention are this evening.

So to the men and women who are out there and are concerned, I can share with you that I think we have a very good plan, one that will come close to $1.9 trillion dollars in terms of what we are offering. But at the same time, it needs to get out as quickly as possible, and it has to be as simple as possible for those men and women to be able to apply for in an unemployment line or the businesses to apply through a local bank so that they can keep people employed or for that larger business to understand that liquidity is

# EXHIBIT 43



# Act by Wednesday for chance to get quicker Economic Impact Payment; timeline for payments continues to accelerate

IR-2020-92, May 8, 2020

WASHINGTON – With a variety of steps underway to speed Economic Impact Payments, the Treasury Department and the Internal Revenue Service urged people to use Get My Payment by noon Wednesday, May 13, for a chance to get a quicker delivery.

The IRS, working in partnership with Treasury Department and the Bureau of Fiscal Services (BFS), continues to accelerate work to get Economic Impact Payments to even more people as soon as possible. Approximately 130 million individuals have already received payments worth more than $200 billion in the program's first four weeks.

Starting later this month, the number of paper checks being delivered to taxpayers will sharply increase. For many taxpayers, the last chance to obtain a direct deposit of their Economic Impact Payment rather than receive a paper check is coming soon. People should visit Get My Payment on IRS.gov by noon Wednesday, May 13, to check on their payment status and, when available, provide their direct deposit information.

"We're working hard to get more payments quickly to taxpayers," said IRS Commissioner Chuck Rettig. "We want people to visit Get My Payment before the noon Wednesday deadline so they can provide their direct deposit information. Time is running out for a chance to get these payments several weeks earlier through direct deposit."

After noon Wednesday, the IRS will begin preparing millions of files to send to BFS for paper checks that will begin arriving through late May and into June. Taxpayers who use Get My Payment before that cut-off can still take advantage of entering direct deposit information.

## How Get My Payment works

The Get My Payment tool provides eligible taxpayers with a projected Economic Impact Payment deposit date. The information is updated once daily, usually overnight. There is no need to check more than once a day. Taxpayers who did not choose direct deposit on their last tax return can use this tool to input bank account

information to receive their payment by direct deposit, expediting receipt.

## Non-Filers portal remains available

For those not required to file a federal tax return, the Non-Filers: Enter Payment Info Here tool helps them submit basic information to receive an Economic Impact Payment quickly to their bank account. Developed in partnership between the IRS and the Free File Alliance, this tool provides a free and easy option for those who don't receive Social Security retirement, survivor or disability benefits (SSDI), Railroad Retirement benefits, Supplemental Security Income (SSI) and VA Compensation and Pension (C&P) benefits. The Non-Filers tool is also available in Spanish.

Eligible taxpayers who filed tax returns for 2019 or 2018 will receive the payments automatically. Automatic payments will also be sent to those receiving Social Security retirement, disability benefits, Railroad Retirement benefits, Veterans Affairs benefits or Supplemental Security Income soon.

## Watch out for scams related to Economic Impact Payments

The IRS urges taxpayers to be on the lookout for scams related to the Economic Impact Payments. To use the new app or get information, taxpayers should visit IRS.gov. People should watch out for scams using email, phone calls or texts related to the payments. Be careful and cautious: The IRS will not send unsolicited electronic communications asking people to open attachments, visit a website or share personal or financial information.

## Stay informed with Economic Impact Payment FAQs; Social Media platforms

Taxpayers should check the Frequently Asked Questions (FAQs) for more information.

*Page Last Reviewed or Updated: 08-May-2020*

# EXHIBIT 44

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*

April 2019, NCJ 252156

# Prisoners in 2017

Jennifer Bronson, Ph.D., and E. Ann Carson, Ph.D., *BJS Statisticians*

The United States prison population declined from 1,508,129 at the end of 2016 to 1,489,363 at the end of 2017, a decrease of 1.2%. During the same period, the number of prisoners under the jurisdiction of federal correctional authorities decreased by 6,100 (down 3%), and the number of prisoners under the jurisdiction of state correctional authorities fell by 12,600 (down 1%). The imprisonment rate for sentenced prisoners was the lowest since 1997, at 440 prisoners per 100,000 U.S. residents of all ages and 568 per 100,000 U.S. residents age 18 or older (figure 1). (Counts of sentenced prisoners include those who have received a sentence of more than one year.)

Findings in this report are based on the National Prisoner Statistics (NPS) program, administered by the Bureau of Justice Statistics (BJS). The program collects annual data from state departments of corrections (DOCs) and the Federal Bureau of Prisons (BOP) on prison

**Bulletin**

### FIGURE 1
**Imprisonment rates of sentenced prisoners under the jurisdiction of state or federal correctional authorities, per 100,000 U.S. residents, 1978–2017**



Note: Jurisdiction refers to the legal authority of state or federal correctional officials over a prisoner, regardless of where the prisoner is held. Counts are based on prisoners with a sentence of more than one year. See appendix table 1 for imprisonment rates.
Source: Bureau of Justice Statistics, National Prisoner Statistics, 1978–2017; and U.S. Census Bureau, post-censal resident population estimates for January 1 of the following calendar year.

## HIGHLIGHTS

- The imprisonment rate for sentenced prisoners under state or federal jurisdiction decreased 2.1% from 2016 to 2017 (from 450 to 440 sentenced prisoners per 100,000 U.S. residents) and 13% from 2007 to 2017 (from 506 to 440 per 100,000).

- The number of prisoners under state or federal jurisdiction decreased by 18,700 (down 1.2%), from 1,508,100 at year-end 2016 to 1,489,400 at year-end 2017.

- The federal prison population decreased by 6,100 prisoners from year-end 2016 to year-end 2017 (down 3%), accounting for one-third of the overall change in the U.S. prison population.

- More than half (55%) of state prisoners were serving sentences for violent offenses at year-end 2016, the most recent year for which data are available.

- The number of state or federal prisoners held in private facilities decreased 5% from 2016 to 2017.

- Non-citizens made up roughly the same portion of the U.S. prison population (7.6%) as of the total U.S. population (7.0%, per the U.S. Census Bureau).

- The imprisonment rate of sentenced black adults declined by 4% from 2016 to 2017 and by 31% from 2007 to 2017.

- Nearly half of federal prisoners were serving a sentence for a drug-trafficking offense at fiscal year-end 2017.

- At year-end 2017, the imprisonment rate for sentenced black males (2,336 per 100,000 black male U.S. residents) was almost six times that of sentenced white males (397 per 100,000 white male U.S. residents).

- At year-end 2016, an estimated 60% of Hispanics and blacks sentenced to serve more than one year in state prison had been convicted of and sentenced for a violent offense, compared to 48% of white prisoners.



**TABLE 6 (continued)**
**Imprisonment rates of sentenced prisoners under jurisdiction of state or federal correctional authorities per 100,000 U.S. residents, by jurisdiction and sex, 2016 and 2017**

| Jurisdiction | 2016 | | | | 2017 | | | |
|---|---|---|---|---|---|---|---|---|
| | Total | Male | Female | Total adult[a] | Total | Male | Female | Total adult[a] |
| Virginia | 448 | 835 | 72 | 575 | 437 | 813 | 73 | 560 |
| Washington | 259 | 473 | 45 | 333 | 262 | 477 | 46 | 336 |
| West Virginia | 393 | 697 | 95 | 494 | 392 | 700 | 89 | 492 |
| Wisconsin | 383 | 721 | 48 | 492 | 391 | 732 | 53 | 501 |
| Wyoming | 408 | 703 | 100 | 534 | 429 | 742 | 103 | 560 |

Note: Jurisdiction refers to the legal authority of state or federal correctional officials over a prisoner, regardless of where the prisoner is held. Counts are for December 31 of each year and are based on prisoners with a sentence of more than one year.
[a]Imprisonment rate per 100,000 U.S. residents age 18 or older.
[b]Total and state estimates for 2016 include imputed counts for North Dakota, which did not submit 2016 National Prisoner Statistics (NPS) data. Total and state estimates for 2017 include imputed counts for New Mexico and North Dakota, which did not submit 2017 NPS data. See *Methodology*.
[c]Includes prisoners held in non-secure, privately operated community corrections facilities and juveniles held in contract facilities.
[d]Prisons and jails form one integrated system. Data include total jail and prison populations.
[e]State submitted updated 2016 population counts.
[f]State did not submit 2017 NPS data. Counts were imputed for the calculation of 2017 rates and should not be compared to 2016 rates.
[g]State did not submit 2016 NPS data. Counts were imputed for the calculation of 2016 rates and should not be compared to 2017 rates.
Source: Bureau of Justice Statistics, National Prisoner Statistics, 2016 and 2017; and U.S. Census Bureau, post-censal resident population estimates for January 1 of the following calendar year.

## Prison admissions and releases

### The number of admissions to state and federal prisons was largely unchanged from 2016 to 2017

Federal and state correctional authorities admitted a total of 606,600 prisoners sentenced to more than one year in 2017, including 418,600 new court commitments (table 7). (See *Terms and definitions*.) The 606,600 admissions in 2017 were similar to the number of prison admissions in 2016 (606,000). The BOP admitted almost the same number of prisoners in 2017 as in 2016 (44,700). However, large decreases were observed in admissions to state prisons from 2016 to 2017 in Tennessee (down 1,400 admissions), Illinois (down 1,200), Ohio (down 1,200), and Pennsylvania (down 1,000) while large increases occurred in North Carolina (up 2,200), Oklahoma (up 1,500), Alabama (up 1,400), and California (up 1,300).

Sixty-seven percent of state prisoners and 90% of federal prisoners admitted in 2017 entered prison on new court commitments. Thirty percent of state and 10% of federal prisoners were admitted for post-custody supervision violations. States that admitted more than half of their prisoners for violations of conditions of probation or parole in 2017 were Washington (71%), Idaho (71%), Vermont (65%), Utah (55%), Maine (53%), New Hampshire (50%), and Pennsylvania (50%).

### Correctional authorities released 3,600 fewer prisoners from state and federal prisons in 2017 than in 2016

The total number of prisoners released by state and federal correctional authorities decreased 1% (down 3,600 releases), from 626,000 in 2016 to 622,400 in 2017. The BOP accounted for almost three-quarters (71%) of the total change in that time, releasing 2,600 fewer prisoners in 2017. Indiana (down 2,900 releases), Arkansas (down 1,900), Illinois (down 1,800), and Delaware (down 1,300) had the largest declines in the number of released prisoners from 2016 to 2017. Kentucky (up 2,000 releases), California (up 1,700), Louisiana (up 1,600), and South Dakota (up 1,000) had the largest increases in the number of persons released from their state prison facilities in 2017.

Four states that reported the type of prison release to BJS in 2017 discharged more than half of their prisoners unconditionally. Post-custody community supervision was not required for the majority of released prisoners in Massachusetts (76% of releases were unconditional), Rhode Island (70%), Florida (61%), and New Jersey (57%).

Most releases from the federal prison system were reported as unconditional. The federal parole system was eliminated under the Sentencing Reform Act of 1984, but federal courts were allowed to impose a term of supervised release after imprisonment as part of a sentence. Because this supervised release term was not implemented under the jurisdiction of the federal prison system, the BOP reports prison releases as unconditional even though released prisoners may serve post-custody community supervision.

**TABLE 7**
**Admissions and releases of sentenced prisoners under jurisdiction of state or federal correctional authorities, 2016 and 2017**

| | Admissions[a] | | | | | Releases[b] | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Jurisdiction | 2016 total | 2017 total | Percent change, 2016–2017 | 2017 new court commitments | 2017 conditional supervision violations[c] | 2016 total | 2017 total | Percent change, 2016–2017 | 2017 unconditional[d,e] | 2017 conditional[e,f] |
| U.S. total[g] | 606,000 | 606,571 | 0.1% | 418,579 | 174,210 | 626,019 | 622,377 | -0.6% | 160,596 | 446,785 |
| Federal[e] | 44,682 | 44,708 | 0.1% | 40,180 | 4,527 | 52,035 | 49,461 | -4.9% | 48,457 | 318 |
| State[g] | 561,318 | 561,863 | 0.1% | 378,399 | 169,683 | 573,984 | 572,916 | -0.2% | 112,139 | 446,467 |
| Alabama | 10,749 | 12,170 | 13.2 | 8,045 | 1,624 | 12,711 | 13,624 | 7.2 | 3,130 | 8,808 |
| Alaska[h] | 1,804 | 1,580 | -12.4 | 1,446 | 134 | 2,159 | 1,941 | -10.1 | 460 | 1,476 |
| Arizona | 13,663 | 13,423 | -1.8 | 10,787 | 2,557 | 13,857 | 14,075 | 1.6 | 2,332 | 11,610 |
| Arkansas | 9,911 | 8,971 | -9.5 | 4,623 | 4,348 | 10,370 | 8,443 | -18.6 | 752 | 7,610 |
| California[i] | 35,730 | 37,077 | 3.8 | 32,396 | 4,644 | 34,528 | 36,203 | 4.9 | 98 | 35,576 |
| Colorado | 8,707 | 9,638 | 10.7 | 6,038 | 3,600 | 8,934 | 9,669 | 8.2 | 1,116 | 8,419 |
| Connecticut[h] | 4,747 | 4,401 | -7.3 | 3,658 | 606 | 5,618 | 5,169 | -8.0 | 2,451 | 2,707 |
| Delaware[h,j] | 3,096 | 2,897 | -6.4 | 2,237 | 646 | 4,041 | 2,736 | -32.3 | 310 | 2,272 |
| Florida[k] | 29,038 | 28,189 | -2.9 | 27,423 | 85 | 31,166 | 30,467 | -2.2 | 18,703 | 11,313 |
| Georgia | 17,585 | 16,699 | -5.0 | 14,567 | 2,124 | 15,053 | 15,210 | 1.0 | 6,713 | 8,320 |
| Hawaii[h] | 1,538 | 1,528 | -0.7 | 876 | 652 | 1,666 | 1,834 | 10.1 | 345 | 781 |
| Idaho | 5,766 | 5,747 | -0.3 | 1,671 | 4,076 | 5,479 | 5,395 | -1.5 | 400 | 4,926 |
| Illinois | 25,661 | 24,468 | -4.6 | 16,401 | 8,062 | 28,615 | 26,850 | -6.2 | 3,982 | 22,763 |
| Indiana | 12,600 | 12,249 | -2.8 | 9,240 | 2,888 | 14,561 | 11,708 | -19.6 | 910 | 10,730 |
| Iowa | 5,541 | 5,619 | 1.4 | 3,790 | 1,773 | 5,305 | 5,632 | 6.2 | 1,182 | 4,378 |
| Kansas | 6,442 | 6,453 | 0.2 | 3,865 | 1,276 | 6,394 | 6,406 | 0.2 | 1,690 | 4,685 |
| Kentucky | 20,111 | 21,239 | 5.6 | 12,366 | 8,605 | 18,552 | 20,555 | 10.8 | 4,572 | 15,371 |
| Louisiana | 15,877 | 16,337 | 2.9 | 10,662 | 5,674 | 16,308 | 17,868 | 9.6 | 1,142 | 16,584 |
| Maine | 657 | 960 | 46.1 | 455 | 505 | 647 | 684 | 5.7 | 320 | 354 |
| Maryland[l] | 8,843 | 8,243 | : | 5,823 | 2,415 | 9,459 | 8,850 | : | 2,871 | 5,919 |
| Massachusetts | 2,059 | 2,141 | 4.0 | 1,909 | 223 | 2,458 | 2,309 | -6.1 | 1,745 | 533 |
| Michigan | 12,573 | 12,013 | -4.5 | 6,670 | 2,720 | 14,081 | 13,470 | -4.3 | 557 | 10,486 |
| Minnesota | 8,027 | 8,195 | 2.1 | 4,804 | 3,391 | 8,254 | 8,092 | -2.0 | 956 | 7,125 |
| Mississippi | 7,510 | 7,553 | 0.6 | 5,488 | 2,049 | 7,080 | 7,748 | 9.4 | 444 | 6,963 |
| Missouri | 18,426 | 18,551 | 0.7 | 9,816 | 8,729 | 18,410 | 18,431 | 0.1 | 1,528 | 16,779 |
| Montana | 2,666 | 2,644 | -0.8 | 1,961 | 683 | 2,546 | 2,770 | 8.8 | 261 | 2,492 |
| Nebraska | 2,310 | 2,436 | 5.5 | 1,979 | 445 | 2,366 | 2,387 | 0.9 | 654 | 1,710 |
| Nevada[m] | 6,059 | 5,862 | -3.3 | 4,990 | 794 | 5,778 | 6,548 | 13.3 | 2,401 | 4,100 |
| New Hampshire | 1,538 | 1,338 | -13.0 | 668 | 670 | 1,601 | 1,409 | -12.0 | 82 | 1,320 |
| New Jersey | 8,837 | 8,611 | -2.6 | 6,189 | 2,422 | 9,685 | 8,959 | -7.5 | 5,072 | 3,683 |
| New Mexico[n] | 3,615 | 3,848 | : | 2,461 | 1,387 | 3,631 | 3,631 | : | 989 | 2,626 |
| New York | 21,081 | 20,421 | -3.1 | 12,594 | 7,727 | 22,047 | 21,667 | -1.7 | 2,330 | 19,042 |
| North Carolina | 16,009 | 18,242 | 13.9 | 13,873 | 4,366 | 16,677 | 17,244 | 3.4 | 2,685 | 14,463 |
| North Dakota[o] | 1,590 | 1,570 | : | 904 | 665 | 1,583 | 1,627 | : | 216 | 1,407 |
| Ohio[p] | 22,792 | 21,602 | -5.2 | 16,554 | 4,401 | 22,850 | 22,299 | -2.4 | 8,889 | 13,246 |
| Oklahoma | 8,778 | 10,228 | 16.5 | 7,658 | 2,570 | 10,404 | 9,682 | -6.9 | 2,973 | 6,623 |
| Oregon[q] | 5,020 | 5,566 | : | 3,707 | 1,717 | 4,712 | 5,428 | : | 35 | 5,185 |
| Pennsylvania | 20,326 | 19,297 | -5.1 | 9,116 | 9,128 | 20,418 | 19,673 | -3.6 | 3,151 | 16,321 |
| Rhode Island[h] | 767 | 572 | -25.4 | 482 | 90 | 939 | 875 | -6.8 | 610 | 257 |
| South Carolina | 6,688 | 6,017 | -10.0 | 4,922 | 1,087 | 6,709 | 6,847 | 2.1 | 2,239 | 4,494 |
| South Dakota | 2,891 | 3,896 | 34.8 | 1,507 | 499 | 2,832 | 3,859 | 36.3 | 311 | 2,467 |
| Tennessee | 12,898 | 11,541 | -10.5 | 6,877 | 4,664 | 13,508 | 13,301 | -1.5 | 5,080 | 8,136 |
| Texas | 77,385 | 76,877 | -0.7 | 47,697 | 27,474 | 76,733 | 77,196 | 0.6 | 9,977 | 64,519 |
| Utah | 3,293 | 4,047 | 22.9 | 1,814 | 2,233 | 3,611 | 3,781 | 4.7 | 674 | 3,085 |

*Continued on next page*

**TABLE 7 (continued)**
**Admissions and releases of sentenced prisoners under jurisdiction of state or federal correctional authorities, 2016 and 2017**

| Jurisdiction | Admissions[a] | | | | | Releases[b] | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 total | 2017 total | Percent change, 2016–2017 | 2017 new court commitments | 2017 conditional supervision violations[c] | 2016 total | 2017 total | Percent change, 2016–2017 | 2017 unconditional[d,e] | 2017 conditional[e,f] |
| Vermont[h,o] | 1,715 | 1,737 | 1.3 | 607 | 1,130 | 1,733 | 1,795 | 3.6 | 284 | 1,504 |
| Virginia[r] | 12,163 | 12,163 | 0.0 | 12,030 | 133 | 12,648 | 12,698 | 0.4 | 1,054 | 11,537 |
| Washington[p] | 25,055 | 25,483 | 1.7 | 7,385 | 18,089 | 24,940 | 25,658 | 2.9 | 2,217 | 23,393 |
| West Virginia | 3,584 | 3,590 | 0.2 | 1,991 | 1,372 | 3,543 | 3,652 | 3.1 | 849 | 2,275 |
| Wisconsin | 6,600 | 6,865 | 4.0 | 4,557 | 2,282 | 5,743 | 5,592 | -2.6 | 212 | 5,324 |
| Wyoming | 997 | 1,069 | 7.2 | 820 | 249 | 1,041 | 963 | -7.5 | 185 | 770 |

Note: Jurisdiction refers to the legal authority of state or federal correctional officials over a prisoner, regardless of where the prisoner is held. Counts cover January 1 through December 31 for each year and are based on prisoners admitted to or released from state or federal correctional authorities with a sentence of more than one year.
:Not calculated.
/Not reported.
[a]Excludes transfers, escapes, and those absent without leave. Includes other conditional-release violators, returns from appeal or bond, and other admissions. See *Methodology*.
[b]Excludes transfers, escapes, and those absent without leave. Includes deaths, releases to appeal or bond, and other releases. See *Methodology*.
[c]Includes all conditional-release violators returned to prison from post-custody community supervision, including parole and probation, either for violations of conditions of release or for new crimes.
[d]Includes expirations of sentence, commutations, and other unconditional releases.
[e]Includes prisoners held in non-secure, privately operated community corrections facilities and juveniles held in contract facilities. The Federal Bureau of Prisons reports prison releases as unconditional even though prisoners may serve post-custody community supervision. The 318 conditional releases are persons who were sentenced before the 1984 Sentencing Reform Act that eliminated federal parole.
[f]Includes releases to probation, supervised mandatory releases, and other unspecified conditional releases.
[g]U.S. total and state estimates for 2016 include imputed counts for North Dakota and Oregon, which did not submit 2016 National Prisoner Statistics (NPS) data on admissions or releases. U.S. total and state estimates for 2017 include imputed counts for New Mexico and North Dakota, which did not submit 2017 NPS data on admissions and releases. See *Methodology*.
[h]Prisons and jails form one integrated system. Data include total jail and prison populations.
[i]California reported that 16,887 prisoners were released as transfers in 2016. These prisoners were released from state jurisdiction to post-custody supervision by county authorities. BJS counted these as conditional releases.
[j]Releases include offenders who received a combined sentence of prison and probation of more than one year.
[k]Florida does not report prison admissions for technical violations. All admissions represent new sentences, with the 85 supervision-violation admissions representing persons who committed new crimes while on post-custody community supervision.
[l]Due to implementation concerns with a new information system, Maryland's counts of admissions and releases for 2017 are estimates and should not be compared to earlier years.
[m]Admissions include local jail inmates admitted to the Nevada Department of Corrections due to medical, behavioral, protective, or local staffing issues and persons ordered by judges to serve 6 months or less in prison prior to actual sentencing for felonies.
[n]State did not submit 2017 NPS data on admissions or releases. Total and detailed types of admissions and releases were imputed from counts reported in 2016 and included in U.S. and state totals. All admissions and releases were included in the reported 2016 data, regardless of sentence length. Estimates of admissions and releases in 2017 are not comparable to previous years' data. See *Methodology* and *Jurisdiction notes*.
[o]State did not submit 2016 or 2017 NPS data on admissions or releases. Total and detailed types of admissions and releases were imputed and included in U.S. and state totals. See *Methodology* and *Jurisdiction notes*.
[p]Includes all admissions and releases from state prison, regardless of sentence length. See *Jurisdiction notes*.
[q]State did not submit 2016 NPS data on admissions or releases. Total and detailed types of admissions and releases were imputed and included in U.S. and state totals. Estimates of admissions and releases in 2016 are not comparable to reported 2017 data. See *Methodology* and *Jurisdiction notes*.
[r]Admission and release counts are preliminary estimates for fiscal year 2017. Counts for 2016 have been updated.
Source: Bureau of Justice Statistics, National Prisoner Statistics, 2016 and 2017.