UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COLIN SCHOLL, et al.,

               Plaintiffs,

    v.

STEVEN MNUCHIN, et al.,

               Defendants.

Case No.  20-cv-05309-PJH

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION AND MOTION FOR CLASS CERTIFICATION**

Re: Dkt. No. 8

      Before the court is plaintiffs Colin Scholl and Lisa Strawn's ("plaintiffs") motion for preliminary injunction, motion for class certification, and motion to appoint class counsel. The matter is fully briefed and suitable for resolution without oral argument.  Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court rules as follows.

**BACKGROUND**

      On August 1, 2020, plaintiffs filed a complaint ("Compl.") in this putative class action asserting three causes of action: (1) violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1); (2) violation of the APA, 5 U.S.C. §§ 702, 706(2); and (3) violation of the CARES Act, 26 U.S.C. § 6824, and the Little Tucker Act, 28 U.S.C. § 1346(a)(2).  Dkt. 1.  On August 4, 2020, plaintiffs filed the present motion for preliminary injunction, motion for class certification, and motion to appoint co-lead counsel.  Dkt. 8.

      Defendants Steven Mnuchin, Charles Rettig, the U.S. Department of the Treasury, the U.S. Internal Revenue Service ("IRS"), and the United States of America (collectively

"defendants") are generally responsible for administering economic impact payments ("EIP") to eligible individuals pursuant to the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act" or the "Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), which was signed into law on March 27, 2020. Compl. ¶¶ 1, 6–11. Plaintiffs are incarcerated and formerly incarcerated persons who did not receive payments (id. ¶¶ 4–5) and seek to certify a nationwide class of all similarly situated persons who are or were incarcerated, otherwise met the criteria to receive an EIP under the CARES Act, but did not receive an EIP, (id. ¶ 33).

In the spring of 2020, the COVID-19 pandemic swept across the United States and the globe causing significant disruptions to the living and working arrangements of virtually everyone. As part of the response to the pandemic, many institutions and businesses closed their doors in an effort to slow or stop the spread of the disease. The secondary and tertiary effects of this response was both widespread and largely unknown at the time. One fairly obvious impact of the pandemic was the loss of employment for millions of Americans; in April 2020 alone more than 20 million Americans lost their jobs. Amador v. Mnuchin, — F. Supp. 3d —, 2020 WL 4547950, at *2 (D. Md. Aug. 5, 2020). In response, Congress passed the CARES Act that included many provisions totaling $2.2 trillion in relief. See id. As part of that relief package, Congress provided for a mechanism to distribute stimulus payments, the EIP, directly to Americans.

The CARES Act, codified in part at section 6428 of the Internal Revenue Code, 26 U.S.C. § 6428, establishes the following mechanism for the IRS[1] to issue EIP to eligible individuals. First, subsection (a) establishes a tax credit for eligible individuals in the amount of $1,200 ($2,400 if filing a joint return), plus $500 multiplied by the number of qualifying children. 26 U.S.C. § 6428(a). This amount is credited against an eligible individual's federal income tax for the year 2020. Id. The amount of the credit is reduced

---

[1] The CARES Act directs the Secretary of the Treasury to issue the advance payments described in section 6428, but the IRS is the agency tasked with determining who should receive the payments.

"by 5 percent of so much of the taxpayer's adjusted gross income" that exceeds $150,000 for joint filers, $112,500 for a head of household, and $75,000 in all other cases.[2]  § 6428(c).  For purposes of the CARES Act, an eligible individual is defined as "any individual" other than (1) any nonresident alien individual, (2) any individual who is allowed as a dependent deduction on another taxpayer's return, and (3) an estate or trust.  § 6428(d).

The EIP is an advance refund of the subsection (a) tax credit and subsection (f) describes the mechanism for implementing the advance refund.  Paragraph (1) of subsection (f) provides that "each individual who was an eligible individual for such individual's first taxable year beginning in 2019 shall be treated as having made a payment against the tax imposed by chapter 1 for such taxable year in an amount equal to the advance refund amount for such taxable year."  § 6428(f)(1).  Paragraph (5) of subsection (f) permits the IRS to substitute taxable year 2018 for taxable year 2019 in paragraph (f)(1) and further allows the IRS to use information for calendar year 2019 provided in Form SSA-1099 or Form RRB-1099 (relating to Social Security benefit statements) if an individual has not filed a tax return for either 2018 or 2019.  § 6428(f)(5).  Thus, if an eligible individual filed a tax return in 2018 or 2019 or filed one of the enumerated Social Security forms, then the Act directs the IRS to treat those taxpayers as eligible for an advance refund of the tax credit.

Paragraph (3) of subsection (f) requires the IRS to "refund or credit any overpayment attributable to this section as rapidly as possible."  § 6428(f)(3).  Additionally, Congress provided that "[n]o refund or credit shall be made or allowed under this subsection after December 31, 2020."  Id.  The CARES Act also has a reconciliation provision between the advance refund and the tax credit such that if a taxpayer receives an advance refund of the tax credit then the amount of the credit is reduced by the

---

[2] In other words, the amount of income in excess of the statutory adjusted gross income is multiplied by 5 percent and that number is deducted (but not below zero) from the amount of the tax credit that would otherwise be paid to the taxpayer.

United States District Court
Northern District of California

1   aggregate amount of the refund.  § 6428(e).  Finally, the CARES Act delegates to the

2   Secretary of the Treasury the authority to "prescribe such regulations or other guidance

3   as may be necessary to carry out the purposes of this section, including any such

4   measures as are deemed appropriate to avoid allowing multiple credits or rebates to a

5   taxpayer."  § 6428(h).

6       Three days after the President signed the CARES Act, the IRS issued a news

7   release explaining that the agency would calculate and automatically issue an EIP to

8   eligible individuals.  Mtn. at 2; Declaration of Yaman Salahi ("Salahi Decl."), Dkt. 11, Ex. 1

9   at 1.[3]  The IRS also established an online portal for individuals who are not typically

10  required to file federal income tax returns (e.g., an individual's income is less than

11  $12,200), which allows those non-filers to enter their information to see if they qualify for

12  an EIP.  Mtn. at 3; Salahi Decl., Ex. 2.  Individuals who use the non-filer online portal

13  have until October 15, 2020 to register in order to receive the EIP by the December 31,

14  2020 deadline imposed by the CARES Act.  Mtn. at 3; Salahi Decl., Ex. 3.

15      On May 6, 2020, the IRS published responses to "Frequently Asked Questions"

16  ("FAQ") on the IRS.gov website.  Mtn. at 3; Salahi Decl., Ex. 4.  Question 15[4] asked

17

18  [3] Plaintiffs separately filed a request for judicial notice, seeking notice of exhibits 1
    through 6, 16, and 39 through 43 of the Salahi Declaration.  Dkt. 12.  Defendants do not
19  object to the request.  The court finds that exhibits 1 through 6, 16, 43, and 44 are
    judicially noticeable as they are publicly available government publications or news
20  releases and GRANTS the request as to those exhibits.  See Daniels-Hall v. Nat'l Educ.
    Ass'n, 629 F.3d 992, 999 (9th Cir. 2010) (taking judicial notice of information made
21  publicly available by government entities).  Exhibits 39 through 42 are statements by
    members of Congress contained in the Congressional Record and related to passage of
22  the CARES Act.  Federal Rule of Evidence 201 permits judicial notice of an "adjudicative
    fact only, not a legislative fact."  As the Advisory Committee Notes stated, "[a]djudicative
23  facts are simply the facts of the particular case.  Legislative facts, on the other hand, are
    those which have relevance to legal reasoning and the lawmaking process, whether in
24  the formulation of a legal principle or ruling by a judge or court or in the enactment of a
    legislative body."  "[J]udicial notice is generally not the appropriate means to establish the
25  legal principles governing the case."  Von Saher v. Norton Simon Museum of Art at
    Pasadena, 592 F.3d 954, 960 (9th Cir. 2010) (alteration in original) (quoting Toth v.
26  Grand Trunk R.R., 306 F.3d 335, 349 (6th Cir. 2002)).  Because exhibits 39 through 42
    relate to statements made during the lawmaking process, they are legislative facts.  The
27  court is free to consult them, but as a technical matter, DENIES the request for judicial
    notice as to those exhibits.
28  [4] The numbers of the FAQs have changed several times since they were first published.
    Defendants state that the FAQ at issue was originally FAQ number 12 and they now refer

United States District Court
Northern District of California

"Does someone who is incarcerated qualify for the Payment [i.e., an EIP]?"  The IRS responded:

> A15.  No.  A Payment made to someone who is incarcerated should be returned to the IRS by following the instructions about repayments.  A person is incarcerated if he or she is described in one or more of clauses (i) through (v) of Section 202(x)(1)(A) of the Social Security Act (42 U.S.C. § 402 (x)(1)(A)(i) through (v)).  For a Payment made with respect to a joint return where only one spouse is incarcerated, you only need to return the portion of the Payment made on account of the incarcerated spouse.  This amount will be $1,200 unless adjusted gross income exceeded $150,000.

Salahi Decl., Ex. 4.  On June 18, 2020, the IRS updated its internal procedures manual to reflect the policy stated in response to the FAQ.  Id., Ex. 5.

On June 30, 2020, the Treasury Inspector General for Tax Administration ("TIGTA") issued a report on the interim results of the 2020 filing season, including results of an audit on the IRS's issuance of the EIPs.  Id., Ex. 6.  The TIGTA noted that on April 10, 2020 the IRS issued 81.4 million payments pursuant to the CARES Act and some of those payments were sent to incarcerated persons and deceased individuals.  Id. at 4.[5] At the time, the TIGTA notified IRS management of its concern regarding the issuance of such payments to incarcerated persons.  The report then stated "IRS management noted that payments to these populations of individuals were allowed because the CARES Act does not prohibit them from receiving a payment.  However, the IRS subsequently changed its position, noting that individuals who are prisoners or deceased are not entitled to an EIP."  Id. at 5.  The IRS provided taxpayer identification numbers of incarcerated persons to the Bureau of Fiscal Service[6] ("BFS") and requested that BFS remove those individuals from subsequent payments issued on May 1, 2020 and May 8,

---

to the question as FAQ number 14.  Opp. at 6 n.7.  Because plaintiffs submit evidence that the FAQ was number 15, the court uses FAQ 15 to refer to the question at issue. While the numbers have changed, the court understands the substance of the FAQ to remain unchanged.
[5] Pin citations to the TIGTA's report refer to the report's original page numbers and not the electronically stamped ECF number on the exhibit.
[6] The BFS is an agency of the Department of the Treasury that issues payments, including the EIPs, on behalf of the IRS.  Salahi Decl., Ex. 6 at 3 n.5.

United States District Court
Northern District of California

2020.  Id.  There were no payments to incarcerated persons in these later tranches.

TIGTA calculated that the April 10th disbursement sent 84,861 payments totaling approximately $100 million to incarcerated persons.  Id. at 6, fig. 3.  In response to these already issued payments, the IRS issued guidance, as reflected in the FAQ, that individuals who received a direct deposit payment in error should repay the advance refund by submitting a personal check or money order to the IRS.  Id. at 6.  Individuals who received a paper EIP check were instructed to return the voided check to the IRS.  Id.  Further, plaintiffs cite news stories reporting that the IRS took proactive steps to intercept and retrieve the April 10th payments such as directing state corrections departments to intercept payments made to incarcerated persons and return them to the IRS.  Mtn. at 5; Salahi Decl., Ex. 7.

Plaintiffs seek to certify a class of all individuals who were incarcerated across the United States since March 27, 2020 and meet the eligibility requirements described in the CARES Act.  They also seek a preliminary injunction to enjoin defendants from enforcing their policy of excluding both plaintiffs and proposed class members from receiving EIPs based on their incarcerated status alone.  Finally, plaintiffs also move the court to appoint them as class representatives and appointing their counsel as class counsel.

**DISCUSSION**

**A.    Legal Standard**

    **1.    Preliminary Injunction**

Federal Rule of Civil Procedure 65 provides federal courts with the framework to issue preliminary injunctions.  Fed. R. Civ. P. 65(a).  Generally, the purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered.  See U.S. Philips Corp. v. KBC Bank N.V., 590 F.3d 1091, 1094 (9th Cir. 2010) (collecting cases).

An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008); see also Munaf v. Geren,

United States District Court
Northern District of California

6

553 U.S. 674, 689–90 (2008).  A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam).  "A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and that [4] an injunction is in the public interest."  Winter, 555 U.S. at 20.

Alternatively, the Ninth Circuit employs a "sliding scale" approach whereby "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the Winter test are also met."  All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1132 (9th Cir. 2011).  "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  Id. at 1135; see also Ramos v. Wolf, — F.3d —, 2020 WL 5509753, at *10 (9th Cir. Sept. 14, 2020) (describing sliding scale alternative approach).

If a plaintiff satisfies its burden to demonstrate that a preliminary injunction should issue, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  Califano v. Yamasaki, 442 U.S. 682, 702 (1979).

### 2.     Class Certification

To maintain a class action, a proposed class must satisfy Rule 23(a)'s numerosity, commonality, typicality, and adequacy of representation requirements.  Fed. R. Civ. P. 23(a).  If all four prerequisites of Rule 23(a) are satisfied, the court then determines whether to certify the class under one of the three subsections of Rule 23(b), which requires plaintiffs to show either: (1) a risk of substantial prejudice from separate actions, (2) that declaratory or injunctive relief benefitting the class as a whole would be appropriate, or (3) that common questions of law or fact common to the class

United States District Court
Northern District of California

1  predominate and that a class action is superior to other methods available for

2  adjudicating the controversy at issue.  Fed. R. Civ. P. 23(b)(1)–(3).

3       The party seeking class certification bears the burden of proof in demonstrating

4  that it has satisfied all four Rule 23(a) requirements and that their action falls within one

5  of the three types of actions permitted under Rule 23(b).  Zinser v. Accufix Research

6  Inst., Inc., 253 F.3d 1180, 1186 (9th Cir. 2001).  "Before certifying a class, the trial court

7  must conduct a rigorous analysis to determine whether the party seeking certification has

8  met the prerequisites of Rule 23."  Mazza v. Am. Honda Motor Co. Inc., 666 F.3d 581,

9  588 (9th Cir. 2012).  To the extent there are "any factual disputes necessary to

10  determine" a Rule 23 criterion, a district court is required to resolve them.  Ellis v. Costco

11  Wholesale, 657 F.3d 970, 983 (9th Cir. 2011) ("[T]he district court was required to resolve

12  any factual disputes necessary to determine whether there was a common pattern and

13  practice that could affect the class as a whole.  If there is no evidence that the entire

14  class was subject to the same allegedly discriminatory practice, there is no question

15  common to the class.").

16  **B.    Motion for Preliminary Injunction**

17       **1.    Subject Matter Jurisdiction**

18       Defendants argue that plaintiffs are not likely to succeed on the merits based on a

19  trio of issues that implicates the court's subject matter jurisdiction: standing, ripeness,

20  and sovereign immunity.  Because these issues directly implicate the court's subject

21  matter jurisdiction to hear the case, the court addresses these threshold questions at the

22  outset.

23            **a.    Standing**

24       Federal courts may adjudicate only actual "Cases" and "Controversies," U.S.

25  Const. art. III, § 2, and may not render advisory opinions as to what the law ought to be

26  or affecting a dispute that has not yet arisen.  Aetna Life Ins. Co. of Hartford, Conn. v.

27  Haworth, 300 U.S. 227, 240 (1937).  Article III's "standing" requirements limit the court's

28  subject matter jurisdiction.  See Cetacean Cmty. v. Bush, 386 F.3d 1169, 1174 (9th Cir.

2004).  The burden of establishing standing rests on the party asserting the claim.

Renne v. Geary, 501 U.S. 312, 316 (1991).  "At this very preliminary stage," plaintiffs

"may rely on the allegations in their Complaint and whatever other evidence they

submitted in support of their [preliminary injunction] motion to meet their burden."

Washington v. Trump, 847 F.3d 1151, 1159 (9th Cir. 2017) (per curiam) (citing Lujan v.

Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)).

The "irreducible constitutional minimum of standing contains three elements."

Lujan, 504 U.S. at 560.  "In order to establish Article III standing, a plaintiff must have (1)

suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the

defendant, and (3) that is likely to be redressed by a favorable judicial decision."

California v. Trump, 963 F.3d 926, 935 (9th Cir. 2020) (citing Lujan, 504 U.S. at 560–61).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a

legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not

conjectural or hypothetical.'"  Spokeo Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016)

(quoting Lujan, 504 U.S. at 560).

Defendants argue that the CARES Act does not give plaintiffs a legally protected

interest in an advance refund.  Opp. at 12.  Rather, the CARES Act created a refundable

credit against an eligible individuals' 2020 tax return.  Id.  According to defendants, a

taxpayer could only sustain an injury when he or she attempts to claim the CARES Act

tax credit on his or her 2020 tax returns and then only if the IRS denies the claim to the

tax credit.  Id.  In response, plaintiffs assert that the failure to pay the advance refund for

which they are eligible is a concrete financial injury that has already occurred.  Reply at 8.

As an initial observation, the deprivation of a monetary benefit is precisely the sort

of economic injury that normally satisfies the injury in fact requirement.  Sierra Club v.

Morton, 405 U.S. 727, 733 (1972) ("[P]alpable economic injuries have long been

recognized as sufficient to lay the basis for standing . . . .").  Plaintiffs cite Van v. LLR,

Inc., for the proposition that "[t]he inability to have and use money to which a party is

entitled is a concrete injury."  962 F.3d 1160, 1161 (9th Cir. 2020) (per curiam) (quoting

1   MSPA Claims 1, LLC v. Tenet Fla., Inc., 918 F.3d 1312, 1318 (11th Cir. 2019)).  This

2   case is persuasive and illustrates how wrongfully withheld money constitutes an injury in

3   fact for standing purposes.  The rationale behind Van's holding is applicable here:

4   "[e]very day that a sum of money is wrongfully withheld, its rightful owner loses the time

5   value of the money."  Id. (quoting Habitat Educ. Ctr. v. U.S. Forest Serv., 607 F.3d 453,

6   457 (7th Cir. 2010)).  Thus, plaintiffs have established a concrete injury.

7          Defendants' argument does not contest the concreteness or particularization of the

8   injury, but rather challenges its imminence, i.e., whether the injury is too speculative or

9   conjectural because plaintiffs would not be harmed until the IRS denies their request for a

10  CARES Act tax credit in the future.  They cite Coon v. Wood, 160 F. Supp. 3d 246, 251

11  (D.D.C. 2016), for the proposition that the mere possibility of future tax liability is

12  insufficient to establish standing to sue in federal court.  There, the plaintiff alleged that

13  defendants negligently misrepresented the potential tax consequences on a sale of real

14  property but the IRS had not imposed any tax liability and available evidence showed that

15  the plaintiff was unlikely to incur any future tax liability.  Id.  The court found injury in fact

16  lacking because the mere possibility of future tax liability was insufficient to confer

17  standing.  Id.

18         This case is distinguishable from Coon for the simple fact that plaintiffs allege that

19  the IRS has already decided to deny EIPs to incarcerated persons.  Moreover, the IRS

20  readily acknowledges that it has done so.  See Declaration of Michael Desmond

21  ("Desmond Decl."), Dkt. 44-1, ¶ 7.  Plaintiffs' injury is actual and imminent in the sense

22  that defendants already denied payments to them and the injury is not merely a

23  speculative fear about future harm that may or may not happen.  Lujan, 504 U.S. at 560.

24         Defendants' argument that plaintiffs do not have a legally protected interest and

25  cannot sustain a cognizable injury until the IRS denies the tax credit is predicated on the

26  assumption that their interpretation of the CARES Act is, in fact, correct.  In other words,

27  defendants' argument goes to the merits of plaintiffs' claims.  If plaintiffs were to prevail

28  on their claims, then the CARES Act's advance refund would presumably be owed to

United States District Court
Northern District of California

them now, not in 2021 when they file their 2020 tax returns.  For that reason, plaintiffs easily satisfy the imminence aspect of the injury in fact requirement.

The court also notes that other district courts that have considered similar arguments by the federal government have determined that both standing and ripeness were met by plaintiffs challenging the Act.  While those cases involve constitutional challenges to the CARES Act, the federal government argued that the plaintiffs did not have standing and their claims were not ripe because the plaintiffs were first required to file a refund claim with the IRS after first being denied a tax credit on their 2020 tax returns.  See Doe v. Trump, 2020 WL 5076999, at *3 (C.D. Cal. July 8, 2020) ("Accepting for this analysis the substantive merits of Plaintiff's constitutional claims, she has suffered a 'concrete and particularized' injury because she has been treated differently from other citizens similarly situated and has been denied a government benefit (in the form of an immediate advance payment) that she would otherwise be eligible for."); see also Amador, 2020 WL 4547950, at *11 (finding standing where plaintiffs claimed that "they have not received the impact payment to which they and their children are otherwise entitled").

The remaining elements of Article III standing, which defendants do not contest, are easily met.  The failure to disburse the EIPs to incarcerated persons is directly traceable to a decision made by the IRS and an order for injunctive relief would directly remedy plaintiffs' injury.  In sum, the court finds that plaintiffs meet the Article III standing requirement.

### b.    Ripeness

"Ripeness is an Article III doctrine designed to ensure that courts adjudicate live cases or controversies and do not 'issue advisory opinions [or] declare rights in hypothetical cases.'  A proper ripeness inquiry contains a constitutional and a prudential component."  Bishop Paiute Tribe v. Inyo Cty., 863 F.3d 1144, 1153 (9th Cir. 2017) (citations omitted).

"For a case to be ripe, it must present issues that are definite and concrete, not

11

hypothetical or abstract.  Constitutional ripeness is often treated under the rubric of standing because ripeness coincides squarely with standing's injury in fact prong."  Id. (internal quotation marks and citations omitted); Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138–39 (9th Cir. 2000) (en banc) ("Sorting out where standing ends and ripeness begins is not an easy task. . . . [I]n 'measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing.'").  Allegations that a "threat" to a "concrete interest is actual and imminent" are sufficient to allege "an injury in fact that meets the requirements of constitutional ripeness."  Bishop Paiute Tribe, 863 F.3d at 1154.  Therefore, if plaintiffs satisfy the Article III standing requirements under Lujan v. Defenders of Wildlife, addressed above, the action here is ripe.  In this case, the analysis for both requirements is the same.  See, e.g., Thomas, 220 F.3d at 1139 ("Whether the question is viewed as one of standing or ripeness, the Constitution mandates that prior to our exercise of jurisdiction there exist a constitutional 'case or controversy,' that the issues presented are 'definite and concrete, not hypothetical or abstract.' . . . We need not delve into the nuances of the distinction between the injury in fact prong of standing and the constitutional component of ripeness: in this case, the analysis is the same.").

"In evaluating the prudential aspects of ripeness, our analysis is guided by two overarching considerations: 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  Thomas, 220 F.3d at 1141.  When the question presented "is 'a purely legal one'" that "constitutes 'final agency action' within the meaning of § 10 of the APA," that suggests the issue is fit for judicial decision.  Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 812 (2003).  However, an issue may not be ripe for review if "further factual development would 'significantly advance our ability to deal with the legal issues presented.'"  Id.

Defendants argue that plaintiffs' claims are not ripe because the CARES Act creates a tax credit for taxable year 2020 and, although many tax credits have been sent out as advance refund payments, the ultimate amount of the tax credit will not be

United States District Court
Northern District of California

determined until plaintiffs file their 2020 tax returns.  Opp. at 10.  According to defendants, Congress contemplated that the ultimate amount or even eligibility for the tax credit would not be determined until these tax returns are filed.  Id.  Next, defendants argue that because Congress permits EIPs to be issued as late as December 31, 2020, it is premature to find the advance payments are wrongfully withheld until that dates passes.  Id.  Finally, they contend that the FAQ addressing incarcerated persons is not a formal administrative decision, it has not undergone formal or informal rulemaking, and does not address many aspects of plaintiffs' claims.  Id. at 11.

With respect to constitutional ripeness, plaintiffs advance the same argument as standing, that they are currently being denied payment of the advance refund.  Reply at 8.  With regard to prudential ripeness, plaintiffs state they are not challenging the FAQ; rather they are challenging the IRS's policy of withholding EIP benefits from incarcerated persons.  Id. at 9.

Because the court has determined that plaintiffs have standing, their claims are constitutionally ripe for adjudication.  See Thomas, 220 F.3d at 1139; Doe, 2020 WL 5076999, at *4 ("The statute is in effect, and Plaintiff has been denied a benefit based on a statutory classification that she alleges to be unconstitutional.  The Government's ripeness argument is essentially no different from its standing argument and does not bar Plaintiff's lawsuit.").  The remaining ripeness issue is whether plaintiffs' APA claims are prudentially ripe for review.

### i.      Fitness of Issues for Judicial Decision

When considering whether issues are fit for review, the question should be a "purely legal one" and the agency action in question should constitute a "'final agency action' within the meaning of § 10 of the APA."  Nat'l Park Hosp. Ass'n, 538 U.S. at 812 (quoting 5 U.S.C. § 704; and Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967), abrogated on other grounds as recognized in Califano, 430 U.S. at 105).  In some cases, even when the question is purely legal and concerning a final agency action, further factual development might be warranted to "significantly advance [the court's] ability to

deal with the legal issues presented."  Id. (quoting Duke Power Co. v. Carolina Env't Study Grp., Inc., 438 U.S. 59, 82 (1978)).

Here, plaintiffs' challenge is a purely legal one.  Their APA claims depend on whether the Treasury Secretary and the IRS are properly interpreting and implementing the CARES Act.  See Abbott Labs., 387 U.S. at 149 (noting that "whether the statute was properly construed by the Commissioner" to be a purely legal challenge).

Next, section 10 of the APA, 5 U.S.C. § 704, provides for judicial review for a "final agency action for which there is no other adequate remedy in a court."  The definition of "agency action," by cross reference of section 701 of the APA, is located at title 5 U.S.C. § 551, which defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  In turn, relief is defined in part as "the whole or part of an agency grant of money, assistance, license, authority, exemption, exception, privilege, or remedy . . . ."  5 U.S.C. § 551(11)(A).  Plaintiffs here are not challenging a rule or regulation promulgated by the IRS but rather the agency's decision to exclude incarcerated persons from those eligible individuals receiving an advance refund pursuant to the CARES Act.  Since the advance refund is a grant of money, the denial of the advance refund is an agency action.

The remaining issue is whether the IRS's action is final such that it is reviewable or whether it is "preliminary, procedural, or intermediate" and not directly reviewable.  5 U.S.C. § 704.  There are two conditions for an agency action to be final under the APA: "First, the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  U.S. Army Corps of Eng'rs v. Hawkes Co., 136 S. Ct. 1807, 1813 (2016) (quoting Bennett v. Spear, 520 U.S. 154, 177–78 (1997)); Or. Nat. Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006) ("[T]he core question is whether the agency has completed its decisionmaking process, and whether the result

of that process is one that will directly affect the parties." (alteration in original) (citation omitted)).

Here, several facts indicate that the IRS's decision to withhold or deny EIPs to incarcerated persons is final.  After initially disbursing EIPs to incarcerated persons, the IRS reversed its decision and, as described in its FAQs, unequivocally took the position that someone who is incarcerated does not qualify for the EIP and should return any prior payments.  Salahi Decl., Ex. 4.  Significantly, defendants submitted a declaration stating that the FAQ addressed the question of whether incarcerated persons may receive an advance payment under the CARES Act.  Desmond Decl. ¶ 8.  Further, the declaration confirms that the IRS decided that individuals deemed to be incarcerated as of April 30, 2020 would not receive advance refund payments.  Id. ¶ 7.  This statement indicates that the IRS's decision regarding the advance refund is final.

Next, plaintiffs submit evidence that the IRS changed its internal manual to define eligible individuals as any individual other than incarcerated individuals, deceased individuals, a filer of Form 1040-NR, 1040-PR, or 1040SS and the three categories outlined in subsection (d) of section 6428.  Salahi Decl., Ex. 5 at 2.  This further supports the conclusion that the IRS considers the issue of advance refund payments to incarcerated persons to be settled.

Buttressing this conclusion is the timing of the CARES Act.  The IRS has established a deadline of October 15, 2020 for non-filers to use the non-filer tool to create a 2019 tax return in order to be eligible for an EIP by the end of the year.  Salahi Decl., Ex. 3 at 1.  Congress requires the IRS to disburse all advance refunds by December 31, 2020.  § 6428(f)(3)(A).  These impending deadlines indicate that no further change to IRS's decision is forthcoming and the decisionmaking process is complete.

With regard to whether the agency action is one by which rights or obligations have been determined, the IRS's decision has clearly determined a right.  In this case, the IRS has determined that incarcerated persons are not eligible to receive an advance refund.  Plaintiffs, as incarcerated or formerly incarcerated persons, were demonstrably

United States District Court
Northern District of California

1   affected by this decision, alleging they are otherwise eligible to receive the EIP but did

2   not receive the payment.  More broadly, the impact of the IRS's decision is evidenced by

3   the fact that the IRS initially issued EIPs to incarcerated persons and then, because of its

4   decision, intercepted payments or ordered recipients to return payments.  Compl. ¶¶ 16–

5   17; Salahi Decl., Ex. 6 at 5.

6   　　　　For the foregoing reasons, the court finds that the IRS's decision to withhold

7   advance refunds to incarcerated persons is a final agency action, that no further factual

8   development is needed, and, therefore, the issue is fit for judicial review.

9   　　　　　　　　　　**ii.        Hardship to the Parties**

10   　　　　The second factor examines "the hardship to the parties of withholding court

11   consideration."  Nat'l Park Hosp. Ass'n, 538 U.S. at 808.  Generally, a showing of

12   hardship requires demonstrating that the regulation in question creates "adverse effects

13   of a strictly legal kind."  Id. at 809 (quoting Ohio Forestry Ass'n, Inc. v. Sierra Club, 523

14   U.S. 726, 733 (1998)).  Such adverse effects do not arise if the regulation in question

15   "do[es] not command anyone to do anything or to refrain from doing anything; [it] do[es]

16   not grant, withhold, or modify any formal legal license, power, or authority; [it] do[es] not

17   subject anyone to any civil or criminal liability; [and it] create[s] no legal rights or

18   obligations."  Id. (alterations in original) (quoting Ohio Forestry Ass'n, 523 U.S. at 733).

19   　　　　Similar to the inquiry whether legal rights or obligations have been determined by

20   the IRS, the agency's decision imposes potential adverse effects of a strictly legal kind.

21   As discussed, the IRS's decision withholds payment of the advance refund to all

22   incarcerated persons.  Plaintiffs contend that they have a legal interest in the advance

23   refund and defendants dispute that point.  Whether the CARES Act creates a legal

24   interest in the advance refund goes to the merits of plaintiffs' claim, but if plaintiffs are

25   likely to succeed on their claims, then they would have established a legal interest in the

26   advance refund.

27   　　　　Finally, defendants suggest that because the CARES Act sunsets payment of the

28   advance refunds for December 31, 2020, plaintiffs' claims are not ripe until that date

United States District Court
Northern District of California

passes.  Opp. at 10.  As discussed, the decision to deny the EIP has already occurred

and Van, 962 F.3d at 1161, holds that delayed payment is a concrete injury.  Moreover,

crediting defendants' argument would put plaintiffs in an untenable position.  If they wait

until after December 31, 2020 to challenge the IRS's withholding of the advanced refund,

then the advance refunds will not be available to them and it is not clear that the court

could order any relief under the APA when Congress unambiguously mandated an end

date to the advance refunds.  Under defendants' ripeness theory, plaintiffs would have to

either pursue a claim pursuant to the Little Tucker Act or claim the tax credit on their 2020

tax returns—either option entails months or years of legal and practical barriers—and

defeats the entire theory of plaintiffs' case, that they are presently being harmed by the

decision not to issue advance refunds to them.

   In light of the foregoing, the court finds the hardship of withholding judicial review

prong met and, therefore, plaintiffs have established that their APA claims are

prudentially ripe for review.

### c.    Sovereign Immunity

   "Absent a waiver, sovereign immunity shields the Federal Government and its

agencies from suit."  FDIC v. Meyer, 510 U.S. 471, 475 (1994).  This immunity also

extends to federal officers sued in their official capacity.  See Dugan v. Rank, 372 U.S.

609, 620 (1963); Aminoil U.S.A., Inc. v. Cal. State Water Res. Control Bd., 674 F.2d

1227, 1233 (9th Cir.1982).  A "waiver of sovereign immunity must be unequivocally

expressed in statutory text," and be "clearly evident from the language of the statute."

FAA v. Cooper, 566 U.S. 284, 290 (2012) (internal quotation marks omitted).

   "[T]he Administrative Procedure Act provides a broad waiver of sovereign

immunity so long as certain conditions are met."  S. Delta Water Agency v. United States,

767 F.2d 531, 535 (9th Cir. 1985).  Section 702 of the APA waives sovereign immunity;

however, the Ninth Circuit has held that claims brought pursuant to the APA must also

satisfy § 704's provisions.  Navajo Nation v. Dep't of the Interior, 876 F.3d 1144, 1170

(9th Cir. 2017).  Because plaintiffs in this case bring two claims under the APA, and move

United States District Court
Northern District of California

1   for a preliminary injunction based only on those APA claims, they must meet the

2   requirements of § 704 in order for the court to determine that Congress waived sovereign

3   immunity.

4          Defendants broadly argue that the IRS's answer to the FAQ is not a final agency

5   action for which there is no adequate alternative. Opp. at 14. As discussed with regard

6   to prudential ripeness, the court finds that the IRS's decision not to disburse EIPs to

7   incarcerated persons constitutes a final agency action. Thus, the only remaining inquiry

8   is whether there are any adequate alternatives to APA review in court. See Hawkes, 136

9   S. Ct. at 1815 ("Even if final, an agency action is reviewable under the APA only if there

10  are no adequate alternatives to APA review in court.").

11         Defendants contend that plaintiffs have such an adequate alternative, which is to

12  bring a refund claim pursuant to 26 U.S.C. § 7422. Opp. at 15 (citing United States v.

13  Clintwood Elkhorn Mining Co., 553 U.S. 1, 4–5 (2008)). Plaintiffs assert that section

14  7422 is not an adequate alternative because they are not seeking to recover tax imposed

15  or collected by the IRS. Reply at 10. They further contend that section 7422 does not

16  permit prospective injunctive and declaratory relief, which they seek in this case. Id. at

17  11. Finally, plaintiffs argue that even if section 7422 applies, then it is not an adequate

18  alternative because it would entail years of delay to file a tax return, file administrative

19  claims, exhaust those claims, and then file in court. Id.

20         Title 26 U.S.C. § 7422(a) states that:

21             [n]o suit . . . shall be maintained in any court for the recovery of
               any internal revenue tax alleged to have been erroneously or
22             illegally assessed or collected, or of any penalty claimed to
               have been collected without authority, or of any sum alleged to
23             have been excessive or in any manner wrongfully collected,
               until a claim for refund . . . has been duly filed with [the IRS].
24

25  Beginning with the text of the statute, plaintiffs' APA claims do not clearly fall within the

26  ambit of § 7422(a). Plaintiffs are not alleging that a tax was erroneously or illegally

27  assessed or collected, a penalty was collected without authority, or any sum is alleged to

28  be excessive. Instead, they contend that Congress requires the IRS to disburse the Act's

1   advance refund without excluding incarcerated persons and the IRS is not faithfully

2   adhering to the statutory command.  E.g., Compl. ¶¶ 18, 20.

3          Next, the nature of plaintiffs' relief falls outside the relief permitted by § 7422.

4   They seek a preliminary injunction requiring defendants to enjoin the decision to exclude

5   incarcerated persons from those eligible to receive an EIP, amongst other injunctive and

6   declaratory relief.  Mtn. at viii; Compl. ¶¶ 43, 48–49.  Both the Fourth and D.C. Circuits

7   have concluded that because § 7422(a) references "recovery of any internal revenue

8   tax", the statute does not explicitly allow for the type of prospective equitable relief

9   requested by plaintiffs.  King v. Burwell, 759 F.3d 358, 366 (4th Cir. 2014), aff'd, 576 U.S.

10  473 (2015); Cohen v. United States, 650 F.3d 717, 732 (D.C. Cir. 2011) (en banc)

11  ("§ 7422(a) would not provide Appellants the equitable relief they seek.  Section 7422(a)

12  provides "for the recovery of any internal revenue tax."  It does not, at least explicitly,

13  allow for prospective relief." (citation omitted)).

14         Defendants cite no case in which a court has determined sovereign immunity not

15  to be waived on the grounds that the parties were first required to pursue a tax refund

16  action under 26 U.S.C. § 7422(a).  See King, 759 F.3d at 366 (noting defendants "fail[ed]

17  to point to a single case in which a court has refused to entertain a similar suit on the

18  grounds that the parties were required to first pursue a tax-refund action under 26 U.S.C.

19  § 7422(a) or 28 U.S.C. § 1346").  The court also finds persuasive the district court's

20  opinion in Amador v. Mnuchin, 2020 WL 4547950, at *6–10, which exhaustively

21  describes the same sovereign immunity analysis and concludes that § 7422(a) is not an

22  adequate alternative to the APA.

23         Finally, there is a disconnect between the motivating purpose of the CARES Act

24  on the one hand and the adequate alternative proposed by defendants on the other.  The

25  CARES Act instructs the Treasury Secretary to distribute economic stimulus to eligible

26  individuals "as rapidly as possible."  26 U.S.C. § 6428(f)(3)(A).  While the IRS has

27  indicated that it will permit eligible individuals who were incarcerated for a portion of 2020

28  to eventually receive the CARES Act tax credit, (Desmond Decl. ¶ 8), they make no such

19

1   declaration with regard to individuals incarcerated for the entirety of 2020.  This means

2   that such an incarcerated person would have to wait until he or she files a 2020 tax

3   return, then wait for the IRS to deny their claim, then exhaust all administrative claim

4   requirements before the claimant can file a suit in federal court pursuant to § 7422.  See

5   26 U.S.C. § 6531(a)(1).  As summarized by the Amador court, "[f]orcing plaintiffs to

6   exhaust their administrative remedies would be an "arduous, expensive, and long"

7   process . . . ."  2020 WL 4547950, at *9 (quoting Hawkes, 136 S. Ct. at 1815–16).

8         In sum, the alternative form of relief suggested by defendants is not an adequate

9   alternative for APA review.  Plaintiffs do not have an adequate alternative relief and they

10   meet the requirements of sections 702 and 704 of the APA such that Congress has

11   waived sovereign immunity in this case.  The court need not reach defendants' argument

12   concerning the Little Tucker Act, (Opp. at 12–14), because plaintiffs do no not rely on that

13   act as waiving sovereign immunity for their motion for preliminary injunction.

14         **2.      Likelihood of Success on the Merits**

15              **a.      Section 706(2)—Contrary to Law**

16         As an initial matter, it is necessary to determine what deference, if any, is owed to

17   the IRS's interpretation of the CARES Act.  Defendants advance no argument regarding

18   deference and, in their reply brief, plaintiffs contend that defendants' interpretation is

19   nothing more than a "litigation position" to which the court owes no deference.  Reply at

20   5.

21         Whether an agency's interpretation of a statute is owed any deference varies with

22   the circumstances surrounding the agency's interpretation.  "[C]ourts have looked to the

23   degree of the agency's care, its consistency, formality, and relative expertness, and to

24   the persuasiveness of the agency's position."  United States v. Mead Corp., 533 U.S.

25   218, 228 (2001) (footnotes omitted) (citing Skidmore v. Swift & Co., 323 U.S. 134, 139–

26   40 (1944)).  The CARES Act contains an express authorization to engage in the

27   rulemaking process; section 6428(h) permits the Treasury Secretary to prescribe such

28   regulations or other guidance necessary to carry out the purpose of the CARES Act.  The

United States District Court
Northern District of California

United States District Court
Northern District of California

1  rulemaking authorization indicates that deference might be required by <u>Chevron, U.S.A.</u>

2  <u>v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984).  <u>See</u> <u>Encino</u>

3  <u>Motorcars, LLC v. Navarro</u>, 136 S. Ct. 2117, 2125 (2016) ("A premise of <u>Chevron</u> is that

4  when Congress grants an agency the authority to administer a statute by issuing

5  regulations with the force of law, it presumes the agency will use that authority to resolve

6  ambiguities in the statutory scheme." (citations omitted)).

7      Despite this authorization, defendants readily admit that the IRS has not issued a

8  regulation and did not follow any notice-and-comment procedure in issuing its guidance

9  (i.e., the FAQ response on incarcerated persons) concerning the CARES Act.  Opp. at

10  11.  The lack of notice-and-comment rulemaking indicates that <u>Chevron</u> deference is not

11  appropriate here.  As <u>Mead</u> teaches, "[a]n agency's interpretation of 'a particular statutory

12  provision' thus qualifies for <u>Chevron</u> deference only 'when it appears that Congress

13  delegated authority to the agency generally to make rules carrying the force of law, <u>and</u>

14  that the agency interpretation claiming deference was promulgated in the exercise of that

15  authority.'"  <u>City of Arlington, Tex. v. F.C.C.</u>, 569 U.S. 290, 320 (2013) (Roberts, C.J.,

16  dissenting) (emphasis added) (quoting <u>Mead</u>, 533 U.S. at 226–27); <u>see also</u> <u>United</u>

17  <u>States v. Trident Seafoods Corp.</u>, 60 F.3d 556, 559 (9th Cir.1995) ("No deference is

18  owed when an agency has not formulated an official interpretation of its regulation, but is

19  merely advancing a litigation position.").

20      The court thus approaches two interpretive questions without any deference to the

21  IRS's position.  First, whether the CARES Act mandates the IRS to issue advance

22  refunds or whether it has discretion to withhold the advance refund and force otherwise

23  eligible individuals to file for the CARES Act payment as a tax credit.  Second, whether

24  incarcerated persons are eligible individuals for purposes of the CARES Act.

25      Starting with the plain language of the statute, subsection (f)(1), which governs the

26  advance refunds, states "each individual who was an eligible individual for such

27  individual's first taxable year beginning in 2019 shall be treated as having made a

28  payment against the tax imposed by chapter 1 for such taxable year in an amount equal

United States District Court
Northern District of California

to the advance refund amount for such taxable year." § 6428(f)(1).  As explained by a recent opinion, subparagraph (f)(1) "creat[es] a legal fiction that qualified individuals 'overpaid' on previously filed taxes."  R.V. v. Mnuchin, 2020 WL 3402300, at *7 (D. Md. June 19, 2020).  The Second Circuit arrived at the same conclusion with respect to an earlier version of § 6428 that disbursed advance refunds in response to the 2008 financial crisis.[7]  See Sarmiento v. United States, 678 F.3d 147, 156 (2d Cir. 2012).  The court explained that the term "shall be treated" was "best interpreted as establishing the legal fiction that eligible taxpayers overpaid their 2007 taxes in an amount equal to the 'advance refund' of their [Economic Stimulus Act] stimulus credit, and not merely as a 'mechanism for making an advance payment or refund and credit for the 2008 tax year.'"  Id. (citation omitted).

Subsection (f)(2) then defines the amount of the advance refund as "the amount that would have been allowed as a credit under this section for such taxable year if this section (other than subsection (e) and this subsection) had applied to such taxable year." § 6428(f)(2).  The phrase "the amount that would have been allowed as a credit under this section" references the credit defined in subsection (a), i.e., $1,200 per taxpayer ($2,400 if filing jointly) and $500 per dependent child.  § 6428(a).

Subsection (f)(3) describes payment of the advance refund: "The Secretary shall, subject to the provisions of this title, refund or credit any overpayment attributable to this section as rapidly as possible."  § 6428(f)(3) (emphasis added).  The use of the word "shall" indicates a mandatory command from Congress to the Treasury Department and the IRS to issue the advance refund and to do so rapidly.  See Serv. Emps. Int'l Union v. United States, 598 F.3d 1110, 1113 (9th Cir. 2010) ("The word 'shall' is ordinarily [t]he

---

[7] Congress has implemented two previous stimulus payments using similar language as the CARES Act.  First, Congress enacted the Economic Growth and Tax Relief Reconciliation Act of 2001, Pub. L. No. 107–16, 115 Stat. 42, which "provided eligible taxpayers a tax credit 'for 2001,' the year the statute was enacted, by means of an "advance refund" of constructively overpaid taxes."  Sarmiento, 678 F.3d at 156.  Second, Congress enacted the Economic Stimulus Act of 2008, Pub. L No. 110-185, 122 Stat. 613, in response to the 2008 financial crisis.

United States District Court
Northern District of California

1   language of command." (internal quotation marks and citations omitted)); see also R.V.,

2   2020 WL 3402300, at *7 ("The Act therefore requires the government to pay the fictional

3   overpayment, and be quick about it.").  The language does not confer discretion on the

4   Secretary to decline to issue advance refunds.[8]

5   　　　　The statutory structure confirms that Congress intended the IRS to issue

6   payments as quickly as possible.  As is self-evident from the language, the advance

7   refund provision contained in subsection (f) was intended to be issued "as rapidly as

8   possible."  § 6428(f)(3)(A).  The tax credit described in subsection (a) is simply a "legal

9   fiction," Sarmiento, 678 F.3d at 156, used to issue the advance refund as soon as

10  possible.  See also Doe v. Trump, 2020 WL 5492994, at *4 (C.D. Cal. Sept. 2, 2020)

11  ("Congress did not want the IRS to wait until individuals submitted their 2020 tax returns

12  to determine if those individuals were eligible for the Advance Credit.  Rather, Congress

13  authorized the IRS to immediately determine eligibility based on prior tax returns.").

14  Additionally, as plaintiffs point out, subsection (e)(1) provides that the amount of the tax

15  credit will be reduced by the amount of any advance refund, but not below zero.  Thus, if

16  a taxpayer's status changes between the time of the advance refund and the tax credit,

17  the taxpayer will not be penalized.  Thus, the advance refund is meant to come first, to be

18  reconciled later on a taxpayer's 2020 returns.  Thus, the structure indicates that

19  Congress intended for the advance refund to be paid first and then reconciled later on a

20  taxpayer's 2020 returns.

21  　　　　Defendants contend that the CARES Act does not mandate that plaintiffs receive

22  an advance refund of a CARES Act credit.  Opp. at 12.  They cite no authority for this

23

24  _____

25  [8] Even if the court were to read subsection (h), which permits the Secretary to establish
    regulations or other guidance, as permitting discretion in carrying out the advance
    refunds, the statutory text is clear.  Where a statute grants an agency discretion, "that
26  discretion may only be exercised within the bounds of the statutory definition itself."
    Safer Chemicals, Healthy Families v. U.S. Envtl. Prot. Agency, 943 F.3d 397, 425 (9th
27  Cir. 2019) (citing Massachusetts v. EPA, 549 U.S. 497, 533 (2007)).  "Where Congress
    has explicitly provided a definition for a term, and that definition is clear, an agency must
28  follow it."  Id.  Moreover, as noted, defendants have not advanced any argument
    concerning discretion.

United States District Court
Northern District of California

1   proposition and do not attempt to explain how the Secretary can ignore the requirement

2   to distribute the refund as rapidly as possible.  See Util. Air Regulatory Grp. v. E.P.A.,

3   573 U.S. 302, 327 (2014) ("The power of executing the laws necessarily includes both

4   authority and responsibility to resolve some questions left open by Congress that arise

5   during the law's administration.  But it does not include a power to revise clear statutory

6   terms that turn out not to work in practice.").  In sum, the language of the statute

7   unambiguously mandates disbursement of the advance refund and requires the

8   Secretary to do so expeditiously.

9          The second inquiry is whether incarcerated persons are eligible individuals.  On

10  this question, the statute is brief and to the point.  Section 6428(d) states:

11              For purposes of this section, the term "eligible individual"
                means any individual other than (1) any nonresident alien
12              individual, (2) any individual with respect to whom a deduction
                under section 151 is allowable to another taxpayer for a taxable
13              year beginning in the calendar year in which the individual's
                taxable year begins, and (3) an estate or trust.
14

15  § 6428(d).  There is no indication that Congress left the definition of "eligible individual"

16  open-ended or otherwise up to the Secretary's discretion to change.  See Jimenez v.

17  Quarterman, 555 U.S. 113, 118 (2009) ("It is well established that, when the statutory

18  language is plain, we must enforce it according to its terms.").

19         There is also no indication that Congress intended to exclude incarcerated

20  persons in the same way that the definition of "eligible individual" excludes certain

21  categories of persons or entities.  As both parties acknowledge, (Mtn. at 11; Opp. at 18

22  n.13), in 2008 Congress passed a stimulus bill that was also codified at title 26 U.S.C.

23  § 6428 in response to the 2008 financial crisis.  See Pub. L. No. 110-185, 122 Stat. 613

24  (2008).  That version of the statute also defined "eligible individual" by excluding the

25  exact same three categories of individuals.  § 6428(e)(3) (2012).  Unlike the current

26  version of the statute, the 2008 stimulus required a recipient of the payment have a

27  minimum qualifying income of $3,000 or a net tax liability greater than zero.  § 6428(b)(2).

28  In turn, qualifying income was defined in reference to the term "earned income" which

24

United States District Court
Northern District of California

1    was then defined in reference to 26 U.S.C. § 32(c)(2). § 6428(e)(4). At the end of all

2    those cross-references, the definition of "earned income" provided that "no amount

3    received for services provided by an individual while the individual is an inmate at a penal

4    institution shall be taken into account. § 32(c)(2)(B)(iv). The fact that Congress

5    previously devised a method to indirectly exclude incarcerated persons from the 2008

6    stimulus but included no such provision here indicates that Congress did not intend to

7    exclude incarcerated persons from the definition of "eligible individual."

8          The court also finds persuasive the fact that the IRS has asserted three different

9    interpretations of the term "eligible individual" since the enactment of the Act, barely six

10   months ago. Initially, the IRS disbursed nearly 85,000 EIPs to incarcerated persons and,

11   when the TIGTA questioned IRS management about this decision, the IRS "noted that

12   payments to these populations were allowed because the CARES Act does not prohibit

13   them from receiving a payment." Salahi Decl., Ex. 6 at 5. Then, as reflected in the FAQ,

14   (id., Ex. 4 at 2–3), the IRS's internal procedure manual, (id., Ex. 5 at 2), and the TIGTA

15   report, (id., Ex. 6 at 5), the IRS decided that incarcerated individuals are not eligible.

16   Now, the IRS takes the position in this litigation that, subject to generally applicable

17   administrative and judicial rules, the IRS plans to allow otherwise eligible individuals who

18   were only incarcerated for a portion of tax year 2020 to claim a CARES Act tax credit.

19   Desmond Decl. ¶ 8. The shifting interpretation demonstrates that the IRS "went well

20   beyond the 'bounds of its statutory authority.'" Utility Air Reg. Grp., 573 U.S. at 326

21   (quoting Arlington, 569 U.S. at 297).

22         In sum, the court finds that plaintiffs are likely to succeed on the merits of their

23   APA contrary to law claim. The statute mandates distribution of the advance refund to

24   eligible individuals. Incarcerated persons who otherwise qualify for an advance refund

25   are not excluded as an "eligible individual." The IRS's decision to exclude incarcerated

26   persons from advance refund payments is likely contrary to law.

27                    **b.      Section 706(2)—Arbitrary & Capricious**

28         "'[A]rbitrary and capricious' review under the APA focuses on the reasonableness

of an agency's decision-making processes." CHW W. Bay v. Thompson, 246 F.3d 1218, 1223 (9th Cir. 2001) (citations omitted). Agency action is invalid if the agency fails to give adequate reasons for its decisions, fails to examine the relevant data, or offers no "rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); see also Encino Motorcars, 136 S. Ct. at 2125. "Chevron deference is not warranted where the regulation is 'procedurally defective'—that is, where the agency errs by failing to follow the correct procedures in issuing the regulation." Encino Motorcars, 136 S. Ct. at 2125 (quoting Mead, 533 U.S. at 227). A rule is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." State Farm, 463 U.S. at 43.

Agencies are required to "reflect upon the information contained in the record and grapple with contrary evidence." Fred Meyer Stores, Inc. v. NLRB, 865 F.3d 630, 638 (D.C. Cir. 2017) (citing Haw. Dredging Constr. Co. v. NLRB, 857 F.3d 877, 881–82 (D.C. Cir. 2017)). Where "the agency has failed to 'examine the relevant data' or failed to 'articulate a rational explanation for its actions,'" its decision is arbitrary and capricious. Genuine Parts Co. v. EPA, 890 F.3d 304, 311–12 (D.C. Cir. 2018) (quoting Carus Chem. Co. v. EPA, 395 F.3d 434, 441 (D.C. Cir. 2005)). And where an agency is uncertain about the effects of agency action, it may not rely on "'substantial uncertainty' as a justification for its actions." Greater Yellowstone Coal., Inc. v. Servheen, 665 F.3d 1015, 1028 (9th Cir. 2011) (quoting State Farm, 463 U.S. at 52). Instead, it must "rationally explain why the uncertainty" supports the chosen approach. Id. ("Otherwise, we might as well be deferring to a coin flip."). "[A]n internally inconsistent analysis is arbitrary and capricious." Nat'l Parks Conservation Ass'n v. E.P.A., 788 F.3d 1134, 1141 (9th Cir. 2015) (citing Gen. Chem. Corp. v. United States, 817 F.2d 844, 857 (D.C. Cir. 1987) (per curiam)).

1    But "[t]he scope of review under the 'arbitrary and capricious' standard is narrow

2  and a court is not to substitute its judgment for that of the agency."  State Farm, 463 U.S.

3  at 43; San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d 581, 601 (9th Cir. 2014)

4  ("Although our inquiry must be thorough, the standard of review is highly deferential; the

5  agency's decision is 'entitled to a presumption of regularity,' and we may not substitute

6  our judgment for that of the agency." (quoting Citizens to Preserve Overton Park, Inc. v.

7  Volpe, 401 U.S. 402, 415–16 (1971), abrogated in part on other grounds as recognized in

8  Califano v. Sanders, 430 U.S. 99, 105 (1977))).

9    Here, the IRS has put forward virtually no public explanation concerning its

10  decision to withhold payments to incarcerated persons.  On May 6, 2020, the IRS posted

11  the following explanation on its website:

12    Q15.    Does someone who is incarcerated qualify for the
      Payment?

13

14    A15.  No.  A Payment made to someone who is incarcerated
      should be returned to the IRS by following the instructions
15    about repayments.  A person is incarcerated if he or she is
      described in one or more of clauses (i) through (v) of Section
16    202(x)(1)(A)  of  the  Social  Security  Act  (42  U.S.C.
      § 402(x)(1)(A)(i) through (v)).  For a Payment made with
17    respect to a joint return where only one spouse is incarcerated,
      you only need to return the portion of the Payment made on
18    account of the incarcerated spouse.  This amount will be $1,200
      unless adjusted gross income exceeded $150,000.

19  Compl. ¶ 15.  This answer described who is an incarcerated person and how an

20  incarcerated person should return an EIP.  It does not describe why or how the IRS

21  arrived at its decision to deny payments to incarcerated persons.  Similarly, defendants

22  appear to have amended their internal procedure manual to add "an incarcerated

23  individual" to the list of excluded individuals who are not eligible for a payment even after

24  having made such payments at the outset of the EIP disbursement.  Salahi Decl., Ex. 5.

25    Defendants have not directed the court to any other evidence indicating that the

26  Treasury Department or IRS gave any reason for its decision, much less an adequate

27

28

United States District Court
Northern District of California

one.[9]  While the court is cognizant of the burdens imposed by society's response to the COVID-19 pandemic layered onto the challenge of administering a massive stimulus program in a short amount of time, a basic tenet of the APA (and government generally) is to explain the basis for an agency's decision that affects legal rights and responsibilities.  The fact that defendants offer virtually no defense on the merits of plaintiffs' arbitrary and capricious claim is telling.  This concession is compounded by the shifting interpretation of the term "eligible individual" with no corresponding public explanation of why the IRS changed its interpretation or the basis for its current position.

For the foregoing reasons, the court finds plaintiffs are likely to succeed on the merits of their APA arbitrary and capricious claim.  Because both claims are likely to succeed on the merits, the court does not reach plaintiffs' claim under 5 U.S.C. § 706(1) that an agency action is unlawfully withheld or unreasonably delayed.

### 3.    Irreparable Harm

"A plaintiff seeking preliminary relief must 'demonstrate that irreparable injury is likely in the absence of an injunction.'"  California v. Azar, 911 F.3d 558, 581 (9th Cir. 2018) (quoting Winter, 555 U.S. at 22); Boardman v. Pac. Seafood Grp., 822 F.3d 1011, 1023 (9th Cir. 2016) ("A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" (quoting Winter, 555 U.S. at 22))).

"There must be a 'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined, and showing that 'the requested injunction would forestall' the irreparable harm qualifies as such a connection."  Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 886 F.3d 803, 819 (9th Cir. 2018) (citing Perfect 10, Inc. v. Google, Inc., 653 F.3d 976, 981–82 (9th Cir. 2011)).  "However, a plaintiff 'need not further show that the action sought to be enjoined is the exclusive cause of the injury.'"

---

[9] While not dispositive, plaintiffs' complaint quotes an IRS spokesperson who said, "I can't give you the legal basis.  All I can tell you is this is the language the Treasury and ourselves have been using."  Compl. ¶ 18.

28

1   Id. (quoting M.R. v. Dreyfus, 697 F.3d 706, 728 (9th Cir. 2012)).

2        The irreparable harm "analysis focuses on irreparability, 'irrespective of the

3   magnitude of the injury.'" Azar, 911 F.3d at 581 (quoting Simula, Inc. v. Autoliv, Inc., 175

4   F.3d 716, 725 (9th Cir. 1999)). "[T]he temporary loss of income, ultimately to be

5   recovered, does not usually constitute irreparable injury." Sampson v. Murray, 415 U.S.

6   61, 90 (1974). But the general rule that "[e]conomic harm is not normally considered

7   irreparable" does not apply where there is no adequate remedy to recover those

8   damages, such as in APA cases. Azar, 911 F.3d at 581 (citing 5 U.S.C. § 702).

9        Whether the temporary loss of income constitutes an irreparable injury varies

10  depending on the facts of the case. For some, the temporary loss of income is a

11  temporary inconvenience and can be easily remedied at law. Thus, in Los Angeles

12  Memorial Coliseum Commission v. National Football League, 634 F.2d 1197, 1202 (9th

13  Cir. 1980), the only alleged injury was lost revenues due to the plaintiff's failure to acquire

14  an NFL team. The court determined that the injury was not irreparable because the lost

15  revenues would be compensable by a damage award if the plaintiff prevailed on the

16  merits. Id.; see also Kitazato v. Black Diamond Hosp. Invs., LLC, 655 F. Supp. 2d 1139,

17  1147 (D. Haw. 2009) (finding no irreparable harm where only injury was an increase in

18  management fees by plaintiff owners of Hawaii resort hotel). In Cool Fuel, Inc. v.

19  Connett, 685 F.2d 309, 313 (9th Cir. 1982), the president of the corporate taxpayer

20  admitted the taxpayer's ability to pay the tax in question and the Ninth Circuit held that

21  the taxpayer had an adequate remedy at law.

22        For others, the temporary loss of income or benefits could seriously impair their

23  ability to procure the basic necessities of life. The Ninth Circuit in Beno v. Shalala, 30

24  F.3d 1057, 1064 n.10 (9th Cir. 1994), recognized an aspect of this noting that

25  "[n]umerous cases have held that reductions in [Aid to Families with Dependent Children]

26  benefits, even reductions of a relatively small magnitude, impose irreparable harm on

27  recipient families." In dissent, Justice Marshall summarized the issue as follows:

28        I cannot accept the majority's apparent holding, buried deep in

United States District Court
Northern District of California

> a footnote, that because of the Back Pay Act, a temporary loss
> in income can never support a finding of irreparable injury, no
> matter how severely it may affect a particular individual.  Many
> employees may lack substantial savings, and a loss of income
> for more than a few weeks' time might seriously impair their
> ability to provide themselves with the essentials of life—e.g.,.
> to buy food, meet mortgage or rent payments, or procure
> medical services.

Sampson, 415 U.S. at 101 (Marshall, J., dissenting) (citations omitted).  While Justice

Marshall's statement is non-binding, the Ninth Circuit has held that irreparable harm can

exist where a plaintiff lacks the resources to procure the basic necessities of life.

In Jensen v. I.R.S., 835 F.2d 196, 198 (9th Cir. 1987), the plaintiff alleged that he

lost an opportunity to challenge a tax deficiency in tax court because the IRS failed to

send him a notice of deficiency.  There was evidence in the record demonstrating that the

plaintiff earned $1,087 a month and the IRS seized $664 of that income leaving him $144

per month to support a family of five.  Id.  The Ninth Circuit[10] reasoned that the levy on

the plaintiff's wages caused more than monetary harm; "[i]t deprived [the plaintiff] of the

ability to provide necessities of life for himself and family."  Id.

In Lopez v. Heckler, 713 F.2d 1432, 1433 (9th Cir. 1983), the Ninth Circuit held

that there was an irreparable injury in a challenge to the policies and procedures in

terminating Social Security disability benefits.  The court discussed at length the harm at

issue:

> We also consider it crucial that, because the members of
> plaintiffs' class are largely infirm and disabled, their resources
> and life spans are by definition extremely limited.  Deprivation
> of benefits pending trial might cause economic hardship,
> suffering or even death.  Retroactive restoration of benefits

---

[10] Defendants would distinguish Jensen and other similar cases cited by plaintiffs as improperly relying on the Ninth Circuit's "possibility" of irreparable harm standard that was overturned by the Supreme Court in Winter v. Natural Resources Defense Council, Inc., 555 U.S. at 22.  Opp. at 15.  The Court reiterated that the correct standard is that a plaintiff seeking preliminary relief must demonstrate that irreparable injury is likely in the absence of an injunction.  Id.  Yet, in Winter, the district court determined that the plaintiffs had established a "near certainty" of irreparable harm.  Id.  Thus, Winter was referring to the likelihood of irreparable harm occurring, not the type of harm itself.  This is evident from the spectrum of terms used to describe the likelihood of an event occurring: possibility (insufficient), likely (sufficient), or near certainty (sufficient).  As plaintiffs point out, (Reply at 13), they cite cases not for the likelihood of harm but for whether loss of financial aid can constitute an irreparable harm at all.

United States District Court
Northern District of California

would be inadequate to remedy these hardships.

Id. at 1437.

Before applying the foregoing standards, a brief review of the financial situation of incarcerated persons is warranted. Incarcerated persons stand in a unique position of sorts. On the one hand, the state provides some basic essentials regardless of income such as housing, some food, and medical care. Because they have been sentenced, state prisons need not and do not pay incarcerated persons anywhere near the minimum wage. See U.S. Const. amend. XIII, § 1. Yet, most incarcerated persons have few means to support themselves. Most individuals are economically disadvantaged before they enter prison. Salahi Decl., Ex. 8 at 1 (citing 2015 study finding "incarcerated people had a median annual income of $19,185 prior to their incarceration, which is 41% less than non-incarcerated people of similar ages"). Due to the COVID-19 pandemic, the economic downturn affecting Americans outside of prison also impacts those inside prison. Plaintiff Scholl explained that he normally works as a porter and also receives anywhere from $30 to $100 from outside publications that publish his art; however, his hours worked as a porter have decreased as has his income from outside sources. Declaration of Colin Scholl ("Scholl Decl."), Dkt. 13, ¶ 5.

As plaintiffs and amici have demonstrated, prisons do not provide all basic necessities required by incarcerated persons, including food and hygiene. With respect to food, incarcerated people supplement their food with items from the commissary, especially since plaintiffs submit evidence that some institutions have reduced the number of calories or meals provided to inmates. Salahi Decl., Ex. 30 at 369 n.44. Food insecurity is linked to negative health impacts, (Amicus Br. at 16), such that a delay in the ability to purchase adequate food is a harm with immediate consequences. Plaintiffs also present evidence that some penal institutions require inmates to pay for their own soap and personal hygiene items. Salahi Decl., Ex. 25 at 2, Exs. 26–28. Moreover, both individual plaintiffs filed declarations stating that they spend anywhere from $36 to $100 a month on hygiene products. Scholl Decl. ¶ 4; Declaration of Lisa Strawn ("Strawn

Decl."), Dkt. 14, ¶ 9.

Communication is also an issue for incarcerated persons.  Prisons charge inmates to use the telephone at an average rate of $5.70 in jail for a 15-minute call and $2.03 in prison for the same time.  Brief of Amici Curiae ("Amicus Br."), Dkt. 40-1 at 8; Salahi Decl., Ex. 19.  At the same time, the COVID-19 pandemic has eliminated in person visits, (Salahi Decl., Ex. 17), while infection in prisons dramatically increase.  E.g., Strawn Decl. ¶ 4 (over 2,000 people in San Quentin state prison infected).  Plaintiff Scholl states that contact helps him mitigate the psychological impacts of social isolation.  Scholl Decl. ¶ 4.  Plaintiff Strawn states that without contact with friends and family, "it would have been difficult and possibly impossible for us to maintain our mental and physical health in prison and to focus on rehabilitation and reentry."  Strawn Decl. ¶ 9.

Incarcerated persons often cannot bear the entirety of costs associated with acquiring basic necessities in prison—food, hygiene, and communication.  The remaining costs often fall on the families of the incarcerated.  Amicus Br. at 9; Salahi Decl., Ex. 11; Strawn Decl. ¶ 9.  These families are also suffering from the economic effects of the pandemic including loss of jobs or wages.  Amicus Br. at 11; Salahi Decl., Ex. 16.  Moreover, the cost of supporting incarcerated persons does not end when they are released from prison; family members are often asked to provide housing, employment, and healthcare for formerly incarcerated persons.  Amicus Br. at 9.

Individuals released from prison during 2020 who did not receive an advance refund are also suffering harm.  Defendants aver that the IRS currently plans to make the CARES Act tax credit available to eligible individuals released from prison during 2020.  Desmond Decl. ¶ 7.  Yet, the harms felt by recently released individuals is particularly acute.  They no longer have the housing and food provided by prison, have uncertain employment, and often have additional financial burdens and other collateral consequences associated with their time in prison.  Amicus Br. at 20.  Plaintiff Strawn is exemplary of this category.  She had one day to prepare for her release and would use the EIP to pay for basic essentials such as food, clothes, and hygiene products.  Strawn

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Decl. ¶¶ 3, 7.  In sum, recently released individuals face the same travails as non-

2  incarcerated eligible individuals who received an EIP but must wait until 2021 to receive a

3  tax credit from the IRS.

4  Irreparable harm does not lie where a plaintiff has an adequate remedy at law.

5  The foregoing evidence demonstrates that plaintiffs and those similarly situated are being

6  deprived basic necessities such as communication with loved ones, food, and hygiene

7  products.  Because they often exist on the margins of the economy and struggle to

8  acquire basic necessities, the harm suffered by these individuals[11] cannot be adequately

9  remedied with later monetary relief.  Indeed, defendants have made clear their position

10  that such relief could only be sought after a taxpayer files a tax return in 2021 (for the

11  year 2020), the IRS denies the tax credit, the taxpayer exhausts all administrative

12  remedies, and then the taxpayer files suit.  The evidence demonstrates that plaintiffs are

13  currently suffering harm and such harm is neither speculative nor remote.

14  To summarize, the irreparable harm "analysis focuses on irreparability,

15  'irrespective of the magnitude of the injury.'"  Azar, 911 F.3d at 581.  Plaintiffs have

16  established they are likely to be irreparably injured without an injunction.

17  **4.      Balance of Equities and Public Interest**

18  "A court must 'balance the interests of all parties and weigh the damage to each' in

19  determining the balance of the equities."  CTIA – The Wireless Ass'n v. City of Berkeley,

20  928 F.3d 832, 852 (9th Cir. 2019) (quoting Stormans, Inc. v. Selecky, 586 F.3d 1109,

21  1138 (9th Cir. 2009)).  "When the government is a party, the last two factors merge."

22  Azar, 911 F.3d at 575.  Therefore, the public interest analysis is subsumed in the balance

23  of equities.

24  The potential damage to plaintiffs and putative class members is evident from the

25

_____

26  [11] The parties spar over whether the harm suffered by families and friends of incarcerated
persons is cognizable for purposes of the irreparable harm analysis.  Mtn. at 18; Opp. at
27  17.  While the court does not discount the immense burden felt by these family members,
plaintiffs have sufficiently established an irreparable harm on their own and with respect
28  to putative class members.  Therefore, the court does not reach the issue of whether it
can weigh the harm felt by family members.

United States District Court
Northern District of California

1    court's discussion of irreparable harm.  Briefly, the harm suffered by incarcerated persons

2    is acute and ongoing.  Their interest in injunctive relief is substantial.

3        Defendants arguments concerning harms to the government are not persuasive.

4    First, defendants argue the IRS would be faced with significant logistical challenges if

5    they are required to issue an additional round of advance refund payments.  Opp. at 18.

6    There is some force behind this argument as the IRS has administered a massive

7    stimulus program in a relatively short period while its employees also responded to the

8    burdens imposed by the pandemic response.  A few facts mitigate the burden on the IRS.

9        First, the IRS already issued EIP payments to some incarcerated persons in April

10   2020, that they then intercepted or required to be returned.  In that sense, the logistics of

11   issuing payments to incarcerated persons should be at least familiar.  Second, as

12   defendants acknowledge, federal law requires the Federal Bureau of Prisons and the

13   head of any State agency charged with administration of prisons to provide the IRS with a

14   variety of information.  Id. at 7–8 (citing 26 U.S.C. § 6116).  Defendants further state that

15   they used this and other information to determine which individuals were not eligible for

16   the advance payments of the CARES Act tax credit.  Id. at 8; Desmond Decl. ¶ 7.  This

17   demonstrates that the information required to disburse EIPs to incarcerated persons is

18   already available to the IRS.

19       Next, defendants cite pending legislation that could specify that incarcerated

20   persons are not eligible for payments under the CARES Act.  Opp. at 18.  Defendants

21   admit that this is speculative.  To add further speculation, defendants concede that there

22   are competing bills in the House and Senate, with the former not discussing incarcerated

23   persons and the latter excluding payments to incarcerated persons.  This argument is

24   simply too speculative to credit; trying to predict whether legislation will pass and what it

25   will contain and then assessing the potential logistical impact on the IRS does not

26   overcome the actual harms currently being suffered by plaintiffs and does not permit the

27   IRS from modifying the clear statutory command in the CARES Act.

28       Finally, defendants cite evidence of fraud and identity theft.  Defendants contend

34

United States District Court
Northern District of California

that the impetus behind issuing the FAQ concerning incarcerated persons was the IRS's concerns regarding fraud.  Desmond Decl. ¶ 5.  Defendants state that in calendar year 2018, the IRS found 6,799 tax returns filed under the social security numbers of prisoners to be false and fraudulent.  Id. ¶ 6.  This sample is not an isolated case and reflects progress from earlier years in reducing fraudulent tax activities.  Defendants also cite prior TIGTA reports and press releases discussing tax refund fraud among prisoners.  Opp. at 7.

Fraud and identity theft are legitimate concerns and constitute a valid burden on the government.  Moreover, the CARES Act delegates authority to the Secretary to issue regulations or other guidance to carry out the Act, including any measures to avoid allowing multiple credits or rebates to a taxpayer.  It is a short logical leap to determine that Congress delegated authority to take necessary steps to avoid allowing any credit or rebate to those not permitted to receive a credit or rebate in the first instance, i.e., in cases of fraud and identity theft.  Yet, defendants have not logically connected the identified burden (fraud) and their remedy (no payments to incarcerated persons).  They cite slightly less than 7,000 total cases of fraud in 2018, though they submit that the number of fraud cases seems to have been greater in the past.  Nearly 85,000 payments were issued to incarcerated persons as part of the April 10th tranche.  Salahi Decl., Ex. 6 at 6.  Presumably there would be additional payments if the court were to certify a class and issue an injunction.  Given the relative low number of past fraud cases compared to the higher number of incarcerated persons otherwise eligible for the EIP, the burden identified by defendants does not outweigh the burden on plaintiffs.

Significantly, when plaintiffs establish that the government's policy violates federal law, the balance of hardships and public interest tip in their favor.  J.L. v. Cissna, 341 F. Supp. 3d 1048, 1070 (N.D. Cal. 2018), (citing Ariz. Dream Act Coal. v. Brewer, 757 F.3d 1053, 1069 (9th Cir. 2014); and Valle del Sol, Inc. v. Whiting, 732 F.3d 1006, 1029 (9th Cir. 2013)); see also League of Women Voters of U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency

United States District Court
Northern District of California

1   action.  To the contrary, there is a substantial public interest in having governmental

2   agencies abide by the federal laws that govern their existence and operations." (internal

3   quotations and citations omitted)).  Given plaintiffs' strong likelihood of success on the

4   merits, this principle also points in favor of an injunction.

5        For the foregoing reasons, the court finds the balance of equities and the public

6   interest tips in plaintiffs' favor and a preliminary injunction would be in the public interest.

7   **C.**    **Motion for Class Certification**

8        Plaintiffs move to certify a class of incarcerated individuals who were incarcerated

9   at any point from March 27, 2020 to the present and who meet the requirements of the

10   CARES Act for an advance refund.  Mtn. at 19.  In response, defendants' opposition does

11   not address the merits of plaintiffs' motion for class certification and instead requests that

12   if the court does not deny the motion for preliminary injunction, that the parties be allowed

13   further briefing on this issue.  Opp. at 2 n.1.  Plaintiffs then filed a notice pointing out that

14   defendants' opposition did not argue against class certification and asking the court to

15   enter an order granting the motion to certify.  Dkt. 45.  Defendants filed a response

16   stating that they did in fact oppose the motion and arguing that a motion for class

17   certification is premature.  Dkt. 46.

18        The court notes that defendants have been on notice of plaintiffs' motion for class

19   certification since early August.  The Civil Local Rules provide that any opposition to a

20   noticed motion must be filed and served not more than 14 days after the motion was filed.

21   Civ. L.R. 7-3(a).  In addition to the minimum time required by the Local Rules, the court

22   granted a two-week extension to the briefing schedule at defendants' request and

23   stipulated to by plaintiffs.  See Dkt. 29.  Despite this additional time, defendants'

24   opposition does not contain any <u>substantive argument</u> opposing plaintiffs' motion for

25   class certification.  Simply put, the court will not countenance a practice whereby one

26   party adopts a "wait and see" approach, testing how it will prevail on the motion for

27   preliminary injunction while delaying resolution of a noticed motion for class certification.

28   Accordingly, the court proceeds to consider plaintiffs' motion for class certification;

United States District Court
Northern District of California

1  however, plaintiffs must meet the requirements of Rule 23 independent of any non-

2  opposition by defendants.  See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350

3  (2011).  ("A party seeking class certification must affirmatively demonstrate his

4  compliance with the Rule—that is, he must be prepared to prove that there are in fact

5  sufficiently numerous parties, common questions of law or fact, etc." (emphasis added)).

6       Further, in their separately filed notice, defendants contend that plaintiffs' motion

7  for class certification is premature and the practice employed in a majority of class

8  actions is to resolve class certification after an appropriate period of discovery.  Dkt. 46 at

9  2.  The court is mindful of the concerns raised by defendants, but in many respects, this

10  is not a typical case.  The CARES Act places an unambiguous deadline on advance

11  refund payments of December 31, 2020.  The IRS has also imposed an October 15, 2020

12  deadline for non-filers to use the IRS's portal to register and file for an EIP.  Permitting

13  discovery for purposes of certifying a class followed by additional briefing on a renewed

14  class certification motion will likely moot plaintiffs' APA claims as related to the EIP.

15       The court finds persuasive the approach taken by the district court in Saravia v.

16  Sessions, 280 F. Supp. 3d 1168 (N.D. Cal. 2017).  There, the plaintiffs filed a putative

17  class action challenging the federal government's practice of holding previously arrested

18  and released noncitizen minors who were then re-arrested in custody beyond seven days

19  while removal proceedings were pending.  Id. at 1177.  The plaintiffs sought a preliminary

20  injunction and class certification enjoining the practice of holding minors longer than

21  seven days without providing them a hearing to contest their confinement.  Id.  Because

22  of the time sensitive nature of the plaintiffs' requested relief, the court provisionally

23  certified a class for purposes of the preliminary injunction.  Id. at 1201–02.

24       A similar approach is applicable here; if plaintiffs meet the requirements under

25  Rule 23, the court will provisionally certify a class for purposes of the preliminary

26  injunction.

27  / / /

28  / / /

**1.    Rule 23(a)**

    **a.    Numerosity**

Rule 23(a)(1) requires that a proposed class be so numerous that joinder of all members is impracticable.  Fed. R. Civ. P. 23(a)(1).  While there is no fixed number that satisfies the numerosity requirement, courts often find that a group greater than 40 members meets such requirement.  Californians for Disability Rights, Inc. v. Cal. Dep't of Transp., 249 F.R.D. 334, 346 (N.D. Cal. 2008); Hernandez v. Cnty. of Monterey, 305 F.R.D. 132, 152–53 (N.D. Cal. 2015) ("A class or subclass with more than 40 members 'raises a presumption of impracticability based on numbers alone.'" (citation omitted)).  A court may make "common-sense assumptions and reasonable inferences" when analyzing numerosity.  West v. Cal. Servs. Bureau, Inc., 323 F.R.D. 295, 303 (N.D. Cal. 2017) (citing The Civil Rights Educ. & Enforcement Ctr. v. RLJ Lodging Trust, 2016 WL 314400, at *6 (N.D. Cal. Jan. 25, 2016)).

Plaintiffs argue that numerosity is satisfied because joinder of over 1.4 million incarcerated persons as parties would be impractical.  Mtn. at 20.  The court agrees with plaintiffs because, at the very least, the IRS initially issued EIPs to nearly 85,000 incarcerated persons before issuing guidance to intercept the payments, repay the EIPs, or void the payment check.  Salahi Decl., Ex. 6 at 6.  This factor is met.

    **b.    Commonality**

Rule 23(a)(2) requires questions of law or fact common to the class.  Fed. R. Civ. P. 23(a)(2).  Under this requirement, plaintiffs must "demonstrate that the class members have suffered the same injury," not merely violations of "the same provision of law." Dukes, 564 U.S. at 349–50.  Given that, plaintiffs' claims "must depend upon a common contention" such that "determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Id.  "What matters to class certification . . . is not the raising of common questions—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  Id.

United States District Court
Northern District of California

1    To that end, the Ninth Circuit has explained that, under this requirement, "plaintiffs

2  need not show that every question in the case, or even a preponderance of questions, is

3  capable of classwide resolution.  So long as there is even a single common question, a

4  would-be class can satisfy the commonality requirements of Rule 23(a)(2)."  Wang v.

5  Chinese Daily News, Inc., 737 F.3d 538, 544 (9th Cir. 2013).  Thus, "where the

6  circumstances of each particular class member vary but retain a common core of factual

7  or legal issues with the rest of the class, commonality exists."  Evon v. Law Offices of

8  Sidney Mickell, 688 F.3d 1015, 1029 (9th Cir. 2012).

9    Plaintiffs argue that common questions include whether the CARES Act authorizes

10  defendants to withhold stimulus payments from incarcerated persons based solely on

11  their status and whether defendants' policy of refusing to issue CARES Act payments to

12  otherwise eligible incarcerated persons is contrary to law, exceeds statutory authority, or

13  is otherwise arbitrary and capricious, among several other questions.  See Mtn. at 20–21.

14    Plaintiffs meet the commonality requirement.  First, plaintiffs and the class are

15  asserting the same legal claim, that defendants' decision to withhold EIPs to incarcerated

16  persons violates the APA.  Second, the facts underlying the class's claims are both

17  straightforward and the same: some percentage of incarcerated persons are owed

18  advance refunds under the mechanism established by the CARES Act, the IRS made a

19  decision applicable to all incarcerated persons to exclude them from that payment, and

20  the incarcerated persons did not receive those payments.  Third, the legal injury in all

21  cases is the same, incarcerated persons did not receive the EIPs provided for by the

22  CARES Act.  Fourth, class members and plaintiffs are all challenging the same IRS policy

23  that excludes them from receiving the advance refund.  Fifth, plaintiffs seek the same

24  relief, an injunction enjoining defendants from enforcing their unlawful policy.

25    In light of the foregoing, plaintiffs' common questions of law and fact easily satisfy

26  the commonality requirement.

27    **c.    Typicality**

28  Rule 23(a)(3) requires that the claims of the named plaintiffs be typical of those of

the proposed class.  Fed. R. Civ. P. 23(a)(3).  "The test for typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'"  Sandoval v. Cty. of Sonoma, 912 F.3d 509, 518 (9th Cir. 2018) (quoting Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992)).

Plaintiffs contend that their claims arise from the same course of events and rely on the same legal arguments as other class members.  Mtn. at 21.  The court agrees. Both plaintiffs Scholl and Strawn were incarcerated for either the entirety or a portion of the class period and did not receive advance refunds despite being otherwise eligible. Scholl Decl. ¶ 2; Strawn Decl. ¶ 2.  As demonstrated by the IRS's decision to claw back previously issued payments to incarcerated persons and withhold payment in May 2020, the conduct in question is not unique to the named plaintiffs and other class members have been injured by defendants' course of conduct.

### d.    Adequacy

Rule 23(a)(4) requires that the party representatives fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a)(4).  The Ninth Circuit has set forth a two-part test for this requirement: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  Staton v. Boeing Co., 327 F.3d 938, 957 (9th Cir. 2003).

Additionally, Rule 23(g) requires that a district court appoint class counsel for any class that is certified and further lists the following four factors relevant to such appointment: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions or other complex litigation and the type of claims in the litigation; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class.  Fed. R. Civ. P. 23(g).  Additionally, a court may consider the proposed counsel's professional qualifications, skill, and experience, as well as such counsel's performance in the action

United States District Court
Northern District of California

1   itself.  In re Emulex Corp. 210 F.R.D. 717, 720 (C.D. Cal. 2002) (citing In re Gen. Motors

2   Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 801 (3d Cir.1995); and

3   Sullivan v. Chase Inv., 79 F.R.D. 246, 258 (N.D. Cal. 1978)).

4       Plaintiffs assert there are no conflicts between named plaintiffs and their counsel

5   and the proposed class.  Mtn. at 21.  They also contend that class counsel[12] has

6   significant experience prosecuting class actions.  Id. at 22.

7       With regard to plaintiffs, the court finds no conflict between named plaintiffs and

8   the proposed class.  They seek the same injunctive relief as class members: an order

9   enjoining defendants from enforcing an unlawful policy.  Based on the filings in the case

10  to date, plaintiffs and their counsel have vigorously prosecuted this action on an

11  abbreviated timeline.

12      With regard to appointment of class counsel, the court finds plaintiffs' counsel

13  meet the requirements of Rule 23(g).  Plaintiffs' counsel has diligently identified claims in

14  a short timespan: the CARES Act was enacted on March 27, 2020, the IRS changed its

15  policy regarding incarcerated persons in early May 2020, and this lawsuit was filed

16  August 1, 2020.  Plaintiffs' counsel has significant knowledge and experience litigating

17  cases involving civil rights, complex litigation, or both.  See Declaration of Kelly Dermody,

18  Dkt. 9, ¶¶ 5–7; Declaration of Mona Tawatao, Dkt. 10, ¶¶ 4–6.

19      Thus, plaintiffs and their counsel are adequate representatives and counsel meet

20  the requirements of Rule 23(g) for appointment as class counsel.

21      **2.      Rule 23(b)(2)**

22      Having satisfied Rule 23(a), plaintiffs may maintain a class action under Rule

23  23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply

24  generally to the class, so that final injunctive relief or corresponding declaratory relief is

25  appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "Class

26  certification under Rule 23(b)(2) is appropriate only where the primary relief sought is

27  _____

28  [12] Proposed class counsel for the class is the law firm Lieff Cabraser Heimann &
    Bernstein, LLP and the civil rights firm Equal Justice Society.

41

United States District Court
Northern District of California

declaratory or injunctive." Ellis, 657 F.3d at 986 (quoting Zinser, 253 F.3d at 1195). The "predominance" and "superiority" requirements of Rule 23(b)(3) do not apply to Rule 23(b)(2) classes. Instead, "[i]t is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole. Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate." Walters v. Reno, 145 F.3d 1032, 1047 (9th Cir. 1998) (citations omitted).

Plaintiffs assert that Rule 23(b)(2) is met in this case because defendants implemented a generally applicable policy of denying CARES Act payments to incarcerated persons on the basis of their status. Mtn. at 22. They further argue that it is immaterial that, as a consequence of the injunctive relief, incidental monetary relief could flow to the class if defendants re-determine the class's eligibility for EIPs benefits under the correct legal standard. Id.

The court agrees with plaintiffs that defendants' policy is generally applicable to the class as a whole. The IRS has decided that all incarcerated persons are ineligible to receive the advance refund payment. While the IRS currently indicates that it will permit persons incarcerated for a portion of 2020 to claim the tax credit on their 2020 tax returns, no such concession has been made for the advance refunds. Rather, there is a uniform policy applicable to both incarcerated and formerly incarcerated persons.

The court is also persuaded that, even if the proposed injunction results in disbursement of monetary relief, the class may still be certified under Rule 23(b)(2). As the Supreme Court has noted, "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" Dukes, 564 U.S. at 360 (citation omitted). Conversely, relief under Rule 23(b)(2) is not appropriate when there is "an individualized award of monetary damages." Id. at 361; see also id. at 362 ("[I]ndividualized monetary claims belong in Rule 23(b)(3).").

In this case, it is significant that plaintiffs request an injunction relating to a generally applicable policy, but any individual determination of monetary relief is left to

the IRS, not the court.  See Wit v. United Behavioral Health, 317 F.R.D. 106, 133 (N.D. Cal. 2016) ("What is of particular significance is that even if Plaintiffs prevail on their request for an injunction requiring that all claims decided under the allegedly faulty Guidelines be reprocessed, the Court will not be required to address individualized claims for damages.").  Because this case does not involve individual determinations regarding monetary damages, the procedural protections provided to a Rule 23(b)(3) class are not necessary.  Dukes, 564 U.S. at 362–63 ("When a class seeks an indivisible injunction benefiting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute.").  The court views plaintiffs' injunction as only a request to enjoin enforcement of an unlawful policy.  Whether a taxpayer otherwise meets the requirements for the EIP is left to the IRS.  For that reason, this class is properly certified under Rule 23(b)(2).

In sum, plaintiffs have met the requirements for class certification under Rule 23(b)(2).  The court provisionally certifies a class of:

> All United States citizens and legal permanent residents who:
>
> (a) are or were incarcerated (i.e., confined in a jail, prison, or other penal institution or correctional facility pursuant to their conviction of a criminal offense) in the United States, or have been held to have violated a condition of parole or probation imposed under federal or state law, at any time from March 27, 2020 to the present;
>
> (b) filed a tax return in 2018 or 2019, or were exempt from a filing obligation because they earned an income below $12,000 (or $24,400 if filing jointly) in the respective tax year;
>
> (c) were not claimed as a dependent on another person's tax return; and
>
> (d) filed their taxes with a valid Social Security Number, and, if they claimed qualifying children or filed jointly with another person, those individuals also held a valid Social Security Number.
>
> Excluded from the class are estates and trusts; defendants; the officers, directors, or employees of any defendant agency; and,

United States District Court
Northern District of California

1    any judicial officer presiding over this action and his/her immediate family and judicial staff.

2    The court further appoints Colin Scholl and Lisa Strawn as representatives of the class

3    and appoints Kelly M. Dermody of Lieff, Cabraser, Heimann & Bernstein LLP and Eva J.

4    Paterson of the Equal Justice Society as co-lead class counsel.

5                                      **CONCLUSION**

6            For the foregoing reasons, plaintiffs' motion for preliminary injunction and motion

7    for class certification is GRANTED.

8                                **PRELIMINARY INJUNCTION**

9            Defendants Steven Mnuchin, in his official capacity as the Secretary of the U.S.

10   Department of Treasury; Charles Rettig, in his official capacity as U.S. Commissioner of

11   Internal Revenue; the U.S. Department of the Treasury; the U.S. Internal Revenue

12   Service; and the United States of America, are hereby enjoined from withholding benefits

13   pursuant to 26 U.S.C. § 6428 from plaintiffs or any class member on the sole basis of

14   their incarcerated status.  Within 30 days, defendants shall reconsider advance refund

15   payments to those who are entitled to such payment based on information available in

16   the IRS's records (i.e., 2018 or 2019 tax returns), but from whom benefits have thus far

17   been withheld, intercepted, or returned on the sole basis of their incarcerated status.

18   Within 30 days, defendants shall reconsider any claim filed through the "non-filer" online

19   portal or otherwise that was previously denied solely on the basis of the claimant's

20   incarcerated status.  Defendants shall take all necessary steps to effectuate these

21   reconsiderations, including updates to the IRS website and communicating to federal and

22   state correctional facilities.  Within 45 days, defendants shall file a declaration confirming

23   these steps have been implemented, including data regarding the number and amount of

24   benefits that have been disbursed.

25   / / /

26   / / /

27   / / /

28   / / /

The injunction will remain in effect until a resolution of this action on the merits.

**IT IS SO ORDERED.**

Dated: September 24, 2020

/s/ Phyllis J. Hamilton

PHYLLIS J. HAMILTON
United States District Judge