1

2

3

4                  UNITED STATES DISTRICT COURT

5                NORTHERN DISTRICT OF CALIFORNIA

6

7   COLIN SCHOLL, et al.,

8              Plaintiffs,                    Case No.  20-cv-05309-PJH

9        v.
                                             **ORDER GRANTING IN PART AND**
10  STEVEN MNUCHIN, et al.,                   **DENYING IN PART MOTION FOR**
                                             **SUMMARY JUDGMENT AND**
11             Defendants.                    **DENYING MOTION FOR STAY**

12                                           Re: Dkt. Nos. 54, 58

13

14         Before the court are defendants Steven Mnuchin, Charles Rettig, the U.S.

15  Department of the Treasury, the U.S. Internal Revenue Service ("IRS"), and the United

16  States of America's (collectively "defendants") motion for stay of preliminary injunction

17  pending appeal (Dkt. 58, "Mtn.") and plaintiffs Colin Scholl and Lisa Strawn's ("plaintiffs")

18  motion for summary judgment, (Dkt. 54, "MSJ").  The matters are fully briefed and

19  suitable for resolution without oral argument.  Having read the parties' papers and

20  carefully considered their arguments and the relevant legal authority, and good cause

21  appearing, the court rules as follows.

22                              **BACKGROUND**

23         On August 1, 2020, plaintiffs filed a complaint ("Compl.") in this class action

24  asserting three causes of action: (1) violation of the Administrative Procedure Act

25  ("APA"), 5 U.S.C. § 706(1); (2) violation of the APA, 5 U.S.C. §§ 702, 706(2); and

26  (3) violation of the CARES Act, 26 U.S.C. § 6824, and the Little Tucker Act, 28 U.S.C.

27  § 1346(a)(2).  Dkt. 1.  On August 4, 2020, plaintiffs filed a motion for preliminary

28  injunction, motion for class certification, and motion to appoint co-lead counsel.  Dkt. 8.

United States District Court
Northern District of California

On September 24, 2020, the court granted plaintiffs' motions, provisionally certified a class, and entered a preliminary injunction.  Dkt. 50.

Defendants are responsible for administering economic impact payments ("EIP") to eligible individuals pursuant to the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act" or the "Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), which was signed into law on March 27, 2020.  Plaintiffs are incarcerated and formerly incarcerated individuals who did not receive payments and members of the class are all similarly situated persons who are or were incarcerated, otherwise met the criteria to receive an EIP under the CARES Act but did not receive an EIP.  Compl. ¶¶ 4–5, 33.

The CARES Act, codified in part at section 6428 of the Internal Revenue Code, 26 U.S.C. § 6428, establishes a tax credit for eligible individuals in the amount of $1,200 ($2,400 if filing a joint return), plus $500 multiplied by the number of qualifying children. 26 U.S.C. § 6428(a).[1]  For purposes of the Act, an eligible individual is defined as "any individual" other than (1) any nonresident alien individual, (2) any individual who is allowed as a dependent deduction on another taxpayer's return, and (3) an estate or trust.  § 6428(d).  The EIP is an advance refund of the subsection (a) tax credit and subsection (f) describes the mechanism for implementing the advance refund. Paragraph (1) of subsection (f) provides that "each individual who was an eligible individual for such individual's first taxable year beginning in 2019[2] shall be treated as having made a payment against the tax imposed by chapter 1 for such taxable year in an amount equal to the advance refund amount for such taxable year."  § 6428(f)(1).

Paragraph (3) of subsection (f) requires the IRS to "refund or credit any overpayment attributable to this section as rapidly as possible."  § 6428(f)(3). Additionally, Congress provided that "[n]o refund or credit shall be made or allowed under this subsection after December 31, 2020."  Id.  The CARES Act also has a reconciliation

[1] A more complete description of the Act can be found in the court's prior order.  Dkt. 50 at 2–4.

[2] The Act permits the IRS to use other information besides a taxpayer's 2019 tax returns including 2018 returns.  See § 6428(f)(5).

1  provision between the advance refund and the tax credit such that if a taxpayer receives

2  an advance refund of the tax credit then the amount of the credit is reduced by the

3  aggregate amount of the refund.  § 6428(e).

4      Three days after the President signed the CARES Act, the IRS issued a news

5  release explaining that the agency would calculate and automatically issue an EIP to

6  eligible individuals.  Declaration of Yaman Salahi ("Salahi Decl."), Dkt. 55, Ex. 1 at 1.

7  Though not required to do so by the Act, the IRS established an online portal for

8  individuals who are not typically required to file federal income tax returns (e.g., because

9  an individual's income is less than $12,200), which allows those non-filers to enter their

10  information to receive an EIP.  Id., Ex. 2.  Individuals who use the non-filer online portal

11  have until October 15, 2020[3] to register in order to receive the EIP by the December 31,

12  2020 deadline imposed by the CARES Act.  Id., Ex. 3.

13      On May 6, 2020, the IRS published responses to "Frequently Asked Questions"

14  ("FAQ") on the IRS.gov website.  Id., Ex. 4.  Question 15 asked "Does someone who is

15  incarcerated qualify for the Payment [i.e., an EIP]?"  The IRS responded:

> A15.  No.  A Payment made to someone who is incarcerated
> should be returned to the IRS by following the instructions
> about repayments.  A person is incarcerated if he or she is
> described in one or more of clauses (i) through (v) of Section
> 202(x)(1)(A) of the Social Security Act (42 U.S.C. § 402
> (x)(1)(A)(i) through (v)).  For a Payment made with respect to
> a joint return where only one spouse is incarcerated, you only
> need to return the portion of the Payment made on account of
> the incarcerated spouse.  This amount will be $1,200 unless
> adjusted gross income exceeded $150,000.

22  Id.  On June 18, 2020, the IRS updated its internal procedures manual to reflect the

23  policy stated in response to the FAQ.  Id., Ex. 5.

24      On June 30, 2020, the Treasury Inspector General for Tax Administration

25  ("TIGTA") issued a report on the interim results of the 2020 filing season, including results

26

27  _____

28  [3] The IRS later extended this deadline to November 21, 2020 with respect to the online portal, (Dkt. 67 at 6) and this court extended the postmark deadline to October 30, 2020 with respect to mailed paper returns, (Dkt. 69 at 7–8).

1    of an audit on the IRS's issuance of the EIPs.  Id., Ex. 6.  The TIGTA noted that on April

2    10, 2020 the IRS issued 81.4 million CARES Act payments and some of those payments

3    were sent to incarcerated individuals and deceased individuals.  Id. at 4.[4]  At the time, the

4    TIGTA notified IRS management of its concern regarding the issuance of such payments

5    to incarcerated individuals.  The report then stated "IRS management noted that

6    payments to these populations of individuals were allowed because the CARES Act does

7    not prohibit them from receiving a payment.  However, the IRS subsequently changed its

8    position, noting that individuals who are prisoners or deceased are not entitled to an EIP."

9    Id. at 5.  The IRS provided taxpayer identification numbers of incarcerated individuals to

10   the Bureau of Fiscal Service[5] ("BFS") and requested that BFS remove those individuals

11   from subsequent payments issued on May 1, 2020 and May 8, 2020.  Id.  There were no

12   payments to incarcerated individuals in these later tranches.

13       TIGTA calculated that the April 10th disbursement sent 84,861 payments totaling

14   approximately $100 million to incarcerated individuals.  Id. at 6, fig. 3.  In response to

15   these already issued payments, the IRS issued guidance, as reflected in the FAQ, that

16   individuals who received a direct deposit payment in error should repay the advance

17   refund by submitting a personal check or money order to the IRS.  Id. at 6.  Individuals

18   who received a paper EIP check were instructed to return the voided check to the IRS.

19   Id.  Further, plaintiffs cite news stories reporting that the IRS took proactive steps to

20   intercept and retrieve the April 10th payments such as directing state corrections

21   departments to intercept payments made to incarcerated individuals and return them to

22   the IRS.  Id., Ex. 7.

23       As part of the order granting plaintiffs' motion for preliminary injunction, the court

24   enjoined defendants from withholding benefits pursuant to the CARES Act from plaintiffs

25   or any class member on the sole basis of their incarcerated status.  Dkt. 50 at 44.  The

27   [4] Pin citations to the TIGTA's report refer to the report's original page numbers and not
the electronically stamped ECF number on the exhibit.

28   [5] The BFS is an agency of the Department of the Treasury that issues payments,
including the EIPs, on behalf of the IRS.  Salahi Decl., Ex. 6 at 3 n.5.

United States District Court
Northern District of California

1   court ordered defendants to reconsider payments to those who would otherwise be

2   entitled to an EIP based on their 2018 or 2019 tax returns but did not receive the

3   payment on the sole basis of their incarcerated status.  Id.  The court also ordered

4   defendants to reconsider any claim filed through the online non-filer tool, described

5   below, for those claims that were previously denied on the sole basis of the claimant's

6   incarcerated status.  Id.  The court set a thirty-day deadline for each reconsideration.  Id.

7       On October 1, 2020, defendants filed an appeal of the court's preliminary

8   injunction order and also filed the present motion for stay of the preliminary injunction

9   pending the appeal.  Plaintiffs filed a motion for summary judgment on their two APA

10  claims.  The court consolidated briefing on these two motions.  Dkt. 62.

**DISCUSSION**

**A.    Legal Standard**

**1.    Motion for Stay**

14      Granting a stay pending appeal is "an exercise of judicial discretion."  Virginian Ry.

15  Co. v. United States, 272 U.S. 658, 672 (1926).  The party requesting a stay bears the

16  burden of convincing a court to exercise that discretion.  Nken v. Holder, 556 U.S. 418,

17  433–34 (2009).  In deciding whether to grant a stay, the court must consider "(1) whether

18  the stay applicant has made a strong showing that he is likely to succeed on the merits;

19  (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of

20  the stay will substantially injure the other parties interested in the proceeding; and (4)

21  where the public interest lies."  Id. at 426 (quotation omitted).  The first two stay factors

22  are "the most critical."  Lair v. Bullock, 697 F.3d 1200, 1204 (9th Cir. 2012).  "[T]he last

23  two are reached only '[o]nce an applicant satisfies the first two factors."  Al Otro Lado v.

24  Wolf, 952 F.3d 999, 1007 (9th Cir. 2020) (second alteration in original) (quoting Nken,

25  556 U.S. at 434–35).

26      "Nken instructed 'that if the petition has not made a certain threshold showing

27  regarding irreparable harm . . . then a stay may not issue, regardless of the petitioner's

28  proof regarding the other stay factors.'"  Doe #1 v. Trump, 957 F.3d 1050, 1058 (9th Cir.

United States District Court
Northern District of California

1   2020) (quoting Leiva-Perez v. Holder, 640 F.3d 962, 965 (9th Cir. 2011) (per curiam); and

2   citing Nken, 556 U.S. at 433–34).  "In the context of a stay request, 'simply showing some

3   possibility of irreparable injury' is insufficient.  Id. at 1058–59 (quoting Nken, 556 U.S. at

4   434).  "Rather, at this juncture, the government has the burden of showing that

5   irreparable injury is likely to occur during the period before the appeal is decided." Id. at

6   1059 (quoting Leiva-Perez, 640 F.3d at 968).

7   **2.   Summary Judgment**

8   The APA limits the scope of judicial review to the administrative record.  5 U.S.C.

9   § 706 (directing the court to "review the whole record or those parts of it cited by a

10   party").  The scope of review is normally limited to "the administrative record in existence

11   at the time of the [agency] decision and [not some new] record that is made initially in the

12   reviewing court."  Lands Council v. Powell, 395 F.3d 1019, 1030 (9th Cir. 2005) (citation

13   omitted).

14   A motion for summary judgment may be used to seek judicial review of agency

15   administrative decisions within the limitations of the APA.  Nw. Motorcycle Ass'n v. U.S.

16   Dep't of Agric., 18 F.3d 1468, 1471–72 (9th Cir. 1994).  Generally, the court should grant

17   a motion for summary judgment if "there is no genuine dispute as to any material fact and

18   the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving

19   party bears the initial burden of informing the court of the basis for the motion and

20   identifying the portions of the pleadings, depositions, answers to interrogatories,

21   admissions, or affidavits that demonstrate the absence of a triable issue of material fact.

22   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

23   "[T]he function of the district court is to determine whether or not as a matter of law

24   the evidence in the administrative record permitted the agency to make the decision it

25   did." City & Cty. of San Francisco v. United States, 130 F.3d 873, 877 (9th Cir. 1997)

26   (alteration in original) (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 769 (9th Cir.

27   1985)).  Thus, the usual standard set forth in Rule 56(c) does not apply.  See San

28   Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv., 819 F. Supp. 2d 1077, 1083–84

United States District Court
Northern District of California

1   (E.D. Cal. 2011) (citing Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89 (D.D.C. 2006));

2   see also Nw. Motorcycle Assoc., 18 F.3d at 1472 (noting that for cases "involv[ing] review

3   of a final agency determination under the [APA], . . . resolution of this matter does not

4   require fact finding on behalf of this court").  Nevertheless, "summary judgment is an

5   appropriate mechanism for deciding the legal question of whether the agency could

6   reasonably have found the facts as it did."  Occidental, 753 F.2d at 770.

7   Under the APA, a court may set aside an agency's final action if the action was

8   "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

9   U.S.C. § 706(2)(A).  This is a "highly deferential" standard under which there is a

10   presumption that the agency's action is valid "if a reasonable basis exists for its decision."

11   Kern Cty. Farm Bureau v. Allen, 450 F.3d 1072, 1076 (9th Cir. 2006).  A reviewing court

12   may also "hold unlawful and set aside agency action, findings, and conclusions" that are

13   "without observance of procedure required by law," or "in excess of statutory jurisdiction,

14   authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C), (D).  Unlike

15   substantive challenges, "review of an agency's procedural compliance is exacting, yet

16   limited."  Kern Cty. Farm Bureau, 450 F.3d at 1076.

17   "Summary judgment thus serves as the mechanism for deciding, as a matter of

18   law, whether the agency action is supported by the administrative record and otherwise

19   consistent with the APA standard of review."  Gill v. Dep't of Justice, 246 F. Supp. 3d

20   1264, 1268 (N.D. Cal. 2017) (quoting Stuttering Found. of Am. v. Springer, 498 F. Supp.

21   2d 203, 207 (D.D.C. 2007)).

22   **B.    Subject Matter Jurisdiction**

23   In both their motion for stay and their opposition to the motion for summary

24   judgment, defendants advance the same arguments with regard to standing, ripeness,

25   and sovereign immunity.  Because these contentions go to the court's subject matter

26   jurisdiction, the court addresses these arguments together.

27   With respect to standing, federal courts may adjudicate only actual "Cases" and

28   "Controversies," U.S. Const. art. III, § 2, and may not render advisory opinions as to what

United States District Court
Northern District of California

United States District Court
Northern District of California

the law ought to be or affecting a dispute that has not yet arisen.  Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240 (1937).  Article III's "standing" requirements limit the court's subject matter jurisdiction.  See Cetacean Cmty. v. Bush, 386 F.3d 1169, 1174 (9th Cir. 2004).  The burden of establishing standing rests on the party asserting the claim.  Renne v. Geary, 501 U.S. 312, 316 (1991).

The "irreducible constitutional minimum of standing contains three elements." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).  "In order to establish Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  California v. Trump, 963 F.3d 926, 935 (9th Cir. 2020) (citing Lujan, 504 U.S. at 560–61).  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  Spokeo Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016) (quoting Lujan, 504 U.S. at 560).

Next, "[r]ipeness is an Article III doctrine designed to ensure that courts adjudicate live cases or controversies and do not 'issue advisory opinions [or] declare rights in hypothetical cases.'  A proper ripeness inquiry contains a constitutional and a prudential component."  Bishop Paiute Tribe v. Inyo Cty., 863 F.3d 1144, 1153 (9th Cir. 2017) (citations omitted).  "For a case to be ripe, it must present issues that are definite and concrete, not hypothetical or abstract.  Constitutional ripeness is often treated under the rubric of standing because ripeness coincides squarely with standing's injury in fact prong."  Id. (internal quotation marks and citations omitted); Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138–39 (9th Cir. 2000) (en banc).  Allegations that a "threat" to a "concrete interest is actual and imminent" are sufficient to allege "an injury in fact that meets the requirements of constitutional ripeness."  Bishop Paiute Tribe, 863 F.3d at 1154.  Therefore, if plaintiffs satisfy the Article III standing requirements under Lujan v. Defenders of Wildlife, the action is ripe.

"In evaluating the prudential aspects of ripeness, our analysis is guided by two

1  overarching considerations: 'the fitness of the issues for judicial decision and the

2  hardship to the parties of withholding court consideration.'"  Thomas, 220 F.3d at 1141.

3  When the question presented "is 'a purely legal one'" that "constitutes 'final agency

4  action' within the meaning of § 10 of the APA," that suggests the issue is fit for judicial

5  decision.  Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 812 (2003).  However,

6  an issue may not be ripe for review if "further factual development would 'significantly

7  advance our ability to deal with the legal issues presented.'"  Id.

8       **1.**     **Article III Standing and Ripeness**

9       In both their stay motion and opposition to plaintiffs' motion for summary judgment,

10  defendants explain at length why the court's analysis of title 26 U.S.C. § 6428 was in

11  error and incarcerated individuals are not entitled to an advance refund.  See Mtn. at 3–7;

12  Dkt. 70 at 8–11.  From that premise, defendants argue that if their interpretation of

13  section 6428 is correct, so too are their arguments regarding ripeness and standing.  Mtn.

14  at 7.  In other words, if plaintiffs' interpretation of the CARES Act is correct, then standing

15  would exist.  If, however, defendants' interpretation of the CARES Act is correct, then

16  standing would not exist because if no advance refund is presently owed, then any harm

17  was not actual or imminent.  Id.

18       Defendants cite cases for the proposition that where a claim of injury arises out of

19  a right that one party contends is nonexistent, then if the claim is meritorious, standing

20  will exist; if not, "standing not only fails but also ceases to be relevant."  Mtn. at 7 (quoting

21  ACLU v. FCC, 523 F.2d 1344, 1348 (9th Cir. 1975)); Dkt. 70 at 13.  Similarly, defendants

22  assert that if the ultimate entitlement to a tax benefit created by section 6428 is a tax

23  credit (as opposed to an advance refund of the credit), then plaintiffs' claims are not ripe

24  until they have attempted to claim the credit on their 2020 tax returns, been denied,

25  exhausted administrative requirements, and filed a refund claim under 26 U.S.C. § 7422.

26  Mtn. at 7; Dkt. 70 at 11–12.

27       In their opposition to the motion for stay, plaintiffs respond by arguing that the

28  court correctly applied section 6428 and the court has already rejected defendants'

United States District Court
Northern District of California

9

1   arguments.  Dkt. 66 at 7.  Like defendants, plaintiffs explain at length why section 6428

2   supports their position.  See id. at 7–10.  In their reply in support of the motion for

3   summary judgment, plaintiffs argue that standing is a threshold issue and is distinct from

4   the analysis into the merits of their claims.  Dkt. 73 at 6.  Plaintiffs also argue that

5   defendants' actions impose a barrier to obtaining CARES Act benefits that others do not

6   face and the need to hurdle special obstacles is itself a detriment that confers standing.

7   Id.

8           The court begins with the observation that both parties' detailed arguments

9   concerning the correct interpretation of section 6428 goes to the merits of plaintiffs' APA

10  claims.  For that reason, the court addresses those arguments with regard to plaintiffs'

11  motion for summary judgment.  Standing and ripeness, however, are a different matter.

12          Defendants' approach to standing and ripeness relies on the assumption that their

13  interpretation of section 6428 is correct.  See Mtn. at 7 ("[W]here a claim of injury arises

14  out of a right that one party contends is nonexistent, then if the claim is meritorious,

15  standing will not exist; if not, 'standing not only fails but also ceases to be relevant.'"

16  (citation omitted)).  This argument is in error.  "The jurisdictional question of standing

17  precedes, and does not require, analysis of the merits."  Equity Lifestyle Properties, Inc.

18  v. Cty. of San Luis Obispo, 548 F.3d 1184, 1189 n.10 (9th Cir. 2008).  In Warth v. Seldin,

19  422 U.S. 490, 500 (1975), the Supreme Court noted that "standing in no way depends on

20  the merits of the plaintiff's contention that particular conduct is illegal," but "often turns on

21  the nature and source of the claim asserted."  See also Whitmore v. Arkansas, 495 U.S.

22  149, 155 (1990) ("Our threshold inquiry into standing 'in no way depends on the merits of

23  the [petitioner's] contention that particular conduct is illegal,' and we thus put aside for

24  now [petitioner's] Eighth Amendment challenge and consider whether he has established

25  the existence of a 'case or controversy.'" (quoting Warth, 422 U.S. at 500)).

26          In East Bay Sanctuary Covenant v. Trump, 950 F.3d 1242 (9th Cir. 2020), the

27  Ninth Circuit addressed an argument similar to the one advanced by defendants here.

28  There, the federal government challenged whether legal aid organizations had standing

and argued that the plaintiffs had "no legally protected interest" in how their organizations were structured or how a regulation applied to third parties. Id. at 1267. In rejecting that argument, the court stated:

> An injury-in-fact is "an invasion of a legally protected interest," but this means an interest that is only concrete and particularized and actual or imminent—not an interest protected by statute. This distinction prevents Article III standing requirements from collapsing into the merits of a plaintiff's claim; "a petitioner's 'legally protected interest' need not be a statutorily created interest," and a plaintiff can have standing despite losing on the merits.

Id. (quoting Ass'n of Pub. Agency Customers v. Bonneville Power Admin., 733 F.3d 939, 950 (9th Cir. 2013); and citing Lujan, 504 U.S. at 560; In re Special Grand Jury 89-2, 450 F.3d 1159, 1172 (10th Cir. 2006)). Injury in fact is a "'judicially cognizable interest'— implying that 'an interest can support standing even if it is not protected by law . . . so long as it is the sort of interest that courts think to be of sufficient moment to justify judicial intervention.'" Id. (alteration in original) (quoting In re Special Grand Jury 89-2, 450 F.3d at 1172).

While plaintiffs' legally protected interest need not be a statutorily created interest, it must be judicially cognizable. "[E]conomic injury is generally a legally protected interest." Ass'n of Pub. Agency Customers, 733 F.3d at 951 (quoting Cent. Ariz. Water Conservation Dist. v. U.S. EPA, 990 F.2d 1531, 1537 (9th Cir. 1993)). The court's prior order determined that defendants' failure to disburse an advance refund to plaintiffs was an economic injury and plaintiffs' injury was actual and imminent because defendants had already denied them payments. Dkt. 50 at 10. Significantly, defendants have already issued over 85,000 advance refund payments to incarcerated individuals that they intercepted or required recipients to repay or void. As the TIGTA report states, the IRS is "relying on [incarcerated] individuals to voluntarily return" the advance refund payments initially sent to them. Salahi Decl., Ex. 6 at 6. Named plaintiffs have sufficiently established through declarations that they are otherwise eligible for an EIP but have not received such a payment. See Dkt. 74-2. These facts easily meet the injury in

United States District Court
Northern District of California

11

fact requirement.

The cases cited by defendants can best be characterized as opinions where the court addressed the merits in order to determine standing or determined whether any legally cognizable right existed.[6]  For example, in <u>American Civil Liberties Union v. F.C.C.</u>, 523 F.2d at 1347, the Ninth Circuit noted that unlike situations where the injury was "so palpable as to be subject to judicial notice, we here are confronted with circumstances in which the truth of the allegation of the injury in fact can only be determined by examining the merits of the asserted claim."  <u>Id.</u> at 1348.  The court then proceeded to examine the merits, stating "[i]f ACLU's claim is meritorious, standing exists; if not, standing not only fails but also ceases to be relevant."  <u>Id.</u>  It is not clear, and defendants have not explained, how this approach is reconcilable with cases like <u>East Bay Sanctuary Covenant</u>.

In some cases, the court's inquiry turned on whether a judicially cognizable right existed.  Thus, in <u>Arjay Associates, Inc. v. Bush</u>, 891 F.2d 894, 896–98 (Fed. Cir. 1989), the court first determined that the appellants had no right to continued importation of a product excluded from importation into the United States by Congress.  The Federal Circuit then held that because "appellants have no right to conduct foreign commerce in products excluded by Congress, they have in this case no right capable of judicial enforcement and have thus suffered no injury capable of judicial redress."  <u>Id.</u> at 898 (citations omitted).  This is true of the Tenth Circuit's approach in <u>Utah v. Babbitt</u>, where the court

> first look[ed] to the relevant provisions of the [Federal Land Policy and Management Act] to determine whether Plaintiffs have a right to participate in the inventory process.  If we conclude that Plaintiffs do not have such a right, then Plaintiffs'

---

[6] More recent opinions have acknowledged that some prior opinions were not necessarily clear as to the standing analysis.  For example, the D.C. Circuit has noted that in some instances the court has "not always been so clear" on not deciding the merits of a plaintiff's claim.  <u>Parker v. District of Columbia</u>, 478 F.3d 370, 377 (D.C. Cir. 2007), <u>aff'd sub nom. District of Columbia v. Heller</u>, 554 U.S. 570 (2008); <u>see also</u> <u>Ass'n of Pub. Agency Customers</u>, 733 F.3d at 951 n.23 ("The exact requirements for a 'legally protected interest' are far from clear." (citations omitted)).

claimed injury based on the denial of this right is without merit and they consequently lack standing to challenge the 1996 inventory on these grounds.

137 F.3d 1193, 1207 (10th Cir. 1998) (citing Claybrook v. Slater, 111 F.3d 904, 907 (D.C. Cir. 1997); Arjay Associates, 891 F.2d at 898).[7]

Here, these cases are neither controlling nor persuasive because plaintiffs do not need to demonstrate that they are correct on the merits of their interpretation of section 6428.  See, e.g., E. Bay Sanctuary Covenant, 950 F.3d at 1267–68 ("Whether [plaintiffs] have a sufficient statutory or otherwise legal basis for their claims is irrelevant at this threshold stage."); Parker, 478 F.3d at 377 ("The Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume arguendo the merits of his or her legal claim.").  Further, they have established a legally cognizable right in the payments that defendants issued and then either intercepted or required to be repaid.

Thus, plaintiffs have sufficiently established standing and defendants are not likely to prevail on this issue.  For the same reason, defendants' argument regarding constitutional ripeness also fails.

### 2.    Prudential Ripeness

In their opposition to plaintiffs' motion for summary judgment, defendants argue that plaintiffs' claims fail the prudential ripeness standard.  According to defendants, the FAQ in question is not the type of agency action ripe for judicial review because the CARES Act does not create a right to the advance refund and the FAQ only addressed the advance refund, not the tax credit.  Dkt. 70 at 12.  Next, defendants assert that the FAQ is not an administrative decision that has been formalized because no regulation

---

[7] In Parker, 478 F.3d at 377, the D.C. Circuit noted an obvious tension in Claybrook: "[a]lthough we recognized in [Claybrook] that it was not necessary for a plaintiff to demonstrate that he or she would prevail on the merits in order to have Article III standing, the rest of our discussion seems somewhat in tension with that proposition."  The Parker court ultimately distinguished Claybrook on the ground that the opinion "was actually based on a separate jurisdictional ground—reviewability under the [APA]—and federal courts may choose any ground to deny jurisdiction . . . ."  Id. at 378 (citation omitted).

United States District Court
Northern District of California

1   has been issued, nor has the FAQ undergone formal or informal rulemaking.  Id.  Finally,

2   the Tax Code already provides for a litigation remedy if an individual disagrees with a

3   final determination of eligibility for a CARES Act credit, providing support for defendants'

4   position that the claims are unripe.  Id. at 12–13.

5          In response, plaintiffs contend that their claims are prudentially ripe because the

6   legal issues are fit for review as demonstrated by the Desmond Declaration, Dkt. 44-1,

7   ¶ 7, which confirmed that plaintiffs and class members were deemed not to qualify for

8   advance payments.  Dkt. 73 at 7.  Next, according to plaintiffs, withholding adjudication

9   would cause hardship on them because they are presently harmed by the decision not to

10  issue advance refunds to them.  Id.

11         The court notes that defendants' argument with regard to prudential ripeness is

12  largely a reprise of their argument advanced in opposition to the motion for preliminary

13  injunction.  Further, the prudential ripeness analysis parallels the inquiry conducted by

14  the court with respect to other aspects of this order.  As discussed herein, the court finds

15  that the IRS's decision regarding disbursement of EIPs to incarcerated individuals is a

16  final agency action.  The court reaffirms its finding that there is substantial hardship to

17  plaintiffs if the court were to withhold a decision.  As the Supreme Court stated in

18  National Park Hospitality Association, 538 U.S. at 808, "a regulation is not ordinarily

19  considered the type of agency action 'ripe' for judicial review under the APA until the

20  scope of the controversy has been reduced to more manageable proportions, and its

21  factual components fleshed out, by some concrete action applying the regulation to the

22  claimant's situation in a fashion that harms or threatens to harm him."  While the action in

23  question is not a regulation, plaintiffs have clearly demonstrated that the IRS has already

24  taken concrete action applying their determination to incarcerated individuals.

25         Accordingly, plaintiffs' claims are prudentially ripe for judicial determination.

26         **3.**      **Sovereign Immunity**

27         "Absent a waiver, sovereign immunity shields the Federal Government and its

28  agencies from suit."  FDIC v. Meyer, 510 U.S. 471, 475 (1994).  This immunity also

United States District Court
Northern District of California

1    extends to federal officers sued in their official capacity.  See Dugan v. Rank, 372 U.S.

2    609, 620 (1963); Aminoil U.S.A., Inc. v. Cal. State Water Res. Control Bd., 674 F.2d

3    1227, 1233 (9th Cir.1982).  A "waiver of sovereign immunity must be unequivocally

4    expressed in statutory text," and be "clearly evident from the language of the statute."

5    FAA v. Cooper, 566 U.S. 284, 290 (2012) (internal quotation marks omitted).

6         "[T]he Administrative Procedure Act provides a broad waiver of sovereign

7    immunity so long as certain conditions are met."  S. Delta Water Agency v. United States,

8    767 F.2d 531, 535 (9th Cir. 1985).  Section 702 of the APA waives sovereign immunity;

9    however, the Ninth Circuit has held that claims brought pursuant to the APA must also

10   satisfy § 704's provisions.  Navajo Nation v. Dep't of the Interior, 876 F.3d 1144, 1170

11   (9th Cir. 2017).

12        In its prior order, the court determined that because the IRS's action was a final

13   agency action and plaintiffs had no adequate alternative to APA review, Congress waived

14   sovereign immunity, under title 5 U.S.C. § 702, such that plaintiffs could proceed with

15   their APA claims.  Dkt. 50 at 20.

16        Defendants assert that they are likely to prevail on their sovereign immunity

17   argument because there has been no final agency action and plaintiffs already have an

18   adequate remedy provided by statute.  Mtn. at 8; Dkt. 70 at 14.

19              a.    Final Agency Action

20        There are two conditions for an agency action to be final under the APA: "First, the

21   action must mark the consummation of the agency's decision-making process—it must

22   not be of a merely tentative or interlocutory nature.  And second, the action must be one

23   by which rights or obligations have been determined, or from which legal consequences

24   will flow."  U.S. Army Corps of Eng'rs v. Hawkes Co., 136 S. Ct. 1807, 1813 (2016)

25   (quoting Bennett v. Spear, 520 U.S. 154, 177–78 (1997)); see also Or. Nat. Desert Ass'n

26   v. U.S. Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006) ("[T]he core question is whether

27   the agency has completed its decisionmaking process, and whether the result of that

28   process is one that will directly affect the parties." (alteration in original) (citation

1    omitted)).

2         Assuming that their interpretation of the statute is correct, defendants argue that

3    because the statute did not require the IRS to issue advance refunds, the statute did not

4    necessitate reaching a final decision with respect to issuance of advance refunds to

5    incarcerated individuals.  Mtn. at 8; Dkt. 70 at 15.  In their opposition to plaintiffs' motion

6    for summary judgment, defendants pick up this argument, contending that the IRS's

7    policy is not one by which rights or obligations have been determined or from which legal

8    consequences will flow.  Dkt. 70 at 15.  According to defendants, the IRS's decision

9    denying issuance of advance refunds to incarcerated individuals is akin to the denial of

10   interim relief that is not a final agency action.  Id.  Finally, defendants assert that the facts

11   cited by plaintiffs indicate that the IRS's policy is not the consummation of a decision-

12   making process, but rather a response to a rapidly developing situation that has

13   continued to evolve in the months following enactment of the CARES Act.  Id. at 14–15.

14        Plaintiffs argue that, despite a rapidly developing situation, defendants do not

15   suggest that they are still considering whether to issue advance refunds.  Dkt. 73 at 7–8.

16   They further contend that defendants have not made an interim decision, rather the

17   decision is final.  Id. at 8.  Finally, plaintiffs cite the court's prior order to rebut defendants'

18   argument that denial of the EIPs has no legal consequences or does not affect plaintiffs'

19   rights.  Id. at 9.

20        First, several facts indicate that the IRS's decision-making process was final and

21   not interlocutory or tentative.  In the preliminary injunction order, the court determined

22   that the action was final because the FAQ[8] took the unequivocal position that

23   incarcerated individuals were ineligible to receive EIPs, defendants submitted a

24   declaration that did not indicate any change to the agency's position was forthcoming, the

25

26   _____

27   [8] Defendants argue that the FAQ is not a final agency action because no regulation has
     been issued and the FAQ has not undergone formal or informal rulemaking.  Dkt. 70 at
     12.  Yet, "given the breadth of the definition of agency action, there will be many final
28   agency actions that do not take the form of rules."  S.F. Herring Ass'n, 946 F.3d at 579
     (citing 5 U.S.C. § 551(13); Or. Nat. Desert Ass'n, 465 F.3d at 987).

IRS changed its internal manual, and the timing of the CARES Act made further agency determination unlikely.  Dkt. 50 at 15–16.

Defendants do not contest these facts, but rather characterize them as a response to a rapidly developing situation that has continued to evolve in the months following enactment of the CARES Act.  While this is an accurate description of the initial roll-out of the CARES Act, once the IRS changed its mind and determined that incarcerated individuals are ineligible for EIPs in early May 2020, the agency has been consistent in that interpretation and has shown no indication whether publicly or in this litigation that it intends to further change its position.  For that reason, this case is similar to San Francisco Herring Association v. Department of the Interior, 946 F.3d 564, 575 (9th Cir. 2019), where the Ninth Circuit determined an agency's decision to be final where the agency "repeatedly declared its authority . . . in formal notices, refused to change its position when pressed, and then enforced its fishing ban against individual fishermen . . . ."

Second, as the court determined in its prior order and reaffirms in this order, the CARES Act requires the IRS to issue EIPs to eligible individuals who meet the criteria established by Congress.  Accordingly, the decision to deny those payments to a specific segment of the population is one where a right has been determined.

Accordingly, the court finds that the IRS's determination that incarcerated individuals are ineligible for an EIP is a final agency action.

### b.     Adequate Alternative Remedy

"Even if final, an agency action is reviewable under the APA only if there are no adequate alternatives to APA review in court."  Hawkes, 136 S. Ct. at 1815.  "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action."  Bowen v. Massachusetts, 487 U.S. 879, 903 (1988).  However, "[t]he legislative material elucidating [the APA] manifests a congressional intention that it cover a broad spectrum of administrative actions, and this Court has echoed that theme by noting that the [APA's] 'generous review provisions' must be given a 'hospitable

United States District Court
Northern District of California

1  interpretation." Id. at 904 (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967),

2  abrogated on other grounds as recognized in Califano v. Sanders, 430 U.S. 99, 105

3  (1977)).

4  Defendants contend that because the Act does not require the IRS to have issued

5  advance refund payments to plaintiffs, but instead contemplates that ultimately eligibility

6  under the CARES Act will be determined at a later date, a refund action under title 26

7  U.S.C. § 7422 is an adequate remedy. Dkt. 70 at 15–16. Because plaintiffs may bring a

8  refund claim if they are ultimately denied the CARES Act credit, their claims do not fall

9  within the APA's immunity waiver. Id. at 16. In response, plaintiffs urge the court to

10  affirm its earlier holding, arguing that defendants press the same argument that the court

11  has already rejected. Dkt. 73 at 9.

12  Defendants' argument fails for two independent reasons. First, as the court

13  determined in its preliminary injunction order, title 26 U.S.C. § 7422(a) does not apply to

14  plaintiffs' claims. Second, even if it does apply, the statute is not an adequate alternative

15  remedy.

16  Generally, section 7422(a) requires a taxpayer to file a claim with the IRS before

17  bringing suit for the recovery of any internal revenue tax.[9] See United States v.

18  Clintwood Elkhorn Min. Co., 553 U.S. 1, 4 (2008) ("A taxpayer seeking a refund of taxes

19  erroneously or unlawfully assessed or collected may bring an action against the

20  Government either in United States district court or in the United States Court of Federal

21  Claims." (citations omitted)). In its prior order, the court reasoned that plaintiffs' claims

22  fell outside section 7422 for two reasons. First, plaintiffs did not allege that a tax was

23  erroneously or illegally assessed or collected, a penalty was collected without authority,

24  or any sum is alleged to be excessive. Dkt. 50 at 18–19. Second, plaintiffs sought

25

26  _____

27  [9] In relevant part, title 26 U.S.C. § 7422(a) states that: "[n]o suit . . . shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected

28  without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund . . . has been duly filed with [the IRS]."

United States District Court
Northern District of California

injunctive and declaratory relief and such equitable relief fell outside the relief permitted by the statute.  Id. at 19 (citing King v. Burwell, 759 F.3d 358, 366 (4th Cir. 2014), aff'd, 576 U.S. 473 (2015); Cohen v. United States, 650 F.3d 717, 732 (D.C. Cir. 2011) (en banc)).

Defendants argue that despite the equitable nature of plaintiffs' relief, the core of their suit is a request to claim a monetary tax benefit that Congress made possible by treating eligible individuals as though they had made a payment against the tax imposed by the Internal Revenue Code on their 2019 taxes and then allowing an advanced refund on that overpayment.  Dkt. 72 at 6.  Defendants therefore distinguish Cohen and King because this suit essentially seeks to recover the overpayment of a sum alleged to have been excessive.  Id.

Defendants' contention mischaracterizes the nature of this suit.  Significantly, the gravamen of the complaint is that the IRS's decision to exclude incarcerated individuals is unlawful because the IRS's decision was both contrary to law and arbitrary and capricious.  This APA suit "questions the administrative procedures" by which the IRS arrived at its decision and whether that decision is unlawful.  Cohen, 650 F.3d at 731; see id. at 733 ("Congress has not required exhaustion in APA suits challenging the adequacy of IRS procedures, only in suits 'for the recovery of any internal revenue tax.'" (quoting 26 U.S.C. § 7422(a))).

As stated by the Supreme Court in Bowen, 487 U.S. at 893 (citation omitted), "[o]ur cases have long recognized the distinction between an action at law for damages . . . and an equitable action for specific relief . . . . The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"  The distinction is evident here where the court enjoined defendants from applying criteria that was contrary to law and arbitrary and capricious.  The fact that this remedy may require the IRS to issue EIPs, assuming an individual meets the remaining criteria delineated in the CARES Act, does not transform this suit into one for damages.  Accordingly, section 7422(a) is not an adequate

United States District Court
Northern District of California

1   alternative remedy.  See King, 759 F.3d at 366 ("[T]he plaintiffs are not seeking a tax

2   refund, they ask for no monetary relief.").

3          Even if the court were to arrive at a contrary conclusion and determine this was a

4   tax refund action, section 7422(a) still fails to offer adequate alternative relief.  A remedy

5   is inadequate if it only offers "doubtful and limited relief."  Bowen, 487 U.S. at 901.  For

6   example, in Hawkes, 136 S. Ct. at 1815, the Court rejected an alternative remedy where

7   "a landowner [would] apply for a permit and seek judicial review in the event of an

8   unfavorable decision" because "the permitting process can be arduous, expensive, and

9   long."  As persuasively reasoned by the district court in Amador v. Mnuchin, — F. Supp.

10  3d —, 2020 WL 4547950, at *9 (D. Md. Aug. 5, 2020), forcing plaintiffs to file a 2020 tax

11  return, wait until the IRS denies their request for a CARES Act tax credit, file an

12  administrative claim with the IRS seeking reconsideration, and only then file a suit in

13  district court would amount to the "arduous, expensive, and long process" that was

14  rejected in Hawkes.  For this separate reason, plaintiffs have no adequate alternative

15  remedy to the APA.

16         To summarize, plaintiffs are challenging an agency action, not seeking a tax

17  refund.  For that reason, an adequate remedy is not available by filing a tax refund suit.

18  Further, defendants have not demonstrated the action in question is anything other than

19  final.  For that reason, Congress waived sovereign immunity under the APA and the court

20  has subject matter jurisdiction to hear the case.

21  **C.     Motion for Stay**

22         **1.     Whether Defendants Will Be Irreparably Harmed Absent Stay**

23         Defendants contend that the government will be irreparably harmed absent a stay

24  because the preliminary injunction will require the government to issue advance refunds

25  to incarcerated individuals.  Mtn. at 8–9.  Once the IRS issues the EIPs to incarcerated

26  individuals, it is unlikely that it will be able to recover any of that money, should the

27  preliminary injunction not be upheld on appeal.  Id. at 9.  This includes both a practical

28  component—prisoners will spend the money—and a legal component—it is uncertain

United States District Court
Northern District of California

1    whether an erroneous refund could be assessed under title 26 U.S.C. § 6201(a).[10]  Id.  In

2    sum, defendants contend that harm to the public fisc is not speculative.  Id. at 10.

3        In response, plaintiffs advance three arguments.  First, the government cannot

4    suffer harm from an injunction that ends an unlawful practice.  Dkt. 66 at 4.  Second,

5    administrative expenses to comply with an injunction do not qualify as irreparable harm.

6    Id.  Third, defendants' concern that it may not recover advance payments is entirely

7    speculative.  Id. at 5.

8        As an initial matter, defendants have not submitted evidence of actual burdens or

9    harms since imposition of the preliminary injunction and their motion relies on

10   assumptions and projections.  See Al Otro Lado, 952 F.3d at 1007.  While defendants

11   argue that they have provided an example of real harm in the form of payments to

12   incarcerated individuals that it will not be able to recover, (Mtn. at 9; Dkt. 72 at 4), that

13   example is not supported by any evidentiary filing.  As stated in Doe #1 v. Trump, the

14   Supreme Court's opinion in Nken "places the burden on the government[] and instructs

15   us only to exercise our discretion to enter a stay when irreparable harm is probable, not

16   merely possible.  The government cannot meet this burden by submitting conclusory

17   factual assertions and speculative arguments that are unsupported in the record."  957

18   F.3d at 1059–60 (citing Nken, 556 U.S. at 434; Azar, 911 F.3d at 581).  The failure here

19   to produce any evidence regarding the government's inability to recover funds militates

20   against finding a likelihood of irreparable harm.

21       Moreover, defendants' arguments that they will be irreparably injured because the

22   IRS will not be able to recover money disbursed to incarcerated individuals is tempered

23   by the fact that the agency already issued EIPs to thousands of incarcerated individuals

24   in April 2020 and, for those payments that were not intercepted by prison officials, the

25   IRS is relying on incarcerated individuals to voluntarily return those advance refunds.

26

27   _____

28   [10] Section 6201 provides the IRS with the general authority to determined and assess tax
     liabilities including interest, additional amounts, additions to the tax, and assessable
     penalties.  Mtn. at 9.

1   See Mtn. at 9 n.6.  Defendants have not plausibly explained how their approach taken in

2   early May 2020 to recoup erroneously issued payments mitigates the harm in this

3   analogous situation.

4          The court also finds persuasive the Ninth Circuit's reasoning in Rodriguez v.

5   Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013), where the court noted that "[t]he

6   government provide[d] almost no evidence that it would be harmed in any way by the

7   district court's order, other than its assertion that the order enjoins 'presumptively lawful'

8   government activity and is contrary to the plain meaning of the statute."  The court then

9   reasoned that the government's "arguments are obviously premised on [its] view of the

10  merits because it cannot suffer harm from an injunction that merely ends an unlawful

11  practice . . . ."  Id. (citing Zepeda v. I.N.S., 753 F.2d 719, 727 (9th Cir. 1983)).  Here,

12  defendants rely on "self-evident" harm, (Dkt. 72 at 4), rather than evidence of such harm.

13  Thus, an order enjoining unlawful conduct cannot harm the government.

14         Next, defendants cite the "herculean task, as a logistical and administrative matter,

15  to attempt to recover all the advance refunds sent to prisoners."  Mtn. at 10.  As plaintiffs

16  point out, however, the Ninth Circuit has cast doubt on the government's position.  In the

17  immigration context, the Ninth Circuit has held that "diversion of the [government]

18  agencies' time, resources, and personnel from other pressing immigration adjudication

19  and enforcement priorities' due to the need to ask additional questions and possibly

20  review documentary evidence at bond hearings was 'minimal' evidence of harm to the

21  government."  Al Otro Lado, 952 F.3d at 1008 (alteration in original) (quoting Hernandez

22  v. Sessions, 872 F.3d 976, 995 (9th Cir. 2017)).

23         Accordingly, defendants have not met their burden to demonstrate an irreparable

24  injury absent a stay.

25         **2.      Whether Defendants Are Likely to Succeed on the Merits**

26         Defendants contend that because the CARES Act does not mandate the IRS to

27  distribute the EIP at all and only requires the IRS to provide a tax credit for tax year 2020,

28  then the IRS did not act contrary to law and its decision was not arbitrary and capricious.

1    Mtn. at 8.  Because the court grants plaintiffs' motion for summary judgment on their APA

2    706(2) claim, it necessarily follows that defendants are not likely to succeed on the

3    merits.

4         Because defendants do not satisfy the first two <u>Nken</u> factors, the court does not

5    reach the remaining factors.  <u>See</u> <u>Nken</u>, 556 U.S. at 434–35.  For the foregoing reasons,

6    defendants' motion for stay is DENIED.

7    **D.    Motion for Summary Judgment**

8         Plaintiffs move for summary judgment on their first and second causes of action.[11]

9    As a threshold matter, plaintiffs contend that there are no genuine disputes of material

10   fact and review is limited to the administrative record.  MSJ at 6.  Plaintiffs state that

11   based on the declaration from the IRS's chief counsel explaining the agency's

12   contemporaneous reasons for its decision, the absence of any indication from defendants

13   that additional reasons were considered, and the fact that plaintiffs' challenge is a legal

14   one, they do not seek to supplement the record or conduct discovery for this motion.  <u>Id.</u>

15   at 6–7.  Defendants do not challenge this contention and present no facts that controvert

16   those produced by plaintiffs.

17        This case presents an interesting threshold question: whether the court can

18   proceed to summary judgment on APA claims before the agency provides or certifies the

19   administrative record.  In cases applying section 706(2)(A), "the focal point for judicial

20   review should be the administrative record already in existence, not some new record

21   made initially in the reviewing court."  <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973) (per

22   curiam).  The court finds that summary judgment on the evidence before the court is

23   appropriate for a few reasons.

24        First, "[t]he whole administrative record . . . is not necessarily those documents

25   that the <u>agency</u> has compiled and submitted as the administrative record.  The whole

26   administrative record, therefore, consists of all document and materials directly or

27   _____

28   [11] Plaintiffs state that if the court grants summary judgment on their class-wide APA
     claims, their third claim under the Little Tucker Act will be mooted.  MSJ at 1 n.1.

23

indirectly considered by agency decision-makers and includes evidence contrary to the agency's position."  Thompson v. U.S. Dep't of Labor, 885 F.2d 551, 555 (9th Cir. 1989) (citation and internal quotation marks omitted).  In this case, the relevant exhibits appended to the Salahi Declaration are the IRS's own materials and publications.  While plaintiffs, rather than the agency, compiled and submitted those documents, they can still be considered part of the administrative record.  Further, as the court determined in its prior order, the documents are judicially noticeable.  Dkt. 50 at 4 n.3.

Second, the declarations submitted by named plaintiffs and agency decision-makers are relevant with regard to the court's subject matter jurisdiction and whether defendants will be irreparably harmed absent a stay.  In other words, they are relevant for purposes other than the court's section 706 determination.  For example, in Lujan v. National Wildlife Foundation, the Supreme Court reviewed two affidavits that purported to establish the plaintiffs were within the contemplated zone of interests of the relevant statute and thus able to seek judicial review under § 702.  497 U.S. 871, 885 (1990) ("We turn, then, to whether the specific facts alleged in the two affidavits considered by the District Court raised a genuine issue of fact as to whether an 'agency action' taken by petitioners caused respondent to be 'adversely affected or aggrieved . . . within the meaning of a relevant statute." (alteration in original)).

Finally, defendants do not challenge whether any particular document is part of the administrative record.  The evidence before the court remains unchanged since the court's preliminary injunction order and reflects what was directly or indirectly considered by agency decision-makers.  Accordingly, the court proceeds to the merits of plaintiffs' claims.

### 1.    First Claim—§ 706(1): Unlawfully Withheld or Unreasonably Delayed

Plaintiffs' first claim is that defendants unlawfully withheld EIP benefits to plaintiffs and class members in violation of title 5 U.S.C. § 706(1).  Compl. ¶ 42.  Section 706(1) of the APA provides that a court "shall compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  "A court can compel agency action under this

1  section only if there is 'a specific, unequivocal command' placed on the agency to take a

2  'discrete agency action,' and the agency has failed to take that action." <u>Vietnam</u>

3  <u>Veterans of Am. v. Cent. Intelligence Agency</u>, 811 F.3d 1068, 1075 (9th Cir. 2016)

4  (quoting <u>Norton v. S. Utah Wilderness Alliance ("SUWA")</u>, 542 U.S. 55, 63–64 (2004)).

5  Discrete agency actions include "rules, orders, licenses, sanctions, and relief."  <u>Hells</u>

6  <u>Canyon Pres. Council v. U.S. Forest Serv.</u>, 593 F.3d 923, 932 (9th Cir. 2010) (citing

7  <u>SUWA</u>, 542 U.S. at 62–63; and 5 U.S.C. § 551(13)).

8        Plaintiffs argue that the discrete agency action here is the failure to disburse

9  advance refunds to certain eligible individuals, specifically, incarcerated individuals and

10  the Secretary has zero discretion to decide who constitutes an eligible individual.  MSJ at

11  10.  According to plaintiffs, defendant have both a legal duty to perform a discrete agency

12  action and failed to perform that action.  <u>Id.</u>  Defendants advance no argument regarding

13  § 706(1) other than asserting plaintiffs' interpretation of the CARES Act generally is

14  incorrect.

15        There is no doubt that the CARES Act compels the Treasury and the IRS to take a

16  discrete agency action.  The definition of agency action includes "relief" and, in turn, the

17  definition of relief includes "grant of money."  5 U.S.C. § 551(11), (13).  The CARES Act

18  requires the Treasury Secretary to disburse advance refund payments in the amount that

19  would have been allowed as a tax credit under § 6428(f)(1), (3) ("The Secretary shall,

20  subject to the provisions of this title, refund or credit any overpayment attributable to this

21  section as rapidly as possible.").

22        It is equally clear that the IRS has taken significant action related to the CARES

23  Act payments.  On June 3, 2020, the Treasury Department announced that it had

24  delivered 159 million EIPs worth more than $267 billion.  Salahi Decl., Ex. 3.  The first

25  disbursement of EIPs occurred just fourteen days after the passage of the CARES Act

26  and the TIGTA assessed that 98 percent of EIPs were correctly computed.  <u>Id.</u>, Ex. 6 at

27  3–4.  Further, the IRS acted with regard to incarcerated individuals.  As plaintiffs allege

28  and the TIGTA report confirms, the IRS issued EIPs to some incarcerated individuals in

1    April 2020 and then decided to change course and not issue EIPs to incarcerated

2    individuals as well as attempt to claw back already issued payments.  E.g., Compl. ¶¶ 17,

3    19.

4          These steps are not the hallmarks of an agency that has failed to act.  What

5    plaintiffs are objecting to is not so much the failure to act but the manner in which the IRS

6    decided to stop payments to incarcerated individuals and the legality of its decision to do

7    so.  Indeed, the complaint alleges that "the IRS took action to exclude incarcerated

8    persons from subsequent EIP disbursements."  Id. ¶ 19 (emphasis added).

9          This case is similar to Hells Canyon Preservation Council v. U.S. Forest Service,

10   593 F.3d at 932, where the plaintiffs alleged that the Forest Service failed to take the

11   discrete action of prohibiting the use of motorized vehicles in certain wilderness areas,

12   which was required by statute.  The Ninth Circuit noted that the agency had been

13   carrying out its statutory responsibility since 1981 by drawing certain boundaries, but the

14   plaintiffs were only taking issue with the way in which the agency carried out its

15   obligation.  Id.  The court summarized why § 706(1) was not applicable: "[h]ad the Forest

16   Service failed to establish a boundary at all, plaintiffs might have a case for § 706(1)

17   review, but we have no basis for compelling the Forest Service to adopt [the plaintiffs']

18   preferred boundary."  Id. at 933 (citation omitted).  Instead, the plaintiff's argument was

19   "better phrased as a claim that the Forest Service's boundary determination was

20   'arbitrary and capricious.'"

21         Here, the IRS carried out its statutory responsibility by issuing advance refund

22   payments to millions of Americans.  It also acted with regard to incarcerated individuals;

23   the agency initially issued EIPs to incarcerated individuals then changed its decision.

24   Purposefully excluding incarcerated individuals from receiving advance refund payments

25   is akin to drawing a boundary.  That boundary might be arbitrary and capricious or

26   contrary to law, but at the very least the agency acted.

27         For the foregoing reasons, plaintiffs' motion for summary judgment for their first

28   claim is DENIED.

### 2.    Second Claim—APA Contrary to Law & In Excess of Statutory Authority

Plaintiffs' second claim is that defendants' policy denying EIP benefits is contrary to law, in excess of statutory authority, and arbitrary and capricious.  The court addresses the arbitrary and capricious element in the next section.

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Generally, plaintiffs argue that defendants' action is contrary to law and exceeds statutory authority because the CARES Act mandates distribution of the advance refund to eligible individuals and otherwise eligible incarcerated individuals are not excluded as an eligible individual under the Act.  MSJ at 12–13.

### a.    Whether the CARES Act Mandates the IRS to Issue Advance Refunds

Plaintiffs contend that the central purpose of the CARES Act was to provide emergency assistance to Americans affected by the pandemic.  MSJ at 7.  Plaintiffs submit that section 6428 requires the IRS to issue advance refunds and to do so as rapidly as possible.  Id.  To that end, they recapitulate the court's preliminary injunction analysis.  See id. at 7–8.  In response, defendants advance novel arguments regarding the language and structure of the Act, which the court addresses separately.

#### i.    Language

As previously noted, section 6428(f)(3)(A) provides in relevant part: "The Secretary shall, subject to the provisions of this title, refund or credit any overpayment attributable to this section as rapidly as possible."  26 U.S.C. § 6428(f)(3)(A).

Defendants agree that this subsection's use of the term "shall" indicates a mandatory command.  Dkt. 70 at 8.  They assert, however, that that command does not require the IRS to issue advance refunds to all eligible individuals before December 31, 2020.  Id.  Instead, defendants argue the "shall" command modifies only the phrase "as

1    rapidly as possible." Dkt. 70 at 8–9. Stated differently, it applies to the speed with which

2    the IRS must issue the advance refunds, <u>not</u> the scope of such issuance. <u>Id.</u>

3         In their reply, plaintiffs contend that this construction would lead to plainly

4    unacceptable results. Principally, plaintiffs explain that, if adopted, it would permit the

5    IRS to unilaterally choose not to issue advance refunds to anyone. Dkt. 73 at 2. In that

6    even, plaintiffs further explain, subsection (f)(3)(A)'s requirement to act "as rapidly as

7    possible" would not be at issue and, thus, the IRS would necessarily be in compliance

8    with the statute. <u>Id.</u>

9         As defendants acknowledge, subsection (a) creates a refundable tax credit to be

10   paid in tax year 2020. Dkt. 70 at 2. The Second Circuit described refundable tax credits

11   as follows:

12              taxpayers who are eligible for tax "refunds" based on [Earned
                Income Tax Credit ("EITC")] and [Additional Child Tax Credit
13              ("ACTC")] tax credits do not actually "overpay" their income
                taxes, at least in the traditional sense of the word. Instead, the
14              EITC and ACTC refundable tax credit programs are structured
                to create the legal fiction that recipients make "overpayments"
15              on their taxes, thereby entitling them to the resulting tax
                "refunds," as a mechanism for achieving certain social policy
16              goals.

17   <u>Sarmiento v. United States</u>, 678 F.3d 147, 152 (2d Cir. 2012); (citing <u>Sorenson v. Sec'y</u>

18   <u>of Treasury</u>, 475 U.S. 851, 864 (1986)). Next, subsection (f)(1) establishes the advance

19   refund: "each individual who was an eligible individual for [tax year 2019] shall be treated

20   as having made a payment against the tax . . . for [tax year 2019] in an amount equal to

21   the advance refund amount for [tax year 2019]." § 6428(f)(1). Subsection (f)(2) defines

22   the "advance refund amount" with reference to the tax credit for tax year 2020 defined in

23   subsection (a): "the advance refund amount is the amount that would have been allowed

24   as a credit under this section for [tax year 2019] if this section (other than subsection (e)

25   and this subsection) had applied to [tax year 2019]. § 6428(f)(2).

26        At this point, <u>Sarmiento</u> is especially relevant. In that case, the plaintiff taxpayers

27   offered to settle with the IRS to pay their outstanding tax liabilities and as a condition of

28   the settlement, plaintiffs agreed that the IRS could retain any refunds or credits to which

United States District Court
Northern District of California

they may have been entitled to receive for 2007 or for earlier tax years.  Sarmiento, 678 F.3d at 150.  The parties disputed when an advance refund provided by the Economic Stimulus Act ("ESA") of 2008. was owed to the plaintiffs.  If the advance refund was owed in 2007, then it was subject to the settlement agreement; however, if the advance refund was owed in 2008, then the refund was outside the time period of the agreement and therefore not subject to it.  Id. at 155.  After reviewing the ESA's structure—which mirrors the CARES Act's structure—the Second Circuit explained section 6428 as follows:

> we think the ESA is clear on its face with regard to which tax years the stimulus credits relate: the basic credit available under subsections (a) and (b) grants eligible taxpayers a refund applicable to the 2008 tax year, whereas the "advance refunds" available under subsection (g) grants eligible taxpayers a refund applicable to the 2007 tax year.

Id.  "Accordingly, plaintiffs' ESA tax refund was within the temporal reach of the [settlement] agreements additional consideration provision, which restricted the IRS's entitlement to withhold plaintiffs' tax refunds to those pertaining to the 2007 tax year."  Id.

Given that the advance refund was owed to the plaintiffs in 2007, the Second Circuit held that the IRS could withhold payment of the refund under the terms of the settlement agreement.  Relatedly, the Sarmiento court also found persuasive the fact that the "shall be treated" language in § 6428(g)(1) (currently located at § 6428(f)(1)) "is best interpreted as establishing the legal fiction that eligible taxpayers overpaid their 2007 taxes in an amount equal to the 'advance refund' of their ESA stimulus credit . . . ."  Id. at 156.  It further reasoned that the "negative conditional phrasing" used in subsection (g)(2) (currently subsection (f)(2)) "seems to reflect a presumption on the part of Congress that the 'advance refunds' available under subsections (f) and (g), in contrast to those available under subsections (a) and (b), do apply to the 2007 tax year."  Id.

The court finds Sarmiento's reasoning persuasive.  Extending it here, the court concludes that the CARES Act's advance refund is owed to taxpayers who meet the criteria of the statute in tax year 2019 (as opposed 2020), and that advanced refund is based on a constructive overpayment of their 2019 tax returns (or 2018 pursuant to

subsection (f)(5)).

Separate from the Second Circuit's reasoning in Sarmiento, defendants' proposed construction of the "shall" verb used in subsection (f)(3)(A) fails for other reasons.  While defendants are correct that subsection (f)(3)(A)'s use of the verb "shall" does require the IRS to act "as rapidly as possible," that verb also compels it to "refund" or "credit."  Plainly read, then, the IRS must (subject to other provisions of title 26) refund or credit an overpayment attributable to section 6428 and do so as quickly as possible.  Defendants fail to proffer any authority or grammar-based justification to limit the reach of the "shall" verb to only this section's final phrase.  Indeed, it appears that the only other authority on this issue would reject any such limitation.  R.V. v. Mnuchin, 2020 WL 3402300, at *7 (D. Md. June 19, 2020) ("The Act therefore requires the government to pay the fictional overpayment, and be quick about it.").

Separately, if Congress meant to express defendants' construction that the "shall" command "applies only to the speed with which the IRS must issue the advance refunds," (Dkt. 70 at 12), it could have done so by reorganizing this section to simply state: The Secretary shall **as rapidly as possible, and** subject to the provisions of this title, refund or credit any overpayment attributable to this section.  But Congress did not.  In any event, as plaintiffs point out, defendants' position on this issue would, if adopted, permit it to lawfully withhold issuing any refund or credit in the first instance.  Such an outcome is at odds with the Second Circuit's conclusion in Sarmiento and the Act's broader economic stimulus goals.

## ii.    Structure

Defendants further assert that the remainder of subsection (f) supports their construction.  For example, subsections (f)(1) and (f)(5) contemplate that the IRS would only look to tax returns from 2018 and 2019 to determine eligibility and if the IRS does not have any of this information, then such individual would not receive an advance refund.  Dkt. 70 at 9.  These individuals must wait to file their 2020 tax returns because, according to defendants, the statute neither confers on them a right to an advance

30

1   refund, nor provides a mechanism to secure that advance refund before they file their

2   2020 return. Id. at 10. Defendants also argue that because no refund or credit is allowed

3   after December 31, 2020, Congress was aware that there would be a subset of refunds

4   or credits for which eligible individuals would be entitled but could not be issued as an

5   advance refund after that date. Id. Finally, defendants point to subsections (a), (c), and

6   (e) as supporting an interpretation of section 6428 as providing a tax credit, not simply a

7   $1,200 stimulus payment. See id. at 10–11.

8       In reply, plaintiffs argue that subsection (f)(5) requires the IRS to look at various

9   readily available sources of information to identify eligible persons but does not provide

10  discretion to the IRS on whether to issue an advance refund. Dkt. 73 at 3.

11      With regard to structure, defendants plausibly argue that Congress did not intend

12  every "eligible individual," as defined by the Act, to receive an advance refund. Thus, if

13  an eligible individual does not have a 2018 or 2019 tax return on file, then he or she must

14  wait until filing of his or her 2020 tax returns to receive a tax credit and is not eligible for

15  an advance refund. However, this conclusion extends to those eligible individuals who

16  lack the above-referenced information on file. That conclusion says nothing about those

17  who the IRS maintains the relevant information to determine whether he or she is entitled

18  to receive an advance refund

19      Defendants next argue that subsection (a) is the only part of the Act that creates a

20  tax benefit and that this reading is confirmed by subsection (b), which confirms that the

21  subsection (a) credit "shall be treated as allowed by subpart C of part IV of subchapter A

22  of chapter 1." Dkt. 70 at 10. Subpart C includes other refundable credits that are

23  straightforward tax credits without the possibility of an advance refund. Id.

24      The court agrees with defendants that the CARES Act mandates a refundable

25  credit, which is generally the same as the tax credits referenced in subpart C. Yet, the

26  distinguishing factor between the CARES Act (as well as earlier versions of section 6428)

27  and those refundable credits is that subsection (f) of the Act provides an explicit

28  mechanism for immediate and mandatory distribution of the refundable credit. This

United States District Court
Northern District of California

United States District Court
Northern District of California

1  distinguishing factor reinforces, rather than detracts from, the court's conclusion that the

2  CARES Act is different from other refundable credits.

3        Accordingly, the court finds that the CARES Act mandates the IRS to issue

4  advance refund payments to those eligible individuals who meet the statutory criteria.

5             **b.**     **Whether Incarcerated individuals are Eligible Individuals for**

6                  **Purposes of the CARES Act**

7        Plaintiffs argue that the statute does not leave open the question of who is eligible

8  to receive an advance refund.  MSJ at 8.  They cite the court's preliminary injunction

9  order and urge the court to make a similar finding here.  Defendants advance no

10  argument in opposition to this contention.

11        The court's prior order determined that the language of section 6428(d)[12] did not

12  indicate that Congress left the definition of "eligible individual" open-ended or otherwise

13  up to the Secretary's discretion to change.  Dkt. 50 at 24 (citing Jimenez v. Quarterman,

14  555 U.S. 113, 118 (2009) ("It is well established that, when the statutory language is

15  plain, we must enforce it according to its terms.")).  Further, past versions of section 6428

16  indicated that Congress knew how to exclude incarcerated individuals if it so desired, but

17  that language did not appear in this version of the statute.  See id. at 24–25.  Finally, the

18  court found persuasive the fact that defendants asserted three different interpretations of

19  who constituted an eligible individual both publicly and in this litigation.  Id. at 25.

20        Because defendants advance no argument to the contrary, the court reaffirms its

21  prior finding that incarcerated individuals are not excludable as an "eligible individual"

22  under the Act.  For that reason, it follows that defendants' interpretation of the CARES

23  Act is "not in accordance with law."  5 U.S.C. § 706(2)(A).

24        For the foregoing reasons, plaintiffs' motion for summary judgment on their second

25

26                       

27  [12] Section 6428(d) provides: "For purposes of this section, the term 'eligible individual' means any individual other than (1) any nonresident alien individual, (2) any individual with respect to whom a deduction under section 151 is allowable to another taxpayer for

28  a taxable year beginning in the calendar year in which the individual's taxable year begins, and (3) an estate or trust."  26 U.S.C. § 6428(d).

1   claim that the agency action was contrary to law and in excess of statutory authority is

2   GRANTED.

3          **3.**     **Second Claim—APA: Arbitrary and Capricious**

4         Plaintiffs' second claim also alleges that defendants' action is arbitrary and

5   capricious.  Compl. ¶ 45.  "'[A]rbitrary and capricious' review under the APA focuses on

6   the reasonableness of an agency's decision-making <u>processes</u>." <u>CHW W. Bay v.</u>

7   <u>Thompson</u>, 246 F.3d 1218, 1223 (9th Cir. 2001) (citations omitted).  Agency action is

8   invalid if the agency fails to give adequate reasons for its decisions, fails to examine the

9   relevant data, or offers no "rational connection between the facts found and the choice

10  made." <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463

11  U.S. 29, 43 (1983); <u>see also</u> <u>Encino Motorcars</u>, 136 S. Ct. at 2125.  "<u>Chevron</u> deference

12  is not warranted where the regulation is 'procedurally defective'—that is, where the

13  agency errs by failing to follow the correct procedures in issuing the regulation." <u>Encino</u>

14  <u>Motorcars</u>, 136 S. Ct. at 2125 (quoting <u>Mead</u>, 533 U.S. at 227).  Where "the agency has

15  failed to 'examine the relevant data' or failed to 'articulate a rational explanation for its

16  actions,'" its decision is arbitrary and capricious. <u>Genuine Parts Co. v. EPA</u>, 890 F.3d

17  304, 311–12 (D.C. Cir. 2018) (quoting <u>Carus Chem. Co. v. EPA</u>, 395 F.3d 434, 441 (D.C.

18  Cir. 2005)).

19        But "[t]he scope of review under the 'arbitrary and capricious' standard is narrow

20  and a court is not to substitute its judgment for that of the agency." <u>State Farm</u>, 463 U.S.

21  at 43; <u>San Luis & Delta-Mendota Water Auth. v. Jewell</u>, 747 F.3d 581, 601 (9th Cir. 2014)

22  ("Although our inquiry must be thorough, the standard of review is highly deferential; the

23  agency's decision is 'entitled to a presumption of regularity,' and we may not substitute

24  our judgment for that of the agency." (quoting <u>Citizens to Preserve Overton Park, Inc. v.</u>

25  <u>Volpe</u>, 401 U.S. 402, 415–16 (1971), <u>abrogated in part on other grounds as recognized in</u>

26  <u>Califano v. Sanders</u>, 430 U.S. 99, 105 (1977))).

27        Here, plaintiffs argue that defendants' policy is arbitrary and capricious because

28  defendants have failed to provide an adequate reason for its decision.  MSJ at 13.  Next,

United States District Court
Northern District of California

1   the policy relies on factors that Congress did not intend it to consider.  Id. at 14.  Plaintiffs

2   contend that, to the extent defendants claim the policy was adopted as an anti-fraud

3   measure, that reason is a post-hoc declaration offered in this lawsuit and defendants

4   have not logically connected instances of fraud to the broader decision not to disburse

5   any payments to incarcerated individuals.  Id.  In response, defendants argue that

6   because section 6428 does not require the IRS to issue advance refund payments to

7   plaintiffs, the IRS has not acted arbitrarily and capriciously.  Dkt. 70 at 16.

8        The court's prior order determined that plaintiffs were likely to succeed on the

9   merits because defendants had not directed the court to any evidence indicating that the

10   Treasury Department or the IRS gave any reason for the decision to exclude payments to

11   incarcerated individuals, much less an adequate one.  Dkt. 50 at 27–28.  Defendants

12   have not advanced any convincing explanation or reason to deviate from the court's prior

13   finding.

14        For example, defendants cited a concern on the part of the IRS that it regularly

15   received information about possible fraudulent tax refunds or other frivolous tax activity

16   involving incarcerated individuals.  See Dkt. 70 at 6–7; Dkt. 44-1, ¶¶ 5–6.  Yet, this

17   explanation was not publicly advanced by the agency at the time it reached its

18   determination and therefore constitutes an impermissible post hoc rationalization.  See

19   Dep't of Homeland Sec. v. Regents of Univ. of Cal., 140 S. Ct. 1891, 1909 (2020) ("While

20   it is true that the Court has often rejected justifications belatedly advanced by advocates,

21   we refer to this as a prohibition on post hoc rationalizations, not advocate rationalizations,

22   because the problem is the timing, not the speaker.  The functional reasons for requiring

23   contemporaneous explanations apply with equal force regardless whether post hoc

24   justifications are raised in court by those appearing on behalf of the agency or by agency

25   officials themselves.").

26        In sum, the court reaffirms its prior finding that defendants' policy of excluding

27   incarcerated individuals from receiving an EIP solely on the basis of their incarcerated

28   status is arbitrary and capricious.  For the foregoing reasons, plaintiffs' motion for

summary judgment on their second claim that the agency action was arbitrary

1    and capricious is GRANTED.

2        **4.      Whether Plaintiffs Qualify for a CARES Act Advance Refund**

3        Finally, defendants argue that plaintiffs' motion should be denied because they

4    have not established, as a factual matter, that they are entitled to a CARES Act credit.

5    Dkt. 70 at 16.  According to defendants, plaintiffs' only support for their contention that

6    they have satisfied the statutory requirement is in the form of their unsworn declarations,

7    neither which contains a valid signature.  Id. at 17 (citing Dkts. 13, 14).  Defendants

8    further contend that plaintiffs have failed to establish that they have a valid Social

9    Security Number, fall within the income limitations of subsection (c), and are not claimed

10   as a dependent on someone else's tax return.  Id. at 17–18.

11       In response, plaintiffs contend that their declarations establish their eligibility for

12   relief because they asserted that they meet the statutory criteria.  Dkt. 73 at 9–10.

13   According to plaintiffs, defendant do not submit any evidence to dispute plaintiffs'

14   declarations, despite having comprehensive databases with information about

15   incarcerated people.  Id. at 10.  Plaintiffs next argue that whether they have Social

16   Security Numbers and their adjusted gross income is relevant only to the amount of

17   payment they would receive, not whether they are eligible individuals for purposes of the

18   Act.  Id. at 12.  Finally, plaintiffs assert that the Civil Local Rules expressly authorizes the

19   use of electronic signatures and their declarations include an attestation from plaintiffs

20   that they authorized their electronic signatures.  Id. at 12–13.

21       Defendants misapprehend the nature of this suit.  At its core, this is not a tax

22   refund action; rather, plaintiffs' claims are grounded in the APA and challenge the IRS's

23   interpretation of the CARES Act and the procedures by which the IRS arrived at its

24   interpretation.  While it is true that plaintiffs aver that they are eligible individuals and

25   otherwise meet the criteria established by the Act, these facts are not necessary to

26   prevail on an APA claim.  The focus of an APA claim is on the agency's action, not on the

27   plaintiffs.  Of course, plaintiffs must meet Article III's standing requirement as well as

28   other prudential requirements, such as the zone-of interest test, to establish a personal

1    stake in the outcome of the case.

2           The court takes no position on whether plaintiffs or class members are in fact

3    owed advance refund payments or the amount of those payments.  Indeed, the court's

4    Rule 23(b)(2) finding was premised on the "indivisible nature of the injunctive or

5    declaratory remedy warranted" but not "an individualized award of monetary damages."

6    Dkt. 50 at 42 (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 360–61 (2011)).

7    The court's determination in this order is that the IRS's action was "arbitrary,

8    capricious, . . . or otherwise not in accordance with law" and the appropriate remedy is to

9    "hold unlawful and set aside" that agency action.  5 U.S.C. § 706(2).  It is incumbent on

10   the IRS, as the agency charged by Congress, to make individual determinations whether

11   an individual is an "eligible individual" and meets the various criteria delineated in the Act.

12          **5.      Class Certification**

13          Finally, plaintiffs request the court confirm class certification for purposes of final

14   judgment.  MSJ at 15 n.7.  Though they acknowledge that the court provisionally certified

15   a class, plaintiffs contend that no change in circumstances material to the propriety of

16   class certification has arisen.  Id.  Defendants respond that this request should be denied

17   because the named plaintiffs lack standing, have failed to establish a waiver of sovereign

18   immunity, and have failed to factually establish that they meet the eligibility criteria of

19   section 6428.  Dkt. 70 at 18.

20          In its prior order, the court provisionally certified a class for purposes of the

21   preliminary injunction.  Dkt. 50 at 43–44.  Because of the time sensitive nature of

22   plaintiffs' requested relief and because defendants failed to offer any substantive

23   argument against class certification, the court's certification was provisional.  Id. at 36–

24   37.  With respect to the current motions, defendants' arguments against class certification

25   are limited to the same arguments that the court rejects throughout this order.  Further,

26   defendants have put forward no contention, whether factual or legal, challenging the

27   court's Rule 23(a) and 23(b)(2) findings in the prior order.

28          Accordingly, the court certifies a class as defined in the court's October 2, 2020

United States District Court
Northern District of California

1    order.  Dkt. 62 at 12–13.

2        **6.     Relief**

3        Plaintiffs request the court to enter a declaration that

4            (1) Section 6428 does not authorize Defendants to withhold
             advance refunds or credits from Class Members solely
5            because they are or were incarcerated; (2) Defendants
             unlawfully withheld or unreasonably delayed delivery of
6            advance refunds to Class Members pursuant to 5 U.S.C.
             § 706(1); (3) Defendants' policy of withholding advance refunds
7            or credits from Class Members because they are or were
             incarcerated is contrary to law and in excess of statutory
8            authority under 5 U.S.C. § 706(2); and (4) Defendants' policy is
             also arbitrary and capricious under 5 U.S.C. § 706(2).
9

10   MSJ at 15.  They also request the court to convert its preliminary injunction into a

11   permanent injunction.  Id. at 15–16.

12       As a general matter, "[t]he court's decision to grant or deny injunctive or

13   declaratory relief under [the] APA is controlled by principles of equity."  Nat'l Wildlife

14   Fed'n v. Espy, 45 F.3d 1337, 1343 (9th Cir. 1995) (citations omitted).  The court has

15   determined above that the IRS's decision to exclude incarcerated individuals from

16   receiving an EIP solely on the basis of their status as incarcerated individuals violated the

17   APA.  The court finds that declaratory relief is a proper remedy for defendants' violation

18   of the APA.  Thus, the court finds and declares that title 26 U.S.C. § 6428 does not

19   authorize defendants to withhold advance refunds or credits from class members solely

20   because they are or were incarcerated.  The court further finds and declares that

21   defendants' policy that persons who are or were incarcerated at any time in 2020 were

22   ineligible for advance refunds under the Act is both arbitrary and capricious and not in

23   accordance with law.

24       Next, plaintiffs request a permanent injunction that enjoins defendants from

25   withholding advance refunds or credits from any class member on the sole basis that

26   they are or were incarcerated and order reconsideration of previously filed claims.  They

27   also seek vacatur of the agency's policy.  "Vacatur is the 'standard remedy' when a court

28   concludes that an agency's conduct was illegal under the APA."  California by & through

Becerra v. U.S. Dep't of the Interior, 381 F. Supp. 3d 1153, 1178 (N.D. Cal. 2019) (citing Pollinator Stewardship Council v. U.S. EPA, 806 F.3d 520, 532 (9th Cir. 2015)); see also Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1405 (9th Cir. 1995) ("Ordinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid.").

While defendants have not promulgated a regulation, vacatur of their unlawful policy excluding incarcerated individuals from receiving CARES Act benefits solely on the basis for such status is warranted.  Further, for reasons discussed herein, the court also exercises its equitable powers to convert its preliminary injunction into a permanent injunction.

**CONCLUSION**

For the foregoing reasons, defendants' motion for stay pending appeal is DENIED. Plaintiffs' motion for summary judgment of their first claim is DENIED and their motion for summary judgment of their second claim is GRANTED.  As discussed herein, the court finds and declares that defendants' policy violated the APA and is hereby VACATED. The Court also vacates the provisional certification of the class and certifies a litigation class for all purposes. Finally, the court enters the following permanent injunction.

**PERMANENT INJUNCTION**

Defendants Steven Mnuchin, in his official capacity as the Secretary of the U.S. Department of Treasury; Charles Rettig, in his official capacity as U.S. Commissioner of Internal Revenue; the U.S. Department of the Treasury; the U.S. Internal Revenue Service; and the United States of America, are hereby enjoined from withholding benefits pursuant to 26 U.S.C. § 6428 from plaintiffs or any class member on the sole basis of their incarcerated status.  Within 30 days of the court's September 24, 2020 order, defendants shall reconsider advance refund payments to those who are entitled to such payment based on information available in the IRS's records (i.e., 2018 or 2019 tax returns), but from whom benefits have thus far been withheld, intercepted, or returned on the sole basis of their incarcerated status.  Within 30 days of the court's September 24, 2020 order, defendants shall reconsider any claim filed through the "non-filer" online

United States District Court
Northern District of California

portal or otherwise that was previously denied solely on the basis of the claimant's incarcerated status.  Defendants shall take all necessary steps to effectuate these reconsiderations, including updates to the IRS website and communicating to federal and state correctional facilities.  Within 45 days of the court's September 24, 2020 order, defendants shall file a declaration confirming these steps have been implemented, including data regarding the number and amount of benefits that have been disbursed.

**IT IS SO ORDERED.**

Dated: October 14, 2020

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge